UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-CV-81558-RAR

| | |
|---|---|
| CLARENCE SIMMONS, FRANKLIN NAVAS, JORGE ARROYAVE, JOSEPH DABBS, JENNIFER DEWITT, ANNE ERDMAN, MARK JAMES,  SHANE JACKSON, MIKE TIERNEY, MARK VAN BUS KIRK, JOHN BUCZYNSKI, ILJA LOPATIK, BRIAN YARBOROUGH, WILLIAM MACSAVENY, RYAN MARSHALL, ALLYSON ROGERS, PETER TULENKO, and GREG LICHTENBERG, on behalf of themselves and all others similarly situated, | <u>CLASS ACTION</u> <br><br> **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | |
| FORD MOTOR COMPANY, | |
| Defendant. | |

### <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Clarence Simmons, Franklin Navas, Jorge Arroyave, Joseph Dabbs, Jennifer Dewitt, Anne Erdman, Mark James, Shane Jackson, Mike Tierney, Mark Van Bus Kirk, Lynne Minish, John Buczynski, Ilja Lopatik, Brian Yarborough, William MacSaveny, Ryan Marshall, Allyson Rogers, Peter Tulenko, and Greg Lichtenberg ("Plaintiffs"), on behalf of themselves and all other similarly situated members of the below-defined Nationwide Class and State Classes they respectively seek to represent (collectively, the "Class"), bring this action against Defendant Ford Motor Company ("Ford" or "Defendant"), upon personal knowledge as to the factual allegations pertaining to themselves and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.      INTRODUCTION

1.      Plaintiffs bring this action individually and on behalf of a class of similarly situated owners and lessees of Ford Mustang-, Ford Expedition-, and Ford Explorer-branded vehicles, model years 2013-2018, with aluminum hoods and panels and sold in the United States (the "Class Vehicles"),[1] all of which were delivered to consumers by Ford with an identical and inherent defect in the Class Vehicles' design and/or manufacturing process that Ford has acknowledged.

2.      The defect, which was latent, but existed at the time that the Class Vehicles left Ford's possession and control, manifests itself over time, and causes the Class Vehicles' aluminum panels to corrode and the exterior paint on the aluminum body parts to bubble, flake, peel, rust and/or blister (the "Corrosion Defect").

3.      Plaintiffs seek damages, injunctive, equitable, and declaratory relief due to the Corrosion Defect in the Class Vehicles, as well as Ford's unlawful conduct in concealing the Defect, failing to cure the Defect, and/or failing to adequately compensate Plaintiffs and Class members for the economic harm they have suffered as a result of the Defect.

4.      As detailed below, due to the Corrosion Defect, the Class Vehicles are prone to, and do experience, premature corrosion leading to paint failures at rates and in a manner that do not conform to industry standards.  The Corrosion Defect substantially decreases the value of the Class Vehicles, forcing owners/lessees of the Vehicles to either live with the problems caused by the Defect or spend significant money—or hope that Ford will cover the cost—to have the corroded panels repaired or replaced and the Vehicles repainted.  Even then, repairing or replacing

---

[1]    Plaintiffs reserve the right to amend their definition of Class Vehicles to include Ford's other vehicles with the same inherent defect, including, but not limited to, vehicles that were manufactured prior to 2013, but that were purchased second-hand from Ford dealerships by consumers after the time that Ford had knowledge of the defect, as alleged in this Complaint.

4811-5615-9159, v. 1

an affected panel does not cure the Corrosion Defect because the customer would still be left with the inherently defective panel or would simply receive another defective panel in its place.  For the same reason, repainting the Class Vehicles does not cure the Corrosion Defect and, in and of itself, results in a cosmetic defect that permanently decreases the Vehicle's value.

5.    Automakers select specific materials to build the body and frame of a vehicle with the purpose of enhancing the vehicle's fuel efficiency, speed, safety, and useful life.  Moreover, automakers paint vehicles for two purposes: (a) to enhance aesthetics (color, gloss, and appearance); and (b) to provide functionality (chemical and corrosion-resistance to protect the body of the vehicle).  If any of these purposes in selecting material and painting the vehicle is compromised, then the value of the vehicle is diminished.

6.    Indeed, the condition of the paint on the body of a motor vehicle is widely recognized in the automotive industry as a factor affecting the value of the vehicle.[2]  This is because "[t]he appearance (color, gloss, and texture) of the surface [of the vehicle] significantly affects a customer's perception of product quality."[3]  In addition, "customer expectations for the attributes given by the appearance of coatings continue to increase as manufacturers compete to provide surfaces that offer enhanced surface characteristics."[4]

7.    Ford recognizes the importance customers place on the exterior appearance of vehicles and has consistently stated that producing vehicles that "[h]ave bold, emotive exterior

---

[2]    *See, e.g.*,  NAAA  Vehicle  Condition  Grading  Scale,  https://www.naaa.com/standards/vehicle_gradingscale.pdf (last visited Nov. 7, 2018); Ed Grabianowski, *How Kelley Blue Book Works*, HowStuffWorks.com (Nov. 21, 2005), http://auto.howstuffworks.com/buying-selling/kelley-blue-book4.htm.

[3]    Nelson K. Akafuah, *et al.*, *Evolution of the Automotive Body Coating Process—A Review*, MDPI (June 13, 2016), p. 20, http://www.mdpi.com/2079-6412/6/2/24.

[4]    *Id.*

designs," "[a]re instantly recognizable in look," and "[p]rovide exceptional value and quality" is fundamental to the goal of serving customers in all markets.[5]

8.     As described more fully below, Ford has been aware of the Corrosion Defect at all relevant times, but has repeatedly failed to disclose and even actively concealed the Defect from Class members and the public, and continued to market and advertise the Class Vehicles as "quality products" with "stunning exteriors" that possess "power" and display "outstanding performance" and "innovative design," which, as a result of the Defect, they are not.

9.     Ford has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Corrosion Defect, which was material to Plaintiffs and Class members, who could not reasonably know of the Defect.  Under all circumstances, Ford had a duty to disclose the latent Corrosion Defect at the point of sale of the Class Vehicles.  Instead, Ford failed and refused to warn customers at the point of sale of the Corrosion Defect, including the common consequences that they would likely suffer as a result of the Defect, not to mention the fact that Ford did not have an effective remedy to cure the Defect and the problems it caused. Further, Ford has refused, and continues to refuse, to provide a meaningful remedy to those who have suffered economic harm as a result of the Corrosion Defect.

10.     Despite Ford's awareness and knowledge of the Corrosion Defect, at Ford's direction, its employees and agents often continue to deny that the Defect even exists, and have developed standard answers to dispel expected complaints made by Plaintiffs and Class members.

11.     For Plaintiffs and Class members with Class Vehicles where the Corrosion Defect has manifested, Ford either provided them with inadequate repairs—which Ford knew or should

---

[5]     Ford Motor Company 2014 Annual Report, https://s22.q4cdn.com/857684434/files/ doc_financials/2014/annual/2014-ford-annual-report.pdf (last visited Nov. 7, 2018).

have known to be inadequate—or even worse, forced them to pay out of pocket for the inadequate repairs, by intentionally limiting its warranty for corrosion-related damage in a manner that, given the nature of their Vehicles' panels, excluded the only type of damage to which the Vehicles were susceptible.

12.     Indeed, as explained further below, Ford provided customers with the false assurance that they could avail themselves of two years of additional coverage for damage related to the Corrosion Defect that resulted in "perforation" to the aluminum panels of the Class Vehicles through its five-year purportedly *unlimited* mileage corrosion warranty, all the while knowing that any such perforation could *not* occur on the Vehicles because aluminum panels simply cannot perforate as a result of the Defect.  However, because customers did not know that perforation could not take place on the panels of their Class Vehicles, they often unknowingly took the risk of having their Class Vehicles inspected by dealerships to determine whether perforation was present, only to be saddled with the costly bills associated with those inspections after perforation was not found and warranty coverage was declined for the damage caused by the Corrosion Defect. Moreover, notwithstanding Ford's knowledge of the Corrosion Defect and the sham corrosion warranty it provided to owners/lessees of the earlier model year Class Vehicles, once a Class Vehicle's warranty expired, Ford had the gall to disclaim, and continues to disclaim, any and all liability, leaving the customer to bear the cost of an expensive, but inadequate repair, or live with the unsightliness of the damage caused by the Defect.

13.     Many Class members with Class Vehicles that have manifested the Corrosion Defect have learned of the futility of making a warranty claim for the Defect, or bringing in their Vehicle for a repair to address the Defect, through online complaints and the experiences of others that have had their warranty claims denied and/or inadequate repairs made to their Vehicles.  As a

- 5 -

result, many Class members have decided to not present their Class Vehicles to Ford dealerships for warranty claims and/or repairs, a requirement from which Class members are excused in light of the futility of Ford's warranty remedy.

14.     As a direct and proximate result of Ford's concealment of, and failure to disclose, the Corrosion Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles that suffer premature corrosion and unsightly paint failures; and (3) must expend significant money to have their Vehicles (inadequately) repaired and repainted.

15.     Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Corrosion Defect at the point of sale.  Plaintiffs and Class members have consequently suffered ascertainable losses and actual damages as a result of Ford's unlawful conduct.  Accordingly, Plaintiffs and Class members seek actual and/or compensatory damages, including equitable relief seeking, *inter alia*, an order that the Class Vehicles are defective and injunctive relief preventing Ford from continuing its wrongful conduct, as alleged herein.

## II.     JURISDICTION

16.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because at least one Class member is of diverse citizenship from Ford, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

17.     The Court has personal jurisdiction over Ford because Ford has purposefully availed itself of the privilege of conducting business activities in the State of Florida.

### III.    VENUE

18.     Venue is proper in this District, pursuant to 28 U.S.C. §1391, because a substantial part of the acts or omissions giving rise to the claims brought herein occurred or emanated within this District, Ford has marketed, advertised, sold, and leased the Class Vehicles in this District, and Ford has caused harm to one or more Plaintiffs residing in this District.

### IV.    PARTIES

**A.    Plaintiffs**

**1.    Clarence Simmons**

19.     Plaintiff Clarence Simmons (for the purpose of this section, "Plaintiff"), is a citizen of Alabama, residing in  Phenix City, Alabama.  Plaintiff purchased a new 2018 Ford Mustang (for the purpose of this section, the "Class Vehicle") on or about the last week of August 2018, at Rivertown Ford, an authorized Ford dealer in Columbus, Georgia.  Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Rivertown Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

20.     Within a week of purchasing the Class Vehicle, Plaintiff noticed that the paint on the hood, above the doors, and on the bumper of his Vehicle was rusting.  Upon noticing the rust on the Class Vehicle, Plaintiff contacted Rivertown Ford to repair the Corrosion Defect, but dealership personnel indicated that Ford would contact Plaintiff at a later date to discuss the issue. Rivertown Ford contacted Plaintiff in early October 2018 and instructed Plaintiff to take the Class Vehicle to the dealership.  After having possession of Plaintiff's Class Vehicle for a week, dealership personnel repainted the hood and rebuffed the Vehicle.  However, the remedy provided by Rivertown Ford did not cure the Corrosion Defect on Plaintiff's Class Vehicle, and, in and of itself, permanently decreases the value of the Vehicle.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 2.     Franklin Navas

21.     Plaintiff Franklin Navas (for the purpose of this section, "Plaintiff"), is a citizen of California, residing in Lancaster, California.  Plaintiff purchased a new 2016 Ford Explorer (for the purpose of this section, the "Class Vehicle") in approximately June 2016, at Antelope Valley Ford Lincoln, an authorized Ford Dealer in Lancaster, California.  Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or personnel at Antelope Valley Ford Lincoln emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetic features of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before

he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable Vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

22.     On or about June or July 2018, Plaintiff noticed that the paint on the hood of his Class Vehicle was flaking, peeling and chipping.  Around the same time, the peeling paint on his Class Vehicle blistered and white spots became visible.  By that time, however, Plaintiff's Class vehicle was no longer under warranty, and he did not want to incur the cost of trying to repair his Class Vehicle, and thus did not seek assistance from Ford.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 3.     Jorge Arroyave

21.     Plaintiff Jorge Arroyave (for the purpose of this section, "Plaintiff"), is a citizen of Florida, residing in Tampa, Florida.  Plaintiff purchased a new 2017 Ford Explorer (for the purpose of this section, the "Class Vehicle") on or about May 2017, at Parks Ford, an authorized Ford dealer in Wesley Chapel, Florida.  Plaintiff's Class Vehicle was covered by a written warranty. Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Parks Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the

- 9 -

sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

22.     On or about June or July 2018, Plaintiff noticed that the paint on the hood of his Class Vehicle was bubbling.  On October 16, 2018, Plaintiff brought his Class Vehicle to Elder Ford of Tampa for a service-related issue and pointed out the paint bubbling that resulted from the Corrosion Defect to a service technician.  In response, the technician provided Plaintiff with a business card for an estimator at Elder Ford and advised that Plaintiff should contact him to make an appointment and have the Corrosion Defect addressed.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 4.     Joseph Dabbs

23.     Plaintiff Joseph Dabbs (for the purpose of this section, "Plaintiff"), is a citizen of Florida, residing in Lithia, Florida.  Plaintiff purchased a new 2013 Ford Explorer (for the purpose of this section, the "Class Vehicle") on or about January 2013, at Parks Ford, an authorized Ford dealer in Wesley Chapel, Florida.  Plaintiff's Class Vehicle was covered by a written warranty. Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Parks Ford emphasized the quality,

durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the

quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the

sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to

disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's

knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but

mistaken, belief that it would be a high quality and durable vehicle that would retain its value.

Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had

he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to

prematurely corrode and its exterior paint to bubble and blister.

24.     In or around late 2015 or early 2016, Plaintiff noticed that the paint on the hood of

his Class Vehicle was bubbling, corroding, and rusting.  In or around the summer of 2016, the

bubbling paint on his Class Vehicle blistered and white spots became visible.  By that time,

however, Plaintiff's Class Vehicle was no longer under warranty, and he did not want to incur the

cost of trying to repair his Class Vehicle, and thus, did not seek assistance from Ford.  However,

in the summer of 2017, Plaintiff became aware of the Corrosion Defect through a friend, who

advised him that Ford had knowledge of the Defect and might cover a repair as a result.

Accordingly, in or around October 2017, Plaintiff contacted Parks Ford to discuss the Corrosion

Defect on his Class Vehicle.  Upon contacting Parks Ford, Plaintiff was put in touch with the

manager of the dealership's collision center named Dawn.  Plaintiff spoke with Dawn on several

occasions, and she advised Plaintiff that she was working with Ford's warranty department to try

getting the damage on his Class Vehicle that was caused by the Corrosion Defect covered.

Ultimately, Ford would not cover the damage to Plaintiff's Class Vehicle under its warranty due

to a lack of perforation, and instead, Dawn provided Plaintiff with an estimate for a repair that

- 11 -

Plaintiff would have to pay for out-of-pocket.  On April 23, 2018, no longer being able to bear the unsightliness of the damage caused by the Corrosion Defect, Plaintiff paid over $500 to have a third-party dealership provide a superficial cosmetic repair to the hood of his Class Vehicle. Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 5.      Jennifer Dewitt

25.      Plaintiff Jennifer Dewitt (for the purpose of this section, "Plaintiff"), is a citizen of Florida, residing in Anthony, Florida.  Plaintiff purchased a new 2016 green Ford Mustang (for the purpose of this section, the "Class Vehicle") on June 11, 2016, at Ford of Ocala, a Ford authorized dealer in Ocala, Florida.  Plaintiff's Class Vehicle was covered by a written warranty. Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Ford of Ocala emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase her Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before she purchased her Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased her Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

- 12 -

26.     In or about March 2018, Plaintiff noticed that the paint on the hood of her Class Vehicle was bubbling and chipping.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for her Class Vehicle at the time of purchase, and the value of her Vehicle has been diminished as a result of the Corrosion Defect.

### 6.     Anne Erdman

27.     Plaintiff Anne Erdman (for the purpose of this section, "Plaintiff"), is a citizen of Florida, residing in Palm Beach Gardens, Florida.  Plaintiff purchased a new 2014 Ford Mustang (for the purpose of this section, the "Class Vehicle") on January 2, 2014, at Wayne Akers Ford, an authorized Ford dealer in Lake Worth, Florida.  Plaintiff's Class Vehicle was covered by a written warranty.   Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Wayne Akers Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase her Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before she purchased her Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased her Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

28.     In or about June of 2014, Plaintiff noticed that the paint on the edge of the hood of her Class Vehicle was bubbling and corroding.  On December 1, 2014, Plaintiff's husband, Chris

Erdman, brought her Class Vehicle to Wayne Akers Ford, where dealership personnel assessed the Corrosion Defect and advised that Wayne Akers Ford would replace the factory hood with a new hood, at no cost to Plaintiff.  While Wayne Akers Ford communicated to Mr. Erdman that the hood of the Class Vehicle was replaced on January 12, 2015, and reported as much to CarFax, the hood of the Vehicle was, in fact, never replaced.  Instead, dealership personnel simply sanded and repainted the hood of the Class Vehicle.  On or about July 2018, Plaintiff noticed that the paint on the hood of her Class Vehicle was once again bubbling.  On August 20, 2018, Mr. Erdman again brought her Class Vehicle to Wayne Akers Ford, where dealership personnel assessed the Corrosion Defect and again advised to replace the corroded hood with a new hood.  However, because Plaintiff's Class Vehicle was now out of warranty, the dealership personnel had to contact Ford's corporate office to explore Plaintiff's options.  Accordingly, personnel submitted to Ford a request to remove what personnel referred to as the "defective hood" and replace it with a new original equipment manufacturer part.  Nevertheless, it took Ford about 30 minutes to deny the dealer's request to replace the Class Vehicle's hood.  Although Ford acknowledged that pictures of the Class Vehicle's hood showed "bubbled paint finish due to corrosion," it denied the request to replace the hood because "the 5 Year (unlimited distance) Corrosion Warranty covers rust damage in perforation (holes) in body sheet metal panes."  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for her Class Vehicle at the time of purchase, and the value of her Vehicle has been diminished as a result of the Corrosion Defect.

### 7.    Mark James

29.    Plaintiff Mark James (for the purpose of this section, "Plaintiff"), is a citizen of Florida, residing in Jupiter, Florida.  Plaintiff leased a new 2014 Expedition (for the purpose of this section, the "Class Vehicle") on May 16, 2014, at Advantage Ford, an authorized Ford dealer

in Stuart, Florida.  Plaintiff bought out the lease contract on his Class Vehicle on April 23, 2016.

Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle,

Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability,

and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other

personnel at Advantage Ford emphasized the quality, durability, and aesthetic features of the

Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the

Class Vehicle conveyed in those commercials and by the sales representative and/or other

personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to

Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and

Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be

a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased

the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect

and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint

to bubble and blister.

30.  On or about February 2017, Plaintiff noticed that the paint on the rear lift gate

handle, on the front edges of the hood, and by the license plate of his Class Vehicle was bubbling.

On or about February 24, 2017, Plaintiff brought his Class Vehicle to Mullinax Ford, an authorized

dealer in Lake Park, Florida, where Nicole Pasahow assessed the Corrosion Defect and advised

Plaintiff that Ford would not cover the cost of the repair because the corrosion had not perforated

the aluminum panel of his Vehicle.  Notwithstanding, Plaintiff informed Ms. Pasahow that he

wanted to submit a request to Ford because he wanted his visit and complaint documented.

Accordingly, Ms. Pasahow took photographs of the Corrosion Defect and submitted a request to

Ford to repair Plaintiff's Class Vehicle.  Ms. Pasahow later called Plaintiff and informed him that

Ford denied the request to repair the Corrosion Defect on his Class Vehicle because it was not covered by the corrosion warranty, as the defect had not perforated the Vehicle's aluminum panel. Plaintiff declined to cover the costs of repairing the Corrosion Defect because he did not want to pay for the repair since no perforation had been found. Thereafter, Plaintiff learned that any warranty claim would be denied because the aluminum panels on his Class Vehicle could not perforate as a result of the Corrosion Defect. Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 8.    Shane Jackson

31.    Plaintiff Shane Jackson (for the purpose of this section, "Plaintiff"), is a citizen of Georgia, residing in Woodstock, Georgia. Plaintiff purchased a new 2017 Ford Mustang (for the purpose of this section, the "Class Vehicle") on January 13, 2017, at Krause Family Ford of Woodstock, an authorized Ford dealer in Woodstock, Georgia. Plaintiff's Class Vehicle was covered by a written warranty. Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Krause Family Ford of Woodstock emphasized the quality, durability, and aesthetic features of the Vehicle. Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle. Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff would not have purchased

the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

32.     In or about March 2018, Plaintiff noticed that the paint along the edge of the hood and on the trunk of his Class Vehicle was chipping.  On April 29, 2018, Plaintiff's Class Vehicle was involved in a hit and run accident in a parking lot, resulting in damage to his front driver's side fender.  That same day, Plaintiff brought his Class Vehicle to a GEICO office, which was located inside of the Krause Family Ford of Woodstock dealership, to have an insurance adjuster assess the damage.  After the adjuster pointed out pre-existing damage on Plaintiff's Class Vehicle associated with the Corrosion Defect, Plaintiff had a technician at the Ford dealership inspect the damage.  The technician refused to attribute the damage to the Corrosion Defect despite the clearly visible corrosion being consistent with the Defect.  In addition, although Plaintiff's Class Vehicle was covered under warranty, which supposedly provides for corrosion repair, the technician advised Plaintiff that he would have to incur the cost of any repairs.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 9.     Mike Tierney

33.     Plaintiff Mike Tierney (for the purpose of this section, "Plaintiff"), is a citizen of Indiana, residing in New Carlisle, Indiana.  Plaintiff purchased a new 2013 red Ford Explorer (for the purpose of this section, the "Class Vehicle") on November 16, 2012, at Jordan Ford, an authorized Ford dealer in Mishawaka, Indiana.  Prior to purchasing the Class Vehicle, Plaintiff herad, viewed and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other

- 17 -

personnel at Jordan Ford emphasized the quality, durability, and aesthetic features of the Vehicle. Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle. Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

34.     On or about September 2016, Plaintiff noticed that the paint on the hood of his Class Vehicle was bubbling, corroding, and flaking. Plaintiff brought his Class Vehicle to Jordan Ford, where dealership personnel assessed the Corrosion Defect and advised that the hood of his Class Vehicle had to be repaired.   Dealership personnel, however, advised Plaintiff that Ford would not cover the cost of the repair because his Class Vehicle was not under warranty – one that would not have covered the repair of the Corrosion Defect even if it were in place at the time. Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 10.     Mark Van Bus Kirk

35.     Plaintiff Mark Van Bus Kirk (for the purpose of this section, "Plaintiff"), is a citizen of Illinois, residing in Stillman Valley, Illinois. Plaintiff purchased a used 2013 Ford Explorer (for the purpose of this section, the "Class Vehicle") on November 24, 2017, at Brad Manning Ford, an authorized Ford dealer in DeKalb, Illinois. Prior to purchasing the Class Vehicle, Plaintiff

heard, viewed and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Brad Manning Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

36.     On or about March 2018, Plaintiff noticed that the paint on the hood of the Class Vehicle was bubbling and chipping.  Plaintiff, however, did not contact Ford or a Ford dealership because he had read online that Ford was aware of the Corrosion Defect and would not cover the cost of repairing the defect unless the Corrosion Defect perforated his paneling, which the defect has not done.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 11.     Lynne Minish

37.     Plaintiff Lynne Minish (for the purpose of this section, "Plaintiff"), is a citizen of Michigan, residing in Rochester Hills, Michigan.  Plaintiff purchased a used 2014 Ford Mustang (for the purpose of this section, the "Class Vehicle") on July 13, 2015, at LaFontaine Automotive Group, an authorized Ford dealer in Howell, Michigan.  Plaintiff's Class Vehicle was covered by

a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at LaFontaine Automotive Group emphasized the quality, durability, and aesthetic features of the Vehicle. Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase her Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before she purchased her Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased her Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

38.     In or about early 2018, Plaintiff noticed that the paint on the hood and around the headlights of her Class Vehicle was bubbling and flaking.  Within the following two weeks, Plaintiff brought her Class Vehicle to Dean Sellers Ford, an authorized Ford dealer in Troy, Michigan, where dealership personnel assessed the Corrosion Defect and advised Plaintiff that the hood of her Vehicle would likely need to be replaced and that they would submit a request to Ford to repair her Vehicle under warranty.  The following day, Plaintiff received a call from a representative at Dean Sellers Ford who advised Plaintiff that Ford would not cover the repair under warranty.  Several months later, Plaintiff learned that Ford had knowledge of the Corrosion Defect and that Ford and/or its dealerships had been covering repairs to certain vehicles affected by the Defect under warranty.  Plaintiff then visited Dean Sellers Ford to find out why the repair

to her Class Vehicle would not be covered under warranty and was told by dealership personnel that the repair would only be covered under warranty if the Defect caused the aluminum panels on her Vehicle to perforate.  Plaintiff then brought her Class Vehicle to Elder Ford, an authorized Ford dealer in Madison Heights, Michigan, where dealership personnel assessed the Corrosion Defect and submitted a request to Ford to repair her Vehicle under warranty, which was subsequently denied.  When Plaintiff asked why her warranty claim was denied, she was told to call Ford Customer Service and open a case to investigate the issue further.  Plaintiff then called Ford Customer Service and was given a case number by a representative, but never heard back from Ford as to her case.  When Plaintiff followed up with Ford Customer Service, she was given another case number, but was told that Ford would only cover the repair if there was perforation to the aluminum panels of her Class Vehicle, and that her case would not be escalated because of a lack of perforation.  Plaintiff then made a final attempt to have her Class Vehicle repaired under warranty and brought her Vehicle to Briarwood Ford, an authorized Ford dealer in Saline, Michigan, where dealership personnel assessed the Corrosion Defect and advised that the repair would not be covered under warranty, but, nonetheless, submitted a request to Ford for a warranty repair.  The following business day, Plaintiff received a telephone call from a representative at Briarwood Ford who advised Plaintiff that her warranty claim had been denied.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for her Class Vehicle at the time of purchase, and the value of her Vehicle has been diminished as a result of the Corrosion Defect.

### 12.   John Buczynski

39.   Plaintiff John Buczynski (for the purpose of this section, "Plaintiff"), is a citizen of New Jersey, residing in Clark, New Jersey.  Plaintiff purchased a new 2015 Ford Explorer (for the purpose of this section, the "Class Vehicle") on or about January 19, 2015, at Bell Ford, an

- 21 -

authorized Ford dealer in Colonia, New Jersey.  Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Bell Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

40.     On or about 2017, Plaintiff noticed that the paint on the edge of the hood of his Class Vehicle was bubbling.  On December 2017, Plaintiff brought the Class Vehicle to Bell Ford for an oil change.  There, he mentioned the bubbling paint to Naomi Boone, a dealership representative, who informed Plaintiff that she would follow up with him later.  Ms. Boone, however, did not speak to Plaintiff again until July 2018, when Plaintiff brought his Class Vehicle to Bell Ford for another oil change.  During that time, Plaintiff again mentioned the paint bubbling on the hood of the Class Vehicle to Ms. Boone.  Ms. Boone assessed the Corrosion Defect on the Class Vehicle and advised that she would take pictures to submit a request to Ford to repair the hood.  On September 1, 2018, after hearing nothing from Bell Ford or Ford for over a month, Plaintiff contacted Paul Singh, the finance manager at Bell Ford, to follow up on the request

submitted to Ford.  Mr. Singh advised Plaintiff that he would call Plaintiff on September 4, 2018, to discuss the issue.  On September 4, 2018, however, Plaintiff did not receive a call from Mr. Singh or anyone at Bell Ford or Ford.  It was not until later that month, after Plaintiff left negative feedback on a survey, that Plaintiff received instructions to stop by Bell Ford to discuss the Corrosion Defect.  Upon Mr. Singh's advice, Plaintiff obtained an estimate of approximately $500 to repair the Corrosion Defect on his hood. Plaintiff submitted the estimate to Mr. Singh on September 20, 2018.  On September 26, 2018, Mr. Singh and Wes Herman, the dealership's service manager, called Plaintiff to advise him that Ford denied his request to repair the hood on his Class Vehicle because the Corrosion Defect had not "rotted through" or perforated the aluminum panel on the Vehicle.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 13.    Ilja Lopatik

41.    Plaintiff Ilja Lopatik (for the purpose of this section, "Plaintiff"), is a citizen of New York, residing in Brooklyn, New York.  Plaintiff leased a new 2015 Ford Mustang (for the purpose of this section, the "Class Vehicle") on or about February 2015, at All American Ford, an authorized Ford dealer in Hackensack, New Jersey.  Plaintiff bought out the lease contract on his Class Vehicle on January 29, 2018.  Plaintiff's Class Vehicle was covered by a written warranty. Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at All American Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his

Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

42.     In or around early 2016, Plaintiff noticed that the paint on the roof of his Class Vehicle was bubbling, rusting, and corroding.  On March 25, 2016, Plaintiff subsequently brought his Class Vehicle to Bayridge Ford where dealership personnel assessed the Corrosion Defect. Because Bayridge Ford did not have a body shop where the Class Vehicle could be repaired, dealership personnel instructed Plaintiff to take the Class Vehicle to All American Ford, which Plaintiff did on March 25, 2016.  The following day, dealership personnel advised Plaintiff that a warranty claim was submitted to Ford's corporate offices and that Ford would cover the repair under warranty.  Accordingly, personnel at All American Ford sanded and repainted the roof of Plaintiff's Class Vehicle at no cost to Plaintiff and returned the Vehicle to Plaintiff on May 3, 2016.  Plaintiff, however, was not satisfied with the quality and appearance of the sanding and re-painting job that All American Ford performed on his Class Vehicle.  On or about May 2018, Plaintiff noticed that the paint on the hood and trunk of his Class Vehicle was again bubbling, rusting, and corroding.  Because the repair performed by All American Ford was necessarily an ineffective remedy, Plaintiff contacted Ford's corporate offices a week later to determine whether Ford would cover the costs of repairing the roof and trunk of his Class Vehicle.  Ford instructed Plaintiff to take the Class Vehicle to the nearest Ford dealer to have it inspected.  On August 2018, Plaintiff brought his Class Vehicle to Bayridge Ford in Brooklyn, New York, where dealership

4811-5615-9159, v. 1

personnel assessed the Corrosion Defect on the hood and trunk.  Dealership personnel advised Plaintiff that the dealership would not cover the costs of repairing the Corrosion Defect, and instructed Plaintiff to call Ford's corporate offices and/or go to a different Ford dealership.  In October 2018, Plaintiff brought his Class Vehicle in to Dana Ford in Staten Island, New York to obtain an assessment of its hood.  Dealership personnel took photographs of Plaintiff's Class Vehicle and submitted a claim to Ford; however, the claim was denied without providing Plaintiff a reason.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 14.   Brian Yarborough

43.    Plaintiff Brian Yarborough (for the purpose of this section, "Plaintiff"), is a citizen of New York, residing in Binghamton, New York.  Plaintiff purchased a new 2013 Ford Mustang (for the purpose of this section, the "Class Vehicle") on October 29, 2013, at Matthews Ford, an authorized Ford dealer in Norwich, New York.  Plaintiff's Class Vehicle was covered by a written warranty.   Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Matthews Ford emphasized the quality, durability, and aesthetic features of the Vehicle.   Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have

- 25 -

paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

44.     On or about early summer of 2015, while on a cross-country road trip, Plaintiff noticed that the paint on the hood of his Class Vehicle was bubbling and blistering.  Aware that his warranty would expire at the end of his road trip due to mileage, Plaintiff brought his Class Vehicle to Crump Reese Ford, a Ford authorized dealer in Moab, Utah, to determine whether the Corrosion Defect was something that he needed to fix while his Vehicle was still under warranty. The service manager at Crump Reese Ford assessed the Corrosion Defect on Plaintiff's Class Vehicle and advised Plaintiff that he should not worry about it until he arrived in New York, because Ford has "an unlimited warranty on rust."  Based on the service manager's representation, Plaintiff decided to wait until after his road trip ended, and once he was back home in New York, to repair the Corrosion Defect on his Class Vehicle.  In or about August or September 2015, Plaintiff brought his Class Vehicle to Matthews Ford, where dealership personnel assessed the Corrosion Defect and advised that the Defect was not covered under warranty due to the Vehicle's mileage and/or because the Defect had not perforated Plaintiff's Vehicle and, instead, had only caused the paint to bubble.  On or about September 24, 2015, Plaintiff brought his Class Vehicle to a third-party body shop where personnel sanded and repainted his Vehicle at a cost of $1,328.83. On or about June 2018, while in attendance at the IMSA RACE at Watkins Glen Race Track, Plaintiff held an informal conversation with an individual who said he worked for Ford Performance, a division of Ford.   During the lengthy conversation, Plaintiff mentioned the Corrosion Defect on his Class Vehicle and the apparent Ford Performance personnel acknowledged the Defect on the Class Vehicles.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class

Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 15.   William MacSaveny

45.     Plaintiff William MacSaveny (for the purpose of this section, "Plaintiff"), is a citizen of North Carolina, residing in New Bern, North Carolina.  Plaintiff purchased a used 2013 Ford Mustang Laguna Seca (for the purpose of this section, the "Class Vehicle") on March 26, 2016, at Washington Ford, an authorized Ford dealer in Washington, Pennsylvania.  Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Washington Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

46.     Shortly after purchasing the Class Vehicle, Plaintiff noticed that the paint on the hood of the Class Vehicle was bubbling.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle

at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 16.    Ryan Marshall

47.    Plaintiff Ryan Marshall (for the purpose of this section, "Plaintiff"), is a citizen of Pennsylvania, residing in Bangor, Pennsylvania.  Plaintiff purchased a Certified Pre-Owned 2015 Ford Explorer (for the purpose of this section, the "Class Vehicle") on June 30, 2017, at Koch 33 Ford, a Ford authorized dealer in Easton, Pennsylvania.  Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Koch 33 Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

48.    In or about late 2017 or early 2018, Plaintiff noticed that the paint on the hood and right, front fender of his Class Vehicle was bubbling and flaking.  In or about February 2018, Plaintiff brought his Class Vehicle to Koch 33 Ford, where dealership personnel assessed the Corrosion Defect and advised Plaintiff that his Vehicle was not covered by the corrosion warranty because the Defect had not perforated the hood or right, front fender of his Vehicle.  Accordingly,

Ford would not cover the cost of repairing the Corrosion Defect on Plaintiff's Class Vehicle. Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 17.    Allyson Rogers

49.     Plaintiff Allyson Rogers (for the purpose of this section, "Plaintiff"), is a citizen of Pennsylvania, residing in Blue Bell, Pennsylvania.  Plaintiff purchased a new 2013 Ford Explorer (for the purpose of this section, the "Class Vehicle") on October 26, 2012, at Chapman Ford of Horsham, a Ford authorized dealer in Horsham, Pennsylvania.  Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Chapman Ford of Horsham emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase her Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before she purchased her Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased her Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

50.     In or about 2015, Plaintiff noticed that the paint on the hood of her Class Vehicle was bubbling, chipping, and peeling.  Subsequently, she brought her Class Vehicle to Bergey's

Ford, an authorized Ford dealer in Ambler, Pennsylvania, to have the brakes of her Vehicle serviced. While at Bergey's Ford, Plaintiff mentioned the Corrosion Defect on her Class Vehicle to dealership personnel, who advised Plaintiff that the Defect was not covered under warranty unless the aluminum on her hood was perforated. Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for her Class Vehicle at the time of purchase, and the value of her Vehicle has been diminished as a result of the Corrosion Defect.

### 18.   Peter Tulenko

51.    Plaintiff Peter Tulenko (for the purpose of this section, "Plaintiff"), is a citizen of Texas, residing in Longview, Texas. Plaintiff purchased a used 2015 Ford Mustang (for the purpose of this section, the "Class Vehicle") on September 17, 2018, at Allstar Ford, an authorized Ford dealer in Kilgore, Texas. Plaintiff's Class Vehicle was covered by a written warranty. Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Allstar Ford emphasized the quality, durability, and aesthetic features of the Vehicle. Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle. Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

52.     In October 2018, one month after Plaintiff purchased his Class Vehicle, Plaintiff noticed that the paint on the hood of his Class Vehicle was bubbling.  Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### 19.   Greg Lichtenberg

53.     Plaintiff Greg Lichtenberg (for the purpose of this section, "Plaintiff"), is a citizen of South Carolina, residing in Aiken, South Carolina.  Plaintiff purchased a new 2018 Ford Mustang (for the purpose of this section, the "Class Vehicle") on March 12, 2018, at Lugoff Ford, an authorized Ford dealer in Lugoff, South Carolina.  Plaintiff's Class Vehicle was covered by a written warranty.  Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Ford marketing materials that touted the quality, durability, and aesthetics of Ford's vehicles, including the Vehicle, and the sales representative and/or other personnel at Lugoff Ford emphasized the quality, durability, and aesthetic features of the Vehicle.  Plaintiff relied on the information regarding the quality, durability, and aesthetics of the Class Vehicle conveyed in those commercials and by the sales representative and/or other personnel in deciding to purchase his Vehicle.  Ford failed to disclose the Corrosion Defect to Plaintiff before he purchased his Class Vehicle, despite Ford's knowledge of the Defect, and Plaintiff, therefore, purchased his Vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Corrosion Defect and the propensity of the Vehicle's aluminum panels to prematurely corrode and its exterior paint to bubble and blister.

54.     Around two weeks after purchasing the Class Vehicle, Plaintiff noticed that the paint on the hood of his Vehicle was bubbling and corroding.  On or about March 19, 2018,

Plaintiff brought his Class Vehicle to Lugoff Ford, where dealership personnel assessed the Corrosion Defect and advised that the hood of the Vehicle would have to be repainted.  Because Plaintiff's Class Vehicle was covered under warranty, Ford covered the costs of having a third-party repaint the hood of the Class Vehicle.  However, the remedy provided by Rivertown Ford did not cure the Corrosion Defect on Plaintiff's Class Vehicle, and, in and of itself, permanently decreased the value of the Vehicle.  Indeed, shortly thereafter, Plaintiff noticed that the paint on the hood of his Class Vehicle was once again bubbling and corroding.  Plaintiff once again brought the Class Vehicle to Lugoff Ford on April 9, 2018, and Lugoff Ford again covered the costs of having a third-party repaint the hood of the Vehicle.  Not much later, however, Plaintiff noticed that the paint on the hood of his Class Vehicle was (for a third time) bubbling and corroding.  Plaintiff brought the Class Vehicle to Lugoff Ford on April 23, 2018, where dealership personnel advised that it would repair the Corrosion Defect by covering the costs of having a third-party repaint the hood of the Vehicle for a third time.  On September 7, 2018, Plaintiff took the Class Vehicle for an oil change to Gerald Jones Ford, an authorized Ford dealer in Augusta, Georgia, where Service Director Guy Kabureck informed Plaintiff that he needed a new hood because the hood on the Vehicle suffered from "metal issues."  Mr. Kabureck informed Plaintiff that "any paint job [used to repair the Corrosion Defect] will bubble again."  Although the dealership personnel at Gerald Jones Ford requested authorization to replace the Class Vehicle's hood, Ford only authorized the personnel to cover the costs of having a third-party repaint the Class Vehicle.  After objecting to having a third-party repaint the hood of the Class Vehicle for yet a fourth time, Ford instructed Plaintiff to take the Vehicle to Dick Williams Ford, an authorized Ford dealer in Columbia, South Carolina, that possessed the capability to paint vehicles in-house.  Ford informed Plaintiff that dealership personnel at Dick Williams Ford would work with Ford's Engineering

Department to ensure that the hood of the Class Vehicle was "correctly" painted. Plaintiff, however, decided to not take his Class Vehicle to Dick Williams Ford given the inadequacies of the prior paint jobs he had received and the inability of any repainting to cure the Corrosion Defect, which was acknowledged by the Service Director at Gerald Jones Ford, not to mention the approximately 200 mile round trip drive it would require. Accordingly, Plaintiff has been in contact with dealership personnel at Gerald Jones Ford to make arrangements for a Ford engineer to assess the Class Vehicle at Ford's location in Augusta, Georgia. Dealership personnel have informed Plaintiff that Ford's engineer will soon assess the Class Vehicle. Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Ford's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Vehicle has been diminished as a result of the Corrosion Defect.

### B.   Defendant

#### 1.   Ford Motor Company

55.    Defendant Ford Motor Company is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan. At all times relevant to this action, Ford and/or its agents (itself and through its related business entities) designed, manufactured, marketed, sold, serviced, distributed, and warranted the Class Vehicles throughout the United States, earning hundreds of millions of dollars in the process. Ford also developed, approved, and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles to which Plaintiffs were exposed.

4811-5615-9159, v. 1

## V.    FACTUAL ALLEGATIONS

### A.    The Class Vehicles and the Corrosion Defect

56.    All the Class Vehicles at issue suffer from the same Corrosion Defect and can easily be identified by their make and model year through the four Technical Service Bulletins ("TSBs") that relate to the Defect.

57.    Ford has marketed, distributed, and warranted the Class Vehicles in the United States in a uniform manner.

58.    Throughout the years, and at all times relevant to this action, Ford has marketed the Class Vehicles as high-quality and durable vehicles that maintain their resale value.  Ford has used tag lines such as "Ford. Designed for living. Engineered to last;" "Built Ford tough!"; "Everything We Do is Driven By You;" and encourages consumers to "Feel the difference."

59.    In its 2011 Annual Report, Ford touted the design and value of its vehicles:

> Across global markets where Ford Motor Company does business, the product strategy remains consistent as our vehicles exhibit bold, emotive exterior designs while offering great handling and performance. . . . Unmistakably a Ford or a Lincoln in look, sound and feel, our products deliver exceptional value to our customers.

60.    So, too, did Ford tout the quality of its vehicles:

> At Ford, quality is designed and built into every vehicle. The vehicles Ford is building today are more durable and reliable than they were even a few years ago. Ford has made significant strides over the past few years to achieve world-class levels of quality and desirability.  This commitment to quality touches every aspect of the vehicle process at Ford – from design to manufacturing to product launch – so that quality is present every step of the way. Through a global product strategy and a single global management team, Ford is leveraging its assets, implementing best practices and a systematic approach to quality. This translates to more satisfied customers.[6]

---

6    *Id.*

61.     The 2012 Annual Report reinforced its focus on design, value, and quality driving customer satisfaction, stating:

> Our plan is centered on serving customers in all markets around the world with a full family of vehicles – small, medium and large; cars, utilities and trucks – that offer the very best quality, fuel efficiency, safety, smart design and value.[7]

62.     But rather than producing vehicles with bold, emotive exterior designs that delivered value to its customers and world-class quality that drove customer desirability and satisfaction, Ford produced Class Vehicles of inferior quality and design with a Corrosion Defect that reduces their value and customer desirability.

63.     Plaintiffs are informed and believe that, because of the Corrosion Defect, aluminum body panels in the Class Vehicles are predisposed to corrosion, which prematurely corrodes the Vehicle's body panels and causes the exterior paint on the panels to bubble, flake, peel, and/or rust under normal conditions that would not cause defect-free Vehicles to prematurely corrode and exhibit such paint failures.  Accordingly, the Corrosion Defect compromises the quality, durability, and value of the Class Vehicles, and requires Class members to have their Vehicles "repaired," often out of pocket, in a manner that does not (and cannot) remedy the Defect or otherwise prevent the recurrence of the problems caused as a result thereof.

**B.      Ford's Business Decisions Caused the Corrosion Defect**

64.     The corrosion process that results in the Corrosion Defect in the Class Vehicles was caused by a confluence of business decisions and choices Ford knowingly made, and continues to make, in designing and managing the production process of the Class Vehicles.

---

[7]  Ford Motor Company 2012 Annual Report, https://s22.q4cdn.com/857684434/files/doc_financials/2012/annual/2012-annual-report.pdf (last visited Nov. 7, 2018).

65.     The Corrosion Defect in the Class Vehicles is a systemic problem associated with the materials and production processes Ford uses, and is not associated with geography or other environmental factors because the Defect is found in Vehicles in every state.

66.     In 1985, Congress established a new fuel economy standard for vehicles manufactured for sale in the United States.  This standard, called the Corporate Average Fuel Economy ("CAFE"), imposed a minimum average fuel economy of 27.5 miles per gallon ("mpg") on each manufacturer's fleet of passenger cars and light trucks with a gross vehicle weight rating of 8,500 lbs. or less for each model year.

67.     In 1999, the National Highway Traffic Safety Association ("NHTSA") and the United States Department of Transportation ("DOT") issued the first in a planned series of reports to Congress on the Automotive Fuel Economy Program and vehicle manufacturers' compliance with the CAFE standard.

68.     The 1999 NHTSA/DOT report showed that: "Ford/Mazda" had the lowest passenger car fuel economy performance of all eight domestic vehicle manufacturers for model years 1998 and 1999; "Ford/Mazda" had the second lowest light truck fuel economy performance of all twelve domestic vehicle manufacturers for model year 1998; and "Ford/Mazda" had the fourth lowest light truck fuel economy performance of all twelve domestic vehicle manufacturers for model year 1999.

69.     More importantly, the 1999 NHTSA/DOT report demonstrated that "Ford/Mazda" was the only domestic manufacturer of passenger cars and light trucks whose 1998 and 1999 model year vehicle lines had failed to achieve the minimum 27.5 mpg CAFE standard set by Congress, leading NHTSA to speculate that "Ford/Mazda" could be subject to civil penalties for non-compliance.

70.     Further, in 1999 (for model year 2000), the United States Department of Energy and the United States Environmental Protection Agency issued the first in a series of "Fuel Economy Guide" publications.  These guides, still published today, are intended to provide reliable fuel economy information to help consumers understand the importance of fuel economy issues in their vehicle purchase decision.  Of the dozens of Ford, Lincoln, and Mercury vehicles listed in the 2000 Fuel Economy Guide, only one, the Ford Focus station wagon (not at issue here), was designated as among the fuel efficiency leaders in its class.

71.     Aware of its non-compliance with the CAFE mileage standard, faced with the threat of government fines or sanctions related to this non-compliance, and hoping to avoid negative publicity and reduced sales associated with its vehicles' poor fuel economy, Ford had already begun looking for ways to design more fuel-efficient vehicles.

72.     Ultimately, Ford decided to replace the steel body panels on its vehicles with aluminum body panels in order to reduce vehicle weight and achieve the desired increased fuel efficiency.  It was Ford's incorporation of aluminum body panels into the Class Vehicles that caused the Corrosion Defect, and it was Ford's decision to continue using the aluminum body panels, with knowledge of the Defect that would result, that caused the Defect to go unremedied to this day.

### C.     Ford's Knowledge of the Corrosion Defect

73.     Upon information and belief, Ford began using aluminum panels on the Expedition in or about the 2000 model year, the Explorer models in or about the 2002 model year, and the Mustang beginning in the 2005 model year.

74.     Ford became aware of problems stemming from the Corrosion Defect soon after it began using the aluminum panels on the Class Vehicles, and on December 27, 2004, Ford issued TSB 04-25-1, entitled "Aluminum Corrosion - Service Tip[]" (the "2004 TSB"), which

4811-5615-9159, v. 1

acknowledged the Corrosion Defect.  The 2004 TSB pertained to 2000-2004 Expeditions and 2000-2005 Explorers, among other vehicles, and stated:

> Some vehicles may exhibit a bubbling or blistering under the paint on the aluminum body parts.  This is due to iron contamination of the aluminum panel. . . .  Ford's Scientific Research Laboratory has performed a number of tests on vehicle body parts returned for corrosion related concerns.  Testing has revealed that the aluminum corrosion was caused by iron particles working their way into the aluminum body part, prior to it being painted.

75.     Ford's 2004 TSB provided a step-by-step procedure for servicing vehicles with "aluminum corrosion," and notably warned that when repairing a vehicle for corrosion damage, "extreme care" should be taken to "protect all aluminum parts to prevent cross metal contamination."

76.     However, the 2004 TSB did not provide a procedure that would eliminate the Corrosion Defect, and instead, simply instructed dealers and service representatives to perform a temporary "sand and repaint" repair.

77.     As a result, the 2004 TSB did not ensure that consumers of the subject vehicles would receive a free corrosion repair under warranty or cover all of the out-of-pocket costs for remedying the Corrosion Defect.  To the contrary, since the 2004 TSB did not contain sufficient information to permit Ford's service representatives to identify or cure the Corrosion Defect, it virtually guaranteed that any repairs performed on the vehicles would no more than temporarily mask the Defect, preferably until Ford's abbreviated "non-perforation" corrosion warranty expired.  One this warranty expired, consumers were left with an extended "perforation" corrosion warranty, which, as explained in detail below, provided only sham, illusory benefits because aluminum does not perforate as a result of the Defect.

78.     Commenting on TSB 04-25-1, Center for Auto Safety ("CAS") Executive Director Clarence Ditlow said:

> This is a very expensive defect to remedy. The TSB requires "extreme care to be taken" including special tools and segregated work areas to remove the corrosion by blasting, re-priming and repainting.  This repair is so difficult that CAS recommends the best fix is to replace the corroded part with a primed steel part and paint it.  Ford cannot guarantee this repair will eliminate all the iron corrosion or prevent other areas from bubbling or blistering in the future.[8]

79.     On December 11, 2006, Ford issued TSB 06-25-15, entitled "Aluminum Body Panels - Corrosion - Service Tip[]" (the "2006 TSB"), which superseded the 2004 TSB and expanded the number of vehicle models and model years affected by the Corrosion Defect. The 2006 TSB included 2000-2007 Ford Expeditions, 2002-2007 Explorers, and 2005-2007 Mustangs. However, internal Ford communications from merely two days after the 2006 TSB was issued have revealed that Ford knew the repairs provided for in the 2006 TSB did not actually repair the damage caused by the Corrosion Defect.

80.     The procedures for repairing the corrosion contained in the 2006 TSB did not change from those stated in the 2004 TSB, and neither did the explanation of the problem – iron particles working their way into the aluminum body part prior to it being painted.

81.     Both the 2004 and 2006 TSB required aggressive sanding to remove the corrosion before being primed and painted, despite the fact that Ford knew, or should have known, that sanding and reworking aluminum panels actually exacerbated corrosion.  Thus, like the 2004 TSB,

---

[8]     Clarence Ditlow, *Ford Service Bulletin Shows Paint Defect on Many 2000-05 Models*, The Center for Auto Safety (Sept. 26, 2006) https://www.autosafety.org/ford-service-bulletin-shows-paint-defect-many-2000-05-models/; *More problems for Ford-Paint Defects in 2000-2005* models, Lemon Law.com (Dec. 11, 2006) http://www.lemonlaw.com/wordpress/more-problems-for-ford-paint-defects-in-2000-2005-models/.

the 2006 TSB virtually guaranteed that any repairs performed on the subject vehicles would no more than temporarily mask the Corrosion Defect, again, preferably until the expiration of the only corrosion warranty of which consumers could actually avail themselves.

82.     In fact, in 2004, Ford tasked a group of engineers to study solutions to corrosion problem in Ford Expeditions, Explorers, and Mustangs.  That group ultimately became the Ford Aluminum Corrosion Task Force ("ACTF").  Although the ACTF engaged in extensive research and testing to resolve the Corrosion Defect, the root cause proved elusive.

83.     On recommendation from ACTF, from 2007 onward, Ford made changes to materials, including the aluminum substrate, and processes to eliminate corrosion, particularly in Mustangs, but Ford was unsuccessful in remediating the Corrosion Defect.

84.     Indeed, the number of Mustangs produced at Ford's Flat Rock Assembly Plant in Flat Rock, Michigan, that exhibit problems associated with the Corrosion Defect – even before they were shipped to dealerships – was staggering.  At one point in late 2007 or early 2008, Ford observed that 46% of the vehicles required sanding in an attempt to address the Corrosion Defect. However, due in part to the large expense it would have to incur to properly address the Corrosion Defect, Ford chose not to address the production process deficiencies in the Flat Rock Assembly Plant that it knew contributed to and exacerbated the Corrosion Defect.

85.     On February 26, 2016, a full *ten years* after Ford issued the 2006 TSB, Ford issued TSB 16-0028, entitled "Aluminum Panel Corrosion" (the "2016 TSB"), which superseded the 2006 TSB and again expanded the number of vehicle models and model years affected by the Corrosion Defect.  The 2016 TSB included 2000-2016 Expeditions, 2002-2016 Explorers, and 2005-2016 Mustangs, and thus, covered the 2013-2016 model year Class Vehicles.  Internal Ford communications have revealed that throughout the ten year period that preceded the 2016 TSB,

Ford was aware that the areas of the vehicles that had been purportedly repaired pursuant to the prior TSBs had been showing signs of repeat corrosion as soon as seven to eight months after the repairs were performed.

86.     Notwithstanding Ford's knowledge of the above, like the 2004 TSB and 2006 TSB, the 2016 TSB similarly provided for pressurized abrasive sand blasting of the areas affected by corrosion, prior to priming and painting.

87.     On August 23, 2017, Ford issued its most recent TSB 17-0062 (the "2017 TSB"), which superseded the 2016 TSB and even further expanded the number of vehicle models and model years affected by the Corrosion Defect.  The 2017 included 2000-2017 Expeditions, 2002-2017 Explorers, and 2005-2017 Mustangs, and thus covered the 2013-2017 model year Class Vehicles.  This time, however, the 2017 TSB called for a ***new panel replacement*** rather than sanding and reworking corroded areas.

88.     Thus, for 14 years, since 2004, Ford has been attempting to fix aluminum panel corrosion in its Expedition, Explorer, and Mustang vehicles while all the time concealing the existence of the Corrosion Defect from its customers and warrantying the Class Vehicles with corrosion warranties that provided only sham, illusory benefits.

89.     Upon information and belief, Ford designed the 2018 model year of the Class Vehicles in the same fashion, with similar materials, and by employing the same production processes as it did with the 2017 model year of the Class Vehicles.  Accordingly, Plaintiffs believe that a new TSB covering the 2018 model year Class Vehicles will soon be issued.

### D.     Applicable Warranties and Certifications

90.     Ford sold the 2013-2015 model year Class Vehicles with a "New Vehicle Limited Warranty" ("NVLW"), which provides bumper-to-bumper coverage for a period of 36 months or 36,000 miles, whichever occurs first.

91.     The NVLW states:

Ford Motor Company dealers will, without charge, *repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship*.

92.     The NVLW further states:

Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs.  For this reason, Ford provides the New Vehicle Limited Warranty in order to remedy any such defects that result in vehicle part malfunction or failure during the warranty period.

93.     In addition, the NVLW contains an extended coverage provision for defects that result in body panel corrosion, which states:

Your vehicle's body sheet metal panels are covered for an extended Corrosion Coverage Period, which lasts for five years, regardless of miles driven.  *The extended warranty coverage only applies if a body sheet metal panel becomes perforated due to corrosion during normal use* due to a manufacturing defect in factory-supplied materials or factory workmanship.

94.     However, internal Ford correspondence has revealed that Ford knew from as early as 2006 that it was impossible for aluminum body panels to perforate, and thus, Ford knew that customers with 2013-2015 model year Class Vehicles could never take advantage of the extended corrosion coverage that the NVLW provided.   Accordingly, the extended warranty coverage provided by Ford was in, and of itself, misleading and deceptive.

95.     Internal Ford correspondence has also revealed that from 2006 through 2010 Ford had been closely monitoring the Corrosion Defect and had observed that the numbers of vehicles that were experiencing corrosion were increasing.  In fact, in April 2010, a senior engineer in the Ford Paint and Body Technology Center acknowledged that the inability of aluminum body panels to perforate presented a "problem" because customers that have vehicles just over the base three-

year warranty would not qualify for the extended coverage, and that the perforation clause in the NVLW should be modified to include an additional provision that would provide customers with the ability to have the damage caused by the Corrosion Defect repaired without cost to the customer.

96.     Approximately six months later, in November 2010, a chief engineer in the Ford Customer Service Division echoed that sentiment, stating that a discussion was needed to reevaluate the warranty for aluminum body panels, and even suggested that the warranty period should be longer for aluminum body panels than it was for steel body panels.

97.     Moreover, in 2013 and 2014 several Ford representatives admitted in deposition testimony elicited in litigation concerning earlier model years of the Mustang vehicles at issue here that the Corrosion Defect caused the aluminum body panels to corrode, and that despite the fact that Ford had studied the Defect for years, they had never seen aluminum body panels perforate. One of the engineers that provided testimony even recalled that his manager was fully aware of the fact that corrosion could never cause perforation on aluminum body panels, and that the extended warranty that Ford provided was, therefore, inadequate to address the only type of corrosion damage that would ever occur on the aluminum panels of the Class Vehicle – non-perforating corrosion damage.

98.     However, instead of modifying the extended warranty so that customers could obtain coverage for the repairs necessitated by the Corrosion Defect, Ford concealed its inadequacy from consumers, and continued to provide them with its sham extended corrosion warranty for several more years. Because the corrosion warranty for the earlier year Class Vehicles "only applies" if the body panel "becomes perforated due to corrosion" and aluminum body panels cannot perforate, the entirety of the corrosion warranty is illusory.

99.     It was only in 2016 that Ford decided to finally revise its extended corrosion warranty in order to provide consumers with the coverage they had expected from the NVLW. Ultimately, it took Ford ten years after the time that it became aware corrosion could not result in perforation on aluminum body panels to finally revise its extended corrosion warranty.

100.    Thus, for model years 2016-2018 Class Vehicles, the NVLW's extended warranty provision was revised to state:

> Your vehicle's body sheet metal panels are covered for an extended Corrosion Coverage Period, which lasts for five years, regardless of miles driven. The extended warranty coverage only applies if a body sheet metal panel becomes perforated due to corrosion during normal use due to a manufacturing defect in factory-supplied materials or factory workmanship. ***If aluminum body panels have corrosion or rust damage, and the damage is not the result of abnormal usage, vehicle accident, customer actions and/or extreme environmental conditions, the corrosion or rust damage repairs are covered for 5 years, unlimited miles.***

101.    Despite this change, Ford continues to deny warranty claims for non-perforating corrosion damage to 2013-2015 model year Class Vehicles, even when those Vehicles are purchased from Ford dealerships as Certified Pre-Owned ("CPO") vehicles, and after the time that the new warranty policy was implemented.

102.    Even worse, Ford and its dealerships have developed conflicting interpretations of the above revised warranty provision and often deny claims for non-perforating corrosion damage to 2016-2018 model year Class Vehicles that are specifically covered by the revised corrosion warranty.

103.    Notwithstanding the above and its knowledge of the Corrosion Defect, Ford represents to customers that each of its CPO vehicles "come[] with the value of comprehensive limited warranty [] coverage" ("CPOLW"), which provides protection for 12 months or up to 100,000 accumulated vehicles miles. Ford also represents that its CPO vehicles are backed by the

- 44 -

remaining time period or mileage of the NVLW.  As with the NVLW, the CPOLW states: "Your dealer will repair, replace or service all covered components, specified on the reverse, that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods."  Although the CPOLW excludes paint and sheet metal from its coverage, the provisions are unconscionable because they exclude damage resulting from the Corrosion Defect, which was known to, but not disclosed by, Ford.

104.    Ford further touts the "Value of Ownership" of its CPO vehicles, which it represents have "undergone a 172-point inspection."  Notably, this includes several inspection points related to the vehicles' body panels, which Ford knows are predisposed to the Corrosion Defect and for which it does not have an adequate remedy for the damage the Defect causes.  Upon information and belief, Ford will not certify a vehicle that has obvious paint work or previously repaired damage.

105.    To date, Ford has been unable to provide a permanent remedy that actually repairs the Corrosion Defect, or prevents it from recurring.  Accordingly, irrespective of the applicable model year of any Class Vehicle, or whether it is a new or CPO vehicle, Ford's representations that it would "repair, replace, or adjust all parts" on the Class Vehicles "that malfunction or fail during a normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" were materially false to the extent that it could not (and did not intend to) repair, replace, or adjust the Corrosion Defect as it was obligated to do.

106.    Similarly, Ford's representations under either corrosion warranty that it would repair, replace, or adjust the Corrosion Defect as obligated under the NVLW are also materially false.

**E.      Ford's Inadequate Remedy for the Corrosion Defect**

- 45 -

107.     As evidenced by the repair instructions in the three TSBs issued prior to the 2017 TSB and the admissions made by Ford employees, repainting the Class Vehicles, even if done properly, does not cure the Corrosion Defect and does not remedy the diminution of value that occurs as a result of repainting.

108.     For all the Class Vehicles, the factory paint was applied to exacting tolerances consistently over all aluminum panels, whereas the TSB repair process is haphazard at best and results in paint inconsistencies relative to appearance and longevity.  Ford knew that the TSB repair procedures were inadequate at the time they were implemented, yet concealed that fact from Plaintiffs and the Class members.

109.     Even if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint.  Indeed, there is a stigma associated with a repainted vehicle, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to lower the price.

110.     In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result.  A non-original paint job could also be an indication of major body repairs to a vehicle that are being hidden, not to mention rust.

111.     According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage.[9]  In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major

---

[9]     CarMax, Carmax.com "Quick Poll" Finds Consumers Often Misidentify Damage Indicators (Apr. 28, 2008), http://investors.carmax.com/news-releases/news-releases-details/ 2008/VIDEO-CarMax-Offers-Tips-to-Spot-Hidden-Vehicle-Damage/default.aspx.

accident, and instructs consumers to do the following in order to determine whether a used car may

have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the
> paintwork or paint on the molding or gaskets. Run your finger along
> the inside of the door edge and see if the finish is smooth or rough.
> A rough finish can be caused by overspray during repainting. If
> signs of repainting are found, ask additional questions to determine
> if the paintwork was for minor scratches and dents or to cover up
> more serious vehicle damage.

112.    Paint work to a vehicle typically shows up on a CARFAX Vehicle History Report,

as such repairs are often reported by the dealerships or body shops performing them.  Even if it is

not, paint work can easily be identified through the use of a paint meter, which is used by dealers

when evaluating vehicles for trade-in purposes.  In the case of the Class Vehicles, given the nature

of the Corrosion Defect and the inadequate repainting of the Vehicles, the paint work can be

identified by potential buyers with the naked eye and without the use of a paint meter.

113.    CarMax's vehicle appraisals are determined, among other criteria, by its inspection

of a "car's condition both inside and out," and it notes that "major defects" can impact their offers.

CarMax significantly lowers the appraised values for vehicles, including Class Vehicles that have

been repainted.

114.    Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the

vehicle.  KBB divides the condition of used vehicles into the following four grades:

> **Excellent** condition means that the ***vehicle looks new***, is in excellent
> mechanical condition and needs no reconditioning. ***This vehicle has
> never had any paint or body work*** and is free of rust. The vehicle
> has a clean Title History and will pass a smog and safety inspection.
> The engine compartment is clean, with no fluid leaks and is free of
> any wear or visible defects. The vehicle also has complete and
> verifiable service records. Less than 5 percent of all used vehicles
> fall into this category.

**Good** condition means that the vehicle is *free of any major defects*. This vehicle has a clean Title History, the paint, *body and interior have only minor (if any) blemishes*, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

**Fair** condition means that the *vehicle has some* mechanical or *cosmetic defects* and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, *the paint, body* and/or interior *need work performed by a professional*. The tires may need to be replaced. There may be some repairable rust damage.

**Poor** condition means that the *vehicle has severe* mechanical and/or *cosmetic defects* and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

## F.    The Damage Caused by the Corrosion Defect

115.    Plaintiffs and Class members purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Ford were not those for which Plaintiffs and Class members bargained.  Rather, the Class Vehicles suffered from a common defect – the Corrosion Defect.  Had Plaintiffs and Class members known of the Corrosion Defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Vehicles to the conditions bargained for; or (c) not purchased or leased the Vehicles.

116.    As a result of the disparity between the quality of the Class Vehicles negotiated for and the Vehicles actually received, Plaintiffs and Class members suffered economic harm.  This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that

remedy); (b) the discount that Plaintiffs and Class members would have required to accept the Vehicles in their actual condition; and/or (c) the diminished value of the Vehicles, both those that have been "sanded and repainted" and those that have not.

117.    Plaintiffs and Class members paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by Ford.  A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Corrosion Defect.  Plaintiffs and Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

118.    As a direct result of Ford's misrepresentations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and Class members paid a premium for the Class Vehicles, which Ford advertised as being durable and of high-quality, and received Vehicles that contained a known but concealed defect.  Ford was unjustly enriched because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

119.    In addition, the widespread disclosure of the Corrosion Defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and Class members have suffered a direct pecuniary loss in the form of the decreased value of their Vehicles, even when the Corrosion Defect has not yet manifested.

4811-5615-9159, v. 1

120.     As a result of Ford's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Corrosion Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

### G.     Fraudulent Concealment Allegations

121.     Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Ford responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles.  Ford necessarily is in possession of, or has access to, all of this information.

122.     Plaintiffs' claims arise out of Ford's fraudulent concealment of the Corrosion Defect and the paint failures and premature rusting and corrosion it causes, and its representations about the quality, durability, and value of the Class Vehicles.

123.     To the extent that Plaintiffs' claims arise from Ford's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, Ford knew, or was reckless in not knowing, of the Corrosion Defect; Ford was under a duty to disclose the Corrosion Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and Ford never disclosed the Corrosion Defect to Plaintiffs or the public at any time or place or in any manner.

124.     Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to Ford:

(a)     *Who*: Ford actively concealed the Corrosion Defect from Plaintiffs and Class members while simultaneously touting the quality and durability of the Class Vehicles. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Ford responsible for such decisions.

- 50 -

(b)      *What*: Ford knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Corrosion Defect.  Ford concealed the Corrosion Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles.

(c)      *When*: Ford concealed material information regarding the Corrosion Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day.  Ford has not disclosed the truth about the Corrosion Defect in the Class Vehicles to anyone outside of Ford.  Ford has never taken any action to inform consumers about the true nature of the Corrosion Defect in Class Vehicles.  And when consumers brought their Class Vehicles to Ford complaining of the paint peeling, flaking, bubbling off, corroding, or rusting off their Vehicles, Ford denied any knowledge of, or responsibility for, the Corrosion Defect, and in many instances, actually blamed owners/lessees for causing the problem.

(d)      *Where*:  Ford concealed material information regarding the true nature of the Corrosion Defect in every communication it had with Plaintiffs and Class members and made contrary representations about the quality and durability of the Class Vehicles.  Plaintiffs are aware of no document, communication, or other place or thing in which Ford disclosed the truth about the Corrosion Defect in the Class Vehicles to anyone outside of Ford.  Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Ford's website.

(e)      *How*: Ford concealed the Corrosion Defect from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles.  Ford actively concealed the truth about the existence and nature of the Corrosion Defect from Plaintiffs

4811-5615-9159, v. 1

and Class members at all times, even though it knew about the Corrosion Defect and knew that information about the Corrosion Defect would be important to a reasonable consumer, and Ford promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

(f)     *Why*: Ford actively concealed material information about the Corrosion Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase or lease the Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality and durability of the Vehicles.  Had Ford disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Fraudulent Concealment Tolling

125.    Ford has known of the Corrosion Defect in the Class Vehicles since at least 2004, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Corrosion Defect, even when directly asked about it by Plaintiffs and Class members during communications with Ford, Ford Customer Assistance, Ford dealerships, and Ford service centers.  Ford continues to conceal the Corrosion Defect to this day.

126.    Any applicable statute of limitation has been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.     Estoppel

127.    Ford was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  Ford actively concealed –

- 52 -

and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class members reasonably relied upon Ford's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Ford is estopped from relying on any statutes of limitation in defense of this action.

### C.      Discovery Rule

128.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Corrosion Defect.

129.    However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Corrosion Defect caused the paint on their Vehicles to peel, flake, bubble, corrode, or rust.

130.    Even then, Plaintiffs and Class members had no reason to know the peeling, flaking, bubbling, corrosion, or rusting were caused by a defect in the Class Vehicles because of Ford's active concealment of the Corrosion Defect. Not only did Ford fail to notify Plaintiffs or Class members about the Corrosion Defect, Ford, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it, and, in many instances, actually blamed the owner/lessee for causing the problem.

131.    Thus, Plaintiffs and Class members were not reasonably able to discover the Corrosion Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing paint failures and premature corrosion on their Vehicles.

## VII.   CLASS ALLEGATIONS

132.    Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the following Nationwide Class (under the laws of the state of Florida) and State Classes defined as:

### Nationwide Class:

All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle.   Class Vehicles consist of Ford Expeditions, Ford Explorers, and Ford Mustangs model years 2013-2018.

### Alabama Class:

All persons or entities that purchased or leased a Class Vehicle within Alabama or that purchased or leased a Class Vehicle and reside in Alabama.

### California Class:

All persons or entities that purchased or leased a Class Vehicle within California or that purchased or leased a Class Vehicle and reside in California.

### Florida Class:

All persons or entities that purchased or leased a Class Vehicle within Florida or that purchased or leased a Class Vehicle and reside in Florida.

### Georgia Class:

All persons or entities that purchased or leased a Class Vehicle within Georgia or that purchased or leased a Class Vehicle and reside in Georgia.

### Illinois Class:

All persons or entities that purchased or leased a Class Vehicle within Illinois or that purchased or leased a Class Vehicle and reside in Illinois.

### Indiana Class:

- 54 -

All persons or entities that purchased or leased a Class Vehicle within Indiana or that purchased or leased a Class Vehicle and reside in Indiana.

**Michigan Class:**

All persons or entities that purchased or leased a Class Vehicle within Michigan or that purchased or leased a Class Vehicle and reside in Michigan.

**New Jersey Class:**

All persons or entities that purchased or leased a Class Vehicle within New Jersey or that purchased or leased a Class Vehicle and reside in New Jersey.

**New York Class:**

All persons or entities that purchased or leased a Class Vehicle within New York or that purchased or leased a Class Vehicle and reside in New York.

**North Carolina Class:**

All persons or entities that purchased or leased a Class Vehicle within North Carolina or that purchased or leased a Class Vehicle and reside in North Carolina.

**Pennsylvania Class:**

All persons or entities that purchased or leased a Class Vehicle within Pennsylvania or that purchased or leased a Class Vehicle and reside in Pennsylvania.

**South Carolina Class:**

All persons or entities that purchased or leased a Class Vehicle within South Carolina or that purchased or leased a Class Vehicle and reside in South Carolina.

**Texas Class:**

All persons or entities that purchased or leased a Class Vehicle within Texas or that purchased or leased a Class Vehicle and reside in Texas.

133.    Excluded from the Class are Ford; its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Ford; Ford's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

134.    Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

135.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

136.    **Numerosity**.  Rule 23(a)(1) of the Federal Rules of Civil Procedure:  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are at least thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Ford's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

137.    **Commonality and Predominance**.  Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure:  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

      a.    whether Ford engaged in the conduct alleged herein;

b.   whether Ford designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.   whether Ford designed, manufactured, marketed, and distributed Class Vehicles with a Corrosion Defect;

d.   whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

e.   whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

f.   whether Ford's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

g.   whether Ford has been unjustly enriched under applicable state laws;

h.   whether Ford has violated its express warranties to Plaintiffs and Class members;

i.   whether Ford actively concealed the Corrosion Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

j.   such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

138.   **Typicality**.  Rule 23(a)(3) of the Federal Rules of Civil Procedure:  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.  All

claims seek recovery on the same legal theories and are based upon Ford's common course of conduct.

139.   **Adequacy**.  Rule 23(a)(4) of the Federal Rules of Civil Procedure:  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

140.   **Declaratory Relief**.  Rule 23(b)(2) of the Federal Rules of Civil Procedure:  Ford has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

141.   **Superiority**.  Rule 23(b)(3) of the Federal Rules of Civil Procedure:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Class members to individually seek redress for Ford's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   CLAIMS

**A.     Claims Brought on Behalf of the Nationwide Class**

### NATIONWIDE COUNT I

### FRAUDULENT CONCEALMENT

142.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

143.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform in all states.   In the alternative, Plaintiffs bring this claim on behalf of each State Class under the law of each state in which Plaintiffs and Class members purchased or leased the Class Vehicles.

144.    Ford fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, as well as the existence of the Corrosion Defect.

145.    Despite advertising the Class Vehicles as durable and being of high quality, Ford knew when it manufactured, marketed, and sold or leased the Vehicles that the design and/or production processes, including the paint systems, used thereon suffered from a design and/or manufacturing defect that reduced the Vehicles' value and subjected the Vehicles to premature corrosion that causes the Vehicles' exterior paint to bubble, flake, peel, and/or rust.

146.    Ford failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the Class Vehicles and Ford knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Ford sought to increase consumer confidence in the Class Vehicles, and to

- 59 -

falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that Ford was a reputable manufacturer that stands behind the automobiles it manufactures. Ford engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

147.    Plaintiffs and Class members were unaware, and could not reasonably discover on their own, that Ford's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

148.    Ford had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Corrosion Defect because:

        a.    Ford had exclusive or far superior knowledge of the Corrosion Defect and concealment thereof;

        b.    the facts regarding the Corrosion Defect and concealment thereof were known and/or accessible only to Ford;

        c.    Ford knew that Plaintiffs and Class members did not know about, or could not reasonably discover, the Corrosion Defect and concealment thereof; and

        d.    Ford made representations and assurances about the qualities of the Class Vehicles, and about the existence of a repair for the Corrosion Defect and Ford's ability and intention to render such a repair, that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles paint used on the Vehicles suffered from a systemic design and/or manufacturing defect.

149.    These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the Class Vehicles, and because they

substantially reduced the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Whether the Class Vehicles were defective, of sound quality, and durable, and whether Ford stood behind such Vehicles, would have been an important factor in Plaintiffs' and the Class members' decisions to purchase or lease the Vehicles. Plaintiffs and Class members trusted Ford not to sell them vehicles that were defective and significantly overpriced.

150. Ford intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were free from known defects, as represented by Ford and reasonably expected by consumers.

151. Plaintiffs and Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts. Plaintiffs and Class members did not receive the benefit of their bargain due to Ford's fraudulent concealment. Plaintiffs' and Class members' actions in purchasing the Class Vehicles were justified. Ford was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Class members.

152. Plaintiffs and Class members relied to their detriment upon Ford's reputation, fraudulent misrepresentations, and material omissions regarding the quality, durability, and high resale value of the Class Vehicles.

153. As a direct and proximate result of Ford's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Class members suffered injury. They purchased and leased Class Vehicles that had a diminished value by reason of Ford's concealment of, and failure to disclose, the Corrosion Defect. Plaintiffs and Class members also paid substantial money to (unsuccessfully) repair the Corrosion Defect.

154.    Accordingly, Ford is liable to the Nationwide Class and/or State Classes for their damages in an amount to be proven at trial.

155.    On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class members.  Ford also continues to conceal material information regarding the Corrosion Defect.

156.    Ford's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**NATIONWIDE COUNT II**

**UNJUST ENRICHMENT**

157.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

158.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class under the common law of unjust enrichment, which is materially uniform in all states.  In the alternative, Plaintiffs bring this claim on behalf of each State Class under the law of each state in which Plaintiffs and Class members purchased or leased Class Vehicles.

159.    Plaintiffs bring this claim as an alternative to the contractual warranty claims asserted below and in the event that Plaintiffs prevail on their claims that any contract with Ford (including any express warranty) was fraudulently induced and/or Plaintiffs prevail in proving that the warranties cannot be enforced by Ford due to Ford having provided the warranties only after entering into a contract with a purchaser or lessor, or due to Ford's intentional and deceptive efforts to conceal the Corrosion Defect and avoid its warranty obligations.

160.    Ford has received millions in revenue from the sale of the Class Vehicles between 2013 and 2018.

161.    This revenue was a benefit conferred upon Ford by Plaintiffs and Class members, individuals living across the United States.

162.    Ford manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class members, while actively concealing the vehicles' known defects and touting their quality, durability, and high resale value.

163.    Ford benefitted from selling defective cars for more money than they were worth, at a profit, and Plaintiffs have overpaid for the cars and, in some instances, been forced to pay to (unsuccessfully) repair the Corrosion Defect.

164.    Plaintiffs and Class members elected to purchase or lease the Class Vehicles based on Ford's misrepresentations, deception, and omissions.  Ford knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and Class members when they elected to purchase or lease the Class Vehicles.

165.    The Class Vehicles' defect, and Ford's concealment of the same, enriched Ford beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues between 2013 and 2018.

166.    Therefore, because Ford will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiffs and each Class member are entitled to recover the amount by which Ford was unjustly enriched at his or her expense.

167.    Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against Ford in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class member's expense, and such other relief as this Court deems just and proper.

## NATIONWIDE COUNT III

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. §2301, *ET SEQ.*)

168.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

169.    This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq*. ("MMWA") by virtue of 28 U.S.C. §1332(a)-(d).

170.    The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. §2301(1).

171.    Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. §2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its written warranties.

172.    Ford is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. §2301(4)-(5).

173.    15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

174.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiffs and Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years, both of which are covered under 15 U.S.C. §2301(6).

- 64 -

175.     Ford breached its warranties, as described in more detail above, and is therefore liable to Plaintiffs and Class members pursuant to 15 U.S.C. §2310(d)(1).  Without limitation, the Class Vehicles share a common design and/or manufacturing defect in that the Vehicles are defectively designed and built with a propensity to cause their body to prematurely corrode and their exterior paint to bubble, flake, peel, and/or rust.  Through its partial practice of covering the cost of having the Class Vehicles sanded and repainted, Ford has tacitly admitted that the Class Vehicles suffer from a Corrosion Defect of its own making, but Ford's refusal to fully cover repairs and acknowledge the Corrosion Defect in order to inform current and future purchasers and lessors of Class Vehicles is woefully insufficient.

176.     In its capacity as a warrantor, Ford had knowledge of the inherent defect in the Class Vehicles.  Any effort by Ford to limit any aspect of its warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

177.     Any limitations Ford might seek to impose on its warranties are procedurally unconscionable.  There was unequal bargaining power between Ford and Plaintiffs and Class members, as, at the time of purchase and lease, Plaintiffs and Class members had no other options for purchasing warranty coverage other than directly from Ford.

178.     Any limitations Ford might seek to impose on its warranties are substantively unconscionable.  Ford knew that the Class Vehicles were defective and would continue to pose infrastructure and quality concerns after the warranties purportedly expired.  Ford failed to disclose these defects to Plaintiffs and Class members.   Thus, Ford's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

4811-5615-9159, v. 1

179.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and each of the other Class members, on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for, and intended to, benefit consumers.

180.    Pursuant to 15 U.S.C. §2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Fed. R. Civ. P. 23.

181.    Plaintiffs and Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.  Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and Class members have not reaccepted their Class Vehicles by retaining them.

182.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. §2310(d)(2), Plaintiffs and Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual

time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Class members in connection with the commencement and prosecution of this action.

183.    Plaintiffs seek the establishment of a Ford-funded program for Plaintiffs and Class members to recover out-of-pocket costs incurred in attempting to rectify the Corrosion Defect in their Class Vehicles.

**B.    Claims Brought on Behalf of the Alabama Class**

**ALABAMA COUNT I**

**VIOLATIONS OF THE ALABAMA DECEPTIVE
TRADE PRACTICES ACT
(ALA. CODE § 8-19-1, *ET SEQ.*)**

184.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

185.    Plaintiff Clarence Simmons (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Alabama Class.

186.    Plaintiff and the Alabama Class members are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

187.    Plaintiff, the Alabama Class members, and Ford are "persons" within the meaning of ALA. CODE § 8-19-3(5).

188.    The Class Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

189.    Ford was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

190.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including, but not limited to:  (i) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have"; (ii) "Representing that goods or services are of a particular standard, quality, or

- 67 -

grade, or that goods are of a particular style or model, if they are of another"; (iii) "Advertising goods or services with intent not to sell them as advertised"; (iv) "Intentionally misrepresenting that a warranty or guarantee confers or involves certain rights or remedies"; and (v) "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  ALA. CODE § 8-19-5.

191.    In the course of its business, Ford violated the Alabama DTPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the available remedies under its corrosion warranties, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices prohibited by the Alabama DTPA:

(a)    representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(b)    representing that Class Vehicles are of a particular standard and quality when they are not;

(c)    advertising the Class Vehicles with the intent not to sell them as advertised;

(d)    representing that the corrosion warranties covering the Class Vehicles confer or involve certain rights or remedies when they do not; and

(e)    engaging in other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

4811-5615-9159, v. 1

192.    Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Alabama Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Alabama Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Alabama Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

193.    Plaintiff and the Alabama Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

194.    Ford had an ongoing duty to Plaintiff and the Alabama Class members to refrain from unfair and deceptive practices under the Alabama DTPA in the course of its business. Specifically, Ford owed Plaintiff and the Alabama Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Alabama Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

195.    Plaintiff and the Alabama Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

196.    Pursuant to ALA. CODE § 8-19-10(a), Plaintiff and the Alabama Class seek monetary relief against Ford for actual damages, in addition to treble damages.

197.    Plaintiff and the Alabama Class also seek declaratory relief, punitive damages, an order enjoining Ford's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs, as well as other proper and just relief under the Alabama DTPA.

198.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.  In addition, on November 7, 2018, a notice letter was sent on behalf of Plaintiff and the Alabama Class to Ford pursuant to ALA. CODE § 8-19-10(e).  Because Ford failed to remedy its unlawful conduct within the requisite time period, Plaintiff and the Alabama Class seek all damages and relief to which they are entitled.

## ALABAMA COUNT II

## BREACH OF EXPRESS WARRANTY
### (ALA. CODE §§7-2-313 AND 7-2a-210)

199.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

200.    Plaintiff Clarence Simmons (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Alabama Class.

201.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under ALA. CODE §§7-2-104(1) and 7-2A-103(3), and a "seller" of the Class Vehicles under §7-2-103(1)(d).

202.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under ALA. CODE §7-2A-103(1)(p).

203.    The Class Vehicles are and were at all relevant times "goods" within the meaning of ALA. CODE §§7-2-105(1) and 7-2A-103(1)(h).

204.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the Alabama Class members with a warranty covering defects

- 70 -

in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

205.    Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the Alabama Class members purchased or leased their Class Vehicles.

206.    Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Alabama Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the Alabama Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

207.    Plaintiff and the Alabama Class members have given Ford a reasonable opportunity to cure its breach of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

208.    Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the Alabama Class members is not limited to their remedies.

209.    Accordingly, Plaintiff and the Alabama Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Alabama Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

210.     As a direct and proximate result of Ford's breach of its express warranties, Plaintiff and the Alabama Class members have been damaged in an amount to be determined at trial.

211.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**C.     Claims Brought on Behalf of the California Class**

**CALIFORNIA COUNT I**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
(CAL. BUS. & PROF. CODE §17200, ET SEQ.)**

212.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

213.     Plaintiff Franklin Navas (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the California Class.

214.     California's Unfair Competition Law ("UCL"), Business and Professions Code §17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

215.     In the course of its business, Ford violated the UCL by engaging in the following unlawful, fraudulent, and unfair business acts and practices:

a.     selling and leasing the Class Vehicles to Plaintiff and California Class members with knowledge that the design and/or production processes, including the paint system, used on those Vehicle was defective, and intentionally concealing the Corrosion Defect from Plaintiff and California Class members;

b.     marketing the Class Vehicles as defect-free and making affirmative representations regarding the quality of the Class Vehicles and the quality

and benefits of the design and/or production processes, including the paint

system, used on the Class Vehicles;

c.      misrepresenting the existence of a repair for the Corrosion Defect and

Ford's ability and intention to render such a repair; and

d.      violating California statutory and common law prohibiting false

advertising, fraudulent concealment, and breach of express warranty.

216.    Ford's scheme and concealment of the true characteristics of the Class Vehicles

were material to Plaintiff and the California Class members, and Ford misrepresented, concealed,

or failed to disclose the truth with the intention that Plaintiff and the California Class members

would rely on the misrepresentations, concealments, and omissions.  Had they known the truth,

Plaintiff and the California Class members would not have purchased or leased the Class Vehicles,

or would have paid significantly less for them.

217.    Plaintiff and California Class members suffered ascertainable loss and actual

damages as a direct and proximate result of Ford's misrepresentations and its concealment of and

failure to disclose material information.

218.    Pursuant to CAL. BUS. & PROF. CODE §17200, Plaintiff and the California Class

members seek any such orders or judgments as may be necessary to restore to Plaintiff and

California Class members any money acquired by unfair competition, including restitution and/or

restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§17203 and 3345, and any

other just and proper relief available under the UCL.

## CALIFORNIA COUNT II

### VIOLATIONS OF THE CALIFORNIA CONSUMER
### LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *ET SEQ.*)

219.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

220.     Plaintiff Franklin Navas (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the California Class.

221.     The Class Vehicles are "goods" as defined in CAL. CIV. CODE § 1761(a).

222.     Plaintiff and the California Class members are "consumers" as defined in CAL. CIV. CODE § 1761(d).  Plaintiff, the California Class members, and Ford are "persons" as defined in CAL. CIV. CODE § 1761(c).

223.     California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

224.     In the course of its business, Ford violated the CLRA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford violated the following enumerated provisions of the CLRA:

> (a)     CAL. CIV. CODE § 1770(a)(2): Misrepresenting the approval or certification of goods;

> (b)     CAL. CIV. CODE § 1770(a)(3): Misrepresenting the certification by another;

- 74 -

(c)   CAL. CIV. CODE § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

(d)   CAL. CIV. CODE § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

(e)   CAL. CIV. CODE § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

(f)   CAL. CIV. CODE § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

225.   Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the California Class, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the California Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the California Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

226.   Plaintiff and the California Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

227.   Ford had an ongoing duty to Plaintiff and the California Class members to refrain from unfair and deceptive practices under the CLRA in the course of its business.  Specifically, Ford owed Plaintiff and the California Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the California Class members, and/or it made

misrepresentations that were rendered misleading because they were contradicted by withheld facts.

228.   Plaintiffs and the California Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

229.   Plaintiff and the California Class members are entitled to recover actual and punitive damages under the CLRA pursuant to CAL. CIV. CODE § 1780(a), and an additional award of up to $5,000 to each Plaintiff and California Class member who is a "senior citizen."

230.   Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.  In addition, on November 7, 2018, a notice letter was sent on behalf of Plaintiff and the California Class to Ford pursuant to CAL. CIV. CODE § 1782(a).  Because Ford failed to remedy its unlawful conduct within the requisite time period, Plaintiff and the California Class seek all damages and relief to which they are entitled.

## CALIFORNIA COUNT III

### VIOLATIONS OF THE FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE §17500, ET SEQ.)

231.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

232.   Plaintiff Franklin Navas (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the California Class.

233.   CALIFORNIA BUS. & PROF. CODE §17500 states:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is

known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

234.    Ford caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff and the California Class members.

235.    Ford has violated CAL. BUS. & PROF. CODE §17500 because the misrepresentations and omissions regarding the quality of the Class Vehicles and the quality and benefits of the design and/or production processes, including the paint system, used on the Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

236.    Ford has also violated CAL. BUS. & PROF. CODE §17500 because the misrepresentations and omissions regarding the existence of a repair for the Corrosion Defect and Ford's ability and intention to render such a repair as set forth in this Complaint were material and likely to deceive a reasonable consumer.

237.    Plaintiff and the California Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiff and the California Class members relied on the misrepresentations and/or omissions of Ford with respect to the quality of the Class Vehicles, the quality and benefits of the design and/or production processes, including the paint system, used on the Class Vehicles, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair. Ford's representations turned out not to be true because during normal driving conditions, the Corrosion Defect would cause premature corrosion of the Vehicle's body and causes the Vehicles' exterior paint to bubble, flake, peel, and/or rust. Additionally, no

repair exists for the Corrosion Defect (aside from replacement of the defective body panel with a non-defective one), Ford cannot repair the Corrosion Defect, nor does it intend to repair the Corrosion Defect.  Had Plaintiff and the California Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiff and the California Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

238.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.  Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

239.    Plaintiff, individually and on behalf of the California Class, requests that this Court enter such orders or judgments as may be necessary to restore to Plaintiff and the California Class members any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement and for such other relief as may be appropriate.

## CALIFORNIA COUNT IV

## BREACH OF EXPRESS WARRANTY
### (CAL. COM. CODE §§2313 AND 10210)

240.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

241.    Plaintiff Franklin Navas (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the California Class.

242.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under CAL. COM. CODE §§2104(1) and 10103(c), and a "seller" of the Class Vehicles under §2103(1)(d).

243.     With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under CAL. COM. CODE §10103(a)(16).

244.     The Class Vehicles are and were at all relevant times "goods" within the meaning of CAL. COM. CODE §§2105(1) and 10103(a)(8).

245.     In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the California Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

246.     Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the California Class members purchased or leased their Class Vehicles.

247.     Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the California Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the California Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

248.     Plaintiff and the California Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

249.     Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the California Class members is not limited to their remedies.

250.     Accordingly, Plaintiff and the California Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the California Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

251.     As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the California Class members have been damaged in an amount to be determined at trial.

252.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

### CALIFORNIA COUNT V

**VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT
FOR BREACH OF EXPRESS WARRANTIES
(CAL. CIV. CODE §§1791.2 AND 1793.2(D)**

253.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

254.     Plaintiff Franklin Navas (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the California Class.

255.     Plaintiff and the California Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE §1791(b).

256.     The Class Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE §1791(a).

257.     Ford is a "manufacturer" of the Class Vehicles within the meaning of CAL. CIV. CODE §1791(j).

258.     Plaintiff and the California Class members bought or leased new Class Vehicles manufactured by Ford.

259.     Ford made express warranties to Plaintiff and the California Class members within the meaning of CAL. CIV. CODE §§1791.2 and 1793.2, as described above.

260.     As set forth above in detail, the Class Vehicles are inherently defective in that they contain a Corrosion Defect that substantially impairs the use and value of the Class Vehicles to reasonable consumers.

261.     As a result of Ford's breach of its express warranties, Plaintiff and the California Class members received goods whose defective condition substantially impairs their value to Plaintiff and the California Class members.  Plaintiff and the California Class members have been damaged as a result of, inter alia, the diminished value of their Class Vehicles, the premature corrosion that causes unsightly failure of the paint used on their Class Vehicles, and the non-use of their Class Vehicles.

262.     Pursuant to CAL. CIV. CODE §§1793.2 and 1794, Plaintiff and the California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase or lease price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

263.     Pursuant to CAL. CIV. CODE §1794, Plaintiff and the California Class are entitled to costs and attorneys' fees.

D.     **Claims Brought on Behalf of the Florida Class**

**FLORIDA COUNT I**

**VIOLATION OF FLORIDA'S UNFAIR**

- 81 -

## & DECEPTIVE TRADE PRACTICES ACT
### (FLA. STAT. §501.201, *ET SEQ.*)

264.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

265.    Plaintiffs Jorge Arroyave, Joseph Dabbs, Jennifer Dewitt, Anne Erdman, and Mark James (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the Florida Class.

266.    Plaintiffs and the Florida Class members are "consumers" within the meaning of FLA. STAT. §501.203(7).

267.    Ford is engaged in "trade" or "commerce" within the meaning of FLA. STAT. §501.203(8).

268.    The Florida Deceptive and Unfair Trade Practices Act ("Florida DUTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FLA. STAT. §501.204(1).

269.    In the course of its business, Ford violated the Florida DUTPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices prohibited by FLA. STAT. §501.204(1):

(a)    representing that the Class Vehicles have characteristics or benefits that they do not have;

- 82 -

(b)     representing that the Class Vehicles are of a particular standard and quality when they are not;

(c)     advertising the Class Vehicles with the intent not to sell them as advertised;

(d)     engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(e)     using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

270.    Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Florida Class, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Florida Class would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiffs and the Florida Class would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

271.    Plaintiffs and the Florida Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

272.    Ford had an ongoing duty to Plaintiffs and the Florida Class members to refrain from unfair and deceptive practices under the Florida DUTPA in the course of its business. Specifically, Ford owed Plaintiffs and the Florida Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally

concealed such material facts from Plaintiffs and the Florida Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

273. Plaintiffs and the Florida Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

**FLORIDA COUNT II**

**BREACH OF EXPRESS WARRANTY**
**(FLA. STAT. §§672.313 AND 680.21)**

274. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

275. Plaintiffs Jorge Arroyave, Joseph Dabbs, Jennifer Dewitt, Anne Erdman, and Mark James (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the Florida Class.

276. Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under FLA. STAT. §§672.104(1) and 680.1031(3)(k), and a "seller" of the Class Vehicles under §672.103(1)(d).

277. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under FLA. STAT. §680.1031(1)(p).

278. The Class Vehicles are and were at all relevant times "goods" within the meaning of FLA. STAT. §§672.105(1) and 680.1031(1)(h).

279. In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiffs and the Florida Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an

- 84 -

extended warranty covering corrosion damage relating to such defects for a period of two additional years.

280.    Ford's warranties formed a basis of the bargain that was reached when Plaintiffs and the Florida Class members purchased or leased their Class Vehicles.

281.    Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiffs and the Florida Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiffs and the Florida Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

282.    Plaintiffs and the Florida Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

283.    Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiffs and the Florida Class members is not limited to their remedies.

284.    Accordingly, Plaintiffs and the Florida Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Florida Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

285.     As a direct and proximate result of Ford's breach of its express warranty, Plaintiffs and the Florida Class members have been damaged in an amount to be determined at trial.

286.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

### E.     Claims Brought on Behalf of the Georgia Class

### GEORGIA COUNT I

### VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN. §10-1-370, *ET SEQ.*)

287.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

288.     Plaintiff Shane Jackson (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Georgia Class.

289.     Ford, Plaintiff, and the Georgia Class members are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE ANN. §10-1-371(5).

290.     The Georgia UDTPA prohibits any "deceptive trade practices," which include misrepresenting the "standard, quality, or grade" of goods or services, and engaging "in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  GA. CODE ANN. §10-1-372(a).

291.     In the course of its business, Ford violated the Georgia UDTPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering

for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices:

(a)    representing that the Class Vehicles have characteristics or benefits that they do not have;

(b)    representing that the Class Vehicles are of a particular standard and quality when they are not;

(c)    advertising the Class Vehicles with the intent not to sell them as advertised; and/or

(d)    engaging in other conduct which created a likelihood of confusion or misunderstanding.

292.    Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Georgia Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Georgia Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Georgia Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

293.    Plaintiff and the Georgia Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

294.    Ford had an ongoing duty to Plaintiff and the Georgia Class members to refrain from unfair and deceptive practices under the Georgia UDTPA in the course of its business. Specifically, Ford owed Plaintiff and the Georgia Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally

concealed such material facts from Plaintiff and the Georgia Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

295.    Plaintiff and the Georgia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

296.    Pursuant to GA. CODE ANN. §10-1-373, Plaintiff and the Georgia Class members seek any such orders or judgments as may be necessary to restore to Plaintiff and the Georgia Class members any money acquired by deceptive trade practices, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the Georgia UDTPA.

**GEORGIA COUNT II**

**VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(GA. CODE ANN. § 10-1-390, *ET SEQ.*)**

297.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

298.    Plaintiff Shane Jackson (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Georgia Class.

299.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful.  GA. CODE ANN. § 10-1-393(a).

300.    In the course of its business, Ford violated the Georgia FBPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the

existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices as defined in GA. CODE ANN. § 10-1-393(b):

    (a)    representing that the Class Vehicles have characteristics or benefits that they do not have;

    (b)    representing that the Class Vehicles are of a particular standard and quality when they are not; and/or

    (c)    advertising the Class Vehicles with the intent not to sell them as advertised.

301.  Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Georgia Class, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Georgia Class would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Georgia Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

302.  Plaintiff and the Georgia Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

303.  Ford had an ongoing duty to Plaintiff and the Georgia Class to refrain from unfair and deceptive practices under the Georgia FBPA in the course of its business.  Specifically, Ford owed Plaintiff and the Georgia Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such

4811-5615-9159, v. 1

material facts from Plaintiff and the Georgia Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

304.     The Georgia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

305.     Pursuant to GA. CODE ANN. § 10-1-399, the Georgia Class seeks an order awarding damages, treble damages, and any other just and proper relief available under the Georgia FBPA.

306.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.  In addition, on November 7, 2018, a notice letter was sent on behalf of Plaintiff and the Georgia Class to Ford pursuant to GA. CODE ANN. § 10-1-399(b).  Because Ford failed to remedy its unlawful conduct within the requisite time period, Plaintiff and the Georgia Class seek all damages and relief to which they are entitled.


### GEORGIA COUNT III

### BREACH OF EXPRESS WARRANTY
### (GA. CODE ANN. §§11-2-313 and 11-2A-210)

307.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

308.     Plaintiff Shane Jackson (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Georgia Class.

309.     Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under GA. CODE ANN. §§11-2-104(1) and 11-2A-103(3), and a "seller" of the Class Vehicles under §11-2-103(1)(d).

310.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under GA. CODE ANN. §11-2A-103(1)(p).

311.    The Class Vehicles are and were at all relevant times "goods" within the meaning of GA. CODE ANN. §§11-2-105(1) and 11-2A-103(1)(h).

312.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the Georgia Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

313.    Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the Georgia Class members purchased or leased their Class Vehicles.

314.    Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Georgia Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the Georgia Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

315.    Plaintiff and the Georgia Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

316.     Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the Georgia Class members is not limited to their remedies.

317.     Accordingly, Plaintiff and the Georgia Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Georgia Class members of the purchase or lease price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

318.     As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the Georgia Class members have been damaged in an amount to be determined at trial.

319.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

### F.     Claims Brought on Behalf of the Illinois Class

### ILLINOIS COUNT I

### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL. COMP. STAT. 505/1, *ET SEQ.*, AND 510/2)

320.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

321.     Plaintiff Mark Van Bus Kirk (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Illinois Class.

322.     Ford, Plaintiff, and the Illinois Class members are "persons" within the meaning 815 ILL. COMP. STAT. 505/1(c) and 510/1(5).   Plaintiff and the Illinois Class members are "consumers" within the meaning of 815 ILL. COMP. STAT. 505/1(e).

323.     The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."  815 ILL. COMP. STAT. 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business.  815 ILL. COMP. STAT. 510/2.

324.     In the course of its business, Ford violated the Illinois CFA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILL. COMP. STAT. 505/2 and 510/2:

>  (a)     representing that the Class Vehicles have characteristics or benefits that they do not have;
>
>  (b)     representing that the Class Vehicles are of a particular standard and quality when they are not;
>
>  (c)     advertising the Class Vehicles with the intent not to sell them as advertised;
>
>  (d)     engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(e)     using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles, whether or not any person has in fact been misled, deceived, or damaged thereby.

325.   Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Illinois Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Illinois Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Illinois Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

326.   Plaintiff and the Illinois Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

327.   Ford had an ongoing duty to Plaintiff and the Illinois Class members to refrain from unfair and deceptive practices under the Illinois CFA in the course of its business.  Specifically, Ford owed Plaintiff and the Illinois Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Illinois Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

328.     Plaintiff and the Illinois Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

329.     Pursuant to 815 ILL. COMP. STAT. 505/10a(a) and 510/3, Plaintiff and the Illinois Class members seek an order awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

## ILLINOIS COUNT II

### BREACH OF EXPRESS WARRANTY
### (810 ILL. COMP. STAT. §§5/2-313 and 5/2A-210)

330.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

331.     Plaintiff Mark Van Bus Kirk (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Illinois Class.

332.     Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under 810 ILL. COMP. STAT. §§5/2-104(1) and 5/2A-103(3), and a "seller" of the Class Vehicles under §5/2-103(1)(d).

333.     With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 810 ILL. COMP. STAT. §5/2A-103(1)(p).

334.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 ILL. COMP. STAT. §§5/2-105(1) and 5/2A-103(1)(h).

335.     In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the Illinois Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

- 95 -

336.     Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the Illinois Class members purchased or leased their Class Vehicles.

337.     Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Illinois Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the Illinois Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

338.     Plaintiff and the Illinois Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

339.     Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the Illinois Class members is not limited to their remedies.

340.     Accordingly, Plaintiff and the Illinois Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Illinois Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

341.     As a direct and proximate result of Ford's breach of its express warranty, Plaintiffs and the Illinois Class members have been damaged in an amount to be determined at trial.

342.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

### G.     Claims Brought on Behalf of the Indiana Class

### INDIANA COUNT I

### VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (IND. CODE § 24-5-0.5-3)

343.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

344.     Plaintiff Mike Tierney (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Indiana Class.

345.     Ford is a "person" within the meaning of IND. CODE § 24-5-0.5-2(2) and a "supplier" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

346.     Plaintiff's and the Indiana Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(1).

347.     Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes, but is not limited to, representing: (i) "That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have"; (ii) "That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not"; and (iii) "That the consumer will be able to purchase the subject of the consumer transaction as advertised by the supplier, if the supplier does not intend to sell it."

348.     In the course of its business, Ford violated the Indiana DCSA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Indiana DCSA:

> (a)     representing that the Class Vehicles have characteristics or benefits that they do not have;
>
> (b)     representing that the Class Vehicles are of a particular standard and quality when they are not; and
>
> (c)     advertising the Class Vehicles with the intent not to sell them as advertised.

349.     Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Indiana Class, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Indiana Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Indiana Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

350.     Plaintiff and the Indiana Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

351.     Ford had an ongoing duty to Plaintiff and the Indiana Class members to refrain from unfair and deceptive practices under the Indiana DCSA in the course of its business.

Specifically, Ford owed Plaintiff and the Indiana Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Indiana Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

352.    Plaintiff and the Indiana Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

353.    Plaintiff and the Indiana Class seek monetary relief, declaratory relief, treble damages, punitive damages, and attorneys' fees against Ford in an amount to be determined at trial.

354.    Plaintiff and the Indiana Class also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices and any other just and proper relief available under the Indiana DCSA.

355.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.  In addition, on November 7, 2018, a notice letter was sent on behalf of Plaintiff and the Indiana Class to Ford pursuant to IND. CODE § 24-5-0.5-5(a).  Because Ford failed to remedy its unlawful conduct within the requisite time period, Plaintiff and the Indiana Class seek all damages and relief to which they are entitled.

## INDIANA COUNT II

### BREACH OF EXPRESS WARRANTY
### (IND. CODE §§26-1-2-313 and 26-1-2.1-210)

356.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

357.     Plaintiff Mike Tierney (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Indiana Class.

358.     Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under IND. CODE §§26-1-2.1-103(3) and 26-1-2-104(1), and a "seller" of the Class Vehicles under §26-1-2-103(1)(d).

359.     With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under IND. CODE §26-1-2.1-103(1)(p).

360.     The Class Vehicles are and were at all relevant times "goods" within the meaning of IND. CODE §§26-1-2.1-103(1)(h) and 26-1-2-105(1).

361.     In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the Indiana Class Members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

362.     Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the Indiana Class Members purchased or leased their Class Vehicles.

363.     Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Indiana Class Members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the Indiana Class Members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

364.     Plaintiff and the Indiana Class Members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

365.     Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the Indiana Class Members is not limited to their remedies.

366.     Accordingly, Plaintiff and the Indiana Class Members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Indiana Class Members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

367.     As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the Indiana Class Members have been damaged in an amount to be determined at trial.

368.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**H.      Claims Brought on Behalf of the Michigan Class**

**MICHIGAN COUNT I**

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(MICH. COMP. LAWS § 445.903, *ET SEQ*.)**

369.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

370.     Plaintiff Lynne Minish (for the purposes of this section, "Plaintiff") brings this claim on behalf of herself and the Michigan Class.

371.   Plaintiff and the Michigan Class members are "persons" within the meaning of MICH. COMP. LAWS § 445.902(1)(d).

372.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." MICH. COMP. LAWS § 445.903(1).  Ford engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:  (i) "Representing that goods or services have … characteristics … that they do not have"; (ii) "Representing that goods or services are of a particular standard … if they are of another"; (iii) "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; and (iv) "Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  MICH. COMP. LAWS § 445.903(1).  By failing to disclose and actively concealing that the Defective Dashboard was not safe, by marketing its Class Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, Class engaged in deceptive business practices prohibited by the Michigan CPA.

373.   In the course of its business, Ford violated the Michigan CPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices prohibited by MICH. COMP. LAWS § 445.903(1):

(a)   representing that the Class Vehicles have characteristics or benefits that they do not have;

(b)   representing that the Class Vehicles are of a particular standard and quality when they are not; and

(c)   concealing the existence of the Corrosion Defect and Ford's ability to repair the Defect.

374.   Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Michigan Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Michigan Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Michigan Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

375.   Plaintiff and the Michigan Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

376.   Ford had an ongoing duty to Plaintiff and the Michigan Class members to refrain from unfair and deceptive practices under the Michigan CPA in the course of its business. Specifically, Ford owed Plaintiff and the Michigan Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Michigan Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

377.    Plaintiff and the Michigan Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

378.    Plaintiff and the Michigan Class seek monetary relief, declaratory relief, treble damages, punitive damages, and attorneys' fees against Ford in an amount to be determined at trial.

379.    Plaintiff and the Michigan Class also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices and any other just and proper relief available under the Michigan CPA.

## MICHIGAN COUNT II

### BREACH OF EXPRESS WARRANTY
### (MICH. COMP. LAWS §§ 440.2313 AND 440.2860)

380.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

381.    Plaintiff Lynne Minish (for the purposes of this section, "Plaintiff") brings this claim on behalf of herself and the Michigan Class.

382.    Ford is and was at all relevant times a "seller" with respect to the Class Vehicles under MICH. COMP. LAWS § 440.2103(1)(c), and a "merchant" under MICH. COMP. LAWS § 440.2104(1).

383.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

384.    Plaintiff and the Michigan Class members are and were at all relevant times "buyers" of the Class Vehicles under MICH. COMP. LAWS § 440.2103(1)(a).

385.    The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

386.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the Michigan Class Members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

387.    Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the Michigan Class Members purchased or leased their Class Vehicles.

388.    Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Michigan Class Members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the Michigan Class Members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

389.    Plaintiff and the Michigan Class Members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

390.    Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the Michigan Class Members is not limited to their remedies.

4811-5615-9159, v. 1

391.     Accordingly, Plaintiff and the Michigan Class Members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Michigan Class Members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

392.     As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the Michigan Class Members have been damaged in an amount to be determined at trial.

393.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

## I.     Claims Brought on Behalf of the New Jersey Class

### NEW JERSEY COUNT I

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. §56:8-1, *ET SEQ.*)

394.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

395.     Plaintiff John Buczynski (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the New Jersey Class.

396.     Ford, Plaintiff, and the New Jersey Class members are "persons" within the meaning of N.J. STAT. ANN. §56:8-1(d).

397.     Ford is engaged in "sales" of "merchandise" within the meaning of §56:8-1(c) and (e).

398.     The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression,

or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. §56:8-2.

399.    In the course of its business, Ford violated the New Jersey CFA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices prohibited by the New Jersey CFA:

(a)    representing that the Class Vehicles have characteristics or benefits that they do not have;

(b)    representing that the Class Vehicles are of a particular standard and quality when they are not;

(c)    advertising the Class Vehicles with the intent not to sell them as advertised; and/or

(d)    knowingly concealing, suppressing, or omitting a material fact about the Class Vehicles with the intent that a consumer rely on the same.

400.    Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the New Jersey Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the New Jersey Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth,

Plaintiff and the New Jersey Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

401.    Plaintiff and the New Jersey Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

402.    Ford had an ongoing duty to Plaintiff and the New Jersey Class members to refrain from unfair and deceptive practices under the New Jersey MPA in the course of its business. Specifically, Ford owed Plaintiff and the New Jersey Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the New Jersey Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

403.    Plaintiff and the New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

404.    Pursuant to N.J. STAT. ANN. §56:8-19, Plaintiff and the New Jersey Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the New Jersey CFA.

### NEW JERSEY COUNT II

### BREACH OF EXPRESS WARRANTY
### (N.J. STAT. ANN. §§12A:2-313 AND 12A:2A-210)

405.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

406.    Plaintiff John Buczynski (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the New Jersey Class.

407.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under N.J. STAT. ANN. §12A:2-104(1), and a "seller" of the Class Vehicles under §12A:2-103(1)(d).

408.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.J. STAT. ANN. §12A:2A-103(1)(p).

409.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. §§12A:2-105(1) and 12A:2A-103(1)(h).

410.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the New Jersey Class Members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

411.    Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the New Jersey Class Members purchased or leased their Class Vehicles.

412.    Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the New Jersey Class Members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the New Jersey Class Members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

413.     Plaintiff and the New Jersey Class Members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

414.     Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the New Jersey Class Members is not limited to their remedies.

415.     Accordingly, Plaintiff and the New Jersey Class Members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the New Jersey Class Members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

416.     As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the New Jersey Class Members have been damaged in an amount to be determined at trial.

417.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**J.      Claims Brought on Behalf of the New York Class**

**NEW YORK COUNT I**

**DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF N.Y. LAW**
**(N.Y. GEN. BUS. LAW §349)**

418.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

419.     Plaintiffs Ilja Lopatik, and Brian Yarborough (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the New York Class.

420.   Plaintiffs and the New York Class members are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS. LAW §349(h).   Ford is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW §349.

421.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. GEN. BUS. LAW §349.

422.   In the course of its business, Ford violated the New York GBL by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New York GBL:

(a)   representing that the Class Vehicles have characteristics or benefits that they do not have;

(b)   representing that the Class Vehicles are of a particular standard and quality when they are not;

(c)   advertising the Class Vehicles with the intent not to sell them as advertised;

(d)   failing to state a material fact if the failure deceives or tends to deceive; and/or

(e)   knowingly concealing, suppressing, or omitting any material fact with the intent that a consumer rely on the same.

423.     Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to the New York Class, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the New York Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiffs and the New York Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

424.     Plaintiffs and the New York Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

425.     Ford had an ongoing duty to Plaintiffs and the New York Class members to refrain from unfair and deceptive practices under the New York GBL in the course of its business. Specifically, Ford owed Plaintiffs and the New York Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the New York Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

426.     Plaintiffs and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

427.     Pursuant to N.Y. Gen. Bus. Law §349, Plaintiffs and the New York Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the New York GBL.

<h2 style="text-align:center">NEW YORK COUNT II</h2>

<h2 style="text-align:center">VIOLATION OF THE NEW YORK FALSE ADVERTISING ACT</h2>

**(N.Y. GEN. BUS. LAW §350)**

428.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

429.    Plaintiffs Ilja Lopatik and Brian Yarborough (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the New York Class.

430.    Ford was engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW §350.

431.    N.Y. GEN. BUS. LAW §350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity. . .."  N.Y. GEN. BUS. LAW §350-a.

432.    Ford caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known, to Ford to be untrue and misleading to consumers including Plaintiffs and the New York Class members.

433.    Ford violated N.Y. GEN. BUS. LAW §350 because the misrepresentations and omissions regarding the quality of the Class Vehicles and the quality and benefits of the design and/or production processes, including the paint system, used on the Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.  Ford also violated N.Y. GEN. BUS. LAW §350 because the misrepresentations and omissions regarding the existence of a repair for the Corrosion Defect and Ford's ability and intention to render such a repair as set forth in this Complaint were material and likely to deceive a reasonable consumer.

434.    Plaintiffs and the New York Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

435.    Pursuant to N.Y. GEN. BUS. LAW §350-e, Plaintiffs and the New York Class members seek monetary relief against Ford measured as the greater of: (a) actual damages in an amount to be determined at trial; and (b) statutory damages in the amount of $500 for each of Plaintiffs and the New York Class members.  Because Ford's conduct was committed willfully and knowingly, Plaintiffs and the New York Class members are entitled to recover three times actual damages, up to $10,000 each.

## NEW YORK COUNT III

### BREACH OF EXPRESS WARRANTY
### (N.Y. U.C.C. LAW §§2-313 AND 2A-210)

436.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

437.    Plaintiffs Ilja Lopatik and Brian Yarborough (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the New York Class.

438.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under N.Y. U.C.C. LAW §2-104(1), and a "seller" of the Class Vehicles under §2-103(1)(d).

439.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.Y. U.C.C. LAW §2A-103(1)(p).

440.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. LAW §§2-105(1) and 2A-103(1)(h).

441.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiffs and the New York Class members with a warranty covering defects

in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

442. Ford's warranties formed a basis of the bargain that was reached when Plaintiffs and the New York Class members purchased or leased their Class Vehicles.

443. Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiffs and the New York Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiffs and the New York Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

444. Plaintiffs and the New York Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

445. Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiffs and the New York Class members is not limited to their remedies.

446. Accordingly, Plaintiffs and the New York Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the New York Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

447.     As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and the New York Class members have been damaged in an amount to be determined at trial.

448.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**K.     Claims Brought on Behalf of the North Carolina Class**

**NORTH CAROLINA COUNT I**

**VIOLATION OF NORTH CAROLINA'S UNFAIR
AND DECEPTIVE TRADE PRACTICES ACT
(N.C. GEN. STAT. §75-1.1, *ET SEQ.*)**

449.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

450.     Plaintiff William MacSaveny (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the North Carolina Class.

451.     North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. §75-1.1, *et seq*. ("North Carolina UDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The North Carolina UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the North Carolina UDTPA.  N.C. GEN. STAT. §75-16.

452.     Ford's acts and practices complained of herein were performed in the course of Ford's trade or business and thus occurred in or affected "commerce," as defined in N.C. GEN. STAT. §75-1.1(b).

453.     In the course of Ford's business, Ford concealed the Corrosion Defect in Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Accordingly, Ford engaged in unfair methods of competition, unconscionable acts or

- 116 -

practices, and unfair or deceptive acts or practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

454. Ford knew or should have known of the Corrosion Defect inherent in the Class Vehicles.

455. Ford had a duty to disclose the existence of the Corrosion Defect in the Class Vehicles. By failing to disclose and by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above, Ford engaged in deceptive business practices in violation of the North Carolina UDTPA.

456. Ford's unfair or deceptive acts or practices were likely to, and did, in fact, deceive reasonable consumers, including Plaintiff and the North Carolina Class members, about the quality of the Class Vehicles and Ford brand, and the true value of the Class Vehicles.

457. Plaintiff and the North Carolina Class members reasonably relied upon Ford's false misrepresentations and unfair or deceptive acts or practices. They had no way of knowing that Ford's representations were false and gravely misleading. As alleged herein, Ford engaged in

extremely sophisticated methods of deception.  Plaintiff and the North Carolina Class members did not, and could not, unravel Ford's deception on their own.

458.   Ford intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the North Carolina Class members.

459.   Ford knew or should have known that its conduct violated the North Carolina UDTPA.

460.   Ford owed Plaintiff and the North Carolina Class members a duty to disclose the defective condition of the Class Vehicles because Ford:

     (a)    possessed exclusive knowledge of the Corrosion Defect and concealment thereof;

     (b)    intentionally concealed the foregoing from Plaintiff and the North Carolina Class members; and

     (c)    made incomplete representations regarding the qualities of the Class Vehicles, and about the existence of a repair for the Corrosion Defect and Ford's ability and intention to render such a repair, while purposefully withholding material facts from Plaintiff and the North Carolina Class members that contradicted these representations.

461.   Ford's concealment of the Corrosion Defect in Class Vehicles was material to Plaintiff and the North Carolina Class members.  A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

462.     Plaintiff and the North Carolina Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these Class Vehicles and/or would have paid less, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff and the North Carolina Class members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff and the North Carolina Class members.

463.     Ford's actions as set forth above occurred in the conduct of trade or commerce.

464.     Ford's unfair or deceptive acts or practices were likely to, and did, in fact, deceive reasonable consumers.

465.     As a direct and proximate result of Ford's violations of the North Carolina UDTPA, Plaintiff and the North Carolina Class members have suffered injury-in-fact and/or actual damage.

466.     Plaintiff and the North Carolina Class members suffered ascertainable loss caused by Ford's misrepresentations and its failure to disclose material information.  Had they been aware of the Corrosion Defect in the Class Vehicles, Plaintiff and the North Carolina Class members either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiff and the North Carolina Class members did not receive the benefit of their bargain as a result of Ford's misconduct.

467.     The repairs offered and instituted by Ford are not adequate.

468.     Plaintiff and the North Carolina Class members seek monetary relief against Ford for actual damages, in addition to treble damages pursuant to N.C. GEN. STAT. §75-16.

469.     Plaintiff and the North Carolina Class members also seek declaratory relief, punitive damages, an order enjoining Ford's unfair, unlawful, and/or deceptive practices, and

reasonable attorneys' fees and costs pursuant to N.C. GEN. STAT. §75-16.1, as well as other proper

and just relief under the North Carolina UDTPA.

**NORTH CAROLINA COUNT II**

**BREACH OF EXPRESS WARRANTY**
**(N.C. GEN. STAT. §§25-2-313 AND 25-2A-103)**

470.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

fully set forth herein.

471.    Plaintiff William MacSaveny (for the purposes of this section, "Plaintiff") brings

this claim on behalf of himself and the North Carolina Class.

472.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles

under N.C. GEN. STAT. §25-2-104(1), and a "seller" of the Class Vehicles under §25-2-103(1)(d).

473.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor

vehicles under N.C. GEN. STAT. §25-2A-103(1)(p).

474.    The Class Vehicles are and were at all relevant times "goods" within the meaning

of N.C. GEN. STAT. §§25-2-105(1) and 25-2A-103(1)(h).

475.    In connection with the purchase or lease of all Class Vehicles, and as detailed

above, Ford provided Plaintiff and the North Carolina Class members with a warranty covering

defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and

an extended warranty covering corrosion damage relating to such defects for a period of two

additional years.

476.    Ford's warranties formed a basis of the bargain that was reached when Plaintiff and

the North Carolina Class members purchased or leased their Class Vehicles.

477.    Ford breached its express warranties (including the implied covenant of good faith

and fair dealing) by: (a) knowingly providing Plaintiff and the North Carolina Class members with

- 120 -

Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the North Carolina Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

478.    Plaintiff and the North Carolina Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

479.    Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the North Carolina Class members is not limited to their remedies.

480.    Accordingly, Plaintiff and the North Carolina Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the North Carolina Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

481.    As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the North Carolina Class members have been damaged in an amount to be determined at trial.

482.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

L.      **Claims Brought on Behalf of the Pennsylvania Class**

**PENNSYLVANIA COUNT I**

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
(73 PA. CONS. STAT ANN. §201-1, *ET SEQ.*)**

483.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

484.    Plaintiffs Ryan Marshall and Allyson Rogers (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the Pennsylvania Class.

485.    Plaintiffs, the Pennsylvania Class, and Ford are "persons" within the meaning of 73 PA. CONS. STAT. ANN. §201-2(2).

486.    Plaintiffs and the Pennsylvania Class purchased or leased the Class Vehicles primarily for personal, family, or household purposes within the meaning of 73 PA. CONS. STAT. ANN. §201-9.2.

487.    All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. ANN. §201-2(3).

488.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . Benefits or qualities that they do not have"; (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another"; (iii) "Advertising goods or services with intent not to sell them as advertised"; and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 PA. CONS. STAT. ANN. §201-2(4).

489.    In the course of its business, Ford violated the Pennsylvania CPL by misrepresenting and/or intentionally concealing material facts regarding the quality of the Class

- 122 -

Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Pennsylvania CPL:

> (a)   representing that the Class Vehicles have characteristics or benefits that they do not have;
>
> (b)   representing that the Class Vehicles are of a particular standard and quality when they are not; and/or
>
> (c)   advertising the Class Vehicles with the intent not to sell them as advertised.

490.   Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Pennsylvania Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Pennsylvania Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiffs and the Pennsylvania Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

491.   Plaintiffs and the Pennsylvania Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

492.   Ford had an ongoing duty to Plaintiffs and the Pennsylvania Class members to refrain from unfair and deceptive practices under the Pennsylvania CPL in the course of its business.  Specifically, Ford owed Plaintiffs and the Pennsylvania Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive

knowledge of the Corrosion Defect and concealment thereof, intentionally concealed the foregoing from Plaintiffs and the Pennsylvania Class members, and/or it made misrepresentations regarding the qualities of the Class Vehicles, and about the existence of a repair for the Corrosion Defect and Ford's ability and intention to render such a repair, while purposefully withholding material facts from Plaintiffs and the Pennsylvania Class members that contradicted these representations.

493.    Plaintiffs and the Pennsylvania Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

494.    Pursuant to 73 PA. CONS. STAT. ANN. §201-9.2(a), Plaintiffs and the Pennsylvania Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the Pennsylvania CPL.

**PENNSYLVANIA COUNT II**

**BREACH OF EXPRESS WARRANTY**
**(13 PA. CONS. STAT. ANN. §§2313 AND 2A210)**

495.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

496.    Plaintiffs Ryan Marshall and Allyson Rogers (for the purposes of this section, "Plaintiffs") bring this claim on behalf of themselves and the Pennsylvania Class.

497.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under 13 PA. CONS. STAT. ANN. §§2104 and 2A103(a), and a "seller" of the Class Vehicles under §2103(a).

498.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 13 PA. CONS. STAT. ANN. §2A103(a).

4811-5615-9159, v. 1

499.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 PA. CONS. STAT. ANN. §§2105(a) and 2A103(a).

500.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiffs and the Pennsylvania Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

501.    Ford's warranties formed a basis of the bargain that was reached when Plaintiffs and the Pennsylvania Class members purchased or leased their Class Vehicles.

502.    Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiffs and the Pennsylvania Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiffs and the Pennsylvania Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

503.    Plaintiffs and the Pennsylvania Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

504.    Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiffs and the Pennsylvania Class members is not limited to their remedies.

505.    Accordingly, Plaintiffs and the Pennsylvania Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the Pennsylvania Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

506.    As a direct and proximate result of Ford's breach of express warranty, Plaintiffs and the Pennsylvania Class members have been damaged in an amount to be determined at trial.

507.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**M.    Claims Brought on Behalf of the South Carolina Class**

**SOUTH CAROLINA COUNT I**

**VIOLATIONS OF THE SOUTH CAROLINA
UNFAIR TRADE PRACTICES ACT
(S.C. CODE ANN. §39-5-10, *ET SEQ.*)**

508.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

509.    Plaintiff Greg Lichtenberg (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the South Carolina Class.

510.    Ford, Plaintiff, and the South Carolina Class members are "persons" under S.C. CODE ANN. §39-5-10.

511.    The sale or lease of the Class Vehicles is within the meaning of "trade" and "commerce" under S.C. CODE ANN. §39-5-10.

512.    The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. CODE ANN. §39-5-20(a).

513.     In the course of its business, Ford violated the South Carolina UTPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the South Carolina UTPA:

(a)     representing that the Class Vehicles have characteristics or benefits that they do not have;

(b)     representing that the Class Vehicles are of a particular standard and quality when they are not;

(c)     advertising the Class Vehicles with the intent not to sell them as advertised and/or

(d)     failing to state a material fact if the failure deceives or tends to deceive; and/or

(e)     knowingly concealing, suppressing, or omitting any material fact with the intent that a consumer rely on the same.

514.     Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the South Carolina Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the South Carolina Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the South Carolina Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

515.    Plaintiff and the South Carolina Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

516.    Ford had an ongoing duty to Plaintiff and the South Carolina Class members to refrain from unfair and deceptive practices under the South Carolina UTPA in the course of its business.  Specifically, Ford owed Plaintiff and the South Carolina Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge of the Corrosion Defect and concealment thereof, intentionally concealed the foregoing from Plaintiff and the South Carolina Class members, and/or it made misrepresentations regarding the qualities of the Class Vehicles, and about the existence of a repair for the Corrosion Defect and Ford's ability and intention to render such a repair, while purposefully withholding material facts from Plaintiff and the South Carolina Class members that contradicted these representations.

517.    Plaintiff and the South Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

518.    Pursuant to S.C. Code ANN. §39-5-140(a), Plaintiff and the South Carolina Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the South Carolina UTPA.

## SOUTH CAROLINA COUNT II

### BREACH OF EXPRESS WARRANTY
### (S.C. CODE ANN. §§36-2-313 AND 36-2A-210)

519.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

4811-5615-9159, v. 1

520.     Plaintiff Greg Lichtenberg (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the South Carolina Class.

521.     Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles under S.C. CODE ANN. §§36-2-104(1) and 36-2A-103(1)(t), and a "seller" of the Class Vehicles under §36-2-103(1)(d).

522.     With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under S.C. CODE ANN. §36-2A-103(1)(p).

523.     The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. CODE ANN. §§36-2-105(1) and 36-2A-103(1)(h).

524.     In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the South Carolina Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

525.     Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the South Carolina Class members purchased or leased their Class Vehicles.

526.     Ford breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the South Carolina Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the South Carolina Class members; (b) failing to repair or replace the Class Vehicles at no cost within the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

527.     Plaintiff and the South Carolina Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

528.     Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the South Carolina Class members is not limited to their remedies.

529.     Accordingly, Plaintiff and the South Carolina Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the South Carolina Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

530.     As a direct and proximate result of Ford's breach of its express warranty, Plaintiff and the South Carolina Class members have been damaged in an amount to be determined at trial.

531.     Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

### N.     Claims Brought on Behalf of the Texas Class

### TEXAS COUNT I

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
### (TEX. BUS. & COM. CODE § 17.41, *ET SEQ.*)

532.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

- 130 -

533.    Plaintiff Peter Tulenko (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Texas Class.

534.    Ford, Plaintiff, and the Texas Class are "persons" within the meaning of TEX. BUS. & COM. CODE § 17.45.  Plaintiff and the Texas Class are "consumers" within the meaning of § 17.45. T

535.    The Class Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE § 17.45.

536.    The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") makes unlawful "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" under TEX. BUS. & COM. CODE § 17.46.  Without limitation, this includes: (i) "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not"; (ii) "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; (iii) "advertising goods or services with intent not to sell them as advertised"; (iv) "representing that a guaranty or warranty confers or involves rights or remedies which it does not have or involve"; and (v) "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."

537.    The Texas DTPA also provides a right of action for "breach of an express or implied warranty" and "an unconscionable action or course of action by any person."  TEX. BUS. & COM. CODE § 17.50(a)(2)-(3).

538.    In the course of its business, Ford violated the Texas DTPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the quality of the Class Vehicles and the design and production processes, including the paint systems, used thereon, the available remedies under its corrosion warranties, the existence of the Corrosion Defect, the existence of a repair for the Corrosion Defect, and Ford's ability and intention to render such a repair as detailed above.  Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices prohibited by the Texas DTPA:

(a)    representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(b)    representing that Class Vehicles are of a particular standard and quality when they are not;

(c)    advertising the Class Vehicles with the intent not to sell them as advertised.

(d)    representing that the corrosion warranties covering the Class Vehicles confer or involve certain rights or remedies when they do not; and

(e)    engaging in other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

539.    Ford's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Texas Class members, and Ford misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Texas Class members would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Texas Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

540.    Plaintiff and the Texas Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.

541.    Ford had an ongoing duty to Plaintiff and the Texas Class members to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business.  Specifically, Ford owed Plaintiff and the Texas Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Texas Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

542.    Plaintiff and the Texas Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

543.    Pursuant to TEX. BUS. & COM. CODE § 17.50, et seq., Plaintiff and the Texas Class seek an order awarding damages, treble damages, and any other just and proper relief available under the Texas DTPA.

544.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.  In addition, on November 7, 2018, a notice letter was sent on behalf of Plaintiff and the Texas Class to Ford pursuant to TEX. BUS. & COM. CODE § 17.505(a).  Because Ford failed to remedy its unlawful conduct within the requisite time period, Plaintiff and the Texas Class seek all damages and relief to which they are entitled.

### TEXAS COUNT II

### BREACH OF EXPRESS WARRANTY
### (TEX. BUS. & COM. CODE §§2.313 AND 2A.210)

545.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

546.     Plaintiff Peter Tulenko (for the purposes of this section, "Plaintiff") brings this claim on behalf of himself and the Texas Class.

547.     Ford is and was at all relevant times a "seller" with respect to the Class Vehicles under TEX. BUS. & COM. CODE §2.103(a)(4), and a "merchant" within the meaning of §§2.104(1) and 2A.103(a)(20).

548.     With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under TEX. BUS. & COM. CODE §2A.103(a)(16).

549.     The Texas Class members are and were at all relevant times "buyers" with respect to the Class Vehicles under TEX. BUS. & COM. CODE §2.313(a).

550.     The Class Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE §§2.105(a) and 2A.103(a)(8).

551.     In connection with the purchase or lease of all Class Vehicles, and as detailed above, Ford provided Plaintiff and the Texas Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for a period of two additional years.

552.     Ford's warranties formed a basis of the bargain that was reached when Plaintiff and the Texas Class members purchased or leased their Class Vehicles.

553.     Ford breached its express warranties (including the implied covenant of good faith and fair dealing by: (a) knowingly providing Plaintiff and the Texas Class members with Class Vehicles containing defects in the materials and workmanship that were never disclosed to Plaintiff and the Texas Class members; (b) failing to repair or replace the Class Vehicles at no cost within

the warranty periods; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Ford.

554.    Plaintiff and the Texas Class members have given Ford a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Ford can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

555.    Thus, Ford's warranties fail of their essential purpose, and the recovery of Plaintiff and the Texas Class members is not limited to their remedies.

556.    Accordingly, Plaintiff and the Texas Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Texas Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

557.    As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the Texas Class members have been damaged in an amount to be determined at trial.

558.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide and State Classes, respectfully request that the Court certify the proposed Nationwide and State Classes, including designating the named Plaintiffs as representatives of the Nationwide Class and their respective State Classes and appointing the undersigned as Class Counsel, and the designation

of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against Ford including the following relief:

(i)       A declaration that any applicable statutes of limitations are tolled due to Ford's fraudulent concealment and that Ford is estopped from relying on any statutes of limitations in defense;

(ii)      Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

(iii)     Punitive and exemplary damages under applicable law;

(iv)     Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Corrosion Defect;

(v)      A determination that Ford is financially responsible for all Class notices and the administration of Class relief;

(vi)     Any applicable statutory or civil penalties;

(vii)    An order requiring Ford to pay both pre-judgment and post-judgment interest on any amounts awarded;

(viii)   An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

(ix)     Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(x)      Any such other and further relief the Court deems just and equitable.

## X.      DEMAND FOR JURY TRIAL

559.    Plaintiffs and Class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), of all issues so triable.

4811-5615-9159, v. 1

Dated:  March 16, 2020

Respectfully submitted,

GELBER SCHACHTER &
   GREENBERG, P.A.

By: _/s/ Brian W. Toth_
   BRIAN W. TOTH
   Florida Bar No. 57708
   ADAM M. SCHACHTER
   Florida Bar No. 647101
   1221 Brickell Avenue, Suite 2010
   Miami, Florida 33131
   Telephone: (305) 728-0950
   aschachter@gsgpa.com
   btoth@gsgpa.com
   E-service: efilings@gsgpa.com

   ROBBINS GELLER RUDMAN
     & DOWD LLP
   MARK. J. DEARMAN
   Florida Bar No. 0982407
   JASON H. ALPERSTEIN
   Florida Bar No. 64205
   ERIC S. DWOSKIN
   Florida Bar No. 112459
   120 East Palmetto Park Road, Suite 500
   Boca Raton, FL 33432
   Telephone:  (561) 750-3000
   Facsimile:  (561) 750-3364
   mdearman@rgrdlaw.com
   jalperstein@rgrdlaw.com
   edwoskin@rgrdlaw.com

   STEVEN G. CALAMUSA
   ROBERT. E. GORDON
   DANIEL G. WILLIAMS
   GORDON & PARTNERS, P.A.
   4114 Northlake Boulevard
   Palm Beach Gardens, FL 33410
   Telephone: (561) 799-5070
   Facsimile: (561) 799-4050
   scalamusa@fortheinjured.com
   rgordon@fortheinjured.com
   dwilliams@fortheinjured.com

4811-5615-9159, v. 1

JAMES E. CECCHI
CAROLINE F. BARTLETT
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone:  (973) 994-1700
Facsimile:  (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com


ZACHARY S. BOWER
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
117 NE 1st Avenue
Miami, FL  33132
Telephone: (973) 994-1700
Facsimile:  (973) 994-1744
zbower@carellabyrne.com

*Counsel for Plaintiffs and the Proposed Class*

4811-5615-9159, v. 1