UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-81558-RAR

CLARENCE SIMMONS, et al.,

        Plaintiffs,

v.

FORD MOTOR COMPANY,

        Defendant.

_____/

## DEFENDANT FORD MOTOR COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Respectfully submitted,

JOHN M. THOMAS
KRISTA L. LENART
DYKEMA GOSSETT PLLC
2723 South State Street, Suite 400
Ann Arbor, MI 48104
Telephone: (734) 214-7613
Facsimile: (855) 262-3751
JThomas@dykema.com
KLenart@dykema.com

ERIC C. TEW
DYKEMA GOSSETT PLLC
1301 K. Street, N.W., Suite 1100 West
Washington, D.C. 20005
Telephone: (202) 906-8600
Facsimile: (855) 221-0913
ETew@dykema.com

WENDY F. LUMISH
Florida Bar No. 334332
CHRISTINE L. WELSTEAD
Florida Bar No. 970956
BOWMAN AND BROOKE LLP
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Telephone: (305) 995-5600
Facsimile: (305) 995-6100
Wendy.Lumish@bowmanandbrooke.com
Christine.Welstead@bowmanandbrooke.com

*Counsel for Defendant, Ford Motor Company*

## <u>TABLE OF CONTENTS</u>

TABLE OF ABBREVIATIONS ............................................................................... x

INTRODUCTION ................................................................................................ 1

FACTS ............................................................................................................... 2

    A.    The Alleged Cosmetic Defect. ................................................................ 2

    B.    Corrosion Is A Complex, Multi-Faceted Problem Requiring Complex Mitigation Strategies—And There Is No Evidence That Ford's Strategies Are Less Effective Than Those Of Its Competitors. ................. 3

    C.    Ford's Corrosion Mitigation Strategies Varied From Vehicle to Vehicle, Year To Year, And Month To Month. ......................................... 4

    D.    Corrosion Rates Are Uniformly Low, But Vary By Model, Model Year, Production Date, And Location. ............................................................. 7

    E.    Ford's Recommended Repair Procedures (Technical Service Bulletins). ........................................................................................... 8

    F.    Ford's Best-In-Class Aluminum Corrosion Warranty. .............................. 8

    G.    Ford's Expert's Opinions. ...................................................................... 9

    H.    The Proposed Class Representatives And Their Claims............................ 9

CLASS CERTIFICATION STANDARD ................................................................ 10

ARGUMENT .................................................................................................... 10

I.    THE PROPOSED CLASSES ARE LIMITED BY LACK OF STANDING, CLASS ACTION WAIVER, AND LACK OF PERSONAL JURISDICTION. ................................................................................................... 10

    A.    Plaintiffs Have No Standing To Represent Purchasers Of Other Vehicle Models, Or Those Who Purchased Vehicles In Other States. .................. 10

    B.    The Florida and New York Plaintiffs Have Waived Any Right To Bring Their Two Warranty-Based Consumer Fraud Claims As Class Actions. ................................................................................................... 11

    C.    The Court Has No Personal Jurisdiction To Resolve Claims Of Absent Class Members Outside Florida................................................................ 11

II.    INDIVIDUAL ISSUES PREDOMINATE ON ALL OF PLAINTIFFS' CLAIMS. ....................................................................................... 12

    A.    Plaintiffs Have Not Established That State Laws Are Uniform. .............. 12

    B.    Plaintiffs' Omission-Based Consumer Fraud Claims Raise A Host Of Individual Issues ..................................................................................... 13

        1.    Existence Of The Alleged Defect In 15 Vehicle Models Is An Individual Issue. .......................................................................... 13

2.      Ford's Knowledge Of The Alleged Defect At The Time Of Sale Is An Individual Issue. ................................................................ 15

3.      Materiality And Actual Reliance Are Individual Issues Under California Law. ........................................................................... 15

4.      Materiality, Deception, And Actual Injury Are Individual Issues Under New York Law. ........................................................ 18

5.      Materiality, Actual Deception, And The Likelihood Of Deception Are Individual Issues Under Florida Law. .................. 19

6.      Purchase For Personal, Family Or Household Use Is an Individual Issue Under California Law ........................................ 20

C.      Plaintiffs' Consumer Fraud Claims Based On Ineffective Repair Raises More Individual Issues. .................................................................... 21

D.      Plaintiffs' Consumer Fraud Claims Based On The Corrosion Warranty Raise More Individual Issues. ............................................................ 22

E.      Individual Issues Predominate On Plaintiffs' Unjust Enrichment Claims. ........................................................................................ 23

F.      Statutes of Limitations Raise More Individual Issues. ............................. 24

G.      Plaintiffs Have No Classwide Measure Of Damages. ............................. 25

1.      Repair Cost Is Not A Proper Measure Of Damages For Plaintiffs' Consumer Fraud Claims Based On Omission. ............ 25

2.      Plaintiffs Have No Evidence Of Classwide Damages On Ineffective Repair Or Consumer Warranty Claims. .................... 28

3.      Plaintiffs Have Proposed No Measure Of Restitution For Unjust Enrichment, Let Alone A Classwide Measure. ............................. 28

III.    PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE CLASS, AND A CLASS ACTION WOULD BE SUPERIOR ONLY FOR AN UNASCERTAINABLE CLASS OF UNINJURED OWNERS. .......................... 29

CONCLUSION ............................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alban v. BMW of N. Am., LLC*,
 2010 U.S. Dist. LEXIS 94038 (D.N.J. Sept. 8, 2010) ...........................................................14

*All. Mortg. Co. v. Rothwell*,
 10 Cal. 4th 1226 (1995) ........................................................................................................27

*Amchem Prods. v. Windsor*,
 521 U.S. 591 (1997).............................................................................................................12

*Andersen v. Atl. Recording Corp*.,
 2010 U.S. Dist. LEXIS 44168 (D. Or. May 4, 2010) ..............................................................13

*Anderson v. Ford Motor Co.*,
 2020 U.S. Dist. LEXIS 66549 (W.D. Mo. Feb. 14, 2020) .........................................14, 15, 16

*Anderson v. Ford Motor Co*.,
 Case No. 17-03244 (W.D. Mo., decided Feb. 14, 2020) (Ex. 54) ...........................................11

*Asghari v. Volkswagen Grp. of Am., Inc*.,
 42 F. Supp. 3d 1306 (C.D. Cal. 2013) ...................................................................................25

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)..............................................................................................................16

*In re Baycol Prods. Litig*.,
 218 F.R.D. 197 (D. Minn. 2003)............................................................................................21

*Bergeron v. Monex Deposit Co.*,
 2020 U.S. Dist. LEXIS 210652 (C.D. Cal. Aug. 18, 2020)......................................................15

*Braverman v. BMW of N. Am., LLC*,
 2020 U.S. Dist. LEXIS 91484 (C.D. Cal. May 19, 2020) ........................................................17

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
 137 S. Ct. 1773 (2017)..........................................................................................................11

*Brown v. Electrolux Home Prods.*,
 817 F.3d 1225 (11th Cir. 2016) .......................................................................................10, 24

*Burrows v. Purchasing Power, LLC*,
 2012 U.S. Dist. LEXIS 186556 (S.D. Fla. Oct. 18, 2012).......................................................19

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ......................................................................14

*In Re Checking Account Overdraft Litig.*,
    286 F.R.D. 645 (S.D. Fla. 2012) ...............................................................24

*Cherry v. Dometic Corp.*,
    986 F.3d 1296 (11th Cir. 2021) .................................................................29

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)......................................................................................25

*Cruson v. Jackson Nat'l Life Ins. Co.*,
    954 F.3d 240 (5th Cir. 2020) .....................................................................12

*Daigle v. Ford Motor Co.*,
    2012 U.S. Dist. LEXIS 106172 (D. Minn. July 31, 2012) .......................23

*Deere Constr. v. Cemex Constr. Materials Fla., LLC*,
    2016 U.S. Dist. LEXIS 193561 (S.D. Fla. Dec. 1, 2016) .........................20

*Deluca v. Royal Caribbean Cruises, Ltd.*,
    244 F. Supp. 3d 1342 (S.D. Fla. 2017) .....................................................11

*Dinan v. Sandisk LLC*,
    2019 U.S. Dist. LEXIS 91633 (N.D. Cal. May 31, 2019) ........................22

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ...............................................................19

*Egwuatu v. South Lubes, Inc.*,
    976 So. 2d 50 (Fla. Dist. Ct. App. 2008) ..................................................20

*Ewert v. eBay, Inc.*,
    2010 U.S. Dist. LEXIS 108838 (N.D. Cal. Sept. 30, 2010) .....................20

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*,
    177 F.R.D. 360 (E.D. La. 1997)................................................................14

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
    2010 U.S. Dist. LEXIS 68241 (D.N.J. July 9, 2010)...........................23, 24

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
    2012 U.S. Dist. LEXIS 13887 (D.N.J. Feb. 6, 2012) ..........................20, 24

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)...............................................................................12

*Frank v. DaimlerChrysler Corp.*,
  292 A.D.2d 118 (N.Y. App. Div. 2002) ...................................................................18, 19, 28

*Gibson v. Lynn University*,
  2021 U.S. Dist. LEXIS 54324 (S.D. Fla. Mar. 23, 2021) .......................................................24

*In re GM LLC Ignition Switch Litig.*,
  257 F. Supp. 3d 372 (S.D.N.Y. 2017)...................................................................................19

*In re Greenlane Holdings, Inc.*,
  2021 U.S. Dist. LEXIS 1711 (S.D. Fla. Jan. 6, 2021) ..........................................................16

*Hamm v. Mercedes-Benz U.S.*,
  2021 U.S. Dist. LEXIS 65098 (N.D. Cal. Apr. 2, 2021) .......................................................17

*Harris v. Nortek Global HVAC LLC*,
  2016 U.S. Dist. LEXIS 18795 (S.D. Fla. Jan. 29, 2016) .......................................................14

*Heffner v. Blue Cross & Blue Shield of Ala., Inc.*,
  443 F.3d 1330 (11th Cir. 2006) .............................................................................................15

*Herrera v. Ford Motor Co.*,
  2020 U.S. Dist. LEXIS 110796 (N.D. Cal. June 24, 2020) ....................................................29

*Horne v. Harley-Davidson, Inc.*,
  660 F. Supp. 2d 1152 (C.D. Cal. 2009) ................................................................................25

*Iannacchino v. Ford Motor Co.*,
  451 Mass. 623 (2008) ...........................................................................................................14

*J.P. v. BCBSM, Inc.*,
  2021 U.S. Dist. LEXIS 7462 (D. Minn. Jan. 14, 2021) .........................................................30

*Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  2003 U.S. Dist. LEXIS 25550 (S.D. Fla. May 6, 2003) ........................................................25

*Johannessohn v. Polaris Indus.*,
  450 F. Supp. 3d 931 (D. Minn. 2020).....................................................................................17

*Johnson v. Harley-Davidson Motor Co. Grp., LLC*,
  285 F.R.D. 573 (E.D. Cal. 2012) ..........................................................................................16

*Kia Motors Am. Corp. v. Butler*,
  985 So. 2d 1133 (Fla. Dist. Ct. App. 2008) ....................................................................19, 20

*Lewis v. Mercedes-Benz United States*,
  2021 U.S. Dist. LEXIS 60557 (S.D. Fla. Mar. 30, 2021)............................................11, 12, 15

*Licul v. Volkswagen Grp. of Am., Inc.*,
　2013 U.S. Dist. LEXIS 171627 (S.D. Fla. Dec. 5, 2013) ......................................................25

*Lloyd v. GMC*,
　266 F.R.D. 98 (D. Md. 2010) .......................................................................................14, 17

*Maciel v. BMW of N. Am. LLC*,
　2021 U.S. Dist. LEXIS 34311 (E.D.N.Y. Feb. 23, 2021) ......................................................28

*Mahoney v. Beacon City Sch. Dist.*,
　988 F. Supp. 395 (S.D.N.Y. 1997) ......................................................................................25

*Marchante v. Sony Corp. of Am.*,
　2011 U.S. Dist. LEXIS 139564 (S.D. Cal. Mar. 22, 2011) ...................................................14

*Marshall v. Hyundai Motor Am.*,
　334 F.R.D. 36 (S.D.N.Y. 2019) ...........................................................................................18

*Martin v. Ford Motor Co.*,
　292 F.R.D. 252 (E.D. Pa. 2013) ..........................................................................................12

*Marty v. Anheuser-Busch Cos.*,
　43 F. Supp. 3d 1333 (S.D. Fla. 2014) ..................................................................................28

*In Re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*,
　422 F. Supp. 3d 194 (D.D.C. 2019) .....................................................................................23

*Mickens v. Ford Motor Co.*,
　2015 U.S. Dist. LEXIS 121029 (D.N.J. Sep. 10, 2015) ..................................................22, 23

*Mussat v. IQVIA, Inc.*,
　953 F.3d 441 (7th Cir. 2020) ...............................................................................................12

*Nguyen v. Nissan N. Am. Inc.*,
　932 F. 3d 811 (9th Cir. 2019) ..............................................................................................27

*Nuwer v. FCA US LLC*,
　Case No. 20-60532 (S.D. Fla. Mar. 30, 2021) .......................................................................19

*Oddo v. Arocaire Air Conditioning & Heating*,
　2020 U.S. Dist. LEXIS 150601 (C.D. Cal. May 18, 2020) .........................................14, 15, 17

*Ohio State Troopers Ass'n v. Point Blank Enters.*,
　347 F. Supp. 3d 1207 (S.D. Fla. 2018) .................................................................................10

*Ohio State Troopers Ass'n v. Point Blank Enters.*,
　481 F. Supp. 3d 1258 (S.D. Fla. 2020) .................................................................10, 24, 25, 26

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (N.Y. 1995) ....................................................................................................18

*Palmer v. Convergys Corp.*,
   2012 U.S. Dist. LEXIS 16200 (M.D. Ga. Feb 9, 2012)........................................................11

*Pop's Pancakes, Inc. v. NuCO2, Inc.*,
   251 F.R.D. 677 (S.D. Fla. 2008) .........................................................................................20

*Porsche Cars N. Am., Inc. v. Diamond*,
   140 So. 3d 1090 (Fla. Dist. Ct. App. 2014) .......................................................................20

*Randolph v. J.M. Smucker Co.*,
   303 F.R.D. 679 (S.D. Fla. 2014) .........................................................................................28

*Rollins Inc., v. Butland*,
   951 So. 2d 860 (Fla. Dist. Ct. App. 2006) .........................................................................24

*Roman v. Spirit Airlines, Inc.*,
   482 F. Supp. 3d 1304 (S.D. Fla. 2020) ..............................................................................11

*Rothschild v. GM LLC*,
   2020 U.S. Dist. LEXIS 187300 (E.D.N.Y. Sept. 30, 2020).........................................15, 18

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*,
   601 F.3d 1159 (11th Cir. 2010) ..........................................................................................12

*Sanchez v. Ford Motor Co.*,
   2020 Cal. Super. LEXIS 3431 (Cal. Super. Ct. June 29, 2020)..........................................30

*Sanchez-Knutson v. Ford Motor Co.*,
   310 F.R.D. 529 (S.D. Fla. 2015).........................................................................................20

*Sloan v. Gen. Motors LLC*,
   2020 U.S. Dist. LEXIS 71982 (N.D. Cal. Apr. 23, 2020) .............................................25, 27

*Smith v. GM LLC*,
   988 F.3d 873 (6th Cir. 2021) ..............................................................................................13

*Solomon v. Bell Atl. Corp.*,
   9 A.D.3d 49, 777 N.Y.S.2d 50 (App. Div. 2004) ...............................................................18

*In re: Toyota Motor Corp. Unintended Acceleration Mktg.*,
   2012 U.S. Dist. LEXIS 189744 (C.D. Cal. May 4, 2012) ...................................................19

*In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*,
   2018 U.S. Dist. LEXIS 9797 (D.N.J. Jan. 22, 2018).......................................................23, 24

*U1it4less, Inc. v. FedEx Corp.*,
2015 U.S. Dist. LEXIS 82933 (S.D.N.Y. June 25, 2015) .....................................................11

*United Techs. Corp. v. Mazer*,
556 F.3d 1260 (11th Cir. 2009) ........................................................................................12

*Vasquez v. Superior Court*,
4 Cal. 3d 800, 94 Cal. Rptr. 796, 484 P.2d 964 (1971) ...................................................17

*Vega v. T-Mobile USA, Inc.*,
564 F.3d 1256 (11th Cir. 2009) ..................................................................................23, 24

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009) ...........................................................................................17

**Statutes**

42 Pa. Cons. Stat. § 5525 ........................................................................................................25

735 Ill. Comp. Stat. 5/13-205 ................................................................................................25

Cal. Civ. Code § 1761(a) ........................................................................................................20

Cal. Civ. Code § 1761(d) ........................................................................................................20

Cal. Civ. Code § 1780(a) ........................................................................................................20

Cal. Civ. Code § 1783 .............................................................................................................25

Cal. Civ. Code § 3343(a) ........................................................................................................27

Cal. Civ. Code § 3343(b)(1) ...................................................................................................27

Cal. Civil Code § 338(d) .........................................................................................................25

Cal. Civil Code § 1794.............................................................................................................29

California Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*...............................................10

Fla. Stat. §§ 95.11(3)(f), (k) ...................................................................................................25

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ...................10

Ind. Code § 34-11-2-7(1) ........................................................................................................25

N.C. Gen. Stat. § 1-52 .............................................................................................................25

N.J. Stat. § 2A:14-1.................................................................................................................25

N.J. Stat. §§ 56:12-32, 56:12-42. ..................................................................................29

N.Y. Gen. Bus. Law § 349 ...........................................................................................10

**Other Authorities**

Aaron Twerski & James Henderson, *Manufacturers' Liability For Defective Product Designs: The Triumph Of Risk-Utility*, 74 Brook. L. Rev 1061, 1062 (2009).......................................13

Fed. R. Civ. P. 23(a) ....................................................................................................12

Fed. R. Civ. P. 23(b) ....................................................................................................10

Fed. R. Civ. P. 23(b)(3)................................................................................................29

N.Y. C.P.L.R. 213.........................................................................................................25

N.Y. C.P.L.R. 214.........................................................................................................25

Restatement (Third) Restitution and Unjust Enrichment, § 1.......................................28

## TABLE OF ABBREVIATIONS

| EXHIBIT NO. AND DESCRIPTION[1] | ABBREVIATION IN BRIEF | ECF NO. |
|---|---|---|
| Exhibit 1: Excerpts of Deposition of Erik Anderson (March 24, 2021) | Anderson Dep. | ECF 113-1 at 2 |
| Exhibit 2: Excerpts of Deposition of Mike Gardynik (November 16, 2020) | Gardynik | ECF 113-1 at 64 |
| Exhibit 3: Expert Report of Paul M. Taylor, Ph.D., P.E. | Taylor | ECF 117 |
| Exhibit 4: Expert Declaration of Eric Guyer, Ph.D., P.E. | Guyer | ECF 117 |
| Exhibit 5: Excerpts of Deposition of Janice Tardiff (January 21, 2020) | Tardiff | ECF 113-1 at 73 |
| Exhibit 6: Excerpts of Deposition of Steven Simko (February 27, 2020) | Simko | ECF 113-1 at 93 |
| Exhibit 7: Excerpts of Deposition of Kathy Minnich (September 20, 2019) | Minnich | ECF 113-1 at 114 |
| Exhibit 8: Excerpts of Deposition of Niamh Hosking (January 29, 2021) | Hosking | ECF 113-1 at 151 |
| Exhibit 9: Excerpts of Deposition of Mark Nichols (December 17, 2020) | Nichols | ECF 113-1 at 160 |
| Exhibit 10: Excerpts of Deposition of Robert Starbowski (October 26, 2020) | Starbowski | ECF 113-1 at 204 |
| Exhibit 11: Excerpts of Deposition of Christopher Eikey (December 9, 2020) | Eikey | ECF 113-1 at 235 |
| Exhibit 12: Excerpts of Deposition of Gerard Bonanni (February 5, 2020 and February 28, 2020) | Bonanni | ECF 113-1 at 241 |

---

[1] All exhibits were previously filed at ECF 113 (redacted) and ECF 117 (unredacted)..

| EXHIBIT NO. AND DESCRIPTION[1] | ABBREVIATION IN BRIEF | ECF NO. |
|---|---|---|
| Exhibit 13: Excerpts of Deposition of Timothy Weingartz (January 26, 2021) | Weingartz | ECF 113-1 at 264 |
| Exhibit 14: Excerpts of Deposition of Leah Lichtenburg (February 25, 2020) | L. Lichtenburg | ECF 113-1 at 287 |
| Exhibit 15: Excerpts of Deposition of Peter Alexander Tulenko ("Alex") (February 18, 2020) | Tulenko | ECF 113-1 at 295 |
| Exhibit 16: Excerpts of Deposition of Lynne Minish (February 4, 2020) | Minish | ECF 113-1 at 302 |
| Exhibit 17: Expert Report of Rene Befurt, Ph.D. | Befurt | ECF 113-1 at 313 |
| Exhibit 18: Excerpts of Deposition of Ilja Lopatik (January 6, 2021) | Lopatik | ECF 113-1 at 531 |
| Exhibit 19: Excerpts of Deposition of William MacSeveny (February 20, 2020) | MacSeveny | ECF 113-1 at 536 |
| Exhibit 20: Excerpts of Deposition of Jennifer Dewitt (January 27, 2020) | Dewitt | ECF 113-1 at 541 |
| Exhibit 21: Excerpts of Deposition of Joseph Dabbs (August 18, 2020) | Dabbs | ECF 113-1 at 553 |
| Exhibit 22: Excerpts of Deposition of Michael Tierney (January 29, 2020) | Tierney | ECF 113-1 at 562 |
| Exhibit 23: Expert Report of David W. Harless, Ph.D. | Harless | ECF 117 |
| Exhibit 24: Excerpts of Deposition of Edward Stockton (March 23, 2021) | Stockton Dep. | ECF 117 |
| Exhibit 25: Excerpts of Deposition of Ryan Marshall (January 31, 2020) | Marshall | ECF 113-1 at 569 |
| Exhibit 26: Excerpts of Deposition of Delbert Christopher Erdman (June 25, 2019) | D. Erdman | ECF 113-1 at 575 |
| Exhibit 27: Excerpts of Deposition of Franklin Navas (December 7, 2020) | Navas | ECF 113-1 at 591 |

| EXHIBIT NO. AND DESCRIPTION[1] | ABBREVIATION IN BRIEF | ECF NO. |
|---|---|---|
| Exhibit 28: Excerpts of Deposition of Brian Yarborough (February 7, 2020) | Yarborough | ECF 113-1 at 596 |
| Exhibit 29: Plaintiffs' Second Supplemental Responses to Ford's First Interrogatories | Ex. 29 | ECF 113-1 at 601 |
| Exhibit 30: SMMNS_1 029321 (screenshot only) | Ex. 30 | ECF 117 |
| Exhibit 31: SMMNS_3 000305-16 | Ex. 31 | ECF 117 |
| Exhibit 32: SMMNS_2 001196-218 | Ex. 32 | ECF 117 |
| Exhibit 33: SMMNS_3 017270 | Ex. 33 | ECF 117 |
| Exhibit 34: SMMNS_2 002055-59 | Ex. 34 | ECF 117 |
| Exhibit 35: SMMNS_2 003174-83 | Ex. 35 | ECF 117 |
| Exhibit 36: SMMNS_12 012940 | Ex. 36 | ECF 117 |
| Exhibit 37: SMMNS_12 016239 | Ex. 37 | ECF 117 |
| Exhibit 38: SMMNS_2 015056 | Ex. 38 | ECF 117 |
| Exhibit 39: SMMNS_3 000964 | Ex. 39 | ECF 117 |
| Exhibit 40: SMMNS_5 000759 | Ex. 40 | ECF 117 |
| Exhibit 41: TSB 06-25-15 (SMMNS_5 000104) | Ex. 41 | ECF 113-2 at 12 |
| Exhibit 42: TSB 16-0028 (SMMNS_5 000805) | Ex. 42 | ECF 113-2 at15 |
| Exhibit 43: TSB 17-0062 (SMMNS_5 000851) | Ex. 43 | ECF 113-2 at 18 |
| Exhibit 44: Excerpts of Deposition of Mark James (July 25, 2019) | James | ECF 113-2 at 21 |
| Exhibit 45: 2013 Model Year Ford Warranty Guide (SMMNS_1 029057-97) | Ex. 45 | ECF 113-3 at 2 |

| EXHIBIT NO. AND DESCRIPTION[1] | ABBREVIATION IN BRIEF | ECF NO. |
|---|---|---|
| Exhibit 46: 2014 Model Year Ford Warranty Guide (SMMNS_1 029098-138) | Ex. 46 | ECF 113-3 at 44 |
| Exhibit 47: 2015 Model Year Ford Warranty Guide (SMMNS_1 029139-79) | Ex. 47 | ECF 113-3 at 86 |
| Exhibit 48: 2016 Model Year Ford Warranty Guide (SMMNS_1 029180-220) | Ex. 48 | ECF 113-3 at 128 |
| Exhibit 49: Plaintiffs' Amended Responses and Objections to Defendant Ford Motor Company's First Set of Requests for Admission to Plaintiffs | Ex. 49 | ECF 113-3 at 170 |
| Exhibit 50: Lopatik claim letter and release (LOPATIK_FORD_0000260-61,_0000275) | Ex. 50 | ECF 117 |
| Exhibit 51: Navas state court complaint | Ex. 51 | ECF 113-3 at 193 |
| Exhibit 52: Navas vehicle purchase agreement (NAVAS_FORD_0000002,_0000005-06) | Ex. 52 | ECF 117 |
| Exhibit 53: Excerpts of Deposition of Jorge Arroyave (July 26, 2019) | Arroyave | ECF 113-3 at 231 |
| Exhibit 54: *Anderson v. Ford* | *Anderson v. Ford Motor Co.*, Case No. 17-03244 (W.D. Mo., decided Feb. 14, 2020) | ECF 113-3 at 236 |
| Exhibit 55: Exhibit 7 to Deposition of Edward Stockton | Stockton Ex. 7 | ECF 117 |
| Exhibit 56: Expert Report of Thomas O'Guinn, Ph.D | O'Guinn | ECF 113-4 at 2 |
| Exhibit 57: Expert Report of Itamar Simonson, Ph.D | Simonson | ECF 113-4 at 44 |
| Exhibit 58: Excerpts of Deposition of Shane Jackson (August 28, 2020) | Jackson | ECF 113-4 at 253 |

## **INTRODUCTION**

This multi-state class action involves an alleged defect in one aspect of complex corrosion protection systems used across 15 vehicle models/model years that allegedly makes all of the vehicles prone to one type of cosmetic corrosion (filiform) on one specific body part (the leading edge of the hood). Ford's uncontroverted evidence shows that potentially relevant warranty rates vary but are all extremely low, in some cases almost 0%. (Taylor 15). Plaintiffs have no evidence that the rate of corrosion for class vehicles is greater than the rate for competitive vehicles.

The small possibility that cosmetic corrosion might appear on the leading edge of the hood is one of hundreds of other problems that consumers might, but probably will not, experience with respect to any vehicle, and that will be covered under warranty if they occur to any individual owner during the warranty period. And yet, Plaintiffs' case is premised on the proposition that Ford had an obligation to disclose this one remote possibility, a proposition that necessarily assumes that Ford and all vehicle manufactures have an obligation to disclose all of the equally remote possibilities that they know about—a type of disclosure no vehicle manufacturer makes because it is neither practical nor helpful to disclose the ever-changing minute risks of potential future failures for complex multi-system vehicles.

As Ford's summary judgment motion will show, these and other facts will defeat Plaintiffs' claims on the merits, but they also preclude class certification. There is no common defect, because there are 15 different models/model years and the potential for cosmetic corrosion to occur depends on model, model year, date of production, and location of use. Therefore, the materiality of the allegedly undisclosed information will also vary. Whether any individual consumer bought vehicles knowing of the potential for corrosion to occur depends, for example, on whether they read the warranty, which specifically disclosed the potential for cosmetic corrosion to occur and specified when it would be covered. Classwide reliance cannot be established or presumed, because not all reasonable persons would decline to buy a vehicle because of a remote possibility of cosmetic hood corrosion, particularly where alternative vehicles do not perform any better, either with respect to corrosion or overall reliability. Plaintiffs ignore many other individual issues—they simply pretend there are no individual issues or state law variations—and they do not propose any proper classwide measure of damages. Finally, 20% of the Plaintiffs initially proposed to represent the class hired separate attorneys and made their own individual claims against Ford, demonstrating that this action is not the superior method of resolving this controversy.

1

## FACTS

### A.      The Alleged Cosmetic Defect.

Plaintiffs filed this case on November 14, 2018, alleging an unidentified defect in 2013-2018 Explorers, Mustangs, and Expeditions that allegedly caused "the exterior paint on the aluminum body parts to bubble, flake, peel, rust and/or blister." (ECF No. 1 ¶¶ 1-2). For almost two and a half years, Plaintiffs refused to identify the alleged defect. (*See* Ex. 29, Rog. No. 7). It was not until Plaintiffs filed their class certification motion that Ford learned that Plaintiffs allege only that *some* 2013-2018 Explorers, Mustangs, and Explorers are defective, and that the alleged defect causes corrosion *only* in one specific location, the leading edge of the aluminum hood.

The class Plaintiffs now seek to certify is limited to owners of 2013-2016 Mustangs, 2013-2017 Expeditions, and 2013-2018 Explorers, 15 different configurations of models and model years. (PM 2). As discussed below, these 15 configurations have corrosion protection systems that differ substantially. Nevertheless, Plaintiffs and Anderson attempt to reduce these 15 configurations to their lowest common denominator by focusing on one aspect of the design: the absence of hem sealer along the hood's entire perimeter. (Anderson Rpt. 11 (Pltfs' Ex. 7); PM 3). Anderson opines that this renders all class vehicles defective, but he has no idea how the overall rates of hood corrosion repairs in class vehicles—0.6% for Expeditions, 1.3% for Mustangs, and 4% for Explorers (Taylor 8)[2]—compares to competitors, nor could he quantify how much the addition of full perimeter hem sealer would have reduced the already low corrosion rates. (Anderson Dep. 87-88, 135-40).

In fact, contrary to Anderson's assumption, 2015-2016 Mustangs *did* have full perimeter hem sealer. (Ex. 30; Gardynik 43-45). According to Anderson, the addition of full perimeter hem sealer to these vehicles should have substantially reduced the incidence of hood corrosion. (Anderson Dep. 147). Instead, warranty rates for hood corrosion on 2015 Mustangs *increased* from 0.7% to 0.92%. (Taylor 15). Examination of several competitor vehicles with full perimeter sealer also showed hood corrosion—including Nissan vehicles for which Anderson himself had responsibility. (Guyer ¶¶ 155-57). Conversely, class vehicles with no hem sealer at all—2013-18 Expeditions—have the lowest rate of hood corrosion. (Anderson Rpt. 11 (Pltfs' Ex. 7); Taylor 8). Thus, Anderson's claim that merely adding full perimeter hem sealer would have eliminated or

---

[2] Dr. Taylor's analysis overstates the rate of relevant warranty repairs because it is not limited to repairs on the leading edge of the hood or repairs necessitated by the alleged defect. (Taylor 7).

substantially reduced hood corrosion on class vehicles is wrong.

> **B.    Corrosion Is A Complex, Multi-Faceted Problem Requiring Complex Mitigation Strategies—And There Is No Evidence That Ford's Strategies Are Less Effective Than Those Of Its Competitors.**

Corrosion is a "thermodynamic inevitability" and presents a complex, multi-faceted challenge for both steel and aluminum components. (Hosking 116). There are many kinds of corrosion (e.g., filiform, galvanic, pitting, and crevice), it can occur anywhere on a vehicle (e.g., hood, roof, doors), and it can have multiple causes (e.g., high humidity, road salt, manufacturing imperfections, etc.). (Guyer ¶¶ 32-36, 53-56, 63-95).[3] Correspondingly, corrosion protection is a complex, multi-faceted process that cannot be reduced to a single design, component, or manufacturing technique. (*Id.* ¶ 77). Development of a corrosion protection strategy for any vehicle requires consideration of many factors, including (by way of example only) the type of vehicle and its intended uses; the vehicle's overall design and configuration; various mitigation strategies' advantages and disadvantages; and manufacturing capabilities. (*Id.* ¶¶ 63-95). And there are other considerations: at least one highly effective method of mitigating aluminum corrosion in vehicles was outlawed due to environmental concerns. (Tardiff 86, 307-08).

For decades, the automotive industry and Ford have developed complex mitigation strategies tailored to each model vehicle, and those methods have evolved—and continue to evolve—over time. (Guyer ¶¶ 40-47; Simko 162-64; 249-51; Minnich 306-07, 309-10; Hosking 116; Nichols 337-39). Ford's internal standard is intended to minimize the incidence of corrosion within six years. (Starbowski 24-25). Other manufacturers, including Nissan, where Anderson had responsibility for corrosion prevention, have similar internal standards. (Anderson Dep. 140-41). Anderson claimed that class vehicles failed to meet Ford's standard because he examined "[t]welve market exemplar Ford aluminum hoods" and found filiform corrosion on the leading edge. (Anderson Rpt. 12; Anderson Dep. 60-62, 68-71, 83-84, 156, 195). In fact, he examined only ten hoods (and two liftgates), and only three of the hoods were from class vehicles driven less than six years. (Anderson Rpt. at D1). Anderson knew virtually nothing about the history or condition of the vehicles from which these hoods came. (Anderson Dep. 161-63).

---

[3] Notably, several Plaintiffs' vehicles had corrosion on various steel parts, including the roof and doors. (Guyer ¶ 50 (Table 2)). But Plaintiffs inexplicably appear unconcerned about any corrosion except cosmetic corrosion on their hoods. *See, e.g.,* Jackson 227-228 ("Q. Why aren't you concerned about the [corrosion on the] trunk? A. Well, the trunk is not made of aluminum.").

In any event, Ford's standard is not a guarantee that 100% of body parts on 100% of vehicles will remain 100% free of corrosion for six years. (Starbowski 260-61; Nichols 242-43). Whether Ford's internal standard is met fleet-wide is determined through testing of exemplar vehicles prior to launch, not by post-sale results of individual vehicles. (Starbowski 258-59; Nichols 283-86). This accelerated corrosion testing is intended to replicate six years of use in a compressed timeframe, and involves putting the vehicles through tests using salt, dirt, water, and stones over thousands of miles and many hours of actual driving, as well as placing the vehicles in a humidity booth for 20 hours a day for 12 weeks. (Starbowksi 25-26, 252-55; Nichols 284-86).

Other automakers, including Nissan, have similar internal standards and rely on similar tests, and Anderson relied on Nissan's testing to opine that Nissan vehicles were not defective. (Anderson Dep. 131-32). But *all* of the class vehicles passed accelerated corrosion testing and therefore met Ford's corrosion standard. (Starbowski 258-59). Thus, they are not defective under Anderson's own criteria. Besides, if corrosion on a few class vehicle hoods proves that the vehicles are defective, then Nissan vehicles, including those for which Anderson claimed responsibility, are also defective; Ford's expert found several Nissan hoods with corrosion. (Guyer ¶¶ 155-57).

There is no evidence that Ford vehicles, including class vehicles, perform worse in actual use with respect to corrosion than any of their competitors, including Nissan, either with respect to corrosion on the aluminum hood or with respect to any other aluminum or steel components.

### C.   Ford's Corrosion Mitigation Strategies Varied From Vehicle to Vehicle, Year To Year, And Month To Month.

Ford has utilized robust corrosion protection strategies for all class vehicles throughout the class period. But as detailed below, those strategies (and the related manufacturing processes) differed from vehicle to vehicle and from model year to model year. In fact, there were differences even within model years. (Simko 251; Bonanni 432; Tardiff 290-91; Guyer ¶¶ 41-47).

**Stamping and Hemming Design and Process:** The hoods on the subject vehicles are made from two aluminum sheets that must be cut and stamped into the specified geometry, then joined with adhesive and hemmed. (Minnich 52-53; Guyer ¶¶ 22-23). The shape of the hoods— which differs in each vehicle model at issue—can affect corrosion performance because of the varying potential to capture fluids. (Minnich 284, 296). In addition, the stamping and hemming process causes stress in the aluminum that can affect its microstructure and corresponding corrosion performance, and this stress is distributed differently among the various hood designs. (*Id*. at 295-96; Guyer ¶ 68).

There are manufacturing variabilities involved in joining the inner and outer panels that can affect corrosion performance. (Minnich 59). For example, the amount and placement of adhesive added to the edges of the panels is not identical from hood to hood. (Nichols 326-27; Starbowski 281-82). These variabilities affect both Ford and non-Ford vehicles, and can lead to fluids collecting in the cavities between the panels. (Minnich 282; Guyer ¶¶ 100, 168-70 & Tables 8-9). Vehicles with the most consistent adhesive fill tend to be high priced luxury vehicles, like Jaguar and Land Rover, where lower production volumes and higher costs allow for more precise adhesive application. (Weingartz 178-79).

After adhesive is added, the hem is made by bending the outer panel over the inner panel. The design of the hems vary: the Mustang and Explorer have closed, flat hems, while the Expedition has a closed, flat hem only on the leading and windshield edges, with a downstanding flange on the outside edges. (Guyer ¶ 70; Anderson Rpt. 11).

For 2013-18 Explorers, hem sealer was used only on the leading edge of the hood. (Ex. 31; Nichols 272). For 2013-14 Mustangs, hem sealer was applied only to the leading edge; full perimeter hem sealer was added for 2015-16 model years. (Ex. 30; Gardynik 43-45). The 2013-17 Expedition—which has the best corrosion performance of all class vehicles—has no hem sealer at all. (Taylor 8; Nichols 335-36). For Mustangs and Explorers, sealer was applied through a combination of automated and manual labor, with varying consistency. (Weingartz 142). For high volume vehicles like those at issue here, applying sealer consistently in the right place and amount is challenging for both Ford and other automakers. (*Id.* 143, 185-86; Guyer ¶¶ 168-70 & Table 9).

Even for those hoods that have the same hem design and the same hem sealer, there are inevitable manufacturing variabilities that affect the final hem construction. (Nichols 326). Even variations in how the panels are stowed in racks following manufacture can affect corrosion performance because of the way various oils and lubricants used in the stamping and hemming process collect in the panels' cavities. (Minnich 298-99).

**Conditioner and Pretreatment**: Once the hoods and the other body panels are attached to the vehicle frame, the assembly (known as the "body-in-white" or BIW) proceeds to cleaning and conditioning, pretreatment, and painting. Each step involves immersing the BIW in huge tanks with a chemical bath. These steps are critical to the corrosion mitigation strategy and they differ depending on the vehicle and the date of assembly. (Guyer ¶¶ 26, 43, 45-47). Further, variations

from ideal conditions at any stage can reduce the effectiveness of the mitigation strategy.[4]

Cleaning and conditioning improves corrosion resistance by promoting a fine, uniform zinc-phosphate layer. (Guyer ¶ 26). Pretreatment involves immersing the BIW into another solution designed to enhance corrosion protection. (Weingartz 130-33). Zirconium was added to the pretreatment process at varying points during the class period because Ford found that it improved corrosion performance. (Weingartz 133; Minnich 287; Tardiff 322-23). ███████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Ex. 32 at 01210; Ex. 33; Ex. 34 at 002057). ███████████████████████████████████████████████ ██████████████████████████████████. (Ex. 34 at 002057). Meanwhile, ███████ ███████████████████████████████████████████████████████████ █████████, when the █████████████████████████████. (Ex. 32 at 001210; Ex. 35 at 003181; (Ex. 36; Ex. 37; Ex. 38). By contrast, ████████████████████████████ ███████████████████████████████████████████████████████████ ████████. (Ex. 32 at 001210; Ex. 33; Ex. 39).

**E-Coat:** Electrocoating, or "E-coat," processes followed pretreatment. During the E-coat process, the BIW is immersed in a solution through which an organic coating is applied, which provides a corrosion barrier. (Weingartz 134; Guyer ¶ 27). Some class vehicles were treated with a "hyperthrow" E-coat, a newer technology that can quickly deposit an E-coat in occluded areas of the hood. (Guyer ¶ 44, 45-47). Others were treated with traditional E-coat. (*Id.* ¶¶ 45-47).

**Paint Process:** Painting is the final step. It involves a primer, base coat, and clear coat. (Weingartz 141-42). Ford's painting process has evolved from baking on the primer followed by application of the base and clear coats and then a second bake, to a more environmentally friendly "three-wet" process in which all three coats are applied and then baked once. (*Id.*). Variability in the paint and its application can affect corrosion performance. (*Id.* at 143-44).

**Aluminum Alloy Change:** During 2013 model year production, Ford changed the type of aluminum used in the hoods of class vehicles to a low-copper aluminum alloy. (Ex. 32 at 001208-10; Ex. 40; Starbowski 89-90; Nichols 334). This improved both corrosion resistance and the

---

[4] For example, the tanks in which the BIWs are immersed cannot be completely cleaned more than once or twice per year due to their massive size, and thus the effectiveness of the conditioning and pretreatment process can vary during the production year. (Minnich 300).

ability to hem the hood most effectively. (Tardiff 290; Minnich 283-84, 297). But this "running change" was implemented at different times for each model, so only some 2013 vehicles have a low-copper aluminum hood. (Ex. 32 at 001210; Ex. 40; Minnich 285-89; Simko 63-64).

**Use and Environment**: How and where vehicles are used also affects corrosion performance. Use factors include on road versus off-road driving, owner maintenance, and whether a vehicle is typically parked in a location (*e.g.*, city street) where it is more susceptible to nicks and dents that can initiate corrosion. (Guyer ¶¶ 91-93; Bonanni 432). Environmental factors that can affect corrosion performance include rain, humidity, snow (and the corresponding use of road salts), and atmospheric concentrations of chloride, which can vary significantly even within the same state. (Guyer ¶¶ 85-90; Tardiff 112; Bonanni 432).

### D.   Corrosion Rates Are Uniformly Low, But Vary By Model, Model Year, Production Date, And Location.

The overall rate of hood corrosion warranty repairs on the putative class vehicles is low, ranging from 0.6% for the Expedition, to 1.3% for the Mustang, to 4.0% for the Explorer. (Taylor 8). Eschewing actual data, Plaintiffs claim the issue is widespread by citing a few e-mails from 2008-09 involving vague generalities or estimates of the issue *at that time* regarding vehicles that are *not part of the putative class*, as well as projected (not actual) warranty data relating to *non-class vehicles*. (PM 7). Similarly, Plaintiffs cite the fact that two Ford employees or their family members experienced corrosion. (PM 7). But they fail to note that in one case, the corrosion did not involve the hood, and the other case involved a 2008 Expedition that is not part of the class. (Minnich 112; Eikey 160-61). Moreover, while Plaintiffs rely on irrelevant anecdotal evidence, they ignore relevant anecdotal evidence. Several Plaintiffs who identified themselves as Mustang enthusiasts, and who have attended multiple Mustang shows, denied having heard or seen corrosion issues at those shows. (L. Lichtenburg 16-19; Tulenko 154-56; Minish 99).

While the actual data show that corrosion rates are uniformly low, the rates nevertheless vary by model, model year, production date, and location, thus reflecting the effect that variability in design, materials, manufacture, and use across models and model years have on corrosion performance. (Taylor 8, 12-27).[5]

---

[5] Plaintiffs cite a 2016 survey in which 11 out of 15 model year 2013 Explorers had hood corrosion from a "special cause." (PM 7). There is no evidence concerning what the "special cause" was, or of where on the hood the corrosion occurred. The survey was conducted in Montreal, which Ford

E.      **Ford's Recommended Repair Procedures (Technical Service Bulletins).**

Just as design, materials, and manufacturing processes have evolved, so too have Ford's recommended repair procedures. (Exs. 41-43; Bonanni 417-18). The earliest recommended procedure was repainting the hood. This repair required sanding, because new paint will not adhere properly if applied on top of existing corrosion. (Simko 259; Bonanni 419-20, 474-75). Because "sanding in and of itself does not cause corrosion . . . sanded metal [does] not corrode" if properly protected with primer and paint, which is precisely what Ford recommended. (Simko 258-59). Moreover, in February 2016 Ford released a new TSB that included application of a specialized primer, which proved to be particularly effective. (Ex. 42; Nichols 123, 128-29). At the same time, Ford instructed dealers to apply hem sealer to "all hem areas." (Ex. 42).

The only alternative to sanding and repainting is replacement of the hood. In 2017, the cost of replacement hoods decreased, making replacement more cost-effective than re-painting, so Ford recommended hood replacement. (Nichols 122-23, 127). Ford continued to instruct dealers to apply hem sealer to the new hood. (Ex. 43). This change was not driven by the effectiveness of replacement versus repair, as both appeared effective. (Nichols 129). Indeed, owners with repeat warranty-paid, hood paint repairs represent less than 0.2% of all class vehicles. (Taylor 28-30). That there are *some* repeat repairs is attributable to many of the same factors discussed above, and to the fact that the effectiveness of any repair depends in part on the skill of the repair technician. (Simko 259-60; Nichols 129). There is no evidence that Ford's recommended repairs are any less effective than other manufacturers' recommended repairs.

F.      **Ford's Best-In-Class Aluminum Corrosion Warranty.**

For model years 2013-15, Ford's warranty covered cosmetic corrosion on steel or aluminum, for 3 years/36,000 miles, whichever came first. (Ex. 45 at 029069; Nichols 58-59, 106). More serious corrosion—*i.e.*, corrosion perforating a steel or aluminum panel, affecting the panel's integrity—was covered for five years with no mileage limitation. (Ex. 45 at 029072; Nichols 58-59, 74, 106). Other manufacturers similarly limited cosmetic corrosion coverage to 3 years/36,000 miles, providing extended coverage only for perforating corrosion. (Harless Table 1).

Beginning in model year 2016, however, Ford covered cosmetic aluminum corrosion for a full five years. (Ex. 48 at 029195). Today, more than six years later, Ford's competitors *still* cover

_____

purposefully uses because it has a climate even harsher than Michigan's. (Starbowski 243-44). There is no evidence that Explorers performed any worse than competitor vehicles in Montreal.

cosmetic corrosion for only 3 years/36,000 miles, regardless of whether the corrosion occurs in aluminum or steel. (Taylor 14).

### G. Ford's Expert's Opinions.

In addition to Drs. Paul Taylor and Eric Guyer, whose opinions are referred to above, Ford is submitting reports from four additional experts:

**Dr. Rene Befurt** conducted a controlled study in which potential purchasers of Expeditions, Explorers, and Mustangs were asked to configure their desired vehicle using a website similar to Ford's website. One group of participants was given a disclosure concerning the small potential for non-perforating corrosion to occur. There was no statistically significant difference between the two groups with respect to purchase likelihood or willingness to pay. (Befurt ¶¶ 43-74).

**Dr. Itamar Simonson** conducted a consumer satisfaction survey of owners of 2013-2018 Explorers and four of its major competitors, the Dodge Durango, GMC Acadia, and Chevrolet Traverse. Dr. Simonson found no statistically significant difference among these vehicles in the rate at which owners reported body/exterior problems, including rust and corrosion problems. (Simonson ¶¶ 34-36).

**Dr. Thomas O'Guinn** evaluated Internet postings and found that the rate at which consumers posted complaints about Explorers and Mustangs, including complaints about rust, did not differ from their principal competitors. (O'Guinn ¶ K(9)).

**Dr. David Harless** found that subject vehicles do not depreciate at a rate greater than comparable vehicles, confirming that the market does not attach negative value to the potential for corrosion in class vehicles versus other vehicles. (Harless ¶¶ 3(c), 23-28).

### H. The Proposed Class Representatives And Their Claims.

The operative complaint lists 18 named Plaintiffs, but Plaintiffs' Motion proposed only 10 as class representatives. Since filing their motion, three Plaintiffs have dropped out as proposed class representatives. That leaves: Navas (California; 2016 Explorer); Yarborough (New York; 2013 Mustang); Dabbs (Florida; 2013 Explorer); DeWitt (Florida; 2016 Mustang); Erdman (Florida; 2014 Mustang); Tierney (Indiana; 2013 Explorer); and Van Bus Kirk (Illinois; 2013 Explorer). All but Van Bus Kirk purchased their vehicles new. None own an Expedition, and none own 2017 or 2018 model years of any model.

The purported class representatives assert unjust enrichment claims under the laws of their

states and under the laws of Pennsylvania, New Jersey, and North Carolina. The California, New York and Florida Plaintiffs assert claims under the consumer protection laws of their states.[6]

## CLASS CERTIFICATION STANDARD

"All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1233 (11th Cir. 2016). To overcome this presumption, "the named plaintiffs must have standing and the putative classes must satisfy . . . the four requirements listed in Rule 23(a), and at least one of the requirements listed in Rule 23(b)." *Ohio State Troopers Ass'n v. Point Blank Enters.*, 481 F. Supp. 3d 1258, 1270 (S.D. Fla. 2020). Here, Plaintiffs seek certification under Rule 23(b), and thus must prove that the proposed classes satisfy the commonality, predominance, typicality, adequacy and superiority requirements. As the Eleventh Circuit has emphasized, Plaintiffs must "affirmatively demonstrate" compliance with Rule 23 "by proving that the requirements are '*in fact*' satisfied, which requires a 'rigorous analysis.'" *Brown*, 817 F.3d at 1234. "[I]f doubts remain about whether the standard is satisfied, 'the party with the burden of proof loses.'" *Id*. at 1233.

## ARGUMENT

## I.   THE PROPOSED CLASSES ARE LIMITED BY LACK OF STANDING, CLASS ACTION WAIVER, AND LACK OF PERSONAL JURISDICTION.

### A.   Plaintiffs Have No Standing To Represent Purchasers Of Other Vehicle Models, Or Those Who Purchased Vehicles In Other States.

Any analysis of class certification begins with the issue of standing. *Ohio State Troopers*, 481 F. Supp. 3d at 1271. In this case, Plaintiffs lack standing in two respects.

First, a plaintiff has no standing to represent class members who did not purchase the same model of the product as that plaintiff. *Id*. at 1273. This is true whether the products are similar, or even identical. *Ohio State Troopers Ass'n v. Point Blank Enters.*, 347 F. Supp. 3d 1207, 1222 (S.D. Fla. 2018). Here, no Plaintiff owns an Expedition, so none can represent Expedition owners. Plaintiffs in Indiana (Tierney), Illinois (Van Bus Kirk), and California (Navas) own Explorers, and thus, cannot represent Mustang owners in those states. And the New York Plaintiff (Yarborough) owns a Mustang, so he can cannot represent Explorer owners in New York.

---

[6] **CA**: California Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; **NY:** GBL § 349; **FL**: Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*

Second, "'named plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises.'" *Lewis v. Mercedes-Benz United States*, 2021 U.S. Dist. LEXIS 60557, at *20 (S.D. Fla. Mar. 30, 2021). Plaintiffs from Pennsylvania (Marshall), New Jersey (Lopatik), and North Carolina (MacSeveny) are not proposed class representatives, so there is no representative for those three states.

In sum, based on lack of standing alone, the Expedition must be dropped from all proposed classes; Pennsylvania, New Jersey, and North Carolina must be dropped from the putative unjust enrichment class; the Indiana and Illinois unjust enrichment classes are limited to Explorer owners; the New York consumer fraud and unjust enrichment classes are limited to Mustang owners; and the California consumer fraud and unjust enrichment classes are limited to Explorer owners.

### B. The Florida and New York Plaintiffs Have Waived Any Right To Bring Their Two Warranty-Based Consumer Fraud Claims As Class Actions.

The Florida and New York Plaintiffs agreed in their warranty contracts not to "bring any warranty-related claim as a class representative, . . . a member of a class of claimants or in any other representative capacity."[7] Under federal, Florida, and New York law, parties can agree to class action waivers. *Roman v. Spirit Airlines, Inc.*, 482 F. Supp. 3d 1304, 1316 (S.D. Fla. 2020) (Ruiz, J.); *U1it4less, Inc. v. FedEx Corp.*, 2015 U.S. Dist. LEXIS 82933, at *10 (S.D.N.Y. June 25, 2015). This includes waivers not attached to arbitration clauses. *Id.*, at *10-11.

The class action waivers are enforceable and do not violate public policy, because "[a] statutory provision mandating attorney's fees adequately addresses the policy concerns that surround a case with small amounts of damages and the possibility of deceptive company policies going unchecked because of a lack of litigation." *Palmer v. Convergys Corp.*, 2012 U.S. Dist. LEXIS 16200, at *20 (M.D. Ga. Feb 9, 2012). They are not unconscionable or unenforceable when they do "not affect [a] Plaintiff's substantive right to bring a claim" or "limit . . . liability." *Deluca v. Royal Caribbean Cruises, Ltd.*, 244 F. Supp. 3d 1342, 1348-49 (S.D. Fla. 2017); *accord Anderson v. Ford Motor Co*., Case No. 17-03244 (W.D. Mo., decided Feb. 14, 2020) (Ex. 54) (enforcing the same warranty language at issue here). Thus, Plaintiffs lack class representatives for their "Unfair or Deceptive Warranty" classes in New York and Florida.

### C. The Court Has No Personal Jurisdiction To Resolve Claims Of Absent Class Members Outside Florida.

---

[7] Ex. 45 at 029067 (Yarborough, Dabbs); Ex. 46 at 029108 (Erdman); Ex. 48 at 029190 (Dewitt).

*Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1781 (2017), establishes that, under the Fourteenth Amendment, a state such as Florida cannot exercise specific personal jurisdiction to resolve product-related claims asserted against a non-resident manufacturer by nonresident plaintiffs who did not purchase the product in Florida and were not injured in Florida. With certain exceptions not applicable here, this court's power to exercise specific personal jurisdiction is coextensive with the power of Florida state courts. *See, e.g., United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).

Under *Bristol-Myers*, for example, absent class members who reside in New York and purchased their vehicles in New York plainly could not bring individual actions in state or federal court in Florida.[8] To allow these class members' claims to be litigated in Florida simply because they are members of a class would expand their rights and conflict with the Rules Enabling Act. Thus, this Court cannot certify a class of individuals who purchased vehicles in California, New York, Illinois, Indiana, New Jersey, New York, North Carolina, or Pennsylvania.[9]

## II.    INDIVIDUAL ISSUES PREDOMINATE ON ALL OF PLAINTIFFS' CLAIMS.

Under Rule 23(a), Plaintiffs must prove that there are questions of law or fact common to the class. Plaintiffs have not identified even one such question of law or fact. But "[e]ven if Rule 23(a)'s commonality requirement may be satisfied . . . the predominance criterion [of Rule 23(b)(3)] is far more demanding." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997). Indeed, "[f]ailure to satisfy the predominance requirement, especially in automotive defect cases, has often been the reason courts have denied class certification." *Martin v. Ford Motor Co*., 292 F.R.D. 252, 271 (E.D. Pa. 2013) As demonstrated below, Plaintiffs cannot meet the more demanding predominance requirement of Rule 23(b)(3), and class certification must be denied.

### A.    Plaintiffs Have Not Established That State Laws Are Uniform.

Plaintiffs seeking to represent multi-state classes must show that the applicable laws are sufficiently similar to allow for classwide resolution. *Sacred Heart Health Sys. v. Humana Military Healthcare Servs*., 601 F.3d 1159, 1180 (11th Cir. 2010). But Plaintiffs' approach here—"merely

---

[8] The decisions in *Lewis* and *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct*., 141 S. Ct. 1017 (2021), are not relevant here with respect to nonresident class members, because plaintiffs in those cases were residents of the state in which they filed suit and had been injured in those states.

[9] Ford acknowledges contrary decisions elsewhere, *see, e.g., Mussat v. IQVIA, Inc.,* 953 F.3d 441 (7th Cir. 2020), but those decisions cannot be reconciled with *Bristol-Myers*. Ford has not waived the issue. *See, e.g., Cruson v. Jackson Nat'l Life Ins. Co*., 954 F.3d 240, 251 (5th Cir. 2020).

recit[ing] the elements of [Plaintiffs'] claims . . . without an analysis of how those elements are interpreted or analyzed by the various states"—has been "rejected by courts as overstating the similarities of various state laws." *Andersen v. Atl. Recording Corp.*, 2010 U.S. Dist. LEXIS 44168, at *24 (D. Or. May 4, 2010). And as highlighted below, there are significant differences in the applicable state laws for which Plaintiffs make no attempt to account.

> **B.    Plaintiffs' Omission-Based Consumer Fraud Claims Raise A Host Of Individual Issues.**
>
> > **1.    Existence Of The Alleged Defect In 15 Vehicle Models Is An Individual Issue.**

Plaintiffs' counsel in this case make the same mistake for which they were criticized in *Smith v. GM LLC*, 988 F.3d 873 (6th Cir. 2021), another class action alleging failure to disclose an alleged defect: they "seem to ignore the fundamental question of governing law"—specifically, the standard for requiring disclosure of an alleged design defect—and "eschew their obligation to set forth what that law is." *Id.*

The basis on which Plaintiffs' omission claims rest is an alleged "design defect" that creates a risk of hood corrosion. But defining "design defect"—i.e., developing a standard to distinguish acceptable design-related risks from unacceptable risks—has been a subject of intense debate for decades. *See generally* Aaron Twerski & James Henderson, *Manufacturers' Liability For Defective Product Designs: The Triumph Of Risk-Utility*, 74 Brook. L. Rev 1061, 1062 (2009). Almost no attention has been given to defining "design defect" in the context of cosmetic issues. Moreover, warranties exist precisely because it is understood and accepted that non-safety defects can and do occur in complex products, including motor vehicles. (Harless ¶¶ 38(b), (h), 40(e)(i); Befurt ¶¶ 32, 39-42). Manufacturers know about and keep records of all of the defects they pay to repair under warranty, (Stockton Dep. 11), and responsible manufacturers continuously strive to improve their products to reduce the number of defects that need to be repaired. Plaintiffs' damages expert, Stockton, agreed that a multi-page list of all defects repaired under warranty could be compiled for any vehicle. (Stockton Dep. 237, Ex. 7). Plaintiffs cannot seriously contend that the entire multi-page list should have been disclosed, but they have articulated no standard that would distinguish cosmetic defects that have to be disclosed from those that do not. The cases that address the issue limit the duty of disclosure to defects that cause the product to fail to meet government standards, safety defects, defects that are certain to manifest, defects that impair the product's core function, or defects creating failure rates that are extremely high or higher than comparable

products.[10] Plaintiffs do not identify the standard they think applies in any state.

Plaintiffs' failure to identify a common legal standard governing Ford's obligation to disclose "design defects" is sufficient to warrant denial of class certification. *See, e.g., Castano v. Am. Tobacco Co.,* 84 F.3d 734, 741 (5th Cir. 1996). But whatever the standard, there is no evidence of a common defect affecting all of the different models and model years at issue. As discussed above, there are numerous design, material, manufacturing, and geographical differences among the 15 configurations at issue that affect corrosion performance. These differences are reflected in a wide variation in the rate at which hood corrosion occurs, ranging from an overall rate of 0.6% for the Expedition to 4% for the Explorer. (Taylor 8). The 3/36 warranty repair rates vary with respect to the same model depending on model year and date of production. *Id.* at 13. For example, for the Mustang, rates range from 0.09% (manufactured in July 2013) to 3.15% (manufactured in December 2012). *Id.* Even for the same model year of a vehicle, rates vary from production date to production date. As an example, for model year 2015 Expeditions, the 3/36 rates vary from about 0.3% (manufactured in May 2015) to 1.6% (manufactured in November 2014). *Id.*

"This evidence demonstrates that the failure rate of the [vehicles] at issue in this case may differ among the range of units that make up plaintiffs' proposed classes, meaning that a duty to disclose . . . may exist as to some, but not all, of the proposed class members' [vehicles]." *Oddo,* 2020 U.S. Dist. LEXIS 150601, at *88. Indeed, "[c]ourts have routinely found differences amongst various models fatal to class certification." *Harris v. Nortek Global HVAC LLC*, 2016 U.S. Dist. LEXIS 18795, at *46 (S.D. Fla. Jan. 29, 2016). Plaintiffs will argue that all class vehicles are identical in that they all lack full perimeter hem sealer, but even Plaintiffs' expert, Anderson, refuses to evaluate any one component without putting it in the context of the entire design. (Anderson 47-49, 53-55, 107, 130). And courts reject such attempts to isolate one design feature from the rest of the system. *See, e.g., Lloyd v. GMC*, 266 F.R.D. 98, 100 (D. Md. 2010); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 373 n.43 (E.D. La. 1997).

---

[10] *See, e.g., Iannacchino v. Ford Motor Co.*, 451 Mass. 623 (2008) (product must violate government standards); *Alban v. BMW of N. Am.*, *LLC*, 2010 U.S. Dist. LEXIS 94038, at *33 (D.N.J. Sept. 8, 2010) (manufacturer must "know[] with certainty that a product *will* fail"); *Oddo v. Arocaire Air Conditioning & Heating,* 2020 U.S. Dist. LEXIS 150601 at *81-82 (C.D. Cal. May 18, 2020) (defect must impact safety or (perhaps) central function); *Anderson v. Ford Motor Co.*, 2020 U.S. Dist. LEXIS 66549, at *8 (W.D. Mo. Feb. 14, 2020) ("(1) extremely high in the abstract or (2) significantly higher than comparable vehicles.").

### 2.      Ford's Knowledge Of The Alleged Defect At The Time Of Sale Is An Individual Issue.

Proof of Ford's knowledge of the alleged defect at the time of sale is an essential element of Plaintiffs' claims under the CLRA, and GBL § 349.[11] But Ford's knowledge varies depending on when each class member purchased his or her vehicle. Indeed, it is undisputed that Ford's knowledge regarding hood corrosion and its efforts to improve overall performance have evolved over time. Notably, the majority of the documents Plaintiffs cite long pre-date the proposed class period and relate to non-class vehicles. Plaintiffs highlight the fact that a team of Ford employees with varied expertise met regularly to analyze corrosion issues (PM 10-11), but this simply *proves* that Ford's knowledge changed over time. There would have been no need for such a team if Ford already knew all there was to know about the causes of corrosion and the methods to mitigate it. And, as detailed above, Ford's evolving corrosion knowledge is reflected in the many design and process changes Ford made at various times during the class period in an effort to further improve overall corrosion performance.

### 3.      Materiality And Actual Reliance Are Individual Issues Under California Law.

The CLRA requires proof of actual reliance. *Bergeron v. Monex Deposit Co.*, 2020 U.S. Dist. LEXIS 210652, at *10-*11 (C.D. Cal. Aug. 18, 2020). "In a variety of contexts, we have held that the reliance element of a class claim presents problems of individualized proof that preclude class certification." *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1344 (11th Cir. 2006). Plaintiffs argue that reliance can be presumed (or inferred) where the omission is "material" (PM 24), but this principle is inapplicable here for multiple reasons.

First, Plaintiffs have not presented evidence sufficient to establish that the omission was material. "An omission is material if a reasonable consumer 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Oddo*, 2020 U.S. Dist. LEXIS 150601, at *91-92. No reasonable consumer would view a small risk of cosmetic corrosion as important if all other vehicles they might purchase share the same risk. *See Anderson*, 2020 U.S. Dist. LEXIS 66549, at *8 (W.D. Mo. Feb. 14, 2020) (risk of failure

---

[11] *Marchante v. Sony Corp. of Am.*, 2011 U.S. Dist. LEXIS 139564, at *10 (S.D. Cal. Mar. 22, 2011); *Rothschild v. GM LLC*, 2020 U.S. Dist. LEXIS 187300, at *35 (E.D.N.Y. Sept. 30, 2020). Ford believes that knowledge is also required under FDUTPA, but recognizes that this Court rejected this argument in *Lewis*.

would be material "only where the failure rate is (1) extremely high in the abstract or (2) significantly higher than comparable vehicles."). Yet Plaintiffs have made no attempt to establish that class vehicles are more prone to corrosion of any kind than other vehicles, and Dr. Simonson's study suggests they are not. (Simonson ¶ 14). And Dr. Befurt's study confirms that disclosure of the alleged defect would not affect likelihood of purchase or willingness to pay. (Befurt ¶¶ 43-74).

Second, assuming that the small risk of hood corrosion in class vehicles might be important to some reasonable consumers, the materiality of the risk depends on the probability that corrosion will occur. *Anderson*, 2020 U.S. Dist. LEXIS 66549, at *7-8 (materiality depends on failure rate); c*f. Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event'"); *In re Greenlane Holdings, Inc.,* 2021 U.S. Dist. LEXIS 1711, at *36 (S.D. Fla. Jan. 6, 2021) ("'Materiality depends not only on the magnitude of an effect but also on its probability. . . . Reasonable investors do not want to know everything that could go wrong, without regard to probabilities . . . .'"). Here, as discussed above, the probability of the relevant event (hood corrosion) varies significantly based on model, model year, date of production, and geographic location. Therefore, the issue of materiality also varies.

Third, even assuming that the probability of corrosion was the same for all class vehicles, it could not possibly be important to all reasonable consumers. Drs. Befurt and O'Guinn explain in detail that purchasing an automobile is a highly complex and customer-specific choice that is based on an enormous number of decision-making aspects and substantial amounts of information that consumers may take into account to varying degrees. (Befurt ¶¶ 24-42; O'Guinn ¶ J). According to Plaintiffs' own economist, under "fundamental economic theory" consumers consider actual and expected benefits and attributes of a product and "how those compare to the actual and expected attributes of competing goods." (Stockton Rpt. ¶ 9 (Pltfs' Ex. 42)). For example, for some reasonable consumers, the benefits associated with owning an iconic car like the Mustang could easily outweigh the small risk of cosmetic corrosion on the hood, particularly if the Dodge Challenger and the Chevrolet Camaro pose the same risk (or other risks). *See Johnson v. Harley-Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573, 581 (E.D. Cal. 2012) (multiple factors affect what "'reasonable consumers' would consider material" when purchasing Harley-Davidson motorcycles). At least two Plaintiffs in this case confirmed that they love their cars, even though the cars actually developed corrosion. (Lopatik 83; Minish 80). Absent evidence of how the alleged

omission "compared to other attributes of the product and the relevant market generally," the question of materiality is not susceptible of classwide proof. *Oddo*, 2020 U.S. Dist. LEXIS 150601, at *101-02. In other words, "if the issue of materiality . . . is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 118 (2009).

Fourth, the presumption (or inference) of reliance does not apply where class members had access to the allegedly undisclosed information and individual inquiry is necessary to determine if class members were aware of the information. *See, e.g., Hamm v. Mercedes-Benz U.S.,* 2021 U.S. Dist. LEXIS 65098, at *35 (N.D. Cal. Apr. 2, 2021). In *Hamm*, the plaintiffs alleged a failure to disclose a transmission defect that would cause the transmission to enter "limp mode" and prevent shifting or accelerating. But the owners' manual for class vehicles disclosed the potential for limp mode to occur. *Id.* at *30 n.4. Under these circumstances, "[t]o decipher which class members were aware of the potential 'limp mode' failure of their transmission would require extensive individual inquiries and thus a presumption of reliance is inappropriate." *Id.* at *35. Here, similarly, Ford's warranty guide specifically disclosed the potential for cosmetic corrosion, which would be covered for three years (before model year 2016) or five years (for aluminum body panels in later model years). (Exs. 45-48). In addition, various Plaintiffs admitted that they knew before they purchased their vehicles that metals, both steel and aluminum, could corrode. (Ex. 49, Nos. 68-70). Plaintiff MacSeveny bought a 2016 Expedition after filing the Complaint alleging the Expedition was defective. (MacSeveny 10). Plaintiff Minish bought a 2014 Mustang after finding corrosion on the hood of her 2009 Mustang. (Minish 20). Plaintiff Marshall testified he discovered information on the Internet concerning Mustang corrosion as early as 2009. (Marshall 93-94). Information about corrosion in Ford and other vehicles was publicly available from a variety of sources. (Harless ¶ 15; O'Guinn ¶ K). According to the Complaint, by November 14, 2018, the defect was so widely known that resale prices were negatively affected. (DE 1 ¶ 119). Accordingly, Ford "is entitled to inquire of each class member whether they were aware of this publicity before they purchased their Ford vehicle." *Lloyd*, 266 F.R.D. at 111; *accord, e.g., Braverman v. BMW of N. Am., LLC*, 2020 U.S. Dist. LEXIS 91484, at *8-9 (C.D. Cal. May 19, 2020).

Finally, even if a presumption of reliance were permissible, it is rebuttable. *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814, 94 Cal. Rptr. 796, 484 P.2d 964 (1971). Ford's "rebuttal opportunity requires plaintiff-by-plaintiff determinations of causation." *Johannessohn v. Polaris*

*Indus.*, 450 F. Supp. 3d 931, 985 (D. Minn. 2020).

### 4.  Materiality, Deception, And Actual Injury Are Individual Issues Under New York Law.

"To prevail in a cause of action under General Business Law §§ 349 . . . , the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as a result the plaintiff suffered injury." *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 52, 777 N.Y.S.2d 50 (App. Div. 2004). "A GBL § 349 claim may be premised on a material omission." *Rothschild*, 2020 U.S. Dist. LEXIS 187300. Thus, while reliance is not an element of a GBL § 349 claim, materiality, deception, and actual injury are— and all three of these issues are individual in nature.

**Materiality.** As discussed above, materiality depends upon the probability that corrosion occurs, and that probability varies by model, model year, date of production and location.

**Deception.** As discussed above, there is ample reason to believe that a significant number of class members were exposed to information concerning corrosion in class vehicles and purchased them anyway. Where, as here, the "circumstances" of class members vary with respect to whether they "possessed or could reasonably have obtained the relevant information they now claim the [defendant] failed to provide," the question of "whether a reasonable consumer in plaintiffs' circumstances might have been misled" is not a common question. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 27 (N.Y. 1995); *Solomon*, 9 A.D.3d 49 at 52, 777 N.Y.S.2d at 50.

**Actual injury.** Plaintiffs have proposed no class-wide method of proving an "actual injury" under GBL § 349. Where, as here, the alleged injury arises from nondisclosure of a defect claimed to make a product "prone" to failure, "actual injury" can be established through manifestation of the defect (an individual issue), but *not* through claims of economic injuries attributable to a failure to meet customer expectations. *See, e.g.*, *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 57 (S.D.N.Y. 2019); *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118 (App. Div. 2002).

In *Frank*, the court rejected GBL § 349 (and other) claims brought on behalf of a putative class of vehicle purchasers who claimed their vehicles' seatbacks suffered from a defect that rendered them unsafe in a collision. 292 A.D.2d at 120. They did not claim their vehicles suffered any actual malfunction caused by the defect, but—like Plaintiffs here—alleged they "'suffered economic loss' in that the Class Vehicles and seats did not meet reasonable consumer

expectations," and—like here—sought "compensatory damages 'measured by the cost of correcting the Defect.'" *Id.* The court affirmed the lower court's dismissal of the plaintiffs' claims because they failed to plead any actual injury:

> [I]t would be manifestly unfair to require a manufacturer to become, in essence, an indemnifier for a loss that may never occur. Plaintiffs' argument, basically, is that as an accident becomes foreseeably possible . . . the manufacturer must retrofit the product or otherwise make the consumer whole. However, under such a schematic, as soon as it can be demonstrated, or alleged, that a better design exists, a suit can be brought to force the manufacturer to upgrade the product or pay an amount to every purchaser equal to the alteration cost. Such "no injury" or "peace of mind" actions . . . would increase the cost of manufacturing, and therefore the price of everyday goods to compensate those consumers who claim to have a better design, or a fear certain products might fail.

*Id.* at 127; *see also In re GM LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 429-431 (S.D.N.Y. 2017).[12] Plaintiffs' GBL § 349 claim based on alleged concealment of a defect that makes the vehicles "susceptible" to corrosion requires individualized proof of manifestation—or some injury other than alleged economic injury attributable to the vehicles' failure to meet Plaintiffs' expectations—and this claim cannot be certified for class-wide treatment.[13]

### 5.    Materiality, Actual Deception, And The Likelihood Of Deception Are Individual Issues Under Florida Law.

"[A] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Dist. Ct. App. 2008). A deceptive practice under FDUTPA is a "material representation or omission that is likely to mislead the consumers acting reasonably *under the circumstances*."

---

[12] New York courts distinguish "tendency to fail" cases, which are governed by *Frank*, from breach of contract cases involving products that do not meet specifications and do not rely on a risk of failure to establish their allegations. *Ignition Switch*, 257 F. Supp. 3d at 430. Also distinguishable for the same reason are cases, relied on by Plaintiffs, based on affirmative misrepresentations about products. *See, e.g., Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014).

[13] In *Nuwer v. FCA US LLC*, Case No. 20-60532 (S.D. Fla. Mar. 30, 2021), Judge Singhal declined to dismiss claims of New York plaintiffs who had not experienced a manifestation of the alleged defect. But that opinion was issued at the pleadings stage, where plaintiffs were not required to commit to a theory of injury. Further, the opinion relied on by Judge Singhal supports Ford's position, as that court concluded plaintiffs could not maintain a GBL § 349 claim absent "a manifested defect or the actual or attempted resale of a vehicle that reflects a loss in value." *In re: Toyota Motor Corp. Unintended Acceleration Mktg.*, 2012 U.S. Dist. LEXIS 189744, at *257-58 (C.D. Cal. May 4, 2012). Neither type of injury can be established on a class-wide basis.

*Burrows v. Purchasing Power, LLC*, 2012 U.S. Dist. LEXIS 186556, at *18 (S.D. Fla. Oct. 18, 2012) (emphasis added). Therefore, as in New York, where the "circumstances" of class members vary with respect to whether they possessed or reasonably could have obtained the relevant information, the question of whether a reasonable consumer in plaintiffs' circumstances was likely to be misled is not a common question. *See, e.g., Kia Motors,* 985 So. 2d at 1140; *Pop's Pancakes, Inc. v. NuCO2, Inc.,* 251 F.R.D. 677, 685-86 (S.D. Fla. 2008); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 13887, at *110-11 (D.N.J. Feb. 6, 2012); *Egwuatu v. South Lubes, Inc.*, 976 So. 2d 50, 53-54 (Fla. Dist. Ct. App. 2008). In fact, "[t]he mere possibility some customers in certain situations and in possession of certain information could have reasonably understood [the potential for corrosion to occur] undercuts Plaintiff's theory from a class-certification perspective." *Deere Constr. v. Cemex Constr. Materials Fla., LLC*, 2016 U.S. Dist. LEXIS 193561, at *12 (S.D. Fla. Dec. 1, 2016). Finally, materiality is not a common issue in Florida for the same reasons discussed above.[14]

### 6. Purchase For Personal, Family Or Household Use Is an Individual Issue Under California Law.

Individual issues also predominate on Plaintiffs' CLRA claim because the Court would have to determine whether each California class member is a "consumer," as required by Cal. Civ. Code § 1780(a). A "Consumer" is "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761(d). "Goods" are "tangible chattels bought or leased for use *primarily* for personal, family, or household purposes." Cal. Civ. Code § 1761(a) (emphasis added). A class member who purchases products or services primarily for business purposes does not have standing under the CLRA. *Ewert v. eBay, Inc.*, 2010 U.S. Dist. LEXIS 108838, at *26 (N.D. Cal. Sept. 30, 2010). Some Plaintiffs have admitted that they used their vehicles for business purposes, and Plaintiffs have admitted that the purported class includes business entities. (Ex. 49, Nos. 57-62). Plaintiffs' motion does not even address this issue, but it is inherently fact-specific. *Ewert*, 2010 U.S. Dist. LEXIS 108838, at *27

---

[14] The standard Plaintiffs cite in footnote 9 for proving an "unfair" act under FDUTPA is "outdated." *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. Dist. Ct. App. 2014). The current standard requires that the injury be one "that consumers themselves could not reasonably have avoided." *Id.* Plaintiffs make no claim that this is a common issue. Plaintiffs' reliance on *Sanchez-Knutson v. Ford Motor Co.,* 310 F.R.D. 529, 537-538 (S.D. Fla. 2015) is also misplaced, because Ford is not arguing that actual reliance is required under FDUTPA.

("By failing to show how class members' consumer status can be determined without individualized inquiry, plaintiffs have failed to meet their burden of establishing that common questions of law and fact predominate.").

**C.    Plaintiffs' Consumer Fraud Claims Based On Ineffective Repair Raises More Individual Issues.**

Plaintiffs' first "Unfair or Deceptive Warranty" claim is based on the allegation that "Ford provided deceptive, unfair, and otherwise unconscionable warranty coverage to consumers" by "knowingly provid[ing] an ineffective and harmful repair to its consumers." (PM 21). The individual questions that would be necessary to resolve this claim include, among others, (1) whether class members purchased vehicles still under warranty, (2) whether class members were "provide[d]" repairs, and (3) whether the repair they were provided was "effective." Indeed, whether each repair provided was "effective" (a term Plaintiffs do not define) cannot be answered with common evidence because the repairs provided differed from time to time and from dealer to dealer.[15] In fact, beginning in 2016, dealers were supposed to add full perimeter hem sealer, which according to Anderson should eliminate or substantially reduce the potential for hood corrosion. (Anderson Dep. 147). Thus, neither the specific repair provided to a particular class member, nor Ford's knowledge regarding the effectiveness of the repair at that particular time, are common issues. *See, e.g., In re Baycol Prods. Litig.*, 218 F.R.D. 197, 208 (D. Minn. 2003) ("[T]he issue of Defendants' knowledge will differ from case to case.").

To the extent Plaintiffs' "ineffective repair" claim is intended to be a nondisclosure claim, it fares no better. First, Plaintiffs cannot establish that all class members even read the warranty; in fact, several named Plaintiffs did not. (D. Erdman 20-21; Dewitt 158; Navas 54; Tierney 70; Yarborough 48). Second, class members who purchased after the warranty expired would have no standing to raise such a claim, and those class members cannot be identified without individual inquiry. Third, as discussed above, the allegedly defective repairs recommended by Ford changed over time, and a jury could find that some but not all were ineffective. But even if Plaintiffs can overcome these hurdles, Plaintiffs do not explain what Ford was supposed to disclose, or to whom. Should Ford have disclosed to potential purchasers of subject vehicles (whether or not the vehicle

---

[15] Ex. 41 (recommends repair through sanding, no hem sealer added); Ex. 42 (recommends repair through blasting and adding hem sealer, and use of specialized AzkoNobel primer); Ex. 43 (recommends panel replacement, adding hem sealer, base coat and clear coat).

they purchased was covered by a warranty) that there was a less than 0.2% chance that they would experience corrosion on the leading edge of the hood that would not be repaired effectively on the first attempt? (Taylor 28-30). If so, Plaintiffs offer no evidence that such information would be important to any reasonable consumer, let alone all reasonable consumers, particularly absent evidence of how frequently repairs on alternative vehicles might prove ineffective.

> **D.      Plaintiffs' Consumer Fraud Claims Based On The Corrosion Warranty Raise More Individual Issues.**

Plaintiffs' specious "corrosion warranty" claim also raises individual issues that preclude certification. Each of the 2013-2015 vehicles at issue included a 3 year/36,000 mile "bumper-to-bumper" warranty that covered most issues, including cosmetic corrosion to both steel and aluminum parts. (Ex. 45 at 029069; Ex. 46 at 029110; Ex. 47 at 029151). The warranty also included extended corrosion coverage up to five years, but clearly explained the limitation: "The extended warranty coverage only applies if a body sheet metal panel becomes perforated due to corrosion . . . ." (*Id.*). Thus, the warranty explained to the consumer exactly what they were getting: three years of coverage for corrosion regardless of whether it was merely cosmetic or involved perforation, and five years of coverage for perforating corrosion only. *Dinan v. Sandisk LLC*, 2019 U.S. Dist. LEXIS 91633, at *21 (N.D. Cal. May 31, 2019) ("What ultimately dooms Plaintiff's claims is that Defendant tells the consumer exactly what she is getting.").

Plaintiffs assert that the perforation requirement made the extended five-year warranty "ultimately worthless." (PM 13). But the extended warranty applied to the whole vehicle, not just the hood, and most of the body panels other than the hood were made of steel—and steel is more likely to perforate than aluminum. Moreover, Ford's competitors provided extended corrosion coverage only for corrosion resulting in perforation, and that remains true today. (Taylor 14; Harless Table 5). Thus, class members likely would have gotten the same warranty whatever vehicle they bought.

Nevertheless, Plaintiffs claim Ford should have told consumers that aluminum hoods were *less likely* to perforate than steel hoods. But this would have made the vehicles even more valuable to consumers. Ironically, Plaintiffs copied this theory from *Mickens v. Ford Motor Co.,* 2015 U.S. Dist. LEXIS 121029 (D.N.J. Sep. 10, 2015), another class action alleging premature corrosion in Mustang hoods, but *Mickens* recognized the oddity of the claim: "There is something counterintuitive . . . about a claim based on an apparent *improvement* in the cars' design that rendered perforation less likely. Plaintiffs' position implies a preference for a design that would

fail catastrophically, entitling them to make a claim under the five-year warranty." *Id.* at *33 n.14.

In any event, Plaintiffs' claim cannot be certified because it raises many of the same issues discussed above, including deception, reliance, causation, and materiality. In particular, whether any reasonable consumer would have found the information important, and actually read the warranty and was deceived by it, can only be determined through individual inquiry.

### E.    Individual Issues Predominate On Plaintiffs' Unjust Enrichment Claims.

Plaintiffs seek class certification of their unjust enrichment claim without acknowledging the decision in *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009), that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." And Plaintiffs provide no analysis as to how the elements are interpreted in the various states.[16] Their assertion that unjust enrichment "will rise and fall on the common evidence of Ford's course of conduct," (PM 28), ignores that the individualized inquiries go beyond the defendant's conduct. *Vega*, 564 F.3d at 1274 ("Before it can grant relief on this equitable claim, a court must examine *the particular circumstances of an individual case* and assure itself that, without a remedy, inequity would result or persist.") (emphasis added).

While most states require that there be a benefit to the defendant, in some jurisdictions, the benefit can be conferred through indirect contact with the manufacturer through a retailer. But Plaintiffs have made no attempt to address the individual inquiry required to determine whether class members bought their vehicle new or used, whether Ford reaped a benefit from the transaction, and if so, how the amount of that benefit can be determined on a class-wide basis from common evidence. *See, e.g., In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 68241, at *50-55, *70-75, *95-99, *130-36, *153-55, *232-33 (D.N.J. July 9, 2010) (rejecting unjust enrichment claim under California, Florida, Illinois, New Jersey, New York, and Pennsylvania law, absent evidence of relationship between the Ford dealer and Ford); *Daigle v. Ford Motor Co.*, 2012 U.S. Dist. LEXIS 106172, at *13 (D. Minn. July 31, 2012) (applying Florida law).

Further, Plaintiffs must also show that the benefit conferred on the defendant came at the plaintiffs' expense which requires consideration of what each class member paid, and what their

---

[16] Contrary to Plaintiffs' claim, the law is *not* uniform. *See, e.g., In Re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 422 F. Supp. 3d 194, 232 (D.D.C. 2019) (recognizing differences in the definition of unjustness including in Illinois and New York).

specific vehicle was worth. *See, e.g.*, *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, 2018 U.S. Dist. LEXIS 9797, at \*14-15 (D.N.J. Jan. 22, 2018). Class members who did not pay more than their vehicles were worth have lost nothing. *Id.*; *see also In re Ford Motor Co. E-350*, 2010 U.S. Dist. LEXIS 68241, at \*232-33.

Next, Plaintiffs must establish that it would be unjust under the circumstances for Ford to retain any benefit conferred by a class member. This necessarily depends on individual factors, including the vehicle purchased, whether the consumer knew or reasonably could have known the undisclosed material facts, whether they would have purchased their vehicles knowing those facts, whether they experienced corrosion, whether they received a repair, what repair they received, and whether the corrosion has recurred.[17]

The individualized nature of these inquiries defeat certification of this class. *See, e.g., Vega*, 564 F.3d at 1274-75 ("[W]hether or not a given commission charge back was 'unjust' will depend on what each employee was told and understood about the commission structure and when and how commissions were 'earned.' Those class members who concede awareness . . . cannot claim injustice[.]"); *accord, In re Ford Motor Co. E-350 Van Prod. Liab. Litig.*, 2012 U.S. Dist. LEXIS 13887 at \*107 (the "court would need to conduct separate inquiries into the equities of each class member's consumer experience to resolve these claims"); *Rollins Inc., v. Butland*, 951 So. 2d 860 (Fla. Dist. Ct. App. 2006) (denying certification of unjust enrichment claim because individual issues predominate); *Ohio State Troopers Ass'n*, 481 F. Supp. 3d at 1276 (rejecting class certification where proposed class included members whose products never manifested any defect).[18]

F.     **Statutes of Limitations Raise More Individual Issues.**

---

[17] The Florida named plaintiffs reflect the significant differences on this point. DeWitt and James did not have any repair; Erdman and Dabbs had their hoods repaired, but Dabbs' repair was done by a GM dealer; and Arroyave had his hood replaced. (DeWitt 27, 84-85; James 82-83; D. Erdman 34-35, 134, 152; Dabbs 78, 107-108; Arroyave 111).

[18] The Court's recent opinion denying a motion to dismiss class action allegations in *Gibson v. Lynn University*, 2021 U.S. Dist. LEXIS 54324 (S.D. Fla. Mar. 23, 2021), does not compel a different result because there the factual record was not yet developed as it is here. Likewise, Plaintiffs' reliance on *In Re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 658 (S.D. Fla. 2012), is to no avail. There, the contracts at issue were take-it-or-leave-it—not the result of individual negotiations—and the evidence showed that the plaintiffs did not have different levels of knowledge. Thus, the individualized issues identified in *Vega* and here did not exist.

"[A]ffirmative defenses are still relevant to the question of predominance" and "can defeat predominance in some circumstances." *Brown*, 817 F.3d at 1241. Here, the proposed classes include vehicles beginning with model year 2013, and the statutes of limitations for the various claims in the various states range from 3 to 6 years.[19] This class action lawsuit was not filed until November 14, 2018. Thus, the claims of a significant number of class members are likely time-barred—unless the respective statutes of limitations were tolled by the discovery rule, the fraudulent concealment doctrine, or equitable estoppel. But not all the states recognize these doctrines, and even where recognized, the tests differ by state. And application of these tolling doctrines requires individual inquiry into *what* each class member knew or should have known about the facts giving rise to their claim, *when* each class member knew or should have known them, and *what* actions were taken by Ford vis-a vis each class member.[20] This myriad of individual issues will repeat itself again and again for each class member, and weighs heavily against a finding of predominance. *See, e.g., Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2003 U.S. Dist. LEXIS 25550 at *39-40 (S.D. Fla. May 6, 2003).

### G. Plaintiffs Have No Classwide Measure Of Damages.

#### 1. Repair Cost Is Not A Proper Measure Of Damages For Plaintiffs' Consumer Fraud Claims Based On Omission.

"[U]nder Rule 23(b)(3), a plaintiff must also 'establish that damages are susceptible of measurement across the entire class' . . . ." *Ohio State Troopers Ass'n*, 481 F. Supp. 3d at 1271 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). "[A]t the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case . . . .'" *Comcast,* 569 U.S. at 35. Plaintiffs and their expert, Stockton, propose what Stockton calls

---

[19] **CA**-CLRA and unjust enrichment: 3 years (Cal. Civ. Code § 1783; § 338(d)); **FL**-FDUTPA and unjust enrichment: 4 years (Fla. Stat. §§ 95.11(3)(f), (k)); **IN**-unjust enrichment: 6 years (Ind. Code § 34-11-2-7(1)); **IL**-unjust enrichment:  5 years (735 Ill. Comp. Stat. 5/13-205); **NJ**-unjust enrichment: 6 years (N.J. Stat. § 2A:14-1); **NY**-GBL § 349: 3 years (N.Y. C.P.L.R. 214); unjust enrichment: 6 years (N.Y. C.P.L.R. 213); **NC**-unjust enrichment: 3 years (N.C. Gen. Stat. § 1-52); **PA**-unjust enrichment: 4 years (42 Pa. Cons. Stat. § 5525).

[20] *See, e.g.*, **Discovery rule**: *Asghari v. Volkswagen Grp. of Am., Inc*., 42 F. Supp. 3d 1306, 1320 (C.D. Cal. 2013); **Fraudulent Concealment**: *Sloan v. Gen. Motors LLC*, 2020 U.S. Dist. LEXIS 71982 at *58 (N.D. Cal. Apr. 23, 2020); *Mahoney v. Beacon City Sch. Dist.*, 988 F. Supp. 395, 400 (S.D.N.Y. 1997); **Equitable estoppel**: *Licul v. Volkswagen Grp. of Am., Inc*., 2013 U.S. Dist. LEXIS 171627 at *16 (S.D. Fla. Dec. 5, 2013); *Horne v. Harley-Davidson, Inc*., 660 F. Supp. 2d 1152, 1158 (C.D. Cal. 2009).

a "repair cost" measure of "benefit of the bargain" damages for their consumer fraud claims under the laws of Florida, California, and New York. (Stockton Dep. 24, 59, 99). He surrounds his model with abstruse economic formulas and principles, but his "repair cost" model is unrelated to those principles. His simple theory is that awarding the cost of repairing the defect gives everyone in the class the vehicle for which they bargained. (Stockton Rpt. ¶¶ 26-27 (Pltfs' Ex. 42)). But California and New York do not allow *any* benefit of the bargain damages in cases like this, and Florida's definition of benefit of the bargain damages is inconsistent with Stockton's repair cost model.

**Florida**. This Court has correctly noted that FDUTPA does not cover repair costs. *Ohio State Troopers Ass'n.,* 481 F. Supp. 3d at 1284. Plaintiffs acknowledge this, but claim Stockton is using repair costs "only as a *measure* for actual point-of-sale damages." (PM 25 n.12). But in *Ohio State Troopers* this Court also held that "FDUTPA damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered . . ." *Id.* at 1283 (citations omitted). "Curiously," as in *Ohio State Troopers, id.* at 1284, "Plaintiffs' damages expert . . . did not measure the market value," either of the vehicle as promised or the vehicle as delivered. (Stockton Dep. 269).

Stockton originally seemed to claim that repair costs in his model would be equivalent to the difference in market value between the vehicles as promised and the vehicles as delivered. *Id.* But he ultimately testified that his model would *not* calculate this difference in value; instead, he clarified, it would calculate the "value of the difference." *Id.* at 271. It is not clear what Stockton means by the "value of the difference," but his own testimony makes clear that it is *not* the difference in value that constitutes the appropriate measure of damages under FDUTPA.

In fact, as a matter of basic economic theory, cost of repair alone cannot measure the difference in market value between a product with and without a defect. Rather, as Stockton conceded, the negative effect on market value of an unmanifested defect would depend both on cost of repair *and the probability of manifestation*. (Stockton Dep. 267-68). Stockton's proposed "cost of repair" damages are utterly at variance with his own expected utility theory. His damages would be identical whether the probability of corrosion was 0.001% or 99.999%, but such variations would be of extraordinary importance to any individual who behaved in accord with expected utility theory. (Harless 40(g)). The full cost of repair might be an accurate measure of the difference in market value if there were a 100% probability of a manifestation not covered by

warranty, but the probability of hood corrosion here does not even approach 100% in any vehicle.

Using the correct formula for benefit of the bargain damages, Plaintiffs have presented no evidence that any class member did not get the benefit of their bargain, let alone that all of them did not. Drs. Befurt and Harless demonstrate in different ways that the market value of class vehicles as promised would not differ from the market value as delivered, Dr. Harless by showing that class vehicles have not demonstrated any unusual depreciation and Dr. Befurt by showing that a disclosure would not affect likelihood of purchase or willingness to pay. (Harless ¶¶ 23-29; Befurt ¶¶ 43-74). Plaintiffs have no evidence that consumers attach any negative value to the small possibility of corrosion on one part of a car, any more than they attach negative value to any of the other small possibilities that hundreds of other things might go wrong with that car.

**California**. California law specifically *prohibits* an award of benefit of the bargain damages for fraud. Cal. Civ. Code § 3343(b)(1) ("Nothing in this section shall … [p]ermit the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof.").[21] California statutory law specifies a different measure of damages for fraud: the difference in value between the price paid and the actual value of the product received. Cal. Civ. Code § 3343(a) (a plaintiff defrauded in the purchase of property "is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received").[22] This measure of damages plainly is not common to the class. The price paid will be different for each member of the class, and the actual value of each vehicle as delivered will depend on factors including vehicle model, model year, month of manufacture, mileage and condition (in the case of used vehicles), cost of repair,

---

[21] California measures benefit of the bargain just like Florida. *See All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995). Therefore, if California allowed benefit of the bargain damages here, Stockton's damage model would suffer from the same flaws as it does under FDUTPA.

[22] This is known, somewhat misleadingly, as the "out of pocket" measure of damages; it is intended to restore the parties to the financial position they enjoyed before the transaction. *All. Mortg. Co*., 10 Cal. 4th at 1240. It is contrasted with the benefit of the bargain measure, which is intended to protect the expectancy interest of the defrauded party. *Id.* The court in *Nguyen v. Nissan N. Am. Inc.,* 932 F. 3d 811, 818 (9th Cir. 2019) erroneously referred to the out of pocket damages allowed by Cal. Civ. Code §3343(a) as benefit of the bargain damages; it overlooked the fact that benefit of the bargain damages are expressly precluded by § 3343(b)(1); and it never explained how cost of repair could be a measure of either out of pocket or benefit of the bargain damages. Thus, *Nguyen* is not a reliable interpretation of California law. Nor is *Sloan*, 2020 U.S. Dist. LEXIS 71982, at *163, cited by Plaintiffs, because the court in *Sloan* was required to follow *Nguyen*.

and probability of occurrence.

**New York.** As discussed above, controlling New York authority precludes a cost of repair award where an unmanifested defect is alleged to create a tendency to fail. *Frank,* 292 A.D.2d at 120. In any event, repair costs are not a proxy for properly-calculated benefit of the bargain damages in cases where such damages are allowed. *Maciel v. BMW of N. Am. LLC*, 2021 U.S. Dist. LEXIS 34311, at *25-26 (E.D.N.Y. Feb. 23, 2021). Plaintiffs cite no decisions allowing repair cost recovery in New York under any theory, including benefit of the bargain. The decisions they cite are not to the contrary because repair costs were not sought in those cases. (PM 24).

### 2.    Plaintiffs Have No Evidence Of Classwide Damages On Ineffective Repair Or Consumer Warranty Claims.

With respect to Plaintiffs' consumer fraud claims based on ineffective repair or the perforation requirement for the extended warranty, Plaintiffs assert that their expert, Kirk Kleckner, "concludes that it is appropriate to determine the overpayment amount of both the base warranty and corrosion warranty, and that this amount is capable of being determined on a Class-wide basis for particular component parts." (PM 25). But Kleckner concludes nothing of the sort, neither in his report nor in his deposition. Kleckner merely claims he can calculate the value of Ford's New Vehicle Limited warranty as it applies to specific vehicle "component(s)." (Kleckner Decl. ¶1b, 2a (Pltfs' Ex. 43)). His ability to do even that is questionable, as he has made no attempt to calculate a value or even develop the "actual model to be applied." *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 698 (S.D. Fla. 2014) (denying class certification in part due to plaintiffs' failure to satisfy their burden under *Comcast*). In any event, he makes no claim that he can estimate the amount of any "overpayment." Plaintiffs have proposed no methodology at all of measuring any damages, let alone classwide damages, on these theories.

### 3.    Plaintiffs Have Proposed No Measure Of Restitution For Unjust Enrichment, Let Alone A Classwide Measure.

Plaintiffs claim that their repair cost model suffices "equally well for unjust enrichment, where the measure of damages may be benefit of the bargain." (PM 25 n.11). The remedy for unjust enrichment is restitution, intended to restore the parties to their position before the transaction, not to give either party the benefit of their bargain. *See generally* Restatement (Third) Restitution and Unjust Enrichment, § 1. Plaintiffs cite no authority from any state that permits recovery of benefit of the bargain damages for unjust enrichment. The one case cited by Plaintiffs, *Marty v. Anheuser-Busch Cos.,* 43 F. Supp. 3d 1333, 1351 (S.D. Fla. 2014), did not address this

issue. Instead, it addressed and rejected the defendant's argument that unjust enrichment was not available because the plaintiffs got the benefit of their bargain. But that is simply another way of saying that damages for unjust enrichment cannot be recovered where a contract governing the subject matter exists. The court never addressed the measure of restitution for unjust enrichment.

### III. PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE CLASS, AND A CLASS ACTION WOULD BE SUPERIOR ONLY FOR AN UNASCERTAINABLE CLASS OF UNINJURED OWNERS.

Rule 23(b)(3) requires Plaintiffs to prove that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." This requirement thus "turns on whether a class action is better than other available methods of adjudication." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021). And yet, Plaintiffs address superiority without even mentioning any of the alternatives. Plaintiffs assert that "all Class members have claims that are so small that it would cost them much more to litigate an individual case than they could hope to recover in damages," and that "'[t]here is no reason to believe that the putative class members in this case have any particular interest in controlling their own litigation[.]'" (PM 28). Yet, two of the ten proposed class representatives demonstrate conclusively that these arguments are meritless.

Plaintiff Lopatik retained separate counsel to file a claim against Ford with respect to his 2015 Mustang. His individual attorney asserted a claim against Ford under New Jersey's lemon law, which would have entitled him to a full refund of the purchase price for his car, less a reasonable allowance for use and attorneys' fees. N.J. Stat. §§ 56:12-32, 56:12-42; (Ex. 50). ███████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████, and the parties and the courts were spared untold sums in transaction costs. (Ex. 50).

Plaintiff Navas hired separate counsel who sued Ford in California state court alleging defects in his 2016 Explorer under California's lemon law. (Ex. 51). He seeks reimbursement of the price paid for his vehicle (██████████ less an offset for use), attorney fees, and a civil penalty of up to two times actual damages, under the Act. Cal. Civil Code § 1794; (Ex. 51 ¶¶ 26-29, 52-55; Ex. 52). His potential recovery in his individual litigation exceeds $100,000—plus attorney fees. And he can pursue his claims in state court without worrying that his claims will be lumped in with—and rejected along with—the claims of hundreds of thousands of other class

members who have experienced no problems with their vehicles.[23]

Plaintiffs argued that claims of Lopatik and Navas were typical of the claims of the class. They subsequently dropped Lopatik as a class representative, but continue to claim that Navas was "damaged in the same way as the other members of the Class have been damaged." If this were true, an individual action would be clearly superior to this class action for all class members. But, of course, all class members have not been damaged the same way, and Navas's claims—and the claims of other Plaintiffs who have actually experienced corrosion and other problems with their vehicles—are *not* typical of the majority of class members who have experienced no hood corrosion and no other significant problems with their vehicles. In fact, a class action could be a superior method of resolving the claims of only those class members who are in all practical respects uninjured, *i.e.*, those have who have no viable lemon law claims because they have not experienced any significant problems with their vehicles. But such a class could not be adequately defined and its members would not be capable of determination. Besides, class members who are perfectly happy with their vehicle choice, who have never experienced any problems, and who have never even considered selling their vehicles, have no legitimate right to insist that this Court devote extraordinary public resources litigating claims for injuries that are purely theoretical, if they are injuries at all.

## **CONCLUSION**

All of these issues at the very least create a significant doubt about whether class certification is proper; that doubt requires that Plaintiffs' motion for class certification be denied.

Respectfully submitted,

JOHN M. THOMAS                          BOWMAN AND BROOKE LLP
KRISTA L. LENART                          Two Alhambra Plaza, Suite 800
DYKEMA GOSSETT PLLC              Coral Gables, Florida 33134
2723 South State Street, Suite 400    Telephone: (305) 995-5600
Ann Arbor, MI 48104                        Facsimile: (305) 995-6100

---

[23] Lopatik and Navas are not the only class members who have made individual claims against Ford alleging problems with their class vehicles. *See, e.g., Herrera v. Ford Motor Co.,* 2020 U.S. Dist. LEXIS 110796 (N.D. Cal. June 24, 2020)*; Sanchez v. Ford Motor Co.,* 2020 Cal. Super. LEXIS 3431 (Cal. Super. Ct. June 29, 2020). Whether these class members have executed releases, the scope of the releases, and the validity of the releases raise even more individual issues precluding class certification. Further, Navas's pursuit of an individual lawsuit creates a conflict with other class members, since if Navas prevails in (or settles) his individual suit he will have "little incentive to pursue" the remedies sought here. *J.P. v. BCBSM, Inc.*, 2021 U.S. Dist. LEXIS 7462, at *29 (D. Minn. Jan. 14, 2021).

Telephone: (734) 214-7613
Facsimile: (855) 262-3751                    By:____/s/ Wendy F. Lumish_____
JThomas@dykema.com                                WENDY F. LUMISH
KLenart@dykema.com                                Florida Bar No. 334332
                                                  wendy.lumish@bowmanandbrooke.com
ERIC C. TEW                                       CHRISTINE L. WELSTEAD
DYKEMA GOSSETT PLLC                               Florida Bar No. 970956
1301 K. Street, N.W., Suite 1100 West             Christine.welstead@bowmanandbrooke.com
Washington, D.C. 20005
Telephone: (202) 906-8600
Facsimile: (855) 221-0913
ETew@dykema.com

*Counsel for Defendant, Ford Motor Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the  2nd  day of August 2021, the foregoing was filed using the Court's CM/ECF system which will send electronic notice of the same to all interested parties.

                                        By:____/s/ Wendy F. Lumish_____
                                              WENDY F. LUMISH