**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-81558-RUIZ/REINHART**

CLARENCE SIMMONS et al.,

       Plaintiffs,

v.

FORD MOTOR COMPANY,

       Defendant.

_____/

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Plaintiffs submit this reply in support of their motion for class certification [ECF No. 96].

## I.      INTRODUCTION

A bedrock principle of automotive-hem design for corrosion prevention is that the hem (that is, a joint between two pieces of metal that acts as a cradle for water and moisture) must be kept dry. If the metal is not kept dry, then it is susceptible to corrosion before its intended design life. Two main strategies exist to achieve the design objective of preventing corrosion: sealing the hem to keep water from entering or providing the hem with a drainage mechanism to let water out. In this case, the common design on each Class Vehicle did neither—it allowed water in but had no drainage mechanism to let it out. As a result, all Class Vehicles are defectively designed.

This Design Defect, which is common to each Class Vehicle, underpins each of the classes that Plaintiffs seek to certify, and each class may be certified using common evidence for liability and damages. As reflected in Plaintiffs' motion, that common evidence consists largely of Ford's own documents and from its own internal experts. Not surprisingly, Ford advances many arguments for denying the motion for class certification. Though Plaintiffs will address each argument individually, it is important to highlight two overarching themes at the outset.

First, Ford's entire opposition is based on a fundamental mischaracterization of Plaintiffs' theory of the case. Trying to minimize the Design Defect—a mere "cosmetic defect," Ford calls it, with apparently no pride in its own vehicles—Ford, over and over, claims that the rate of corrosion is low, as if to say that the design defect is not important to consumers and that not everyone in the class was injured. But the "problem for [Ford] is that Plaintiffs are entitled to define their own claim." *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 37 (D.D.C. 2020).[1] And Plaintiffs' claims exist regardless of the rate of corrosion (which, contrary to what Ford states, is astronomically high relative to other Ford vehicles with a nondefective hem design). Instead, Plaintiffs' claim is that each Class Vehicle has the same Design Defect, which makes each Class Vehicle prone to premature corrosion—regardless of whether their vehicles actually corroded. "This characterization is crucial." *Nguyen v. Nissan N. Am., Inc*., 932 F.3d 811, 819 (9th Cir. 2019) ("Both Nissan and the district court mischaracterized Plaintiffs' theory as being centered on performance issues, rather than the defective system itself."). Yes, premature corrosion also injures class members. But the reason Plaintiffs and every class member are damaged by the Design

---

[1] Unless noted, citations, quotations marks, and footnotes are omitted and emphasis is added.

Defect is that their Class Vehicles are worth less than what they would be worth if none were sold with the Design Defect.

Second, Ford ignores the standards for class certification. Although "a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). But Ford invites the Court to do just that—engage heavily with the merits without regard to a proper analysis under Rule 23. Indeed, Ford's opposition—including numerous expert reports, seeking to disprove or dispute Plaintiffs' evidence—not only gets class-certification standards wrong but it doubles effectively as a motion for summary judgment; Ford alludes to a forthcoming motion for summary judgment. *See* Opp. at 1. But contrary to what Ford suggests, "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012).[2]

Finally, for the reasons set forth in this reply—as well as in Plaintiffs' responses to Ford's motions to exclude Plaintiffs' experts, in their motions to exclude Ford's experts, and in Plaintiffs' attached rebuttal reports[3]—none of Ford's other arguments has merit, either.

## II.    ARGUMENT

With these overarching principles at the fore, Plaintiffs will address each of Ford's arguments in the order in which Ford makes them.

### A.    Ford's Standing, Class Action Waiver, and Personal-Jurisdiction Arguments Have No Merit

#### 1.    Standing

Asserting lack of standing, Ford seeks to limit the proposed classes by vehicle and by state. *See* Opp. at 10. In support, Ford states that "a plaintiff has no standing to represent class members who did not purchase the same model of the product as that plaintiff." *Id.* Ford also states that "named plaintiffs in class actions have … been prohibited from asserting claims under a state law

---

[2] That Ford doesn't even cite many portions of its expert reports shows that they are merits-oriented and should not be considered at class certification.

[3] In rebuttal, Plaintiffs submit four reports, which pertain both to Plaintiffs' motion for class certification and to Plaintiffs' motions to Exclude Ford's experts [ECF No. 126]. *See* Exhibit A: Analysis of Hood Corrosion on Some Ford Models: Rebuttal Report ("Wachs Report"); Exhibit B: Expert Report of Steven P. Gaskin; Exhibit C: Expert Rebuttal Report of Erik Anderson; Exhibit D: Reply Report of Edward M. Stockton.

other than that which the plaintiff's own claim arises." *Id.* at 11 (quoting *Lewis v. Mercedes-Benz USA LLC*, 2021 WL 1216897, at *7 (S.D. Fla. Mar. 30, 2021)). Ford's arguments fail.

As summarized recently by the Eleventh Circuit, Article III of the Constitution "requires two related, but distinct, inquiries to determine whether a class representative has standing to represent a class." *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1046 (11th Cir. 2020). First, a "class representative must satisfy the individual standing prerequisites of the case or controversy requirement." *Id.* Second, "the class representative must also be part of the class and possess the same interest and suffer the same injury as the class members." *Id.*

To begin with, Ford makes no argument that any of the Plaintiffs does not satisfy the Article III case-or-controversy requirement. Nor could it. By buying a Class Vehicle that contained the Design Defect, covered by the New Vehicle Limited Warranty ("NVLW"), each Plaintiff "suffered an injury in fact" that is "fairly traceable to" Ford's conduct and "that is likely to be redressed by a favorable judicial decision." *Id.*

Ford's argument, rather, centers on the second inquiry, which "focuses on the relation between the class representative's injuries and those he alleges on behalf of the class." *Id.* But contrary to what Ford seems to believe, "class representative standing does not necessarily require that the class representative suffer injury at the same place and on the same day as the class members." *Id.* at 1047. Instead, it requires only "that the named plaintiff and class members have the same interest and suffer the same injury." *Id.* To make that determination, courts "compare[]" the plaintiffs' "injuries to the injuries they alleged on behalf of the proposed class." *Id.* In so comparing, courts look at "the nature of the injury" and whether it "stemmed from the defendant's alleged" misconduct. *Id.*

Under these principles, Plaintiffs meet the second inquiry. Each Plaintiff bought a Class Vehicle, covered by the same NVLW, each Class Vehicle contains the same Design Defect, and the Design Defect stems from Ford's misconduct. In short, because Plaintiffs "ha[ve] the same interest and suffered the same injury as the class members, [they] ha[ve] class representative standing to bring the claims [they] alleged." *Id.* Nothing more is required.

Ford seeks to limit the classes by each Plaintiffs' model vehicle and by state. *See* Opp. at 10-11. Although Ford relies on this Court's decision in *Lewis*, 2021 WL 1216897, the Court in *Lewis* relied chiefly on older district court orders, and not on *Fox*—again, the Eleventh Circuit's most recent guidance in this area. And again, in *Fox*, the Eleventh Circuit made clear that the

inquiry was on interest and injury, and not the place where the injury may have occurred. *See* 977 F.3d at 1047 ("While those injuries may have occurred on different days at different restaurants, those facts do not change what injuries [the plaintiff] alleged those class members suffered."). The Eleventh Circuit's approach is consistent with other decisions on class-representative standing. *See, e.g.*, *Carter v. Forjas Taurus, S.A.*, 701 F. App'x 759, 765 (11th Cir. 2017) ("[Objector] says [plaintiff's] gun does not have the false safety defect. But [plaintiff] alleged he owned a class gun that suffered from the same defects as the rest of the class guns. Thus, [plaintiff] suffers from the same alleged injury as the rest of the class."); *Amin v. Mercedes Benz USA, LLC*, 301 F. Supp. 3d 1277, 1284 (N.D. Ga. 2018) ("[W]hat really matters at this stage are *claims*, whether or not they involve more than one particular model of a product.") (emphasis in original); *see also Heurer v. Nissan N. Am., Inc.*, 2017 WL 3475063, at *5 (S.D. Fla. Aug. 11, 2017) (plaintiff had standing to bring class action based on multiple model years of vehicle that all had the same dashboard defect).

### 2. Class-Action Waivers

Ford asserts that the Florida and New York Plaintiffs have agreed not to "bring any warranty-related claim as a class representative, … a member of a class of claimants or in any other representative capacity." Opp. at 11. For at least two reasons, Ford waived this defense.

First, even though Plaintiffs raised warranty claims in their complaint, Ford did not raise class-action waiver in its answer. *See* ECF No. 71. "In responding to a pleading, a party must affirmatively state any … affirmative defense, including: … waiver." Fed. R. Civ. P. 8(c); *see also Ennis v. Alder Protection Holdings, LLC*, 2021 WL 409785, at *3 (D. Utah Feb. 5, 2021) (referring to the issue of "waiver" in the context of class-action waivers as an "affirmative defense[]"). The "[f]ailure to plead an affirmative defense generally results in a waiver of that defense." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010). By failing ever to raise the class-action waivers as an affirmative defense, Ford has waived it.

Second, Ford's actions in this litigation are plainly inconsistent with any desire to enforce the class-action waivers. This action was filed in November 2018. In each of their complaints Plaintiffs raised claims, on a class basis, for deceptive and breach of warranty. In none of its answers did Ford raise the class-action waiver, and Ford never moved to dismiss or to strike Plaintiffs' class allegations relating to their warranty claims, either—a procedure that defendants commonly use to avoid class claims. *See Phillips v. NCL Corp.*, 824 F. App'x 675, 680 (11th Cir. 2020) (affirming order granting motion to strike class allegations based on class-action waiver).

All the while, Plaintiffs litigated this action as a class action, including participating in and taking class discovery, and Ford has taken defensive discovery on this basis, too. It was only in April 2021 that Ford, in its opposition to the motion for class certification, raised for the first time the class-action waiver. In similar situations, courts haven't hesitated to find waiver of contractual rights through litigation conduct. *See, e.g.*, *Davis v. White*, 795 F. App'x 764, 765 (11th Cir. 2020) (affirming order denying motion to compel arbitration based on waiver where company moved to compel arbitration 18 months into the litigation); *Joca-Roca Real Estate, LLC v. Brennan*, 772 F.3d 945, 948 (1st Cir. 2014); *E.C. Ernst, Inc. v. Manhattan Const. Co. of Tx.*, 551 F.2d 1026, 1040-41 (5th Cir. 1977) (finding waiver of contractual right to arbitrate where defendant waited approximately two-and-a-half years to raise the issue); *Lukis v. Whitepages Inc.*, 2021 WL 1600194, at *7 (N.D. Ill. Apr. 23, 2021) (waived right to compel arbitration and enforce class-action waiver through litigation conduct; "its delay did waive its right to seek arbitration of Lukis's claim"). Similarly, had Ford raised the class-action waiver at the outset, this action could (and would) have been litigated quite differently. *Cf. In re Cox Enters. Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1119 (10th Cir. 2015) ( "The court may not have been able to compel arbitration of absent class members at that time, but Cox's assertion or mention of its right at that point would have fundamentally changed the course of the litigation, ensured a more expedient and efficient resolution of the trial, and prevented Cox's improper gamesmanship."). In short, Ford has waived its right to enforce the class-action waivers by sitting on that right and failing to assert it earlier in the litigation.

### 3.    Personal Jurisdiction

Citing *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773 (2017), Ford asserts that, "under the Fourteenth Amendment, a state such as Florida cannot exercise specific personal jurisdiction to resolve product-related claims asserted against a non-resident manufacturer by nonresident plaintiffs who did not purchase the product in Florida and were not injured in Florida." Opp. at 12. But *Bristol-Myers* did not involve a class action; it involved a mass-tort multi-district litigation. *See* 137 S. Ct. at 1777. And, for this reason, courts have not extended *Bristol-Myers* to class actions—as Ford itself acknowledges. *See* Opp. at 12 n.9. Most prominently, in *Mussat v. IQVIA, Inc.*, 953 F.3d 441 (7th Cir. 2020)), *cert. denied*, 141 S. Ct. 1126 (2021), the Seventh Circuit reversed a district court's order interpreting *Bristol-Meyers* as stating that "not just the named plaintiff, but also the unnamed members of the class, each had to show minimum contacts

between the defendant and the forum state." *Id.* at 443. In its opinion, the Seventh Circuit emphasized core differences between mass actions and class actions: "We see no reason why personal jurisdiction should be treated any differently from subject-matter jurisdiction and venue: the named representatives must be able to demonstrate either general or specific personal jurisdiction, but the unnamed class members are not required to do so." *Id.* at 447.

  **B.**  **Questions of Law or Fact Common to Class Members Predominate**

  Ford does not contest that the proposed classes are adequately defined and clearly ascertainable or that Plaintiffs have satisfied the four prerequisites of Federal Rule of Civil Procedure 23(a). In fact, Ford does not challenge Plaintiffs' motion on these grounds at all. Instead, Ford puts all its eggs in the predominance inquiry of Rule 23(b)(3). *See* Opp. at 12.

  In their motion, Plaintiffs identified the three steps required by the Eleventh Circuit to determine whether predominance is satisfied, and showed by reference to law and facts that, in the words of Rule 23, "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Mot. at 21-28. As required, Plaintiffs first identified their claims, classified them as common or individual questions based on how Plaintiffs would prove them at trial, and then showed that common questions "truly predominate" over individualized ones because "the addition or subtraction of any of the plaintiffs to or from the class should not have a substantial effect on the substance or quality of evidence offered." *Id.* at 21 (quoting *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1235 (11th Cir. 2016)). In its opposition, Ford does not seriously grapple with Plaintiffs' showing, or even acknowledge that these three steps exist; instead, Ford, in serial fashion, just lists a host of supposed individualized issues. Although some of these may indeed be individual in nature, "predominance requires a qualitative assessment … ; it is not bean counting, and the relative importance of the common versus individual questions also matters." *Brown*, 817 F.3d at 1235. And here, the relative importance of the many common questions plainly predominates over the individual ones.

  **1.**  **Uniformity of Laws**

  Claiming that "Plaintiffs seeking to represent multi-state classes must show that the applicable laws are sufficiently similar to allow for classwide resolution[,]" Opp. at 12 (citing *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010)), Ford asserts that "there are significant differences in the applicable state laws for which Plaintiffs make no attempt to account[,]" *id*. at 13.

This isn't true, and Ford seeks to create differences where none exists. To begin with—and putting to the side the nationwide unjust-enrichment class, which Plaintiffs will address separately, below—Plaintiffs' three proposed classes are brought under the laws of only three states: California, Florida, and New York. *See* Mot. at 2. In their motion, Plaintiffs showed that each state's deceptive and unfair trade practices statutes were materially similar, *id*. at 21, that claims brought under each "have materially similar elements," *id*. at 21-22, and that the damages under each state's laws were calculated the same, *id*. at 24. Ford does not seriously dispute any of this.

Plaintiffs need to show only that "any variation" in state law "is manageable." *Sacred Heart*, 601 F.3d at 1180. In so doing, plaintiffs may identify "the applicable state law variations and then determin[e] whether such variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines." *Id*. Plaintiffs have done that, too, by identifying the elements of each of Plaintiffs' claims; by citing law from each state that each state "requires only objective, not subjective, evidence[,] Mot. at 22; by showing that evidence supporting causation is similar, if not identical, among the three states, *id*. at 23-24; and by showing that because each state calls for or permits "benefit of the bargain" damages models, *id*. at 24-25. Even if there were significant variations among these three states' laws, these three proposed classes could easily be broken up into subclasses for each state. Under the Eleventh Circuit's precedent, doing so is sufficient. *See Sacred Heart*, 601 F.3d at 1180.

## 2. Plaintiffs' Deceptive Design Defect Class

Ford is mistaken that Plaintiffs' "[o]mission-[b]ased [c]onsumer [f]raud [c]laims [r]aise a [h]ost of [i]ndividual [i]ssues." Opp. at 13.

### a. Ford Asserts that the Existence of the Alleged Defect in 15 Vehicle Models Is an Individual Issue, but This Ignores Plaintiffs' Evidence

First, Ford contends that the "existence of the alleged defect in fifteen vehicles models is an individual issue." *Id*. In support, Ford argues that Plaintiffs have ignored the "standard for requiring disclosure of an alleged design defect," *id.*, and Ford states that "there is no evidence of a common defect affecting all of the different models and model years at issue," *id*. at 14. Each of Ford's arguments is wrong.

Contrary to Ford's assertion, Plaintiffs have not ignored controlling law. Citing an out-of-context quotation from *Smith v. GM LLC*, 988 F.3d 873 (6th Cir. 2021), Ford contends Plaintiffs have "eschew[ed] their obligation to set forth what that law is." Opp. at 13. Not true. Plaintiffs

bring their claims under the deceptive and unfair trade practices statutes of California, Florida, and New York, and claims brought under each "have materially similar elements: an unfair or deceptive act; causation; and damages." Mot. at 21-22. Ford doesn't seriously dispute any of this; instead, it cites a law review article for the proposition that "defining design defect … has been a subject of intense debate for decades." Opp. at 13. But defining a design defect is not an element of any of Plaintiffs' claims. And though Ford states Plaintiffs "have articulated no standard that would distinguish cosmetic defects that have to be disclosed from those that do not," *id.*, that's just not true. As stated elsewhere, Ford itself knows and has admitted that the Design Defect is material. *See* Mot. at 24 ("Corrosion performance for a given period of time … is a basic customer expectation." (quoting Minnich Dep. 273:25-274:1)). And when a defect is material, which is the principal standard, then it must be disclosed—as even one decision that Ford cited shows. *See* Opp. at 10 (citing *Anderson v. Ford Motor Co.*, 2020 WL 1853321, at *6 (W.D. Mo. Feb. 14, 2020)).[4]

Ford is also just wrong by stating that "whatever the standard, there is no evidence of a common defect affecting all of the different models and model years at issue." Opp. at 14. In making this statement, Ford ignores the expert opinion and evidence put forth by Plaintiffs' expert Erik Anderson, which states that "[e]ach of the Class Vehicles has the same Design Defect[.]" Mot. at 3; *see id.* at 3-5. Although Ford may disagree with Anderson's opinion, *see* Opp. at 14, Ford's disagreement—a merits inquiry—is not properly resolved on a motion for class certification. *See In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 422 F. Supp. 3d 194, 247 (D.D.C. 2019) ("[W]hether plaintiffs will be able to prove the existence … is solely a merits issue and has no relevant to class certification."); *Hisley v. Ocean Spray Cranberries, Inc.*, 2018 WL 6300479, at *5 (S.D. Cal. Nov. 29, 2018) ("On class certification, the Court does not resolve issues of disputed facts."); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) ("What Land Rover argues is whether class members can win on the merits. For appellants' claims regarding the existence of the defect and the

---

[4] In *Anderson*, the court focused on materiality when considering whether Ford was required to disclose an alleged defect. 2020 WL 1853321, at *6 ("Plaintiff's allegation that Ford failed to disclose the [alleged defect] … does not, alone, demonstrate that this fact is material…. A duty to warn that a glass product might break could be material if a manufacturer's product broke at a significantly higher rate than other products …."). Here, Ford has admitted that protection against premature corrosion is material (and, even though not required for purposes of class certification, Plaintiffs have shown that the Class Vehicles have a high rate of corrosion as well). *See* Wachs Report at 19 & Table 2.

defendant's alleged violation of consumer protection laws, this inquiry does not overlap with the predominance test.").

### b. Ford's Knowledge of the Design Defect Is Not an Individual Issue

Ford contends that under the CLRA and GBL—but not under FDUTPA—"[p]roof of Ford's knowledge of the alleged defect at the time of sale is an essential element of Plaintiffs' claims." Opp. at 15. Even if Ford is correct that knowledge is an element of either claim, knowledge doesn't present an individual issue. Rather, Ford's knowledge would be proved through common evidence—including Ford's own documents and testimony. *See* Mot. at 22 ("Plaintiffs will use Ford's own documents and testimony that Ford knowingly concealed the Design Defect from its consumers."). And it is entirely unclear how Ford's knowledge—which is a common question that doesn't depend on any one Plaintiff or class member—could be regarded as an individual issue.

### c. Materiality and Reliance are Not Individual Issues Under California law

Ford asserts that materiality and actual reliance are individual issues under California law. Opp. at 15. In so doing, Ford acknowledges "that reliance can be presumed (or inferred) where the omission is material[,]" but Ford states simply that "this principle is inapplicable here for multiple reasons." *Id*. Ford is mistaken.

To begin with, as Plaintiffs have shown, materiality and reliance are not necessarily individual issues for purposes of class certification. *See, e.g.*, Mot. at 23-24 (citing authorities); *see also, e.g.*, *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1019 (C.D. Cal. 2015) ("The court concludes that plaintiffs have made a sufficient showing for purposes of class certification that the … claim is material[.]"), *aff'd*, 674 F. App'x 654 (9th Cir. 2017); *Schaefer v. Overland Express Family of Fund*s, 169 F.R.D. 124, 131 (S.D. Cal. 1996) ("[T]he presence of different methods of reliance by different members of the class does not result in a conclusion that individual issues predominate over the common questions."). Ford's sweeping statement that materiality and reliance present individual issues under California is incorrect.

Again treating class certification as if it were a motion for summary judgment, Ford states that "Plaintiffs have not presented evidence sufficient to establish that the omission was material." Opp. at 15. Ford cannot be serious; one of Ford's top internal experts testified that "[c]orrosion performance for a given period of time … is a basic customer expectation." Mot. at 24 (quoting

Minnich Dep. 273:25-274:1).[5] Ford can assert all it wants that "[n]o reasonable consumer" would think that the design defect was material, Opp. at 15, but that's disputed by Ford's own evidence. *See Martin v. Monsanto Co.*, 2017 WL 1115167, at \*7 (C.D. Cal. Mar. 24, 2017) ("[Defendant]'s own documents and consumer studies demonstrate materiality."). And it's also disputed by Plaintiffs' expert's proofs—by way of example, based on Ford's own warranty data, and in response to Dr. Paul Taylor, Plaintiffs' rebuttal expert Dr. Allise Wachs concludes that the Class Vehicles suffer hood corrosion related to the Design Defect at ranges from 8.8 (2016-2017 Expedition) to a whopping 581.4 (2013-2015 Explorer) times worse than non-class comparison vehicles, the 2013-2014 F-150 and the 2009-2010 Explorer (vehicles that employed a downstanding flange, which is a drainage strategy for the leading edge of the hem of their hoods). *See* Wachs Report at 19 & Table 2. At any rate, gain, courts don't resolve issues of disputed facts on class certification. *See McCormick*, 422 F. Supp. 3d at 247; *Hisley*, 2018 WL 6300479, at \*5.

Ford states that even if the design defect were material to some consumers, "the materiality of the risk depends on the probability that corrosion will occur." Opp. at 16. Again, Ford fundamentally misstates Plaintiffs' theory of the case, which is not about the probability that corrosion will occur; Plaintiffs allege that the Design Defect injures all members of the proposed classes regardless of whether corrosion occurs.

Ford states "it could not possibly be important to all reasonable consumers." *Id.* at 16. This *ipse dixit* is odd at best (how could premature corrosion not be material to consumers?), but it is

---

[5] In opposition to summary judgment, Plaintiffs would identify tons of evidence that Ford believed that corrosion on its aluminum body parts, including the hood, was important to consumer purchasing decisions. This includes not only that a Ford witness testified that corrosion performance was a "basic customer expectation," but also: (1) Ford's Trustmark Requirements, which consider customer expectations in North America and require no visible corrosion on the hood for six years in service. Ford does not dispute this is an industry-standard minimum; (2) Ford's marketing department advocated the change in the corrosion warranty to remove the perforation requirement because it believed it could affect customer perception of the durability of Ford's aluminum hood, which could affect a customer's decision to purchase a vehicle; (3) In its financial analysis on removing the perforation requirement, Ford specifically evaluated the cost of hood corrosion claims; (4) Ford's change in recommended service repair to panel replacement; (5) an internal survey showing the cost of corrosion on panels, including on the hood; and (6) Ford's President of North American, agreeing that the perforation requirement caused consumer confusion and dissatisfaction because consumers expected Ford to cover corrosion, which affects all aluminum body panels, including the hood on the Class Vehicles. Further, Plaintiffs believed it was important. And, of course, reasonable consumers think it is important to know if Ford's cars are corrosion-buckets. In short, there is plainly a genuine dispute of material fact on materiality.

also irrelevant. Again, "[m]ateriality is judged from the perspective of a reasonable consumer, and it is generally a question of fact." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1226 (9th Cir. 2015). And whether Ford's actions and omissions "would be material to a reasonable consumer" are "common questions" that are "subject to attack at trial." *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 564 (N.D. Cal. 2020). The reasonable-consumer test is "objective," and "[t]his objective test renders claims under the … CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1095 (N.D. Cal. 2018).

Ford states that "the presumption (or inference) of reliance does not apply where class members had access to the allegedly undisclosed information and individual inquiry is necessary to determine if class members were aware of the information." Opp. at 17. In support, Ford cites a decision where the owner's manual actually disclosed the defect in the part at issue, and Ford contends that the "warranty guide specifically disclosed the potential for cosmetic corrosion" here. *Id*. That's not Plaintiffs' theory of the case; nor has Ford has pointed to any evidence suggesting that it ever disclosed to any consumer that the Class Vehicles were prone to premature corrosion.

Last, Ford contends that "even if a presumption of reliance were permissible, it is rebuttable." *Id*. But this argument is just another way of saying class-wide treatment of reliance is not available under California law, which is incorrect. *See Krueger v. Wyeth, Inc.*, 2016 WL 3981125, at *2 (S.D. Cal. Apr. 4, 2016) ("Individualized proof of deception and reliance are not necessary under California law for plaintiff to prevail on class claims.").

### d.    Materiality, Deception, and Actual Injury Are Not Individual Issues Under New York Law

Despite Ford's statement to the contrary, "materiality, deception, and actual injury" are not "individual in nature" under New York law. Opp. at 18. Indeed, "[m]ateriality under Section 349 of the GBL is an objective inquiry; a deceptive act is defined as one likely to mislead a reasonable consumer acting reasonably under the circumstances." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015). Further, section 349 does not "require proof of reliance, []or proof that defendants intended to mislead consumers." *Id.* Here, Plaintiffs' claims "depend on generalized evidence" and "[c]lasswide evidence will be used to establish whether" Ford's acts were "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* "Likewise, classwide evidence will determine whether plaintiffs were injured." *Id.*

Ford largely cites various New York state-court orders that do not apply these principles

in light of Rule 23 or federal class-certification standards. *See* Opp. at 18. Ford does cite one federal district court order, *see* Opp. at 19 (citing *In re General Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372 (S.D.N.Y. 2017)), but that order does not bear on the question whether materiality, deception, or injury are individual issues.

### e.    Materiality, Actual Deception, and the Likelihood of Deception Are Not Individual Issues Under Florida Law

Contrary to what Ford states, materiality, actual deception, and actual injury are not individual issues under Florida law, either. Tellingly, Ford entirely ignores *Carriuolo v. General Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016), which affirmed an order granting class certification against a vehicle manufacturer and, in so doing, specifically affirmed the trial court's findings of predominance under the plaintiffs' FDUTPA claim. *See also id.* at 985 ("Because a plaintiff asserting a FDUTPA claim need not show actual reliance on the representation or omission at issue, the mental state of each class member is irrelevant."); *id.* at 986 ("[B]ecause the injury is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy, causation and damages may also be amenable to class-wide resolution.").

Citing a decision from a Florida intermediate appellate court, Ford also claims that Plaintiffs' definition of an "unfair practice" under FDUTPA is "outdated." Opp. at 20 n.14. It is not clear, candidly, how a Florida intermediate appellate court could alter the definition of "unfair practice" that has been used and not changed by the Florida Supreme Court. *See Herrell v. Seyfarth, Shaw, Fairweather & Geraldson*, 491 So. 2d 1173, 1175 (Fla. Dist. Ct. App. 1986) ("The rule is well established that in the absence of constitutional, or statutory authority reflecting a change in the common law, a district court of appeal is not empowered to overrule controlling precedent of the Florida Supreme Court."). At any rate, even with the definition of "unfair trade practice" cited by *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096 (Fla. Dist. Ct. App. 2014), Plaintiffs' injuries were plainly of the kind "that consumers themselves could not reasonably have avoided." *Id.* Ford makes no claim otherwise.

### f.    Purchase for Personal, Family, or Household Use is Not an Individual Issue Under California Law

Ford claims that "[i]ndividual issues also predominate on Plaintiffs' CLRA claim because the Court would have to determine whether each California class member is a consumer" and that a "class member who purchases products or services primarily for business purposes does not have standing under the CLRA." Opp. at 20. To the extent that any of the proposed class definitions is

over-inclusive, this could easily be addressed by narrowing the class definitions to include class members who have not bought Class Vehicles primarily for business purposes. *See, e.g.*, *Ewert v. eBay, Inc.*, 2010 WL 4269259, at *9 (N.D. Cal. Oct. 25, 2010) ("There can be little doubt that many non-consumers are included as class members under either of plaintiffs' proposed class definitions."). And a "class does not need to be defined to such a precise degree that any error in definition would make the class invalid." *Johnson v. Midland Credit Mgmt. Inc.*, 2012 WL 5996391, at *12 (N.D. Ohio Nov. 29, 2012). Or this could be addressed through a class member's certifying that the purchase of the Class Vehicles is for personal, family, or household purposes.

### 3.    Plaintiffs' Ineffective-Repair Class

Ford is mistaken that Plaintiffs' ineffective-repair class raises too many individual issues to be certified. *See* Opp. at 21.

To begin with, it is important to restate what the proposed class is and what it is based on. It consists of "[a]ll current owners who purchased a new or used model year 2013-2016 Ford Mustang, model year 2013-2017 Ford Expedition, or model year 2013-2018 Ford Explorer from a Ford dealership in California, Florida, or New York." Mot. at 2. It is based on the core allegation that "Ford knowingly provided an ineffective 'repair' of the defective hood for the Class Vehicles." *Id.* at 1. Although "Ford recommended that any corrosion be repaired through sanding and painting the affected area," Ford "knew that this repair did not work, that the corrosion recurred soon after repair, and that sanding aluminum exacerbates the sensitivity of aluminum to corrosion." *Id.* It was only after it became financially convenient to do so that Ford, in 2017, stopped offering the sand-and-paint repair and began replacing the hoods instead. *Id.* at 1-2.

Ford—again mischaracterizing Plaintiffs' theory—cites many supposed individual questions that would have to be answered, including "whether the repair they were provided was effective." Opp. at 21. But this is not an individual question, because Plaintiffs are alleging that the sand-and-paint repair that was offered for all these Class Vehicles during that timeframe was ineffective because it did nothing to address the Design Defect. In other words, this is a common question—one that applies to all Class Vehicles—that entails deciding solely whether sand-and-repair was effective in addressing the Design Defect. The merits of whether this repair was effective is not decided at class certification. *See McCormick*, 422 F. Supp. 3d at 247; *Hisley*, 2018 WL 6300479, at *5.

### 4.  Plaintiffs' Deceptive-Warranty Class

Ford also claims that Plaintiffs' deceptive-warranty class "raises individual issues that preclude certification." Opp. at 22. Yet again, Ford is wrong.

Because Ford, again, mischaracterizes Plaintiffs' deceptive-warranty claim, it is important to restate that claim here. As stated in Plaintiffs' motion, each NVLW for the 2013-2015 Class Vehicles contained a three year or 36,000 mile bumper-to-bumper warranty, and each contained "an extended warranty that covered body sheet metal panels … for an extended Corrosion Coverage Period" for five years, regardless of the miles driven. Mot. at 12. Although, as its name suggests, the extended warranty purported to cover corrosion, it would do so only if the body sheet-metal panel "perforated." *Id.* Because aluminum panels don't perforate in this context, Plaintiffs alleged that the extended warranty was deceptive, unfair, and ultimately worthless. *Id.* at 12-13.

Although Ford purports to challenge this proposed class on the ground that it raises individual issues, on close review Ford appears to be challenging the merits of the claim. First, Ford says Plaintiffs' claim fails because the extended warranty itself stated that perforation was required. Opp. at 22. Plaintiffs disagree that this alleged disclosure at all affects their claim; indeed, the president of Ford's customer service division wrote to the President of Ford North America that the perforation requirement caused "customer confusion" and "dissatisfaction." Mot. at 13. But resolving that issue now is improper, because—as already stated—"whether plaintiffs will be able to prove the existence [of their claim] is solely a merits issue and has no relevance to class certification." *McCormick*, 422 F. Supp. 3d at 247.

Ford next claims that Plaintiffs "copied this theory from *Mickens v. Ford Motor Co.*," Opp. at 22, but the court in *Mickens* expressly did "not rule … whether … the warranties were sufficiently misleading to constitute affirmative acts of unlawful conduct under" New Jersey law, 2015 WL 5310755, at *12 (D.N.J. Sept. 10, 2015).

Finally, Ford states only that "Plaintiffs' claim cannot be certified because it raises many of the same issues discussed above, including deception, reliance, causation, and materiality." Opp. at 23. But Ford does nothing to explain why this is so.

In short, Ford has failed to identify a single, coherent, individual issue that would preclude certification on Plaintiffs' deceptive-warranty class.

### 5.      Plaintiffs' Unjust-Enrichment Class

Citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009), Ford states that unjust-enrichment claims are rarely certifiable. But many courts after *Vega* have certified unjust-enrichment classes in cases, like this one, in which a defendant's uniform and undisclosed business practices apply to all class members. *See, e.g.*, *Muzuco v. Re$ubmitit, LLC*, 297 F.R.D. 504, 521 (S.D. Fla. 2013) ("The Eleventh Circuit has cautioned that unjust enrichment claims are rarely suitable for class-wide resolution…. Here, however, Defendants' business operations are the same to all members of the putative class…. Where, as here, highly individualized issues are absent, class certification for an unjust enrichment claim is appropriate."); *In re Checking Acct. Overdraft Litig.*, 286 F.R.D. 645, 658 (S.D. Fla. 2012) (similar); *Cnty. of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 671 (S.D. Fla. 2010) (similar).

### 6.      Statute of Limitations

Ford is wrong that statute of limitations defeat predominance. *See* Opp. at 25.

Despite recognizing that *Brown*, 817 F.3d 1225, is the leading Eleventh Circuit decision on how affirmative defenses affect predominance, Ford does not engage with its analysis. In *Brown*, consumers who purchased front-loading washing machines brought a putative class action against the machines' manufacturer for breach of warranty. The manufacturer raised the defense of misuse. The Eleventh Circuit acknowledged, as did the district court, that "individual affirmative defenses ordinarily do not defeat predominance." *Id*. at 1240. But the court recognized "some circumstances" in which affirmative defenses could defeat predominance, such as where it raised "complex, individual questions" or "the affirmative defenses [were] coupled with several other individual questions." *Id*. at 1241. "What matters is the type of evidence that the parties will submit to prove and disprove the defense." *Id*. at 1240.

Here, Plaintiffs intend to show that the statute-of-limitations defense is tolled based on fraudulent concealment, estoppel, or the discovery rule—all of which turn on Ford's concealment of the Design Defect. *See* Second Am. Compl. ¶¶ 125-31 [ECF No. 70]. Ford does not argue that the statute-of-limitations defense raises a "complex, individual" question or that the statute of limitation defense is coupled with several other individual issues. Indeed, the defense rises or falls on common evidence of Ford's concealment—not on individual questions. "Courts consistently hold [] that the statute of limitations does not bar class certification, even when individual issues are certain to exist." *In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 651-52 (S.D. Fla.

2015). Ford makes no effort to apply *Brown*'s analysis or to distinguish orders such as *Checking Account*. Ford's run-of-the-mill statute-of-limitations defense does not defeat predominance here.

Ford's one case in support, *Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2003 WL 21146714 (S.D. Fla. May 6, 2003, predates *Brown* and is factually distinguishable. There, the court found that "variations in tort and contract law of the several governing jurisdictions, as well as the sheer volume of individual factual variations that would arise at trial [would] overwhelm common issues[.]" *Id.* at *13. That's not the case here, though, since Plaintiffs have moved to certify a class based on only three states' substantially similar statutory consumer protections laws. Further, *Jim Moore* is an outlier; no Florida district court has cited it after *Brown* and no federal court on class certification has cited *Jim Moore* after *Brown*, either.

### 7.   Class-wide Measure of Damages

Ford asserts that Plaintiffs have no class-wide measure of damages. *See* Opp. at 25-29. Specifically, Ford asserts that repair cost is not a proper measure for benefit-of-the-bargain damages for consumer fraud claims of Florida, California, and New York, *see id.* at 25-28; that Plaintiffs have no evidence of class-wide damages on ineffective repair or on their deceptive-warranty claims, *see id.* at 28; and that Plaintiffs haven't proposed a measure of damages for unjust enrichment, *see id.* at 28-29. Each of Ford's assertions is mistaken.

### a.   Repair Costs

As stated elsewhere, Plaintiffs' expert Ted Stockton ("Stockton") used the cost of replacing the defective hood as a proxy to measure benefit-of-the-bargain damages. Contrary to the statements by Ford and those in certain factually distinguishable orders, using repair cost as a proxy to measure benefit-of-the-bargain damages is acceptable for consumer fraud claims under Florida, California, and New York law.

### (1)   Florida

Because the plain language of FDUTPA allows for recovery of only "actual damages," Fla. Stat. § 501.211, courts have concluded that FDUTPA does not allow for "consequential damages, such as repair damages or resale damages." *E.g.*, *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. Dist. Ct. App. 2008); *see also, e.g.*, *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 481 F. Supp. 3d 1258, 1284 (S.D. Fla. 2020) ("[I]t is well-accepted that FDUTPA does not cover repair costs."). But court decisions do recognize that benefit-of-the-bargain damages models are available under FDUTPA. *See Carriuolo*, 823 F.3d 977 at 986 ("[T]he FDUTPA benefit of the bargain model provides a standardized class-wide damages figure because

the plaintiff's out-of-pocket payment is immaterial."); *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 453 (5th Cir. 2001) ("Texas's DTPA and Florida's DUT[P]A both recognize the legal cognizability of benefit of the bargain damages."). And Ford cites no binding authority—and, to Plaintiffs' knowledge, none exists—for the proposition that a party may not use the cost of repair as a proxy to measure benefit-of-the-bargain damages. For good reason: as one court stated in reviewing the same damages model put forth by Stockton, "benefit-of-the-bargain theories … are a classic measure of damages in both contract and tort contexts" and "[o]ne obvious measure of such damages is the cost to repair the defective product." *Sloan v. Gen. Motors LLC*, 2020 WL 1955643, at *48 (N.D. Cal. Apr. 23, 2020).

Here, Stockton uses the cost of replacing the defective hood as a proxy for measuring benefit-of-the-bargain damages. Ford claims that Stockton does not calculate damages consistent with how courts usually state that they should be measured: "FDUTPA damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." Opp. at 26 (quoting *Ohio State Troopers*, 481 F. Supp. 3d at 1283).[6] But that's not so. As Stockton wrote, "[t]he market value of the repair restores consumers to a position equivalent to that which they would have occupied had the Class Vehicles been non-defective." Stockton Report ¶ 34 [ECF No. 97-3]. Indeed, reasonable consumers would not accept a repair on a new vehicle, unless the repair was at least worth as much as the difference in value between what was promised and what was delivered. Thus, Stockton, in fact, offers a reasonable estimate of the difference in market value between what was promised and what was delivered by using repair cost as a proxy.

Trying to resist this conclusion, Ford—again changing Plaintiffs' theory of the case—focuses on the *rate* of corrosion by stating that the "full cost of repair might be an accurate measure

---

[6] The first Florida court to state this measure of FDUTPA damages is *Rollins, Inc. v. Heller*, 454 So. 2d 580 (Fla. Dist. Ct. App. 1984), which adopted the formula in *Raye v. Fred Oakley Motors, Inc.*, 646 S.W.2d 288 (Tex. App. 1983). In so doing, the court stated that "Florida's statutes should be interpreted, and actual damages measured, in a similar manner" as in *Raye*. *Rollins*, 454 So. 2d at 585. In *Raye*, after a buyer agreed to purchase a van, the van was damaged while parked in the seller's lot. The buyer accepted delivery in reliance on the seller's promise to repair. Unsatisfied with the repair, the buyer sued under Texas's Deceptive Trade Practices Act. The court reasoned that "[i]f … a defect becomes apparent after the product has been used, then the damages should be the value of the repairs." 646 S.W.2d at 291. The court held "the appropriate measure of damages is the reasonable cost of repairing the van to the condition contemplated by the bargain." *Id.* at 292. A similar rationale underlying *Raye* is what underlies Stockton's analysis here.

of the difference in market value if there were a 100% probability of a manifestation not covered by warranty[.]" Opp. at 26-27. But that is precisely Plaintiffs' case, because each Class Vehicle "manifests" the Design Defect the moment it rolls off the assembly line. Indeed, Stockton considered this: "Plaintiffs allege the following, which I assume to be true for purposes of this Report: All Class Vehicles suffer from a common organic design defect that makes the hoods prone to premature corrosion." Stockton Report ¶ 6. Again, Ford is free to challenge at trial whether each of the Class Vehicles has the Design Defect (and would, in turn, be free to challenge Stockton's opinion as well). But that doesn't affect Plaintiffs' damages model here. *See Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 991 (Fla. Dist. Ct. App. 2004) ("This case turns on a relatively simple question, at least as to damages—Is a car with defective seatbelt buckles worth less than a car with operational seatbelt buckles? Common sense indicate that it is, but, at this stage of the case, we need not decide that issue. Rather, we only determine that [the plaintiff] is entitled to go forward with her case.").

In sum, Stockton has put forth a benefit-of-the-bargain damages model that can used on a class-wide basis—by buying a Class Vehicle, each of which has the Design Defect, Plaintiffs received a vehicle worth less than what it would be worth had it not had the Design Defect.

### (2)   California

Citing a California statute, Ford states that "California law specifically prohibits an award of benefit of the bargain damages for fraud." Opp. at 27 (citing Cal. Civ. Code § 3343(b)(1)).

There are at least two problems with Ford's argument. First, as relevant to their motion for class certification, Plaintiffs aren't suing Ford for fraud; rather, they are suing Ford for violations of California's consumer protection statute and for unjust enrichment. So whatever the merit of Ford's argument based on this statute (and, based on existing law, it does not appear to have any merit), it has no relevance to Plaintiffs' motion for class certification. *See Sharpe v. Puritan's Pride, Inc.*, 466 F. Supp. 3d 1066, 1075-76 (N.D. Cal. 2020) ("As a matter of statutory construction, the general provisions in Section 3343 do not trump the specific remedies enumerated in the CLRA itself…. No specific damages measure is prescribed in the CLRA, and the door is open to any reasonable measure."); *Daniel v. Ford Motor Co.*, 2016 WL 2899026, at *6 n.5 (E.D. Cal. May 18, 2016) ("[W]hile section 3343 provides the exclusive measure of damages for fraud cases, Ford has not cited a single decision from the California Supreme Court

of California appellate courts holding that section 3343 also provides the exclusive measure of damages for CLRA claims.").

Second—as Ford itself acknowledges, *see* Opp. at 27 n.22—federal courts in California, having closely analyzed the law, have permitted benefit-of-the-bargain damages for violations of California's consumer protection statutes. *See Nguyen*, 932 F.3d at 818 ("[W]e are satisfied that Plaintiff's proposed benefit-of-the-bargain measure of damages is both cognizable under the CLRA and a reasonable basis of computation."); *Sloan*, 2020 WL 1955643, at *48 (similar).

### (3)   New York

To Ford, "New York authority precludes a cost of repair award where an unmanifested defect is alleged to create a tendency to fail[,]" and "repair costs are not a proxy for properly-calculated benefit of the bargain damages in cases where such damages are allowed." Opp. at 28. Neither order that Ford cites—*Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9 (App. Div. 2002), and *Maciel v. BMW of N. Am., LLC*, 2021 WL 983013 (E.D.N.Y Feb. 22, 2021)—assists Ford.

In *Frank*, an appellate court affirmed a lower court's dismissal of plaintiffs' claims because plaintiffs didn't allege that they had been damaged, 741 N.Y.S.2d at 17, and, at any rate, the plaintiffs didn't raise a similar claim to what Plaintiffs raise here. In *Maciel*, though the plaintiff there did argue cost of repair as a proxy to measure benefit-of-the-bargain damages, the order is plainly distinguishable. To begin with, the court was dealing with a breach-of-warranty claim, *see* 2021 WL 983013, at *8; here, Plaintiffs, for class purposes, assert no such claim. Second, the court never stated categorically that cost of repair could not be used as a proxy to measure benefit-of-the-bargain damages—even in the context of a breach-of-warranty claim. Last, the court grounded its conclusion that the plaintiff failed to plead actual damages on the plaintiff's failed attempt "to invoke the 'special circumstances' exception set forth under the UCC." *Id.*

### b.   Class-wide Damages on Plaintiffs' Ineffective-Repair, Defective-Warranty, and Unjust-Enrichment Claims

Contrary to what Ford states, *see* Opp. at 28, Plaintiffs have put forth evidence of class-wide damages for their ineffective-repair class and deceptive-warranty class. Indeed, and as stated in their motion for class certification, Plaintiffs' expert Kirk D. Kleckner "proposes a methodology to evaluate Ford's failure to fulfill the bargain under which consumers agreed to purchase the Class Vehicles at the point of sale due to the deceptive warranties." Mot. at 25. Ford claims that Kleckner "concludes nothing of the sort," Opp. at 28, but Ford is just disagreeing with Kleckner's conclusions—which is irrelevant at the class certification stage.

As for Ford's claim that Plaintiffs have failed to propose a measure of damages for unjust enrichment because, Ford states, Plaintiffs' cited authority of *Marty v. Anheuser-Busch Cos.*, 43 F. Supp. 3d 1333 (S.D. Fla. 2014), is distinguishable, Plaintiffs disagree. Indeed, the plaintiffs in *Marty* alleged "that they paid a premium" for the allegedly deceptive product. *Id.* at 1350-51. And it was in that context that the court stated that "the plaintiffs in the instant case did not receive the benefit of that bargain and have alleged a cause of action for unjust enrichment." *Id.* at 1351. For its part, Ford has cited no authority suggesting that a benefit-of-the-bargain damages model would be unavailable for unjust enrichment—often referred to by courts as "a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff." *Cobalt Multifamily Inv'rs I, LLC v. Shapiro*, 9 F. Supp. 3d 399, 411 (S.D.N.Y. 2014). Here, the difference in the value that Plaintiffs paid for the Class Vehicles and the value that Plaintiffs would have paid for the Class Vehicles without the Design Defect shouldn't be retained by Ford.

### c.   Plaintiffs' Claims Are Typical and a Class Action Is Superior

Ford states that because Plaintiff Ilja Lopatik was, but no longer is, a class representative, and because Plaintiff Franklin Navas sued Ford in 2016 under California's lemon law, neither is typical. *See* Opp. at 29-30. Ford cites no law for this proposition, and it provides no good reason for it, either. Indeed, "[t]he test for typicality … is not demanding. Neither typicality nor commonality requires that all putative class members share identical claims, and both may be satisfied even if some factual differences exist between the claims of representatives and represented parties." *Checking Account*, 307 F.R.D. at 642.

Finally, Ford asserts that Plaintiffs have not shown, in the words of Rule 23(b)(3), that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Opp. at 29. Nonsense. In their motion, Plaintiffs set forth four specific considerations favoring class treatment. *See* Mot. at 28-29. In its opposition, Ford doesn't grapple seriously with any of these considerations. Instead, Ford again cites Plaintiffs Lopatik's and Navas' experiences. But Ford has not explained how their experiences at all diminishes Plaintiffs' showing that a class action is superior to other methods, and no good reason exists.

### III.   CONCLUSION

The Court should grant Plaintiffs' motion for class certification.

Respectfully submitted,

DATED:  August 5, 2021

**ROBBINS GELLER RUDMAN.
 & DOWD LLP**

 

 

<u>**Mark J. Dearman**</u>
MARK J. DEARMAN

MARK J. DEARMAN
Florida Bar No. 0982407
ERIC S. DWOSKIN
Florida Bar No. 112459
ALEXANDER C. COHEN
Florida Bar No. 1002715
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
mdearman@rgrdlaw.com
edwoskin@rgrdlaw.com
acohen@rgrdlaw.com

**GORDON & PARTNERS**
ROBERT E. GORDON
STEVEN G. CALAMUSA
DANIEL G. WILLIAMS
4114 Northlake Blvd., Suite 200
Palm Beach Gardens, FL  33410
Telephone:  561/799-5070
561/799-4050 (fax)
rgordon@fortheinjured.com
scalamusa@fortheinjured.com
dwilliams@fortheinjured.com

**CARELLA, BYRNE, CECCHI, OLSTEIN,
 BRODY & AGNELLO, P.C.**
JAMES E. CECCHI
CAROLINE F. BARTLETT
MICHAEL A. INNES
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com
minnes@carellabyrne.com

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
ZACHARY S. BOWER
117 NE 1st Avenue
Miami, FL  33132
Telephone:  973/994-1700
973/994-1744 (fax)
zbower@carellabyrne.com

**GELBER SCHACHTER & GREENBERG, P.A.**
ADAM M. SCHACHTER
Florida Bar No. 647101
BRIAN W. TOTH
Florida Bar No. 57708
SunTrust International Center
One Southeast Third Avenue, Suite 2600
Miami, FL 33131
Telephone: 305/728-0950
305/728-0951 (fax)
aschachter@gsgpa.com
btoth@gsgpa.com
E-service: efilings@gsgpa.com

*Counsel for Plaintiffs and the Proposed Class*