UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-81558-RAR

CLARENCE SIMMONS, et al.,

      Plaintiffs,

v.

FORD MOTOR COMPANY,

      Defendant.

_____/

**DEFENDANT FORD MOTOR COMPANY'S OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE DEFENDANT'S EXPERTS**

Respectfully submitted,

JOHN M. THOMAS
KRISTA L. LENART
DYKEMA GOSSETT PLLC
2723 South State Street, Suite 400
Ann Arbor, MI 48104
Telephone: (734) 214-7613
Facsimile: (855) 262-3751
JThomas@dykema.com
KLenart@dykema.com

ERIC C. TEW
DYKEMA GOSSETT PLLC
1301 K. Street, N.W., Suite 1100 West
Washington, D.C. 20005
Telephone: (202) 906-8600
Facsimile: (855) 221-0913
ETew@dykema.com

WENDY F. LUMISH
Florida Bar No. 334332
CHRISTINE L. WELSTEAD
Florida Bar No. 970956
BOWMAN AND BROOKE LLP
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Telephone: (305) 995-5600
Facsimile: (305) 995-6100
Wendy.Lumish@bowmanandbrooke.com
Christine.Welstead@bowmanandbrooke.com

*Counsel for Defendant, Ford Motor Company*

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD ............................................................................................. 2

I.     DR. GUYER'S OPINIONS ARE ADMISSIBLE. ................................................ 3

    A.     Dr. Guyer's Opinions Are Relevant .......................................................... 3

        1.     Dr. Guyer's opinions are relevant to whether the question of design defect is common to the class. ............................................. 5

        3.     Dr. Guyer's opinions are relevant to whether Plaintiffs have proposed a classwide measure of damages. .................................... 8

        4.     Plaintiffs' reliance on *Nguyen v. Nissan* is misplaced. ................... 8

    B.     Plaintiffs' Miscellaneous Arguments Are Meritless. ................................. 9

    C.     Dr. Guyer Is Qualified To Address "Basic Corrosion Science." .............. 12

II.    DR. TAYLOR'S OPINIONS ARE ADMISSIBLE. ............................................. 12

    A.     Dr. Taylor Is Qualified And His Analyses Of Actual Data Is Helpful. ..... 13

    B.     Dr. Taylor's Warranty Rate Analysis Based On Actual Data Is Reliable .................................................................................................. 16

        1.     Rate Calculations are a recognized methodology. ........................ 16

        2.     Warranty rates are routinely used and routinely accepted. ........... 18

    C.     Dr. Taylor's Analysis Of Overall Corrosion Rates In Class And Other Vehicles Is Relevant. ............................................................................. 20

    D.     Dr. Taylor's TSB Analysis Is Admissible. .............................................. 22

III.   DR. HARLESS'S OPINIONS ARE ADMISSIBLE. ........................................... 23

    A.     Dr. Harless' Opinions Are Relevant. ...................................................... 24

    B.     Dr. Harless' Use Of "Clean" Vehicles Did Not Impact His Results And Is Most Methodologically Consistent With Plaintiffs' Claims. ................ 24

    C.     Dr. Harless' Methodology Reliably Establishes That The Alleged Defect Does Not Have a Substantial Impact On Value. ........................... 26

IV.    PROFESSOR O'GUINN'S OPINIONS ARE ADMISSIBLE. ............................ 30

    A.     Conclusion M.1 Is Relevant And Reliable. ............................................. 30

    B.     Conclusion M.2 Is Relevant And Reliable. ............................................. 32

    C.     Conclusion M.3 Is Relevant And Admissible ......................................... 33

V.     DR. RENE BEFURT'S OPINIONS ARE ADMISSIBLE. .................................. 35

    A.     Dr. Befurt's Qualifications and Opinions ................................................ 35

B.      Dr. Befurt's Opinions Are Relevant To Actual Reliance And Causation....................................................................................... 37

C.      Dr. Befurt's Opinions Are Relevant To Materiality. .................. 39

D.      Dr. Befurt's Reliable Opinions "Fit" Plaintiffs' Theory Of The Case. .... 40

E.      Plaintiffs' Gripes About Dr. Befurt's Disclosure Language Are Unfounded And In Any Event, Do Not Impact The Validity Of His Study. ........................................................................................... 43

F.      Dr. Befurt's Methodology Presented The Stimuli To Respondents In A Realistic and Engaging Manner, and There Is No Evidence That Respondents Were Not Aware Of The Disclosures................................. 44

G.      Dr. Befurt Relied On Appropriate Sources............................... 48

H.      Dr. Befurt's Opinions, Including Those Pertaining To Stockton, Are All Reliable And Helpful To The Jury. ...................................... 49

VI.     EXCLUSION IS NOT WARRANTED UNDER RULE 403. ........................... 50

CONCLUSION............................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*All. Mortg. Co. v. Rothwell*,
    10 Cal. 4th 1226 (1995) ...........................................................................20, 21, 25, 41

*Anderson v. Ford Motor Co.*,
    2020 U.S. Dist. LEXIS 66549 (W.D. Mo. Feb. 14, 2020) ...................................6, 7

*Banh v. Am. Honda Motor Co.*,
    2020 U.S. Dist. LEXIS 139274 (C.D. Cal. July 28, 2020)......................................40

*Beaty v. Ford Motor Co.*,
    2021 U.S. Dist. LEXIS 137155 (W.D. Wash. July 8, 2021) .....................................6

*Braverman v. BMW of N. Am., LLC*,
    2020 U.S. Dist. LEXIS 91484 (C.D. Cal. May 19, 2020) ...........................30, 31, 32

*Chapman v. Proctor & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) .............................................................................30

*City of Tuscaloosa v. Harcros Chems., Inc.*,
    158 F.3d 548 (11th Cir. 1998) ...............................................................................16

*Coba v. Ford Motor Co.*,
   2017 U.S. Dist. LEXIS 123546 (D.N.J. August 4, 2017),
   *aff'd* 932 F.3d 114 (3d Cir. 2019) ......................................................................18, 19, 35

*Coba v. Ford Motor Co.*,
   932 F.3d 114 (3d Cir. 2019).........................................................................................19

*Crawford v. ITW Food Equip. Grp., LLC*,
   977 F.3d 1331 (11th Cir. 2020) .....................................................................................5

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)..........................................................................................1, 2, 30

*Edmondson v. Caliente Resorts, LLC*,
   2017 U.S. Dist. LEXIS 220882 (M.D. Fla. Aug. 31, 2017) .......................................47

*Elward v. Electrolux Home Prods.*,
   2020 U.S. Dist. LEXIS 96000 (N.D. Ill. June 1, 2020) ............................................18

*Finer Space, LLLP v. Diamond H. Constr., LLC*,
   No. H-06-1723, 2008 U.S. Dist. LEXIS 4389 (S.D. Tex. Jan. 22, 2008)..........15, 16

*Gardner v. Ford Motor Co.*,
   2015 U.S. Dist. LEXIS 194098 (M.D. Fla. June 3, 2015).........................................33

*Hamm v. Mercedes-Benz U.S.*,
   2021 U.S. Dist. LEXIS 65098 (N.D. Cal. Apr. 2, 2021) ...............................30, 31, 32

*In re Abilify Aripiprazole Prods. Liab. Litig.*,
   2021 U.S. Dist. LEXIS 53463 (N.D. Fla. Feb. 10, 2021) ...........................................5

*In re Disposable Contact Lens Antitrust*,
   329 F.R.D. 336 (M.D. Fla. 2018)..................................................................................2

*In re Mercedes-Benz Tele Aid Contract Litig.*,
   267 F.R.D. 113 (D.N.J. 2010)......................................................................................32

*In re Volkswagen Clean Diesel Mktg. Sales Practices Prods. Liab. Litig.*,
   500 F. Supp. 3d 940 (N.D. Cal. 2020) ........................................................................46

*Johnson v. Harley-Davidson Motor Co. Grp., LLC*,
   285 F.R.D. 573 (E.D. Cal. 2012) ................................................................................40

*Jones v. ConAgra Foods, Inc.*,
   2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014) .........................................38

*Lloyd v. GMC*,
   266 F.R.D. 98 (D. Md. 2010)...............................................................................30, 31

*Martinez v. Cont'l Tire the Ams. LLC.*,
  2021 U.S. Dist. LEXIS 139538 (D.N.M. July 27, 2021).............................................18

*McDowell v. Brown*,
  392 F.3d 1283 (11th Cir. 2004) ...............................................................................2, 3

*Mirkin v. Wasserman*,
  5 Cal. 4th 1082 (1993) ..........................................................................................37, 48

*Munch v. Sears Roebuck & Co.*,
  2007 U.S. Dist. LEXIS 62897 (N.D. Ill. Aug. 27, 2007) ...........................................7

*Navelski v. Int'l Paper Co.*,
  244 F. Supp. 3d 1275 (N.D. Fla. 2017)....................................................................42

*Neale v. Volvo Cars of N. Am., LLC*,
  2021 U.S. Dist. LEXIS 132157 (D.N.J. July 15, 2021)..............................34, 35, 37

*Nguyen v. Nissan N. Am., Inc.*,
  932 F.3d 811 (9th Cir. 2019) ...................................................................................8, 9

*Nightlight Sys. v. Nitelites Franchise Sys.*,
  2007 U.S. Dist. LEXIS 95565 (N.D. Ga. July 17, 2007)....................................42, 44

*Oddo v. Arocaire Air Conditioning & Heating*,
  2020 U.S. Dist. LEXIS 150601 (C.D. Cal. May 18, 2020) ...........................7, 19, 39

*Ohio State Troopers Ass'n v. Point Blank Enters.*,
  2020 U.S. Dist. LEXIS 58984 (S.D. Fla. Apr. 3, 2020) .............................................47

*Oscar v. BMW of N. Am., LLC*,
  2012 U.S. Dist. LEXIS 84922 (S.D.N.Y. June 19, 2012) ..........................................39

*Putnam v. Henkel Consumer Adhesives, Inc.*,
  2007 U.S. Dist. LEXIS 96166 (N.D. Ga. Oct. 29, 2007).........................................42

*Quiet Tech. DC-8, Inc. v. Hurel Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) .....................................................................2, 3, 30

*Randolph v. J.M. Smucker Co.*,
  303 F.R.D. 679 (S.D. Fla. 2014)...............................................................................39

*Redmond v. City of E. Point*,
  2004 U.S. Dist. LEXIS 31631 (N.D. Ga. Mar. 26, 2004).........................................42

*Reitman v. Champion Petfoods United States, Inc.*,
  2019 U.S. Dist. LEXIS 221941 (C.D. Cal. Oct. 30, 2019)......................................44

*Rosenfeld v. Oceania Cruises, Inc.*,
    654 F.3d 1190 (11th Cir. 2011) ....................................................3

*Shanks v. Jarrow Formulas, Inc.*,
    2019 U.S. Dist. LEXIS 160199 (C.D. Cal. Aug. 27, 2019)..................38

*St. Louis Condo. Ass'n v. Rockhill Ins. Co.*,
    2021 U.S. App. LEXIS 21429 (11th Cir. July 20, 2021).......................48

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011) ....................................................38

*Taylor v. Trapeze Mgmt., LLC*,
    2019 U.S. Dist. LEXIS 230212 (S.D. Fla. Feb. 28, 2019) ...................47

*Tincher v. Omega Flex*,
    628 Pa. 296, 104 A.3d 328 (2014) ...............................................43

*Townsend v. Monster Bev. Corp.*,
    303 F. Supp. 3d 1010 (C.D. Cal. 2018) ........................................38

*United States v. Moss*,
    290 F. App'x 234 (11th Cir. 2008) ..............................................32

*Watkins v. MGA Entm't, Inc.*,
    2021 U.S. Dist. LEXIS 138888 (N.D. Cal. July 26, 2021)...............34, 37

*Weaver v. Champion Petfoods USA Inc.*,
    2019 U.S. Dist. LEXIS 222836 (E.D. Wis. Dec. 31, 2019).................44

## REGULATORY CASES

*Denial of Motor Vehicle Defect Petition*,
    80 FR 18935 (April 8, 2015) ......................................................5

*Denial of Motor Vehicle Defect Petition*,
    85 FR 26517 (May 4, 2020).........................................................5

## RULES

Fed. R. Evid. 401 ....................................................................1, 2

Fed. R. Evid. 402 ........................................................................1

Fed. R. Evid. 403 ......................................................................50

Fed. R. Evid. 702 ......................................................................48

Fed. R. Evid. 803(6)...................................................................23

Fed. R. Evid. 1006 ........................................................................................................................16

**STATUTES**

California Legal Remedies Act................................................................................................34, 38

New York General Business Law § 349 ........................................................................................39

Defendant Ford Motor Company ("Ford") submits this brief in opposition to Plaintiffs' Motion To Exclude Defendant's Experts ("PM").

## INTRODUCTION

Nominally, Plaintiffs' Motion seeks to exclude five of Ford's experts under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993), and Plaintiffs do quibble about certain aspects of the methodologies employed by some of those experts. But much of Plaintiffs' motion challenges the *relevance* of their opinions. Plaintiffs cast their relevance challenges in the language of *Daubert*—they claim the irrelevant opinions do not "fit" their claim and would not assist the jury—but those challenges could be resolved simply by reference to Fed. R. Evid. 401 and 402, because the opinions at issue have at least some tendency to establish facts relevant to Ford's defense.  In fact, that evidence relates directly to how class vehicles *actually* perform and what real consumers *actually* consider and deem important. The evidence "fits" Ford's defenses even if it does not "fit" Plaintiffs' claims.

Plaintiffs' attempt to deny that the evidence is relevant to their claims is one more indication of their attempt to divorce this litigation entirely from the what actually happens in the world outside of the courtroom. In the courtroom, Plaintiffs would have this Court believe, "reasonable" consumers value class vehicles based only on some unknown potential for corrosion on the leading edge of the hood, without regard to how class and other vehicles perform with respect to corrosion generally and without regard to any other attributes real consumers would consider important. In the courtroom, according to Plaintiffs, it does not matter to "reasonable" consumers whether the potential for corrosion to occur on the leading edge of the hood is 0.1% or 99.9%. In the courtroom, unlike the real world, "reasonable" consumers have the option to purchase defect-free vehicles with hoods that never corrode.

The largely undisputed evidence that Plaintiffs seek to exclude shows, among other things,

that class vehicles do not share a common design or manufacturing process and that they perform differently with respect to corrosion; that not all reasonable consumers would have relied on an additional disclosure regarding corrosion or would have deemed it important; and that there is no classwide measure of damages.  Far from being irrelevant, the evidence Plaintiffs seek to exclude is critical, both to class certification and to the merits.

## **LEGAL STANDARD**

This Court must consider Plaintiffs' Motion through the lens of its "limited 'gatekeeper' role envisioned in *Daubert* [*v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 591 (1993)]." *Quiet Tech. DC-8, Inc. v. Hurel Dubois UK Ltd.,* 326 F.3d 1333, 1342 (11th Cir. 2003) (quoting *Ambrosini v. Labarraque*, 101 F. 3d 129, 141 (D.C. Cir. 1996)).

> The Eleventh Circuit has adopted a three part analysis for determining whether expert testimony is admissible under *Daubert* and Federal Rule of Evidence 702. Under this analysis, expert evidence is admissible if the court finds: (1) the expert is competent and qualified to testify regarding the matters that he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical, or specialized expertise, provides testimony that will assist the trier of fact to understand the evidence or determine a fact in issue.

*In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 359 (M.D. Fla. 2018).

The requirement that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" goes "primarily to relevance." "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. The definition of "relevant evidence" in Fed. R. Evid. 401 is a "liberal one": evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* at 587. In the specific context of expert testimony, there "must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). In

other words the expert testimony must "logically advance[] a material aspect of the case." *Id.* (quotation marks omitted).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quotation marks omitted). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quotation marks omitted). That is why "identification of [] flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Quiet Tech.*, 326 F.3d at 1345. "Indeed, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld*, 654 F.3d at 1193 (quotation marks omitted).

## I.     DR. GUYER'S OPINIONS ARE ADMISSIBLE.

Dr. Guyer has a Ph.D. in Materials Science and Engineering, and he is a licensed Professional Engineer in the fields of Mechanical Engineering and Metallurgical Engineering. His report details the numerous ways that class vehicles differ in ways that affect corrosion performance, both in design and manufacturing processes. He also opines that corrosion is a complex issue for which there is no single root cause, and that Plaintiffs' proposed solution—full perimeter overhem sealer—will not prevent leading edge hood corrosion. In fact, he found several vehicles with full perimeter hem sealer that exhibited leading-edge hood corrosion. He also tested Plaintiffs' expert's theory that water could flow by gravity from the sides of the hoods to the leading edge, and found that this was not true for all class vehicles.

### A.     Dr. Guyer's Opinions Are Relevant.

Plaintiffs' principal argument, repeated in various ways in various parts of their Motion, is that Dr. Guyer's opinions are irrelevant to their legal theory. Plaintiffs acknowledge that Ford

relies on Dr. Guyer's opinions to show that commonality is lacking because "Ford's design for corrosion performance in general and its manufacturing process changed over time." (PM at 36). Dr. Taylor's warranty analysis confirms that these changes, and other factors, result in differences in how class vehicles perform in the real world with respect to corrosion. (ECF 117, Ex. 3, Taylor Report at 3-30). Plaintiffs' expert, Erik Anderson, confirmed this in his rebuttal report where he acknowledges that "there are differences over time throughout the Class Vehicles with respect to pre-treatment and aluminum alloy, and these do result in differences in propagation rate," (ECF 132-3, Anderson Rebuttal Report at 3), and in his second deposition. (Ex. A, 7/27/21 Anderson dep. at 19-20, 35).[1] Plaintiffs do not deny—indeed, they appear to admit—that Dr. Guyer has identified design and manufacturing changes that can affect corrosion performance, because they criticize Ford and Dr. Guyer for "focusing on variables that affect performance." (PM at 29).

Nevertheless, Plaintiffs repeatedly insist that Dr. Guyer's opinions are irrelevant because he "ignor[es] that Plaintiffs' design defect theory is not based on performance but on the design itself." (PM at 29).[2] According to Plaintiffs, Dr, Guyer's opinions are relevant only to an "invented theory" created by Ford: that "Plaintiffs have alleged that the design defect causes corrosion at a high rate or rate that is higher than Ford's competitors." (PM at 32-33). "Because Plaintiffs' theory is not based on the failure rate, Guyer's opinions are irrelevant." (*Id.* at 37).

In fact, however, the performance of class vehicles in the real world—i.e., the rate at which

---

[1] Anderson's theory is not that the design and production processes do not affect corrosion performance; instead, his untested theory is that the presence or absence of full perimeter overhem sealer has a greater impact on corrosion performance than the other factors identified by Dr. Guyer. (Ex. A, 7/27/21 Anderson dep. at 19-20, 35).

[2] *See also* (PM at 33 ("Plaintiff's legal theory is not based on the *performance* of the allegedly defective . . . system, but instead the system itself, which he claims is defective."), quoting *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819 (9th Cir. 2019); 37 ("Plaintiffs' claims … are not based on performance.")).

corrosion occurs within the six year period identified by Plaintiffs—is unquestionably relevant to whether a common design defect exists, whether information about the alleged defect would be material and relied upon by to all consumers, and whether damages can be established on a classwide basis. As Anderson testified, "I'm certainly not saying I don't care about performance. I really truly do." (Ex. A, 7/27/21 Anderson dep. at 30). This Court should care as well.

1.      **Dr. Guyer's opinions are relevant to whether the question of design defect is common to the class.**

Under any recognized legal standard, the probability or likelihood of injury is relevant to whether a product is defectively designed. For example, "[t]he risk utility test balances six factors to determine whether a product's risk outweighs its utility to the consumer," including the "likelihood/gravity of potential injury." *Crawford v. ITW Food Equip. Grp., LLC,* 977 F.3d 1331, 1342 (11th Cir. 2020). Under the consumer expectation test, a product is defectively designed if the product is more dangerous than an ordinary consumer expects. *Id.* This standard is met if the "defect in the product establishes a strong likelihood of injury to the user or consumer thereof." *In re Abilify Aripiprazole Prods. Liab. Litig.*, 2021 U.S. Dist. LEXIS 53463, at *14 (N.D. Fla. Feb. 10, 2021). The National Highway Traffic Safety Administration ("NHTSA") routinely considers failure rates in determining whether a defect related to motor vehicle safety exists. *See, e.g., Denial of Motor Vehicle Defect Petition,* 85 FR 26517 (May 4, 2020) (defect petition denied where failure rate was "comparable" to "peer vehicles"); *Denial of Motor Vehicle Defect Petition,* 80 FR 18935, 18936 (April 8, 2015) (denying defect petition in part because of "low failure rate"). Plaintiffs have not identified *any* alternative standard, let alone a legally recognized standard. If there is a recognized standard for determining the existence of a design defect that does not depend on how the product has or will perform in the real world, Plaintiffs have not cited it and Ford is unaware of it.

Plaintiffs are arguing that all the other elements of Ford's varying corrosion protection systems are irrelevant because, regardless of those elements, Ford should not have used a closed hem design without full perimeter overhem sealer. An argument almost identical to this was recently rejected in *Beaty v. Ford Motor Co.*, 2021 U.S. Dist. LEXIS 137155, at *34-35 (W.D. Wash. July 8, 2021). Plaintiffs in that case alleged that the vehicles at issue were defective because they used fully tempered glass in panoramic sunroofs, making them prone to shatter. *Id.* at *34. Just as Plaintiffs here argue that Ford should not have used a closed hem design without full perimeter hem sealer regardless of whatever other corrosion protection measures it adopted, the plaintiffs in *Beaty* argued "it does not matter how Ford placed the tempered glass on Class Vehicles, it should not have done so at all, regardless of location, orientation or geometry." *Id.* The court rejected this argument and denied class certification, because "Defendant's evidence more persuasively demonstrates that the Class Vehicles' PSRs' different designs, e.g., sizes, locations, setbacks, and orientations, affect the PSRs' propensities to shatter, as demonstrated by the PSRs' different claim rates and replacement rates." *Id.* at *35.

In short, real-world performance is unquestionably relevant to whether a design defect exists; Dr. Guyer's opinion (in conjunction with Dr. Taylor's warranty analysis) establishes that there are variables in design and manufacturing processes that can and do cause the corrosion performance of class vehicles to vary by model, model year, and production date; and, therefore, Dr. Guyer's opinion is relevant to whether the question of design defect is common to the class.

### 2. Dr. Guyer's Opinions Are Relevant To Whether Materiality Is A Common Issue.

Even assuming the existence of a design defect, this "does not automatically lead to the conclusion that the fact is material." *Anderson v. Ford Motor Co.*, 2020 U.S. Dist. LEXIS 66549, at *7 (W.D. Mo. Feb. 14, 2020). After all, warranties exist precisely because it is understood and

accepted that non-safety defects can and do occur in complex products, including motor vehicles. (ECF 117, Ex. 23, Harless Report ¶¶ 38(b), (h), 40(e)(i); ECF 113-1, Ex. 17, Befurt Report ¶¶ 32, 39-42). Corrosion in particular can and sometimes does occur in all vehicles, and a reasonable consumer would not find this fact material if the corrosion rate were comparable to other available vehicles. *See Anderson,* 2020 U.S. Dist. LEXIS 66549, at *8 ("All objects made of glass may shatter, and thus while all [sunroofs] may shatter a reasonable consumer would not find this fact material if the [sunroof] failure rate were insignificant—particularly as compared to other available vehicles.").

It follows that a potential for corrosion would be material to a reasonable consumer's purchasing decision only where the rate of corrosion is "(1) extremely high in the abstract or (2) significantly higher than comparable vehicles." *Id.; accord, e.g., Munch v. Sears Roebuck & Co.*, 2007 U.S. Dist. LEXIS 62897, at *11 (N.D. Ill. Aug. 27, 2007) ("A product's rate of failure would be material to a reasonable person only if it exceeded a standard rate of failure in the industry for comparable machines produced by comparable manufacturers."). Indeed, simple logic suggests a reasonable consumer—and a reasonable jury—is more likely to find a 75% chance of corrosion to be important than a 10% chance, and more likely to find a 10% chance more important than a 2% chance. This would be true even if the corrosion at issue raised safety concerns, *see Anderson,* 2020 U.S. Dist. LEXIS 66549, at *7-8, which of course it does not.

In short, the performance of class vehicles with respect to corrosion is relevant to whether any corrosion defect would be material; Dr. Guyer's opinion establishes that the corrosion performance of class vehicles can vary by model, model year, and production date; and, therefore, Dr. Guyer's opinion is relevant to whether the question of materiality is common to the class. *See, e.g., Oddo v. Arocaire Air Conditioning & Heating*, 2020 U.S. Dist. LEXIS 150601, at *88 (C.D.

Cal. May 18, 2020) ("This evidence demonstrates that the failure rate of the HVAC systems at issue in this case may differ among the range of units that make up plaintiffs' proposed classes, meaning that a duty to disclose, pursuant to California law, may exist as to some, but not all, of the proposed class members' HVAC systems.").

### 3. Dr. Guyer's opinions are relevant to whether Plaintiffs have proposed a classwide measure of damages.

As argued at length elsewhere, (1) Plaintiffs are seeking benefit of the bargain damages; (2) benefit of the bargain damages are measured by the difference in value between the vehicle as promised (i.e., a vehicle without the alleged defect) and the vehicle as delivered (i.e., a vehicle with the defect); and (3) as a matter of logic and under expected utility theory, the extent to which the potential for corrosion diminishes the value of class vehicles depends on the probability that corrosion will actually occur. (ECF 142, Reply Brief In Support of Ford's Motion To Exclude Plaintiffs' Experts at 8-10; ECF 114, Ford's Motion To Exclude Plaintiffs' Experts at 15-21). Plaintiffs' economist, Ted Stockton, admitted as much. (*See* ECF 114, Ford's Motion To Exclude Plaintiffs' Experts at 19-21).

In short, the corrosion performance of class vehicles is relevant to whether and to what extent the value of class vehicles has been diminished; Dr. Guyer's opinion establishes that the corrosion performance of class vehicles can vary by model, model year, and production date; and, therefore, Dr. Guyer's opinion is relevant to whether benefit of the bargain damages is an issue common to the class.

### 4. Plaintiffs' reliance on *Nguyen v. Nissan* is misplaced.

Plaintiffs rely on *Nguyen v. Nissan N. Am., Inc.,* 932 F.3d 811 (9th Cir. 2019), to support their position that their design defect theory is viable without regard to the real-world performance of class vehicles. (PM at 33.) But this reliance is misplaced. The district court in *Nguyen* rejected

the plaintiffs' damages model because it believed that damages would vary depending on whether and when the alleged defect *actually* manifested for each class member. The Ninth Circuit held this was error, because Plaintiffs' causes of action in *Nguyen* did not require proof of manifestation. Here, as in *Nguyen*, California class members do not need to prove that their vehicles *actually* corroded while they owned their vehicles. But each of those class members *are* required to prove the existence of a design defect, the materiality of that defect, and damages caused by that allege defect. As discussed above all of those questions depend not on the actual manifestation of the defect but *on the probability that it will manifest*. The court in *Nguyen* did not address probability at all, let alone its relevance to design defect, materiality, and damages.

### B.    Plaintiffs' Miscellaneous Arguments Are Meritless.

Plaintiffs make various miscellaneous arguments, all of which are meritless.

**Dr. Guyer's Flow Test.** Dr. Guyer poured liquid water into the sides of two hoods and demonstrated that it never reached the leading edge, disproving Anderson's claim that this was a possibility common to all class vehicles. Plaintiffs criticize Dr, Guyer for "assuming" that Anderson's "only" theory was that water entered the hem through the sides of the hood where it then flowed to the leading edge. (PM at 34). Plaintiffs assert that Dr. Guyer's assumption was "plainly wrong" because "moisture flows by capillary action in the C cavity of the hem to the leading edge." (*Id.*). Therefore, Plaintiffs claim, Dr. Guyer's flow test—in which he demonstrated that water entering the hem on the sides did not reach the leading edge of the hood—was irrelevant.

Plaintiffs appear not to understand Anderson's actual theory. According to Anderson's report, (1) liquid water *does* enter through the sides of the hood where it flows by gravity (not capillary action) to the B and C cavities in the leading edge, and (2) *once in the leading edge*, the water *then* moves by capillary action through the C cavity to the trim edge (which is on the underside of the hood, rearward of the hood's leading edge.) (ECF 97-1, Ex. 7, Anderson Report

at 9-10). Anderson's theory is clearly shown in Images 8 and 12 of his original report, which show water *first* moving by gravity from the sides of the hood to the leading edge, and *then* by capillary action from the leading edge to the trim edge. (*Id.*). Anderson confirmed this interpretation of Images 8 and 12 in his second deposition. (Ex. A, 7/27/21 Anderson dep. at 77-81). Dr. Guyer's flow test was intended only to address the movement of water by gravity from the sides to the B and C cavities in the leading edge; it was not intended to test the movement of water by capillary action from the B and C cavities to the leading edge. The fact that he did not test the latter proposition does not render his test of the former unreliable.

If Plaintiffs are now suggesting that water can reach the B and C cavities at the leading edge through capillary action, humidity, or some mechanism other than water flowing by gravity from the sides, those theories were not included in Anderson's original report, and that explains why Dr. Guyer did not test those theories. Besides, even if Anderson has other theories that Dr. Guyer did not test, that does not render the test he did conduct unreliable.

Plaintiffs also contend that Dr. Guyer's flow test was unreliable because he tested only two hoods. (PM at 39). But at the very least, Dr. Guyer's flow test reliably demonstrates that water will not flow by gravity from the sides of the hood to the leading edge in all class vehicles, and that all class vehicles are not common in this respect. Moreover, it is Plaintiffs' burden to prove that the feature they are criticizing is common to the class, not Ford's burden to demonstrate otherwise, and yet Anderson tested *zero* hoods to determine if his theory did in fact apply to all class vehicles.

**Exemplar Hood Study.** Dr. Guyer examined numerous hoods to determine their design attributes, including use of overhem sealer. Plaintiffs claim that Dr. Guyer's conclusions regarding hem sealer "might" be mistaken because he did not review design drawings and other data from manufacturers. (PM at 39-40). But Dr. Guyer never claimed to know whether the exemplar hoods

without full perimeter hem sealer were consistent with the manufacturer's design intent; regardless of what the manufacturer's design intent may have been, the fact remains that Dr. Guyer found hoods that *did* have full perimeter hem sealer that *still* experienced corrosion. Further, Plaintiffs ignore the analyses that Dr. Guyer did other than simply examining the hoods for overhem sealer; he also evaluated the coating thickness, e-coats, pretreatments, type of metal, and the types of forming used for the hems.

**Blistering vs. Filiform Corrosion.** Mr. Anderson wrote a report claiming that liquid water caused filiform corrosion. Dr. Guyer explained in his report filiform corrosion is caused by humidity, not liquid water; liquid water causes blistering corrosion. Anderson himself confirms Dr. Guyer's opinion in a rebuttal report. (ECF 132-3, Anderson Rebuttal Report at 11). In other words, Dr. Guyer's report shows that Anderson's initial report was wrong in a material respect.

Plaintiffs do not claim that this section of the report is unreliable or unhelpful. Instead, they claim (1) that Dr. Guyer himself failed to make the distinction in *Mickens,* another case alleging corrosion, and (2) "Anderson's theory is consistent with **both** filiform and blistering corrosion." (PM at 35). But these are not reasons to exclude Dr. Guyer's undisputed opinion on this topic. Besides, as Dr. Guyer testified, the distinction between blistering and filiform corrosion was not significant *Mickens*, but it *is* significant in this case. Anderson in his report addressed only corrosion caused by liquid water, which he claimed could be eliminated by overhem sealer which would prevent *liquid* water from reaching the leading edge.  But Anderson no theory concerning how overhem sealer could prevent filiform corrosion caused by humidity.

**Ford's Root Cause Analysis.** Dr. Guyer opined in his report that the conclusions reached by Ford were consistent with the conclusions he reached independently based on his own investigation, i.e., that there are a number of reasons why corrosion can occur and there is no single

root cause. Plaintiffs claim this opinion would not be helpful to the jury, but the fact that numerous experts with expertise in various fields reached the same conclusion is relevant to whether those same conclusions are correct. Besides, Anderson also claims that the conclusions reached by Ford were consistent with the conclusions he reached. If Dr. Guyer should be prohibited from opining that Ford's conclusions were consistent with his, so too should Anderson.

### C.    Dr. Guyer Is Qualified To Address "Basic Corrosion Science."

Plaintiffs repeatedly claim that this case involves only "basic corrosion science." (PM at 30, 32). And yet they claim that Dr. Guyer, who has both a Master's Degree and a Ph.D. from Stanford in Materials Science and Engineering, is not qualified to express his opinions because he "is not an expert in automotive design." (*Id.* at 33). They make this frivolous argument in a single paragraph without any citation to any supporting authority. And they ignore the facts that Dr. Guyer is licensed as a professional engineer both with respect to metallurgical engineering *and* mechanical engineering. Besides, Plaintiffs do not really challenge Dr. Guyer's opinions. They agree, for example, that different class vehicles have different features than can affect corrosion performance; they simply claim performance is irrelevant. They agree that blistering and filiform corrosion are different forms of corrosion with different causes; they simply claim (erroneously) that Anderson addressed both in his report. And they do not deny that Dr. Guyer found corrosion on vehicles with full perimeter hem sealer. Under these circumstances, their claim that he is nevertheless unqualified to address "basic corrosion science" is untenable.

## II.    DR. TAYLOR'S OPINIONS ARE ADMISSIBLE.

Dr. Paul Taylor's report compares *actual* warranty data for potentially relevant hood repairs on class vehicles, broken down by model, model year, date of production, and geographic location. (ECF 117, Ex. 3, Taylor Report at 3-30). Notwithstanding Plaintiffs' claim that all class vehicles share the same common design defect, Dr. Taylor's analysis shows that class vehicles

perform quite differently depending on model, model year, date of production, and geographic location. For example, three-year warranty rates for the Mustang range from 0.09% to 3.15%, depending on date of production. (*Id.* at 13). And although Plaintiffs claim that there is no adequate repair for the alleged defect, Dr. Taylor's analysis shows that (1) the number of repeat warranty repairs is minuscule, and (2) that minuscule rate also varies from model to model (the 0.08% repeat repair rate for the Explorer is 8 times higher than the 0.01% rate for the Expedition). (*Id.* at 28-30). Dr. Taylor also shows that the overall warranty rate of corrosion for class vehicles is within the range of other Ford vehicles. (*Id.* at 31-32).

Strangely, Plaintiffs do not make the same argument with respect to Dr. Taylor that they do with respect to Dr. Guyer. i.e., they do not argue that the real-world performance of class vehicles is irrelevant to their claim. Further, Plaintiffs do not contend that Dr. Taylor's analyses or calculations are incorrect. In fact, Plaintiffs rebuttal expert confirmed that she had no reason to quarrel with Dr. Taylor's computations (with one minor exception with respect to one figure). (Ex. B, Wachs dep. at 56-59, 63-66, 89-91). Instead, Plaintiffs argue that Dr. Taylor's Ph.D. in Mechanical Engineering does not qualify him to do "Grade-School Math" (PM at 9); that his analysis is unreliable because it analyzes *actual data* and not projections and estimates calculated by a computer program (*id.* at 13-15); and because warranty data (obviously) does not include most repairs made after the warranty period has expired (*Id.* at 14). As this summary suggests, Plaintiffs' arguments border on the frivolous.

    **A.**    **Dr. Taylor Is Qualified And His Analyses Of Actual Data Is Helpful.**

Plaintiffs first argue that Dr. Taylor is not qualified to calculate warranty repair rates because he "has not demonstrated he has education, training or experience in the highly specialized statistical field of reliability engineering/warranty forecasting." (*Id.* at 9). And yet, *on the very same page,* Plaintiffs argue that Dr. Taylor's analysis would not be helpful to the jury because it

"involves mere recitation of numbers and basic math." (*Id.*).

The truth, of course, lies between these two extremes. Dr. Taylor did not purport to do any highly specialized statistical analysis or forecasting; Plaintiffs seem to be arguing that Dr. Taylor is not qualified to do an analysis he did not do (an issue that is of academic interest only). Nor did Dr. Taylor's analysis involve a "mere recitation of numbers and basic math." The analysis Dr. Taylor conducted required him to understand how Ford's warranty database is organized, the fields and codes used, and the limitations of those codes and fields. Because he understood based on his experience that the codes and fields did in fact have limitations, Dr. Taylor developed a process to differentiate claims associated with hood paint concerns from other warranty repairs. Here is one paragraph from Dr. Taylor's three page description of this process, which illustrates its complexity:

> Two approaches were used to identify hood repairs: the causal base part number, and a search of customer and technician text fields for the word '*hood*.' The causal base part number is Ford's number describing a specific part that has been deemed to be the cause for the repair. The hood base part numbers for the Subject vehicles were "16000," "16612," "542528," and "1616612." There are also free-form text fields that typically contain descriptions of the customer's concern and the technicians' findings and repair. If the word 'hood' (case – i.e. capital or small letters – were ignored) appeared in any of the free-form text fields, or the causal base part number was a hood part, the record was assumed to have satisfied the hood component.

(ECF 117, Ex. 3, Taylor Report, Ex. D at 52).

Of course, rate calculations require both a numerator and a denominator. For purposes of calculating a simple, overall rate of potentially relevant hood warranty repairs, the numerator would be the number of warranty repairs divided by the total vehicle population; both Dr. Taylor and Plaintiffs' rebuttal expert, Dr. Wachs, did this simple analysis. (*Id.* at 7-8; Ex. B, Wachs dep. at 106-111 and Ex. 6). But the more directly relevant analyses require more complicated analysis tailored to the specific question to be answered. For example, Dr. Taylor conducted an analysis to determine if warranty rates for the Explorer differed based on model year, even though Plaintiffs claimed all model years shared the same common design feature. (*See, e.g.,* ECF 117, Ex. 3, Taylor

Report at 12-13, 15). To answer this question, it would not be proper to simply compare (for example) the overall warranty rates for a 2014 Explorer with the overall rates for a 2016 Explorer, because the 2014 Explorer had a 3-year/36,000 mile warranty period while the 2016 Explorer had a 5 year unlimited mileage warranty. Thus, the overall warranty rate for the 2016 Explorer would be higher simply because it had a longer warranty period. (*See* Ex. C, Taylor dep. at 123-24). To adjust for this when he did the model year to model year comparison, Dr. Taylor include in the numerator only repairs within 3 years/36.000 miles, and he included in the denominator only the number of vehicles that had a full three years in service. (*Id.*). This "apples to apples comparison" shows that the warranty rates for this period for the 2014 Explorer was 1.4% while the rate for the 2016 Explorer was 2.6%, almost twice as large.[3] (*Id*; ECF 117, Ex. 3, Taylor Report at 15).

This type of analysis was required for each of the models, each of the model years, and each of the questions Dr. Taylor set out to answer. Plaintiffs' argument that Dr. Taylor's analysis would not be helpful because it "applies simple arithmetic" and "requires no specialized knowledge beyond the knowledge of average individuals" is simply wrong. *See, e.g., Finer Space, LLLP v. Diamond H. Constr., LLC*, No. H-06-1723, 2008 U.S. Dist. LEXIS 4389, at *9 (S.D. Tex. Jan. 22, 2008). In *Finer Space,* the plaintiff sought to exclude the testimony of a certified public accountant because he was "nothing more than a human calculator," essentially the same argument made by Plaintiffs here. The court, relying on Eleventh Circuit authority, rejected this argument:

> The record establishes … that Middleton [the CPA] reviewed voluminous financial records, including invoices and expense reports, relating to the project at issue in this case. He then determined inter alia the expenditures supported by invoices and those not supported by invoices. This testimony could clearly assist the jury to "understand the evidence or to determine a fact in issue." See, e.g., FED. R. EVID. 702; *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564-65 (11th Cir. 1998) …. Plaintiff's

---

[3] Plaintiffs criticize Dr. Taylor because he "failed to include all relevant data" in his analyses (PM10), demonstrating the type of error a lay person might make when attempting to compare warranty rates in 2014 and 2016 Explorers.

request to exclude Middleton's testimony is denied.

*Id*. The court further observed that "[t]o the extent that Middleton's testimony is merely a summary of the voluminous financial records, such summary testimony is likely admissible under Rule 1006 of the Federal Rules of Evidence." *Id.* at 9 n.3. (Rule 1006 provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.").

Dr. Taylor's analysis in this case was even more complex than the CPA's analysis in *Finer Space.* Like the CPA in *Finer Space,* Dr. Taylor reviewed voluminous records to determine which were potentially relevant. But he went beyond what the CPA did by calculating rates, which required the exercise of professional judgment and expertise to determine the appropriate numerator and denominator for each specific part of the analysis. His testimony is clearly helpful to this Court in deciding class certification, and it will be helpful to this Court and a jury deciding the merits. *See, e.g., City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 563-64 (11th Cir. 1998) (district court abused its discretion by excluding testimony from an expert that would assist the jury by "calculating, compiling, and explaining the costs borne and profits enjoyed by the defendants during the period of the alleged conspiracy").

**B.     Dr. Taylor's Warranty Rate Analysis Based On Actual Data Is Reliable.**

Plaintiffs claim that Dr. Taylor's warranty rate analysis is not reliable for two reasons, both of which are meritless.

**1.     Rate Calculations are a recognized methodology.**

First, relying on the rebuttal report of Dr. Wachs, Plaintiffs claim that Dr. Taylor failed to apply reliable, peer-reviewed principles or methods. (PM at 13). But Dr. Taylor simply calculated rates; this Court can take judicial notice that rates are calculated by dividing an appropriate numerator by an appropriate denominator and (for percentages) multiplying by 100. Dr. Wachs

calculated an overall rate of hood warranty repairs in exactly the same way as Dr. Taylor, and reached almost the exactly the same result. (Ex. B, Wachs dep. at 106-11 and Ex. 6). Dr. Wachs simply decided not to include that analysis in her report.[4] Of course, selection of the appropriate numerator and denominator to answer the other questions addressed by Dr. Taylor required exercise of professional expertise and judgment, but Dr. Wachs had no quarrel with the methodology Dr. Taylor used to answer those questions or with the results he obtained. (Ex. B, Wachs dep. at 56-59, 63-66, 89-91).

In fact, Dr. Wachs in her report notes that the first step in any warranty analysis is to "[s]ummarize actual data," and she recognizes that Dr. Taylor "did the first step (summarize data)." (ECF 132-1, Wachs Report at 5, 8). Dr. Wachs' only real quarrel with Dr. Taylor's analysis is that he did not go beyond this first step to make estimates and projections using sophisticated statistical tools and models. (*See id.* at 5-9). In other words, Plaintiffs and Dr. Wachs criticize Dr. Taylor for relying on what *actually* happened instead of *estimates* of what might have happened or *projections* of what might happen—estimates and projections that are made by computer programs such as Weibull—that are not subject to cross examination. But Dr. Taylor had no need to estimate or project; he had the existing, actual data showing that the performance of class vehicles varies by model, model year, and production date. There is no reason to believe that these differences would magically disappear in any estimates or that projections based on actual data would show anything different. In fact, Dr. Wachs projected and estimated warranty rates for Explorers, Mustangs, and Expeditions. (Ex. B, Wachs dep. Ex. 4). Not surprisingly, her estimated and projected rates differed substantially from model to model, just like the actual rates calculated by

---

[4] For each model (Explorer, Expedition, and Mustang), Dr. Taylor and Dr. Wachs both divided the total number of warranty repairs by the total number of vehicles sold. The results were not identical only because Dr. Wachs counted slightly fewer repairs than Dr. Taylor.

Dr. Taylor. As she testified:

> The numbers are different, but we would expect the numbers to be different. They're different platforms, so -- I mean, when you have a different design, depending on the corrosives they see, the distance they are from corrosives. I mean, the two vehicles are different heights, different geometry, different weights, different demographics. I'm not expecting those rates to be the same because they're exposed differently, so.

(*Id.* at 53).

### 2.    Warranty rates are routinely used and routinely accepted.

Second, Plaintiffs argue that Dr. Taylor's analysis is not reliable because warranty data does not include repairs not paid for under warranty, such as repairs that occur after the warranty period has expired. (PM at 14).[5] Arguments like this have been routinely rejected by courts. *See, e.g., Martinez v. Cont'l Tire the Ams. LLC.*, 2021 U.S. Dist. LEXIS 139538, at *9 (D.N.M. July 27, 2021) ("Plaintiffs argue in detail that the warranty adjustment rate is not representative of the actual failure rate of the Subject Tire due to defects in determining what qualifies for an adjustment. Plaintiffs' arguments about the probative value of the warranty adjustment data generally goes to its weight, not whether it is admissible."); *Elward v. Electrolux Home Prods.*, 2020 U.S. Dist. LEXIS 96000, at *56 (N.D. Ill. June 1, 2020) ("[T]he complaint rate should not be conflated with the failure rate, a boundary Electrolux frequently attempts to push in its briefing. Still, Electrolux is 'free to argue that the claims rate is important evidence of non-defectiveness.'") (citations omitted).

In fact, the only decisions Plaintiffs rely on in support of this argument *also* conclude that warranty data, whatever its limitations, is admissible. *Coba v. Ford Motor Co.*, 2017 U.S. Dist.

---

[5] Of course, warranty records would not include warranty claims that have been denied, but Plaintiffs have presented no evidence that valid warranty claims have been routinely denied. With respect to 2013-2015 model years, some warranty claims for repairs after 3 years or 36,000 miles would have been denied because there was no perforation of the hood, but that is simply because the 3 year/36,000 mile warranty period for cosmetic, non-perforating corrosion had expired.

LEXIS 123546 (D.N.J. August 4, 2017), *aff'd* 932 F.3d 114 (3d Cir. 2019). Plaintiffs suggest that

the court in *Coba* accepted the argument they are making here, but in fact the court rejected it:

> Coba's point might be well taken if the issue were, *ex post,* the actual rate of delamination that materialized. The issue material to Coba's NJCFA claim, however, is Ford's knowledge at the time of Coba's purchases. … That seems to be a reasonable source of real-time data on which a company could rely. Of course, Ford could have reasoned that the actual rates might be somewhat higher than those suggested by the AWS data, to some unknown degree. The possibility of such an adjustment does not alter the clear import of the evidence with respect to Ford's knowledge at the time.

*Id.* at *14-15. And Plaintiffs fail to note that this ruling was expressly affirmed on appeal:

> And while Coba criticizes the warranty data as under-inclusive because it covered only tanks that Ford actually replaced while excluding those denied warranty coverage, he identifies no concrete evidence of a higher rate of delamination.
>
> In any event, the relevant question is not the actual rate of delamination viewed in hindsight, but what Ford knew and therefore could have disclosed to customers about that rate. And the warranty data—reflecting delamination-based replacements at a rate of even less than 1%—was the information Ford had at the time.

*Coba v. Ford Motor Co*., 932 F.3d 114, 126 (3d Cir. 2019).

Here, as in *Coba,* at least one of the relevant questions in this case is what Ford knew and

could have disclosed to putative class members. For this purpose, Dr. Taylor's analysis, far from

being underinclusive, is wildly overinclusive, because it includes data available only *today* (as of

October 2020), eight years or more after the first 2013 class vehicle was sold and long after the

last 2018 class vehicle was sold. Besides, for class certification purposes, the most relevant

question is whether the performance of class vehicles varies depending on model, model year, and

production date. *See, e.g., Oddo,* 2020 U.S. Dist. LEXIS 150601, at *88. For this purpose, the

underinclusive nature of warranty data does not matter, because there is no reason to believe the

data for any class vehicle is any more or less underinclusive than the data for any other class

vehicle. However underinclusive the data might be, it *still* shows that the performance of class

vehicles varies by model, model year, and date of production. As discussed above, Dr. Wachs's

analysis—presumably intended to estimate or project the number of repairs not included in the warranty data—*confirm* that performance varies by model (she did not do an analysis for each model year or for date of production).

### C.   Dr. Taylor's Analysis Of Overall Corrosion Rates In Class And Other Vehicles Is Relevant.

Figure 18 in Dr. Taylor's report demonstrates that, when *all* paint-related warranty repairs are considered, warranty rates for class vehicles fall well within the range of rates for other Ford vehicles. Plaintiffs and Dr. Wachs argue that this comparison is "flawed because this is a case regarding hoods—and not general body panels." (PM at 15-16). This argument illustrates the flawed logic that lies at the core of this litigation.

Consider the 2017 Expedition. Dr. Wachs estimates that the failure rate for hoods on the 2017 Expedition will be 20 times higher than the failure rate for hoods on 2013-2014 F-150's. (ECF 132-1, Wachs Report at 18, Table 1).[6] But the 2013-2014 F-150s perform particularly well with respect to paint problems generally, which is perhaps why Plaintiffs' counsel chose those vehicles for Dr. Wachs to use in her comparison. (ECF 117, Ex. 3, Taylor Report at 32, Figure 18). In fact, out of the 90 Ford vehicles analyzed by Dr. Taylor, the 2013-2014 F-150s performed better with respect to paint problems than all of them except two. (*Id.*). The two that performed even better with respect to paint problems were the 2017 F-150—*and the 2017 Expedition.* (*Id.*).

Plaintiffs would have this Court and the jury believe that all class members, and the market generally, would value 2017 Expeditions less because of a relatively high potential for corrosion on the leading edge of the hood, even though the 2017 Expedition performs better with respect to

---

[6] Actually, Dr. Wachs combined the 2016 and 2017 model Expeditions, and did no separate analysis for the 2017 Expedition. But Plaintiffs want to assume there is no significant difference between the two model years, so, for purposes of this example, Ford will assume the same.

all corrosion and other paint issues than 97% of the other Ford vehicles Dr. Taylor evaluated. Plaintiffs would have this Court and the jury believe that a rational consumer would reject the 2017 Expedition because of the potential for corrosion on the leading edge of the hood, even though other vehicles that the consumer might buy would have a *greater* potential for corrosion generally.

Ford picked the 2017 Expedition because it provides the clearest illustration of the irrational premise on which this case rests: that corrosion on the leading edge of the hood, regardless of the probability that it might occur, is of such overriding importance that all other considerations that go into purchasing a vehicle pale into insignificance. But Dr. Taylor's report demonstrates that the same irrationality exists regardless of which class vehicle is analyzed. For example, Dr. Wachs estimates that the 2013-2015 Explorer has a hood corrosion rate 200 times greater than the 2013-2014 F-150, but for paint problems generally the 2015 Explorer performs better than 57% of the other Ford vehicles that Dr. Taylor analyzed. Dr. Wachs estimated that the 2013-2015 Mustang has a hood corrosion rate 100 times or more greater than the 2013-2014 F-250, but for paint problems generally the 2015 Mustang performs better than 83% of the other Ford vehicles analyzed by Dr. Taylor. (ECF 132-1, Wachs Report at 19, Table 2; ECF 117, Ex. 3, Taylor Report at 32 Figure 18). The overall paint problem warranty rate for *all* class vehicles is well within the range of rates for the other Ford vehicles analyzed by Dr. Taylor; as Dr. Taylor opines, class vehicles "are not outliers" with respect toto overall paint performance. (*Id.* at 31).

Just like every vehicle ever sold, class vehicles perform better on some metrics and worse on others. Plaintiffs have focused all their attention on one of the metrics on which class vehicles might perform relatively poorly: leading-edge hood corrosion. But this attention—this litigation microscope, so to speak—distorts and overstates the importance this one metric has in the real world. This point might or might not require summary judgment for Ford, but at the very least it

demonstrates that Dr. Taylor's analysis in Figure 18 and the accompanying text is relevant.

      **D.**     **Dr. Taylor's TSB Analysis Is Admissible.**

Dr. Taylor opines that "Ford is not alone in issuing TSB's associated with paint repairs of aluminum panels, or even rust/corrosion associated with body panels." (ECF 117, Ex. 3, Taylor Report at 35). As examples, he lists several TSBs issued by other manufacturers involving paint or corrosion issues. (*Id.* at 35-36). Further, he explains that "manufacturers can publish hundreds of communications for different models of vehicles covering a variety of concerns or topics, some of which can be of more significance than cosmetic paint repairs." (*Id*. at 40). He also provides screen shots from the NHTSA web site showing that for the 2013 Camaro and the 2013 Challenger—both peer vehicles to the 2013 Mustang—the manufactures issued numerous TSBs relating to a variety of topics, including airbags, brakes, steering, speed control engine cooling, electrical, etc. (*Id.* at 35-38).

Plaintiff argues that Dr. Taylor's opinion should be excluded "as unhelpful, speculative or irrelevant because [the service bulletins] do not concern the Class Vehicles and specific aluminum hood defect at issue in this case." (PM at 12). But this opinion is relevant and helpful precisely because it shows how Plaintiffs' "litigation microscope" distorts reality. Dr. Taylor used the 2013 Mustang as his example; if a class member decided not to purchase a 2013 Mustang because of an unusual disclosure about the potential for hood corrosions, that class member could not have purchased a vehicle with no potential problems; rather, he or she would have purchased a different vehicle with a different set of potential problems. While the Camaro or the Challenger *might* have had a reduced risk of hood corrosion relative to the Mustang, other components (perhaps including the brakes or the speed control or the airbags) would have had an *increased* risk of failure relative to the Mustang. At the same time, the Camaro or Challenger might have been more expensive with less attractive styling or might have had poorer fuel economy, higher emissions, and lower crash

ratings in government tests—vehicles, in other words, that offered less of what attracted the class member to the Mustang in the first place.

Dr. Taylor's list of service bulletins and screen shots are merely demonstrative exhibits designed to illustrate this more general point, which is supported by Dr. Taylor's decades of experience. The list of service bulletins and the screen shots are not hearsay, because Dr. Taylor's opinions do not depend on the truth of the service bulletins; the service bulletins are available to the public and would be considered by any rational consumer concerned about corrosion or reliability. To the extent they do constitute hearsay, they would likely be admissible as business records under Fed. R. Evid. 803(6). Plaintiffs' objections to the analysis are meritless.

## III.    DR. HARLESS'S OPINIONS ARE ADMISSIBLE.

Dr. Harless is a Professor of Economics in the School of Business at Virginia Commonwealth University in Richmond, Virginia. (ECF 117, Ex. 23, Harless Report ¶ 1). He has decades of experience analyzing depreciation and allegations of diminished value in vehicles. (*Id.* ¶ 1, Exs. A-C). Plaintiffs do not challenge his qualifications. He was asked to determine "(1) whether there was any evidence of diminished value of the subject Ford vehicles and whether the depreciation of the subject Ford vehicles is consistent with Plaintiffs' allegations, (2) whether there was any economic damage or loss due to the alleged defect that was common to all members of the proposed class, and (3) to evaluate the methodology, claims, and conclusions of Plaintiffs' damages expert, Mr. Stockton." (*Id.* ¶ 3).

To answer the first two questions, he compared the putative class vehicles' depreciation rates to "similar vehicles in the same submarket," looking for any evidence that their depreciation was "abnormal or excessive." (*Id.* ¶ 18). He explained the rationale for his analysis:

If the allegation that Plaintiffs would have substantially changed their choices and/or their willingness to pay for the subject vehicles if the alleged defect had been disclosed to them is correct, then these differences should subsequently impact prices of these vehicles in

23

used vehicle markets as information about the alleged defect became known. But if vehicle prices are never observed to fall relative to comparison vehicles, then it is evidence contrary to Plaintiffs' claim that they 'overpaid,' and would instead be evidence that the market value of the vehicles they received was not less than the market value of the vehicles for which they bargained.

(*Id.* ¶ 3(c)). Dr. Harless found that the subject vehicles do not depreciate at a rate greater than comparable vehicles, confirming that the market does not attach negative value to the potential for corrosion in the putative class vehicles. (*Id.* ¶¶ 3(c), 23-28, 44-45).

Plaintiffs challenge his opinions based on his valuation model (summarized in ¶¶ 44-46). (*See* PM at 2-6). Plaintiffs are not clear about whether they are challenging his opinions under *Daubert*'s reliability prong, its relevance prong, both, or some mismatch of the two. (*See id.*). Regardless, his opinions are both relevant and based on reliable methodology.

### A.     Dr. Harless' Opinions Are Relevant.

Dr. Harless' opinions are clearly relevant. He conducted his analysis for the express purpose of testing "whether the depreciation of the subject Ford vehicles is consistent with Plaintiffs' allegations." (ECF 117, Ex. 23, Harless Report ¶ 3). He determined that the depreciation rates were not consistent with Plaintiffs' allegations because the subject vehicles do not depreciate at a rate greater than comparable vehicles. (*Id.* ¶¶ 3(c), 23-28, 44-45). That finding showed, contrary to Plaintiffs' damages theory, that the market does not attach negative value to the potential for corrosion in the putative class vehicles versus other vehicles. (*Id.*). In other words, his analysis demonstrated how Plaintiffs did not actually suffer any of the benefit of the bargain damages they allege—let alone on a class-wide basis. (*Id.*).

### B.     Dr. Harless' Use Of "Clean" Vehicles Did Not Impact His Results And Is Most Methodologically Consistent With Plaintiffs' Claims.

Plaintiffs criticize Dr. Harless for using vehicles classified as "clean" in his comparative analyses despite the fact that vehicles with manifested corrosion might not qualify as "clean." (*See*

PM at 4, 6). One problem with this critique is that Dr. Harless conducted the same comparative analyses with vehicles classified as "average"[7] and got the same results. (*See* ECF 117, Ex. 23, Harless Report ¶ 28 n.46 ("I also undertook the same analysis using NADA Guide values for vehicles in 'average" condition and reached identical conclusions about the relative depreciation of the subject for vehicle lines."); Ex. D, Harless dep. at 27 ("I also gathered data on [] trade-in values for vehicles in average condition and undertook the parallel analysis of that data on vehicles in that condition and came to the same conclusions I reached for the clean condition vehicles.")). So Plaintiffs' critique is moot.

Regardless, though, Dr. Harless' choice of "clean" vehicles is most methodologically consistent with his assigned task: testing the validity of Plaintiffs' claims. Plaintiffs' class-wide damages theory is that the alleged corrosion defect decreased the value of *all* putative class members' vehicles—regardless of whether it manifested in their vehicles. (*See* ECF 70, Second Amended Complaint ¶ 119 ("[T]he widespread disclosure of the Corrosion Defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and Class members have suffered a direct pecuniary loss in the form of the decreased value of their Vehicles, even when the Corrosion Defect has not manifested.")). So Dr. Harless sought out to evaluate whether there was such a "*generalized* diminution in value, . . . a decrease in market value relative to comparison vehicles even among vehicles *not* manifesting the alleged defect." (ECF 117, Ex. 23, Harless Report ¶ 3(a) (emphasis in original)). He chose "clean" vehicles because those are the vehicles— many without a manifestation of the alleged defect—that would have experienced excessive depreciation if Plaintiffs' class-wide damages theory were accurate. (*See id.* ¶ 41(e)). Plaintiffs

---

[7] At his deposition, Dr. Harless explained that vehicles with manifested corrosion might be classified as "average" "but that would depend upon the other aspects of the vehicle's condition." (Ex. D, Harless dep. at 29-30).

cannot ignore manifestation in creating their class-wide damages theory and then criticize Dr. Harless for doing the exact same thing in evaluating that theory.

Dr. Harless does not dispute that an actual manifestation of corrosion on a vehicles' hood might somewhat decrease the value of that particular vehicle. (*See id.* ¶ 3(a) ("Manifestation of the alleged defect is, at least in some circumstances, an observable attribute of a particular vehicle upon inspection before a sale. In such circumstances, such vehicles should be expected to be subject to a specific diminution in value; that is, a decrease in market value of the vehicle with the amount of the decrease depending on the extent of the manifestation and the amount necessary to repair it.")). But Plaintiffs are not seeking damages for decreased value due to actual manifestations of corrosion so there was no need for Dr. Harless to model the diminution in value of vehicles with a manifestation. Plaintiffs chose their class-wide theory of diminution in value regardless of manifestation and all Dr. Harless did was select "clean" vehicles to most accurately test that theory.

### C.   Dr. Harless' Methodology Reliably Establishes That The Alleged Defect Does Not Have a Substantial Impact On Value.

Plaintiffs' second criticism of Dr. Harless' methodology is that it cannot isolate the impact of this particular alleged defect on vehicle depreciation. (*See* PM at 4-6). They argue that, since the comparator vehicles he chose also "had their own defects," his methodology was incapable of "filter[ing] out the extent to which the corrosion defect might affect the resale values of Class Vehicles." (*Id.* at 4). This criticism is not valid for four reasons.

First, the comparator vehicles Dr. Harless chose are all reliable comparators. As he explained in his Report, "[i]n order to assess whether the depreciation of a particular vehicle line is abnormal or excessive, its market value must be compared to similar vehicles in the same submarket" because that allows him "to control for common factors affecting depreciation" such as "changes in gasoline prices and shifting tastes from cars to SUVs." (ECF 117, Ex. 23, Harless

Report ¶ 18). He therefore compared the Explorer's depreciation to other vehicles in the "Unibody SUV with 3 row seating" submarket (e.g.., the Dodge Durango and Toyota Highlander), the Expedition's depreciation to other vehicles in the "Truck-based Large SUV" submarket (e.g., the Chevrolet Tahoe and Nissan Armada), and the Mustang's depreciation to other vehicles in the "Pony Car" submarket (the Chevrolet Camaro and Dodge Challenger). (*Id.* Table 1). Based on his years of experience, those were "the best possible comparison[s] . . . [he] kn[e]w of to apply in this situation." (Ex. D, Harless dep., at 84).

Second, Dr. Harless' conclusion that the alleged defect did not substantially impact the putative class vehicles' values is the only way to interpret his results that aligns with the evidence in this case. His analysis showed that the putative class vehicles depreciated at almost the same rates over time as the comparator vehicles. (*See* ECF 117, Ex. 23, Harless Report ¶¶ 24-26). Assuming Plaintiffs' theory that the alleged defect substantially impacted used vehicle prices over time were true, the only other way to explain Dr. Harless' results would be if, but for the alleged defect, the Ford vehicles would have retained their value much better than the comparators—that the Ford vehicles would have had depreciation performance that was "off the charts" but the alleged defect dragged that exemplary performance down to its competitors' level. But there is no evidence showing Ford vehicles are somehow substantially better at retaining their value than competitor vehicles. So the only remaining explanation for Dr. Harless' results is that the alleged defect must not have substantially impacted the putative class vehicles' values over time.

That logic is especially true for the Mustang and Explorer, which continuously had slightly better retained values than some of their comparators over time. (*See id.* ¶¶ 24, 26). They would have had to have been *really* superb "retained value performers" in order to consistently maintain that position over time even as (under Plaintiffs' theory) the market became aware of the alleged

defect, thereby decimating their resale values.[8] Since there is no evidence for this "super-retained value performer" explanation, Dr. Harless drew the only possible conclusion from his analysis. The fact that he cannot isolate out the impact of every single defect the putative class vehicles might suffer from is irrelevant.

Third, Dr. Harless' methodology is a reliable way of measuring what he sought to measure: whether the data supports Plaintiffs' theory that the putative class vehicles had inflated purchase prices due to the undisclosed alleged defect. As he explained in his report, consumers expect all vehicles to have some "defects and problems." (*Id.* ¶¶ 37(c)-(e)). That is why the warranties automakers offer with their vehicles have value to consumers—the automakers promise to repair some of those inevitable, expected defects and problems for a limited period. (*See id.* ¶¶ 38(a), (h) ("If consumers did not expect defects, then warranties would have no value.")). But if a vehicle had some sort of hidden extraordinary defect that was outside of consumers' expectations for defects, then, as the market realized the existence of the defect, that realization would have a substantial negative impact on resale value. (*See id.* ¶¶ 3(b)-(c), 27(a), 41; Ex. D, Harless dep. at 66-67 (explaining that, if Plaintiffs' theory about an inflated purchase price "were true at the point of sale," then the "long history of people . . . experiencing the defect" would have caused a "change in values" as the market gained "more and more information about the vehicle")). That is especially true when, as here, the market has had many years to incorporate that growing knowledge into the vehicles' resale price. (*See* ECF 117, Ex. 23, Harless Report ¶ 41(c)).

If Plaintiffs' theory has any merit at all (it does not), they must be relying on that type of

---

[8] The 2017 model year Expedition did retain less of its value than its competitors but that is explained by its outdated styling. (See id. ¶ 25). And it actually narrowed the gap in retained value relative to its comparators over time—the exact opposite of what would be expected under Plaintiffs' theory that the market gradually learned of the alleged defect. (*See id.* ¶ 25(d)).

extraordinary defect, one that supposedly causes the putative class vehicles to have an inflated purchase price because it was not incorporated into consumers' standard expectations for certain defects that would be covered under warranty. (*See id.* ¶¶ 3(c), 46). Since that is the type of defect Dr. Harless' methodology is designed to detect, his methodology was a reliable way to test Plaintiffs' theory. (*See id.* ¶ 38(h) ("If such out-of-warranty costs were significantly greater for the subject vehicles than was expected when they were sold new, then that would be reflected in market prices, but my depreciation analysis showed no evidence of adverse or abnormal depreciation.")). His methodology is not designed to measure the price impact of standard defects that consumers expect and bargain around with the warranty; those price impacts would not show up in his results. But that is not the type of defect that would support Plaintiffs' theory because consumers get their benefit of the bargain notwithstanding the occasional appearance of such defects that are addressed through the warranty. (*See id.*). Plaintiffs cannot criticize Dr. Harless' methodology for failing to detect the price impact of a type of defect that does not "fit" their theory and that his methodology is thus not intended to measure.

Finally, Dr. Harless' analysis showed that the putative class vehicles' resale values did not substantially decrease relative to comparable vehicles in any way for any reason. (*See, e.g., id.* ¶ 46). Therefore, there was never a need to determine whether any such decrease was attributable to a particular defect. Plaintiffs' criticism that his methodology cannot disentangle the *reasons* for any change in market value is irrelevant because Dr. Harless's analysis found no change; the question of the reason for a substantial decrease never arose.

Even if either of Plaintiffs' criticisms had merit (they do not), the criticisms go to weight, not admissibility. Their first criticism focuses on the particular vehicles ("clean" vehicles) Dr. Harless chose to input into his model. But that type of "garbage in, garbage out" argument is an

"identification of [a] flaw[] in generally reliable scientific evidence" that is "precisely the role of cross-examination," not a reason to completely exclude Dr. Harless' testimony. *Quiet Tech.,* 326 F.3d at 1344-45. And their second criticism targets the conclusion that Dr. Harless draws from his analysis—that the alleged defect did not substantially impact resale values—but a proper *Daubert* reliability analysis "focus[es] . . . . '*solely on principles and methodology, not on the conclusions that they generate.*'" *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014) (quoting *Daubert*, 509 U.S. at 594-95) (emphasis in original).

## IV.    PROFESSOR O'GUINN'S OPINIONS ARE ADMISSIBLE.

Professor Thomas O'Guinn is the Chair of the Department of Marketing at the University of Wisconsin. He summarizes his conclusions as follows in Paragraph M of his report:

1. Information about potential corrosion in class vehicles was available to purchasers of class vehicles from 2013 forward.

2. However, the incidence of corrosion in class vehicles causing significant customer dissatisfaction is rare, and comparable to that of competitive vehicles.

3. Not all consumers would have made a purchase decision based in whole or in part on the small risk of corrosion on any part of class vehicles.

(ECF 113-4, O'Guinn Report at 18). Plaintiffs challenge all three conclusions as unreliable and irrelevant. Plaintiffs are wrong; at best, they have identified areas for cross-examination.

### A.    Conclusion M.1 Is Relevant And Reliable.

In its opposition to class certification, Ford argued that a presumption of reliance does not apply where class members had access to the allegedly undisclosed information and individual inquiry is necessary to determine if class members were aware of the information. As legal support, Ford relied on three cases, *Hamm v. Mercedes-Benz U.S.,* 2021 U.S. Dist. LEXIS 65098, at *35 (N.D. Cal. Apr. 2, 2021), *Braverman v. BMW of N. Am.*, LLC, 2020 U.S. Dist. LEXIS 91484, at *8-9 (C.D. Cal. May 19, 2020), and *Lloyd v. GMC*, 266 F.R.D. 98, 111 (D. Md. 2010). (ECF 156,

Ford's Opposition to Class Certification at 17.) As factual support, Ford relied on the New Vehicle

Limited Warranty, Dr. Harless's Report, the testimony of Plaintiffs MacSeveny and Minish, the

allegations in Plaintiffs Complaint—and paragraph K of Professor O'Guinn's report, summarized

in Conclusion M.1. But Plaintiffs in their motion argue as if Ford relied only on *Hamm* and only

on Professor O'Guinn's report.

Thus, Plaintiffs argue that Professor O'Guinn's opinion is "not relevant to defeat the

presumption of reliance under *Hamm*" for four reasons. First, they argue that "O'Guinn's evidence

does not demonstrate what was known to the class ***pre-purchase***" because "his evidence post-dates

the start of the class [in 2013]." (PM at 43). This argument assumes that the only information

available to class members **pre**-purchase—including, for example, purchasers of 2018

Explorers—was information available in 2013. That, of course, is untrue. Second, Plaintiffs argue

that "the internet posts by brand enthusiasts [relied on by Professor O'Guinn] were not information

disclosed by Ford," while the information available to consumers in *Hamm* was provided by the

manufacturer in the owners guide. (*Id.*). Plaintiffs simply ignore the decision in *Braverman*:

> [At least] some putative class members knew of the alleged limitations of the Range
> Extender before they leased or purchased their Class Car. *That knowledge could have
> been acquired from various sources, including* authorized dealers, magazine articles,
> *online sources*, and/or from having previously leased an i3. Thus, a determination would
> need to be made as to each putative class member's knowledge regarding the Range
> Extender, the source of that knowledge, and when that knowledge was obtained as part
> of a determination as to whether the alleged omission was material to each class member's
> decision to lease or purchase their Class Car. Consequently, individual issues would
> predominate over common issues of law and fact as to the consumer protection and
> fraudulent concealment claims.

2020 U.S. Dist. LEXIS 91484, at *8-9 (emphasis added).

Third, Plaintiffs argue that Professor O'Guinn's study "was not limited to the part or metal

at issue here (the ***aluminum hood***) or the specific manifestation (premature corrosion or paint

bubbling or blistering)." (PM at 43 (emphasis in original)). This is another artifact of Plaintiffs'

"litigation microscope," and it assumes that the only type of corrosion that consumers would care about is bubbling or blistering on the leading edge of an aluminum hood.[9]

Finally, Plaintiffs argue that "Ford has made no **wholesale** disclosure, unlike a specific disclosure by a car manufacturer in the owner's manual, as the court found in *Hamm*." (PM at 43 (emphasis in original).) It is true that Professor O'Guinn's report does not refer to any such disclosure, but Professor O'Guinn's report was not the only evidence relied upon by Ford to support its argument under *Hamm* and *Braverman*. In fact, unless Plaintiffs are distinguishing between an "owner's guide," and a "warranty guide," this case is just like *Hamm.* As Ford argued in opposition to class certification, "Ford's warranty guide specifically disclosed the potential for cosmetic corrosion, which would be covered for three years (before model year 2016) or five years (for aluminum body panels in later model years)." (ECF 156, Ford's Class Cert. Opp. at 17).

Professor O'Guinn's report alone may not by itself be conclusive on the issue of whether the principle applied in *Hamm* or *Braverman* applies here, but "evidence need not be conclusive of a material issue in order to be relevant and admissible." *United States v. Moss*, 290 F. App'x 234, 244 (11th Cir. 2008).

**B.  Conclusion M.2 Is Relevant And Reliable.**

Plaintiffs suggest that Professor O'Guinn "recanted" conclusion M.2 (PM at 44), but this is incorrect. Professor O'Guinn testified as follows:

Q. Okay. Let's look at conclusion number 2. 'However, the incidence of corrosion in class vehicles causing significant customer dissatisfaction is rare and comparable to that

---

[9] Plaintiffs' reliance on *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 158 (D.N.J. 2010) is misplaced. In that case. Professor O'Guinn concluded that many class members would have been aware of an FCC rule change that allowed a cellular service provider to discontinue service. But that was not the material fact at issue. Rather, the material fact at issue was that the service provider would actually take advantage of the rule change and discontinue service. Here, the material fact is the potential for corrosion in class vehicles, and that is exactly the information Professor O'Guinn looked for in his Internet study.

of competitive vehicles.' Do you stand by that conclusion?

A. Yeah.

(Ex. E, O'Guinn dep. at 284). Professor O'Guinn also explained the basis for his conclusion:

Q. Is there a relationship between significant customer dissatisfaction and the chatter that you see on the internet?

A. Yeah. Generally speaking, if people are dissatisfied, they post more; and if they're satisfied, they don't do anything. But if they're dissatisfied, they're going to come home and put something on Yelp or Nextdoor. They're going to let somebody know they were unhappy at the restaurant. So, yes, the fact that there's so few and that people have to be pretty motivated to post -- and they don't post positive stuff very much. So, when you see this and you see these low rates -- from my experience, low rates -- it just says that this is just not a big deal.

(*Id.* at 284-85). In short, Professor O'Guinn was not trying to calculate the failure rate or the incidence of corrosion. Nevertheless, the relative dearth of complaints on the Internet is consistent with what Dr. Taylor found in his analysis of warranty rates and what Dr. Simonson found in his consumer satisfaction survey; all this evidence suggests "that this is just not a big deal."

As for Plaintiffs' other complaints about Professor O'Guinn's Internet study, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of challenging disputed, but admissible evidence." *Gardner v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 194098, at *15 (M.D. Fla. June 3, 2015).

### C.    Conclusion M.3 Is Relevant And Admissible.

Conclusion M.3 is that "[n]ot all consumers would have made a purchase decision based in whole or in part on the small risk of corrosion on any part of class vehicles." Plaintiffs claim that this conclusion is irrelevant because "Ford asked Professor O'Guinn to evaluate the wrong standard for materiality." (PM at 48). But Professor O'Guinn was not asked to opine specifically on materiality, and he did not opine on materiality. Whether his conclusions are *relevant* to materiality is a question that need not be decided for purposes of this motion, because Conclusion

M.3 is directly relevant to whether *actual reliance* is a common question. There should be no question that actual reliance is required under California law for purposes of the CLRA claim. *See, e.g., Neale v. Volvo Cars of N. Am., LLC,* 2021 U.S. Dist. LEXIS 132157, at *29 (D.N.J. July 15, 2021) ("Defendants next contend that individual questions of reliance and causation preclude predominance as to Plaintiffs' CLRA claim. The Court agrees."); *Watkins v. MGA Entm't, Inc.*, 2021 U.S. Dist. LEXIS 138888, at *38 (N.D. Cal. July 26, 2021) ("The Court concludes that both the UCL and CLRA claim fail because they sound in fraud and Plaintiffs have not alleged any specific facts showing reliance.")

Plaintiffs also argue that Professor O'Guinn's conclusion is irrelevant because he "assume[d] that Plaintiffs are contending that Ford should be held liable for failing to disclose a small incidence of corrosion." (PM at 49). But regardless of what Plaintiffs are contending, Ford *is* contending that it "cannot be held liable for failing to disclose a small incidence of corrosion." If the evidence is not relevant to Plaintiffs' claims, it is nevertheless relevant to Ford's defense.

Plaintiffs criticize Professor O'Guinn for not considering evidence showing that "corrosion performance is important to consumer purchasing decisions and Ford understood as much." (*Id.* at 90). If by corrosion performance Plaintiffs mean the probability that corrosion will occur, Ford agrees this is critical in determining what is important to consumers at the time they are making a purchase decision. But Professor O'Guinn's conclusion expressly incorporates the assumption that the probability of corrosion is small, an assumption that is supported by his own Internet study, Dr. Taylor's warranty analysis, and Dr. Simonson's consumer satisfaction survey. Further, Plaintiffs have made it clear that the probability of corrosion occurring has no bearing at all on their theory, so Ford suspects Plaintiffs here mean something other than probability; they probably mean that corrosion that actually occurs will be important to consumers who actually experience

it. If so, *they* are the ones who are applying the wrong standard of materiality:

> Materiality is assessed, not in retrospect, but from the perspective of the prospective buyer. For the unlucky customers whose trucks were among the approximately 1% of 6.0L diesel trucks to suffer fuel tank delamination by March 2007, the issue might be deemed material in retrospect. Some might naturally have decided to take their business elsewhere. Hence the internal Ford and Magni emails describing tank delamination as 'very serious issue,' a 'big issue,' an 'ongoing issue,' and a 'known issue,' and Ford's efforts to solve the problem.

> The materiality issue, however, has a different focus. The materiality of the known risk of delamination turns on whether a reasonable consumer deciding whether to purchase a 2006 Ford F-350 Super Duty 6.0L diesel truck—ignorant, of course, of the future—would attach importance to the risk of delamination in making that decision.

*Coba*, 2017 U.S. Dist. LEXIS 123546, at *23-24; *accord, e.g., Neale,* 2021 U.S. Dist. LEXIS 132157, at *31 ("The inquiry is not whether a reasonable consumer would want a pool in her vehicle, but rather whether the risk of water leaks, balanced against the benefits of the plus-shaped design of the sound plugs, would dissuade her from purchasing a Class Vehicle.").

Finally, Plaintiffs argue that Professor O'Guinn is not qualified to offer an opinion on the impact of corrosion on a consumers' purchasing decision because "he's never studied it, or conducted any empirical research or a focus group, published any articles or had any specific training." (PM at 51). But Professor O'Guinn's conclusion is supported by a wealth of research that applies generally. He explained that he did not need to do a study specific to corrosion or this case, because "[h]umans don't reinvent their human thought processes because it's a car. That's silly." (Ex. E, O'Guinn dep. at 266-67).

## V.   DR. RENE BEFURT'S OPINIONS ARE ADMISSIBLE.

### A.   Dr. Befurt's Qualifications and Opinions

For almost two decades, Dr. Rene Befurt has researched and modeled consumer choice in the automotive field. He specializes in developing survey experiments and choice modeling approaches in consumer surveys, and he has handled numerous projects for automobile

manufacturers to help his clients understand consumer preferences and market forces through market simulations. (ECF 113-1, Ex. 17, Befurt Report App'x A). Plaintiffs do not challenge Dr. Befurt's qualifications.

Dr. Befurt's April 12, 2021 expert report had three primary sections. First, citing authorities of the type typically considered by experts in his field, the report described in detail the heterogenous nature of consumers' vehicle purchase processes, preferences, and considerations. (*Id.* ¶¶ 16-42). The second section described a consumer survey Dr. Befurt designed and conducted to test whether additional realistic and prominent disclosures of the alleged defect in the warranty had a statistically significant effect on consumers' likelihood of purchasing the vehicles. (*Id.* ¶¶ 43-74). The study was designed to replicate the type of vehicle configurator consumers would actually use in the real world; in fact, it is largely identical to the actual vehicle configurator found on Ford's website. Eligible respondents were randomly assigned to the "Standard Warranty" or "Additional Disclosures" group, and were presented with vehicle purchase background materials and a vehicle configurator that—just like a real-world configurator—presented a series of options that respondents could click on to view information about and make choices regarding the various options. (*Id.* Figure 2). In both groups, the configurator differed from the real-world configurator in that it had an additional "Warranty and Disclosures" panel added to the bottom of the series of options. Respondents in the "Additional Disclosures" group were presented with stimuli that was exactly the same as that presented to the "Standard Warranty" group, except that they included additional realistic and prominent disclosures about the alleged defect. (*Id.*) Respondents in both groups were then asked to indicate, using percentages, their likelihood of purchasing the vehicle they configured. Based on the survey results, Dr. Befurt concluded that additional realistic and prominent disclosures of the alleged defect in the warranty have no statistically significant effect

on consumers' likelihood of purchasing the vehicles, and their willingness-to-pay is not affected by the inclusion of additional prominent disclosures of the alleged defect in the warranty. (*Id*. ¶¶ 74, 99). Finally, Dr. Befurt's report offered criticisms of assumptions regarding consumer behavior and consumer vehicle purchase decision-making that underlie the opinions of Plaintiffs' damages expert, Ted Stockton. (*Id.* ¶¶ 75-98).

### B.    Dr. Befurt's Opinions Are Relevant To Actual Reliance And Causation.

Plaintiffs principal argument is that Dr. Befurt's first two sections are not relevant to materiality, because they are based on data and information about real-world "consumers' subjective and individual preferences" rather than a hypothetical reasonable consumer. (PM at 17-20, 23-24). As discussed below, Plaintiffs cannot reasonably claim that evidence about how actual consumers behave, and what actual consumers find important in the real world, is entirely irrelevant to what a reasonable consumer would do. But the issue need not be decided for purposes of this motion, because whatever relevance Dr. Befurt's opinions might have to materiality, his opinions are directly relevant to other issues in this case, including reliance and causation.

As discussed above, Plaintiffs must prove actual reliance for all California class members. *See, e.g. Neale,* 2021 U.S. Dist. LEXIS 132157, at *29; *Watkins,* 2021 U.S. Dist. LEXIS 138888, at *38. To prove that class members relied on an omission, Plaintiffs must prove that had the omitted information been disclosed, all class members would have (1) been aware of the disclosure, and (2) behaved differently. *Mirkin v. Wasserman,* 5 Cal. 4th 1082, 1093 (1993).

The first two sections of Dr. Befurt's report are directly relevant to both elements of reliance. Dr. Befurt's opinion that consumers vary in the information they search for and attend to in the vehicle purchase process depending on their preferences and goals (ECF 113-1, Ex. 17, Befurt Report ¶¶ 19, 25) is highly relevant to the question of whether all class members would have been aware of a disclosure had one been made and whether the issue can be resolved on a

class-wide basis. And his opinion that consumers vary in the importance they attribute to information they gather during the vehicle purchase process (*id.* ¶¶ 26-38) is highly relevant to the question of whether all class members would have behaved differently had they been aware of the allegedly omitted information and whether that issue can be resolved on a class-wide basis.[10]

Dr. Befurt's empirical study of real-world consumers is relevant to both elements as well. His study confirms that one cannot presume that, if presented with a realistic, prominent disclosure during the real-world vehicle purchase process, all class members would have attended to and engaged with the disclosure and changed their purchasing behavior accordingly. Thus, his study reflects that actual reliance in the real world is an individual issue that cannot be proven on a class-wide basis.

Case law confirms that information about consumers' "subjective" and "individualized" preferences and behavior is relevant to determining whether reliance is a common issue under the CLRA. *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-1024 (9th Cir. 2011) (holding that under the CLRA, "[i]f the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified," and citing information regarding various individual consumer circumstances that could demonstrate a lack of reliance) (citation omitted). *See also Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1047-58 (C.D. Cal. 2018) (reviewing consumer survey data and concluding "there are significant individualized issues related to proof of reliance); *Jones v. ConAgra Foods,*

---

[10] *Shanks v. Jarrow Formulas, Inc.*, 2019 U.S. Dist. LEXIS 160199 (C.D. Cal. Aug. 27, 2019) (PM at n.22) supports Ford's position. There, the plaintiff relied on scientific literature that, unlike Dr. Befurt's reliance materials, had nothing to do with consumer purchasing decisions. Since the Plaintiff failed to present any evidence that the challenged statements were material to a reasonable consumer, but the defendant presented a survey refuting that proposition, the court **denied class certification** due to "significant individualized issues related to proof of reliance." *Id.* at *15-21.

*Inc.*, 2014 U.S. Dist. LEXIS 81292, at *57 (N.D. Cal. June 13, 2014) (finding that class action plaintiffs had failed to meet their burden as to reliance, and noting lack of survey or other evidence that class members would attach importance to "100% natural" claim).

Such evidence is also highly relevant to the issue of causation and deception under the NY GBL § 349 and FDUTPA. *See, e.g.*, *Oscar v. BMW of N. Am., LLC*, 2012 U.S. Dist. LEXIS 84922, *12-14, 21 (S.D.N.Y. June 19, 2012) (based in part on "the inherently individualized nature of the [vehicle] purchase decision," it was "impossible to conclude, on a global basis, whether the disclosure of the downsides of [the allegedly defective tires] would have affected purchasers' decisions to buy the MINI S, or the price at which they would have made that purchase."; certification of NY GBL § 349 claim denied because causation could not be determined on a class-wide basis); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 696 (S.D. Fla. 2014) (denying class certification in part due to evidence of varying interpretations of "All Natural" and plaintiffs' resulting inability to establish that the term would deceive an objectively reasonable consumer).

## C.    Dr. Befurt's Opinions Are Relevant To Materiality.

The issue need not be decided for purposes of this motion, but it flies in the face of common sense to assert that all information about how actual consumers behave in the real world, and what they actually find important in the real world, is *wholly irrelevant*—and *cannot* be considered by this Court or a jury—in resolving the question of whether an "objectively" "reasonable consumer" would have found the allegedly omitted information about the alleged defect to be important to their vehicle purchase decision.

And it is not the law. Regardless of applicability of an "objective" standard, courts routinely consider—and base decisions on—evidence, including surveys, regarding consumers' real-world decision-making processes and considerations when determining whether materiality is an individual question that precludes class certification. *See, e.g., Oddo*, 2020 U.S. Dist. LEXIS

150601, at *101-02 (denying class certification in part because plaintiffs' expert's survey did not indicate "how consumers 'valued' Carrier's alleged omissions 'compared to other attributes of the product and the relevant market generally"; materiality therefore was not susceptible to classwide proof); *Johnson v. Harley-Davidson Motor Co. Grp., LLC,* 285 F.R.D. 573, 581 (E.D. Cal. 2012) (finding that "while materiality is generally determined by the 'reasonable consumer standard,'" evidence demonstrated that "there are multiple factors affecting what 'reasonable consumers' would consider material when purchasing one of the class motorcycles" and materiality was therefore not a common issue).  Because they are relevant to materiality and reliance, Dr. Befurt's opinions are not "contrary to law" and "unreliable," and they "logically advance[] a material aspect of the proposing party's case" and "'fit' the disputed facts." (PM at 17, 19 (quoting *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 830309, at *2 (N.D. Fla. Mar. 4, 2021)).

Further, *Plaintiffs* offer "subjective" and "extrinsic" evidence to support their claims. (*See, e.g.,* PM at n.20 (referencing extrinsic evidence); ECF 70, Second Amended Complaint ¶¶ 19-54 (25 pages of subjective and individualized allegations detailing each named Plaintiff's vehicle purchase and use experience and subjective assertion that each named Plaintiff "would not have purchased the Class Vehicle" had they known of the alleged propensity for corrosion)). And Plaintiffs' rebuttal expert Steven Gaskin believes that surveys result in "objective" measurements of the population. (Ex. F, Gaskin dep. at 35-36). *See also Banh v. Am. Honda Motor Co.*, 2020 U.S. Dist. LEXIS 139274, at *49 (C.D. Cal. July 28, 2020) ("According to Gaskin, the results of this survey confirm that Honda's omissions were material and resulted in overcharging class members for the Vehicles."). "Subjective" and "extrinsic" evidence cannot be relevant when it supports Plaintiffs' claims but irrelevant when it refutes them.

### D.      Dr. Befurt's Reliable Opinions "Fit" Plaintiffs' Theory Of The Case.

Plaintiffs assert that Dr. Befurt's opinions do not "fit" with Plaintiffs' theory of the case

because Dr. Befurt "merely assess[ed]" the "likelihood of a consumer *purchasing* a Subject Vehicle if, hypothetically, Ford's warranties disclosed the design defect" (PM at 19 (emphasis in original)). But this assessment is directly relevant to Plaintiffs' claim that had Ford disclosed the alleged defect, they "would not have purchased the Class Vehicle, or would not have paid as much for it." (ECF 70, Second Amended Complaint ¶ 53; *see also* ECF 97-3, Ex. 42, Stockton Report ¶ 26 (opining that upon finding out about the defect, a reasonable consumer would either demand repair or elect not to purchase the vehicle)).

Nonetheless, Plaintiffs assert that Dr. Befurt's opinions do not fit Plaintiffs' theories because he fails to assess the impact of Ford's deceptive conduct "on the values that Plaintiffs paid and should have paid for their vehicles." (PM at 21). But Plaintiffs' damages expert Stockton did not even purport to offer a method for measuring such a difference, which is a measure of out of pocket (not benefit of the bargain) damages. (The important difference between out-of-pocket and benefit-of-the bargain damages in explained in *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995).) And Plaintiffs' warranty valuation expert Kleckner offered no method for calculating damages for "a warranty that covers hood corrosion and provides for an effective repair (hood replacement)." (PM at 20). The opinions of Stockton and Kleckner therefore do not "fit" with Plaintiffs' theories and must be excluded.

In any event, Dr. Befurt did "test the effect of Ford's omissions on consumers' purchasing decisions" (*id.*), including the impact on respondents' willingness to pay. In Dr. Befurt's study, consumers engaged in a realistic market exercise in which they could express their likelihood to purchase a vehicle *at a particular price.* The survey asked consumers to rate their likelihood of purchase on a scale of 0-100%; to the extent that the disclosure reduced the respondents' willingness to purchase at the price displayed, it would have reduced the respondent's assessment

of the likelihood to purchase. Since Dr. Befurt's study demonstrated that the additional disclosures did not cause any impact on consumers' purchase likelihood, one can conclude that they provide no value to consumers. (ECF 113-1, Ex. 17, Befurt Report ¶ 74).

Dr. Befurt was not required to use Plaintiffs' proposed "accepted way" of testing the effect of Ford's omissions on consumers' purchasing decisions. (PM at 20). Gaskin has never utilized the method proposed in Plaintiffs' brief. (Ex. F, Gaskin dep. at 38-39). Dr. Befurt designed his study in accordance with "generally accepted survey principles," *Nightlight Sys. v. Nitelites Franchise Sys.*, 2007 U.S. Dist. LEXIS 95565, at *12 (N.D. Ga. July 17, 2007), including defining an appropriate target population, selecting an experimental design to control for potential biases and noise, designing a configurator that approximated a realistic shopping environment, designing stimuli that were meaningful and realistic and were in line with FTC disclosure guidelines, ensuring that survey questions were clear and balanced, minimizing the possibility of "demand artifacts," screening out respondents with specialized knowledge, utilizing attention and quality check questions, basing the likelihood of purchase question on a Juster scale, and mitigating starting point bias. (*See* ECF 113-1, Ex. 17, Befurt Report ¶¶ 44, 46, 47, 49-55, 59-60, 64, 69-70, and footnotes to those paragraphs and sources cited therein).

Dr. Befurt's relevant opinions are thus based on a reliable methodology, and Plaintiffs' criticisms "amount to no more than a disagreement with [Dr. Befurt's] choice of methodology." *Putnam v. Henkel Consumer Adhesives, Inc.*, 2007 U.S. Dist. LEXIS 96166, at *21-22 (N.D. Ga. Oct. 29, 2007). Experts "'may employ a [] wide choice of methodologies in developing an expert opinion.'" *Redmond v. City of E. Point*, 2004 U.S. Dist. LEXIS 31631, at *23 (N.D. Ga. Mar. 26, 2004) (quoting *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000)), and it is not "for the Court to pick and choose which variant of [a] methodology it prefers, to the exclusion

of the other." *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1296 (N.D. Fla. 2017).

> **E.      Plaintiffs' Gripes About Dr. Befurt's Disclosure Language Are Unfounded And In Any Event, Do Not Impact The Validity Of His Study.**

On pages 21-22 of their Motion, Plaintiffs complain about the specific language Dr. Befurt chose for the additional disclosures in his study. The survey utilized existing language from Ford's New Vehicle Limited Warranty, and as Dr. Befurt testified, rather than describing every technical or engineering-based detail of the alleged defect in the additional disclosures, he chose language that was designed to capture "the consumer-facing elements of plaintiff's allegations" in "an understandable way" (Ex. G, Befurt dep. at 27), and to "reasonably reflect the language that respondents would experience in the real world." (*Id.* at 69-70). Dr. Befurt researched and pretested the disclosure language, and based on that testing he concluded that the stimuli were easy to read and understandable. (ECF 113-1, Ex. 17, Befurt Report ¶ 55 and n.92; Ex. G, Befurt dep. at 40-41, 80, 84-90, 110).

Plaintiffs complain that Dr. Befurt's additional disclosure language was "one-sided" and not "neutral," and described "the impact of the future possibilities of rust or corrosion" instead of mentioning a "design defect." (PM at 21-22). But this is consistent with Plaintiffs' assertion during discovery that Ford should have disclosed to customers the "consequences that they would likely suffer as a result of the defect" (Ex. H, Plaintiffs' 5/24/19 Supp. Responses to Ford's First Interrogatories at 41). And given Plaintiffs' assertion that "defining a design defect is not an element of any of Plaintiffs' claims," (ECF 132, Reply in Support of Plaintiffs' Class Certification Motion at 8), it was reasonable to not specifically describe the alleged defect as a "design defect" in the disclosures. Besides, Ford's obligation, if any, was to disclose material facts, and whether the facts establish a "design defect" under whatever unidentified standard Plaintiffs are relying on is a matter of opinion, not fact. *See, e.g., Tincher v. Omega Flex*, 628 Pa. 296, 389, 104 A.3d 328,

384 (2014) ("The term 'defect' in design cases is an epithet -- an expression for the legal conclusion rather than a test for reaching that conclusion.") (quotation marks omitted). Plaintiffs also complain that Dr. Befurt's disclosure stated that "[a]luminum body parts are not likely to perforate," instead of stating that "aluminum never perforates in this context." (PM at 21). But the language chosen by Dr. Befurt was consistent with the testimony of Ford's expert Dr. Eric Guyer, who thought the likelihood of perforation occurring on vehicle aluminum panels in six years in service was "probably very low." (Ex. I, Guyer dep. at 261-62).

Neither *Weaver v. Champion Petfoods USA Inc.*, 2019 U.S. Dist. LEXIS 222836 (E.D. Wis. Dec. 31, 2019) nor *Reitman v. Champion Petfoods United States, Inc.*, 2019 U.S. Dist. LEXIS 221941 (C.D. Cal. Oct. 30, 2019) help Plaintiffs. (PM at 22). Unlike the surveys in those cases, which presented a lengthy series of corrective statements, Dr. Befurt tested Plaintiffs' omission theory through exactly the method approved in those cases—by using a control group and presenting two versions of the disclosures, one containing the allegedly omitted information and one without. In any event, disputes about "particular terms used in the questions or the questions themselves" in a survey go "to the weight afforded the survey, and not its admissibility." *Nightlight Sys.*, 2007 U.S. Dist. LEXIS 95565, at *22.

**F.      Dr. Befurt's Methodology Presented The Stimuli To Respondents In A Realistic and Engaging Manner, and There Is No Evidence That Respondents Were Not Aware Of The Disclosures.**

Plaintiffs and their expert Gaskin criticize Dr. Befurt's study because he did not track or measure which respondents actually "viewed, read, or understood" the disclosures in the warranty section. (PM at 23). Thus, they claim, Dr. Befurt could not rule out the "confounding factor" that "survey respondents did not read the disclosure." (*Id.*).[11]

---

[11] Although Gaskin's report contains additional criticisms of Dr. Befurt's study, they are not raised in Plaintiffs' motion and therefore do not form the basis for Plaintiffs' challenge.

But Plaintiffs ignore Dr. Befurt's detailed testimony on this point. He designed the survey as "a balance of accessibility of information, without creating what we call demand artifacts which are biases that can arise from overly present, overly frequent, overly obvious information that give away the purpose of the survey." (Ex. G, Befurt dep. at 23-24). Based on his experience, and in accordance with generally accepted principles of survey design, Dr. Befurt chose a method of presenting the additional disclosures to participants that was consistent with a manner in which information would be presented in the real world, but the information would be more prominent, more visible, and more explained than it was in the actual warranty. (*Id.* at 27-28, 43; ECF 113-1, Ex. 17, Befurt Report ¶¶ 46-55 and n.73-91). The additional disclosures were elevated to the level of a category of features that participants clicked on as they configured their vehicle. (Ex. G, Befurt dep. at 44). The first screen containing additional disclosures appeared when a respondent clicked on the "Warranty and Disclosures" category, and additional information containing more disclosures was presented—consistent with the "natural habitat" of the configurator—when respondents clicked on an information button. (ECF 113-1, Ex. 17, Befurt Report ¶ 48; Ex. G, Befurt dep. at 47-49). Even Gaskin admitted it was possible that respondents "wondered" why the category said "warranty and disclosure instead of just warranty," and "probably most" respondents saw the Warranty and Disclosures tab, made a decision on its relative personal importance, then chose whether to click on the information. (Ex. F, Gaskin dep. at 119-20).

Thus, there is no reason to believe that respondents were not aware of the stimuli, given that the design of the survey facilitated access to the disclosures as part of the natural purchase and information-processing flow, and displayed the disclosures in a manner that was more prominent than in the real world. (Ex. G, Befurt dep. at 77-78, 101-02, 104-05). Further, Dr. Befurt utilized generally accepted methods including pretesting, attention check tests, and completion rate checks

to confirm that respondents were engaged with the configurator and were highly likely to go to all the available information submenus. (ECF 113-1, Ex. 17, Befurt Report ¶¶ 55, 60, 64 and n.92, 99, and 103; Ex. G, Befurt dep. at 89-90, 105-07, 123-24). And it is recognized in the literature cited by Dr. Befurt that respondents are more engaged when using a configurator compared to other forms of customization survey exercises, such as the conjoint analyses typically employed by Gaskin.[12] But Gaskin's studies contain no guarantees that respondents read and understand every stimulus he presents,[13] and he primarily bases his conclusions regarding respondent engagement—including his conclusions about engagement in Dr. Befurt's study—on survey *results*. In other words, Gaskin assumes that respondents are engaged only if their reactions to the stimulus "make[] sense" and are in line with his preformed expectations as to how they should react. (Ex. F, Gaskin dep. at 124-27, 148, 158, 183-85 (asserting that he did not need to track whether respondents clicked on a label for more information, because "all I care about—that positive result shows that they were looking at that attribute.")). But Gaskin's results do not engender confidence in his hindsight-driven method. *See, e.g.*, *In re Volkswagen Clean Diesel Mktg. Sales Practices Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020) (excluding Gaskin's conjoint analysis as unreliable in part because the results suggested that some consumers value a $2,000 navigation system in a $16,000 vehicle at $9,000, and that VW was a premium brand compared to Audi. In any event, disputes regarding choices Dr. Befurt made regarding

---

[12] *See, e.g.*, Valenzuela, Ana, Ravi Dhar, and Florian Zettlemeyer, "Contingent Response to Self-Customization Procedures: Implications for Decision Satisfaction and Choice," *Journal of Marketing Research*, Vol. 46(6), 2009, pp. 754-763 (comparing by-alternative (i.e. conjoint analysis) and by-attribute (i.e. Dr. Befurt's configurator) product customization).

[13] In Gaskin's surveys, lengthy descriptions of critical attributes are buried in a series of computer screens, and summaries are included in lists of attributes on choice screens, but Gaskin does not track what respondents read or how long they spend on each screen, or whether they click on information buttons. (Ex. F, Gaskin Dep. 141-42, 144-48, Ex. 3 at Figure 1 and ¶ 49).

disclosure presentation go to weight and not admissibility. *See Ohio State Troopers Ass'n v. Point Blank Enters.*, 2020 U.S. Dist. LEXIS 58984, at *35-36 (S.D. Fla. Apr. 3, 2020) (criticisms of survey, including alleged failure to "ensure survey participants read the disclosure" did not affect admissibility of expert's opinions); *see also Taylor v. Trapeze Mgmt., LLC*, 2019 U.S. Dist. LEXIS 230212, at *7 (S.D. Fla. Feb. 28, 2019) ("[w]hile there will be occasions when" surveys are "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare," and "[u]sually, objections based on flaws in the survey's methodology are properly addressed by the trier of fact.") (citations omitted); *Edmondson v. Caliente Resorts, LLC*, 2017 U.S. Dist. LEXIS 220882, at *34 (M.D. Fla. Aug. 31, 2017).

But the larger flaw in Plaintiffs' criticism is that it ignores that Dr. Befurt's survey, and the stimuli in particular, were designed to mimic the actual automobile buying process, in which consumers may attend to the information presented to them to varying degrees. (ECF 113-1, Ex. 17, Befurt Report ¶ 47; *see also* Ex. F, Gaskin dep. at 161 (conceding that consumers are not required to read warranty and disclosure information when purchasing a vehicle)). Thus, information in the survey was available to participants—as in the real world—"according to their own preferences and their own cognitive laws and their own interests when it comes to reading." (Ex. G, Befurt dep. at 49-50). It does not impact the validity of a survey if respondents may not read or perceive certain elements of a realistic stimulus, if that reflects their natural behavior. (*Id.* at 36-37; *see also* 122-125 (for the confound to exist and move measurement results, it would have to be that "not a single person" paid attention to the disclosures, which is "an absolutely unrealistic scenario")). Gaskin and Plaintiffs' criticism is actually that the disclosure in Dr. Befurt's study was not presented in an *over-prominent* manner that would have been inconsistent with realistic marketplace conditions. But Gaskin acknowledges that his studies have been criticized for over-

prominence (Ex. F, Gaskin dep. at 172-73), and Plaintiffs present nothing to support a finding that generally accepted survey design principles required—or allowed—over-prominence here.

Dr. Befurt's approach was thus consistent with accepted survey design principles, and with Plaintiffs' theory that Ford had a duty to disclose the alleged defect to consumers; no duty to ensure that consumers actually viewed, read, and understood the information is alleged. (*Compare* ECF 70, Second Amended Complaint ¶ 227 *with* PM at 23). Plaintiffs have cited no law that imposes such a duty on manufacturers, and it is *Plaintiffs'* burden to prove that had a disclosure been made, class members would have been aware of it and changed their behavior. *See Mirkin, supra.*

### G.     Dr. Befurt Relied On Appropriate Sources.

As the 11th Circuit has recognized, experts can base their opinion on facts or data in the case "that the expert has been made aware of." *St. Louis Condo. Ass'n v. Rockhill Ins. Co.*, 2021 U.S. App. LEXIS 21429, at *22 n.8 (11th Cir. July 20, 2021) (quoting Fed. R. Evid. 703). And under Rule 702, "the evidence an expert relies on simply must be 'based on sufficient facts or data,' and is 'the product of reliable principles and methods,' that the expert has 'reliably applied . . . to the facts of the case.'" *Id.* (quoting Fed. R. Evid. 702.)

Plaintiffs argue that Dr. Befurt did not rely on materials that would be considered  by "experts in the field of compliance with consumer fraud statutes."  (PM at 26). But Dr. Befurt does not claim to be an expert in the field of "compliance with consumer fraud statutes." (Nor, for that matter, does Gaskin. Ex. F, Gaskin dep. at 31-32.) Dr. Befurt relied on the kinds of facts and data that experts in his actual field of marketing and consumer behavior would reasonably rely on. His sources included a variety of academic and industry articles relevant to his analysis of consumers' vehicle-buying process and sources reflective of information typically accessed by consumers during the process, such as *Consumer Reports* and *Kelley Blue Book*. (*See generally* ECF 113-1, Ex. 17, Befurt Report App'x C). He also cited articles from reputable academic journals and

literature on general consumer behavior and the vehicle purchase process, use of configurators by consumers and academics, and survey best practices. (*Id.*) Indeed, Gaskin regularly relies on the same types of sources as Dr. Befurt, including subjective preferences of survey respondents, and internet websites. (*See* Exs. J, K, Excerpts from Gaskin Reports, identifying materials relied upon; ECF 132-2, Gaskin Report Ex. B, citing www.dummies.com).

### H.     Dr. Befurt's Opinions, Including Those Pertaining To Stockton, Are All Reliable And Helpful To The Jury.

While Dr. Befurt does not offer damages opinions, his opinions are relevant and helpful to assist the trier of fact in evaluating the reliability of the numerous unrealistic and unsupported assumptions regarding consumer purchase decision-making that Stockton presents as a foundation of his damages opinions. His assumptions are not limited to issues of "materiality," as Plaintiffs suggest, but include assumptions that class members bargained for a defect-free vehicle; or that disclosing the alleged defect would prompt consumer behavior such as "demand[ing] repair of the defect" or choosing "not to purchase that vehicle." Stockton's foray into consumer behavior further suggests that "reasonable" consumers would "reach a different perception of utility and value a transaction differently, depending upon whether a defect was revealed or concealed," and that consumers can and do instantly negotiate a price for a future repair at the point of purchase. (ECF 113-1, Ex. 17, Befurt Rpt. ¶¶ 75-98). Since Stockton proffers expert opinions based on assumptions about how consumers act and think, the trier of fact should be permitted to hear reliable criticisms of those assumptions from Dr. Befurt, who has spent around two decades examining various aspects of real-world consumer behavior specifically in the automobile industry.

Dr. Befurt's remaining opinions will be helpful because they offer much that is beyond the "understanding of the average lay person." (PM at 25). His reliable opinions regarding the heterogeneity of the vehicle purchase process and consumer preferences are based on his extensive

experience and a detailed review of academic literature and other sources, and they include application of concepts such as "heuristics" (ECF 113-1, Ex. 17, Befurt Report ¶ 29), which are not commonly understood by the average lay person. Dr. Befurt's survey design, executions, statistical analyses, and the process of translating survey data into conclusions go far beyond the understanding of an average lay person, and although Plaintiffs are desperate to prevent their claims from being evaluating in the context of real-world consumer vehicle purchases, this Court and the jury should be allowed to learn about Dr. Befurt's reliable consumer survey and his conclusions therefrom. Whether or not extrinsic evidence of materiality is "required" (PM at 25), it is certainly helpful. Without the survey, this Court and the jury will have no empirical evidence to assist them in evaluating whether additional realistic and prominent disclosures of the alleged defect would have had an effect on consumers' likelihood of purchasing the vehicles and their willingness to pay for the vehicles.[14]

## VI.    EXCLUSION IS NOT WARRANTED UNDER RULE 403.

For all of Ford's experts addressed in the motion. Plaintiffs make the same generic argument, in virtually identical language, that their testimony would risk confusing or misleading the jury and should be excluded under Fed. R. Evid. 403.  But evidence of how class vehicles actually perform, and how actual consumers actually behave, will not be confusing or misleading; on the contrary, it might be the most helpful information available.

**<u>CONCLUSION</u>**

Plaintiffs' motion should be denied.

---

[14] Plaintiffs argue there is no evidence that Dr. Befurt's study was peer reviewed "by experts in the field of consumer fraud." (PM at 24). But Plaintiffs have asserted that "peer review is not a requirement for admissibility." (ECF 128, Plaintiffs' Opposition to Ford's Motion to Exclude Plaintiffs' Experts at n.26). And Gaskin disagrees with Plaintiffs' assertion that if a survey is prepared for litigation, it detracts from its reliability. (PM at 25; Ex. F, Gaskin dep. at 34).

Respectfully submitted,

JOHN M. THOMAS
KRISTA L. LENART
DYKEMA GOSSETT PLLC
2723 South State Street, Suite 400
Ann Arbor, MI 48104
Telephone: (734) 214-7613
Facsimile: (855) 262-3751
JThomas@dykema.com
KLenart@dykema.com

ERIC C. TEW
DYKEMA GOSSETT PLLC
1301 K. Street, N.W., Suite 1100 West
Washington, D.C. 20005
Telephone: (202) 906-8600
Facsimile: (855) 221-0913
ETew@dykema.com

BOWMAN AND BROOKE LLP
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Telephone: (305) 995-5600
Facsimile: (305) 995-6100

By: ___*/s/ Wendy F. Lumish*_____
    WENDY F. LUMISH
    Florida Bar No. 334332
    wendy.lumish@bowmanandbrooke.com
    CHRISTINE L. WELSTEAD
    Florida Bar No. 970956
    Christine.welstead@bowmanandbrooke.com

*Counsel for Defendant, Ford Motor Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the __9th__ day of August 2021, the foregoing was filed using the Court's CM/ECF system which will send electronic notice of the same to all interested parties.

By: ___*/s/ Wendy F. Lumish*_____
    WENDY F. LUMISH