UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-81558-RAR

CLARENCE SIMMONS, *et al*.,

      Plaintiffs,

v.

FORD MOTOR COMPANY,

      Defendant.

_____/

**ORDER DENYING PLAINTIFFS'
MOTION TO EXCLUDE DEFENDANT'S EXPERTS**

**THIS CAUSE** comes before the Court upon Plaintiffs' Motion to Exclude Defendant's Experts [ECF No. 126] ("Motion"). The Court has reviewed Plaintiffs' Motion, Defendant's Response in Opposition [ECF No. 161], Plaintiffs' Reply in Support [ECF No. 168], and other relevant portions of the record.[1] For the reasons set forth below, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion [ECF No. 126] is **DENIED**.

## BACKGROUND

This is a class action suit brought by Plaintiffs on behalf of themselves and similarly situated members of a purported Nationwide Class and multiple State Classes against Ford Motor Company alleging design defects in Ford Mustang-, Expedition-, and Explorer-branded vehicles. *See* Second Amended Class Action Complaint [ECF No. 70] ("Compl.") at 1–2. The alleged defect causes "the Class Vehicles' aluminum panels to corrode and the exterior paint on the aluminum body parts to bubble, flake, peel, rust and/or blister." *Id*. at 2. Plaintiffs' Motion for Class

---

[1] Plaintiffs' Motion contains numerous citations to their previously offered and since-stricken rebuttal expert reports. Pursuant to the Court's Order Granting Defendant's Motion to Exclude Plaintiffs' Rebuttal Experts and Rebuttal Reports of Previously Disclosed Experts, [ECF No. 196], these late-submitted reports will not be considered in the instant Order.

Certification is presently before the Court. *See generally* [ECF No. 151]. In their opposition to Plaintiffs' Motion for Class Certification, Defendant offers five expert witnesses: David W. Harless ("Dr. Harless"), Paul M. Taylor ("Dr. Taylor"), Rene Befurt ("Dr. Befurt"), Eric P. Guyer ("Dr. Guyer"), and Thomas Clayton Gibson O'Guinn ("Dr. O'Guinn"). Mot. at 1. Defendant filed the instant Motion requesting that this Court exclude all of Defendant's class certification experts pursuant to Federal Rules of Evidence 403 and 702, as well as the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *Id.* at 1–2.

## LEGAL STANDARD

Federal Rule of Evidence 702 "controls the admission of expert testimony." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (*en banc*). When expert testimony is introduced under Rule 702, "the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence." *City of S. Miami v. Desantis*, No. 19-22927, 2020 WL 7074644, at *3 (S.D. Fla. Dec. 3, 2020) (citing *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005)). "The presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight, not admissibility." *Id.* (quoting *Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 408 (D.D.C. 2017)) (internal quotation marks omitted). Thus, "the rejection of expert testimony is the exception rather than the rule." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments).

As the Supreme Court explained in *Daubert*, the purpose of the expert admissibility rules is for district courts to serve as "gatekeepers to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing

*Daubert*, 509 U.S. at 597 n.13) (internal quotation marks omitted).  However, this role must be properly balanced with a parties' right to a jury trial where "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

In the Eleventh Circuit, the admissibility inquiry has been distilled down to three factors, which require the district court to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).  These factors are referred to as qualification, reliability, and helpfulness.  *Frazier*, 387 F.3d at 1260.  While "there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Id*.

With respect to qualification, an expert may be qualified based on "knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-21089, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007)).  "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id*. (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).  "[S]o long as the expert is minimally qualified, objections to the level of the expert's

expertise go to credibility and weight, not admissibility." *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 8-10052, 2009 WL 2058384, at *1 (S.D. Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *Carnival Corp.*, 2013 WL 752697 at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).

The reliability inquiry requires the court to determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261–62 (citation omitted) (internal quotation marks omitted). Generally, to make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). The Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability as these factors are not dispositive. *See id.* Accordingly, trial judges are afforded "considerable leeway" when assessing reliability. *Id.* at 1258 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The final element—helpfulness—considers whether the expert testimony applies to "matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63. This prong requires

trial courts to "exclude expert testimony that is 'imprecise and unspecific,' or [when the] factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)).  To be helpful, a nexus must exist between the offered opinion and the facts of the case.  *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591.  For example, testimony is not helpful "where a large analytical leap must be made between the facts and the opinion."  *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Although sometimes helpful, a hearing is not necessary for the Court to fulfill its gatekeeping role of determining whether an expert's testimony meets the requirements set forth in *Daubert.  See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2007); *see also United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (holding that *Daubert* hearings are not required); *Cook ex rel. Estate of Tessier*, 402 F.3d at 1113 (noting that the trial court was under no obligation to hold a *Daubert* hearing).  The decision to hold a *Daubert* hearing is within the discretion of the Court.  *United States v. Junkins*, 537 F. Supp. 2d 1257, 1259 n.1 (S.D. Ala. 2008) (denying the Government's requests for a hearing because it would not have materially advanced the Court's understanding of the issues).  Here, a *Daubert* hearing will not materially advance the Court's understanding of the proposed expert testimony and the issues before it.  Thus, the Court declines to hold one.  *Corwin*, 475 F.3d at 1252 n.10 ("hearings are not prerequisite to such determinations under the Federal Rules or established law.").

## ANALYSIS

Plaintiffs challenge each expert witness presented by Defendant on varying grounds under *Daubert*.  In addition to these challenges, Plaintiffs' Motion contains a single section for each expert which allege that,

> [E]ven if [the expert's] opinions are otherwise admissible under
> Rule 702, they are inadmissible because the risk of confusion or
> misleading the jury outweighs their probative value. "Exclusion
> under [Federal] Rule [of Evidence] 403 is appropriate if the
> probative value of otherwise admissible evidence is substantially
> outweighed by its potential to confuse or mislead the jury." *Frazier*,
> 387 F.3d at 1263 (citing *United States v. Rauco*, 765 F.2d 983, 995
> (11th Cir. 1985)).

Mot. at 6. Plaintiffs provide no basis whatsoever to support the contention that the experts'

testimony has the potential to mislead the jury. They also do not explain why the opinions lack

probative value to the extent that it would warrant their exclusion. As opposed to addressing each

of these baseless challenges in turn, the Court finds that the probative value of all the experts'

testimony outweighs the unstated potential to confuse or mislead the jury. Further, as explained

below, Plaintiffs' specific challenges under *Daubert* are also denied.

## I.   David W. Harless

Dr. Harless is a Professor of Economics at Virginia Commonwealth University. Harless

Report at 47 [ECF No. 117-23]. He holds both a B.S. and Ph.D. in economics. *Id*. He has decades

of experience evaluating the depreciation of vehicles due to alleged design defects in numerous

representative matters. *Id*. at 11. However, Plaintiffs do not challenge Dr. Harless's qualifications.

*See* Mot. at 3–4. Instead, they claim that his opinions are "irrelevant and unhelpful to the jury"

because "the facts Harless relied upon and his analysis of those facts do not support his opinions."

*Id*.

It is clear, however, that Dr. Harless's testimony applies to "matters that are beyond the

understanding of the average lay person[,]" and therefore satisfies the helpfulness prong under

*Daubert*. *Edwards*, 580 F. App'x at 823. Dr. Harless formed his opinions by comparing the trade-

in value of the Class Vehicles with the trade-in value of comparable competitor vehicles over time

and found that the Class Vehicles followed a similar pattern of depreciation as competitor vehicles.

Harless Report, ¶¶ 18–20.  As a comparison, Dr. Harless explained the trade-in values of gasoline vs. diesel Volkswagen Group vehicles before and after Volkswagen's announcement that the diesel vehicles had a "cheat device" which caused emissions control systems to be inoperative unless the vehicles sensed they were under testing conditions.  *Id*. at ¶¶ 29–33.  His comparison showed a dramatic drop-off in the trade-in value of diesel vehicles as compared to otherwise identical gasoline vehicles.  *Id*.  Dr. Harless then used this information to form his ultimate opinion that the corrosion defect had little to no effect on the value of the Class Vehicles.  Harless Report, ¶¶ 16–17; 27–28; 33.

As the average lay person would not have knowledge of the depreciation rates of the Class Vehicles, or similar depreciation rates of comparable vehicles and vehicles with admitted design defects, this testimony would undoubtedly assist the trier of fact in forming an opinion regarding a fact at issue in this case.  Further, a nexus clearly exists between Dr. Harless's opinion that the corrosion in Class Vehicles did not have an appreciable effect on the Class Vehicles' values and Plaintiffs' claim that they were denied the benefit of their bargain in purchasing a Class Vehicle.  Accordingly, the Court finds Dr. Harless's testimony helpful under *Daubert* and appropriate for the Court's consideration at the class certification stage.

## II.   Paul M. Taylor

Dr. Taylor is a Professional Engineer employed by an engineering and scientific consulting firm.  Taylor Report at 1 [ECF No. 117-3].  He holds a B.S., M.S., and Ph.D. in Mechanical Engineering.  *Id*.  In addition to significant experience performing design and failure root-cause analyses of hundreds of products, including vehicles, and components and systems used in vehicles, Dr. Taylor regularly reviews and analyzes databases maintained by manufacturers, such as automobile warranty repair data, and automotive service materials.  *Id*.  Dr. Taylor was retained

by Ford to review warranty data and calculate the rates of hood paint repairs for the Class Vehicles, and compare those rates with the rates of hood paint repairs in other Ford vehicles. *Id*. at 2. In their Motion, Plaintiffs paradoxically claim that Dr. Taylor's opinions are so simple that they constitute an impermissible lay opinion and are thus unhelpful, but so complicated that Dr. Taylor, as a Ph.D. in Mechanical engineering, is not qualified to give them. Mot. at 6–9. Additionally, Plaintiffs raise challenges to the reliability of Taylor's testimony. *Id*. at 13. The Court finds these allegations baseless and will address each in turn.

### a. Qualifications

Plaintiffs argue that Dr. Taylor is unqualified to calculate, analyze, and compare warranty repair rates due to their belief that he "has not demonstrated he has education, training or experience in the highly specialized statistical field of reliability engineering/warranty forecasting." Mot. at 9. Dr. Taylor is, indeed, not a statistician. But he does not claim to be. Instead, Dr. Taylor states that his experience in reviewing and analyzing data, including databases maintained by manufacturers, allowed him to perform repair rate analysis in the instant case. Resp. at 13–15. Dr. Taylor's analysis required him to understand Ford's warranty database, including its organization, the fields and codes utilized, and the implications and limitations of those codes and fields. *Id*. Thus, it is clear that Dr. Taylor gained the requisite expertise based on his "knowledge, skill, [and] experience" in evaluating warranties in past representative matters. *See Carnival Corp.*, 2013 WL 752697 at *3.

Further, regarding Plaintiffs' contention that Dr. Taylor lacks the requisite expertise in statistical analysis, the Court notes that "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id*. Thus, the Court is satisfied that

Dr. Taylor is qualified to perform the relatively simple statistical analysis in this case and is well beyond "minimally qualified" to analyze and opine on the warranty rates of Class Vehicles.

### b.  Reliability

In their attack on Dr. Taylor's reliability, Plaintiffs raise two primary grounds: 1) Dr. Taylor's method is not supported by reliable methodology; and 2) Taylor impermissibly compared warranty rates of Ford vehicles without hood corrosion to those of Class Vehicles.  Mot. at 13–15.  Both challenges are easily disposed of.  Regarding the first critique, the calculation of warranty rates is reliable as it constitutes simple percentages.  *See* Resp. at 16–18 (outlining Dr. Taylor's calculations).  As previously stated, Dr. Taylor's expertise in this matter allowed him analyze Ford's data to determine the *actual* warranty rate.  Dr. Taylor combed through extensive and complex warranty data to determine the warranty rate for each of the Class Vehicles and comparable vehicles.  Plaintiffs' critique is that Dr. Taylor did not utilize the formula that Plaintiffs' since-stricken rebuttal expert utilized in calculating the *expected* warranty rate.  *See* Mot. at 13–15; *see also* Resp. at 16.  But this critique constitutes a difference of opinion between experts that can be explored via cross-examination—it does not impact the admissibility of Dr. Taylor's calculations.

Plaintiffs' second point, that Dr. Taylor improperly considered corrosion-related warranty claims of comparable vehicles as opposed to simply hood corrosion, is also misplaced.  Although comparisons to vehicles with corrosion on body panels other than the hood is not directly analogous to vehicles with the purported design defect, the effect of these flaws on comparable vehicles' warranty rates when contrasted with the Class Vehicles' warranty rate is relevant.  This is because said comparisons directly contradict Plaintiffs' contention that they were harmed by the purported design defect.  Plaintiffs also fail to establish why this calculation is unreliable.  *See*

Mot. at 13. Thus, the Court is satisfied that Dr. Taylor's analysis of actual warranty repair data to calculate the warranty repair rate utilizing a percentage-based calculation is sufficiently reliable under *Daubert* to be considered in determining class certification.

### c.  Helpfulness

Plaintiffs claim that Dr. Taylor's testimony is unhelpful because it amounts to an impermissible lay opinion as "it is merely grade-school math[,]" and that technical service bulletins "constitute evidence that does not require an expert opinion." Mot. at 9 (cleaned up). Regarding the former challenge, the Court disagrees. The statistical calculations underlying Dr. Taylor's expert opinion are not the part of his analysis that requires expertise. Resp. at 14. Rather, as explained above, Dr. Taylor's expertise stems from his background in investigating and calculating warranty repair rates. His analysis here involved combing through Ford's extensive warranty database, as well as the databases of manufacturers of comparable vehicles, and interpreting the various codes and fields to determine the overall warranty rate of Class Vehicles and how it compared to other vehicles. *Id*. This database analysis is clearly "beyond the understanding of the average lay person[,]" such that it is helpful to the trier of fact. *Edwards*, 580 F. App'x at 823.

To support their challenge that technical service bulletins "constitute evidence that does not require an expert opinion[,]" Plaintiffs cite a variety of out of circuit case law for the proposition that technical service bulletins alone do not constitute expert evidence and are inadmissible hearsay. *See* Mot. at 11–12. While Plaintiffs are correct that "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony[,]" that is clearly not what Defendant has done here. *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). Instead, Dr. Taylor merely

utilizes Ford's technical service bulletins as a piece of evidence in forming his overall conclusions that the warranty rate of Class Vehicles is not significantly higher than other comparable vehicles. *See* Resp. at 22.

Additionally, Plaintiffs' argument ignores the fact that it has long been established in this Circuit that "an expert [is permitted] to rely on hearsay evidence for the purposes of rendering an opinion based on his expertise," so as long as they are not "repeating hearsay evidence without applying any expertise whatsoever[.]" *United States v. Garcia*, 447 F.3d 1327, 1337 (11th Cir. 2006) (quoting *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003)) (internal quotation marks omitted). Here, Defendant has not presented Dr. Taylor solely as a means of backdooring the technical service bulletins into evidence. Rather, Dr. Taylor merely used these bulletins in forming his conclusions. Thus, the Court finds that Dr. Taylor's testimony is sufficiently helpful under *Daubert* as the warranty rate is at issue in this case and Dr. Taylor utilized specialized knowledge well beyond the understanding of a layperson to determine and analyze that rate.

### III.    Rene Befurt

Dr. Befurt is a purported expert in marketing and analytics. He holds a Ph.D. in marketing from the University of St. Gallen Center for Business Metrics and has extensive experience applying marketing research methods to litigation matters and strategic business problems. Befurt Report, Appendix A at 1 [ECF No. 117-17]. He specializes in developing survey experiments and choice modeling approaches in consumer surveys. *Id.* He has served as an expert witness in survey and sampling matters for a variety of clients, including the U.S. Department of Justice, the U.S. Federal Trade Commission, the Office of the Attorney General of New York, Microsoft, Oracle, Keurig, Dr. Pepper, Fiat Chrysler Automobiles, and Nestlé. *Id.*

Dr. Befurt was retained to "assess whether and to what extent disclosures of the potential occurrence of the Alleged Defect within the Ford warranty would affect consumers' likelihood to purchase Ford Expedition, Explorer, and Mustang vehicles."  Befurt Report at ¶ 9.  Ultimately, Dr. Befurt concluded that "the presence or absence of additional realistic and prominent disclosures of the Alleged Defect in the warranty has no statistically significant effect on consumers' likelihood of purchasing the vehicles."  *Id*. at ¶ 14.  In their Motion, Plaintiffs do not challenge Dr. Befurt's qualifications, but they challenge both the reliability and helpfulness of his conclusion.  Mot. at 16–17.  As explained below, the Court finds that Dr. Befurt's opinions are sufficiently reliable and helpful such that they should be considered in determining class certification.

### a.   Reliability and Helpfulness

Plaintiffs' challenge to Dr. Befurt's testimony confuses the standard for expert reliability and helpfulness under *Daubert* with a challenge to relevance.  Plaintiffs also advance a misplaced argument that Dr. Befurt's testimony alone is insufficient to rebut the materiality element that Plaintiffs must establish at the class certification stage.

For example, in challenging the helpfulness and relevance of Dr. Befurt's opinion, Plaintiffs state that the testimony could not possibly help the jury because "[w]hat a reasonable consumer would find material in making such a purchase, however, is an objective standard that looks at whether Ford's omissions were likely to deceive an objectively reasonable consumer, not their subjective preferences or individual circumstances."  Mot. at 17 (citing *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) ("Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably.")).  Plaintiffs rely on this authority to support the proposition that Dr. Befurt "improperly views the

issues through the prism of individual consumers' subjective preferences, circumstances, and perceptions." Mot. at 18. (cleaned up).

However, this argument ignores both the objective factors that Plaintiffs are required to satisfy under California law and the fact that "[t]o avoid exclusion on *Daubert* grounds, it is only necessary for [Defendant] to demonstrate that [Dr. Befurt's opinions] can apply to [rebutting] at least one of Plaintiffs' claims." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, No. 18-63130, 2020 WL 1666763, at *6 (S.D. Fla. Apr. 3, 2020) (citing *Rink*, 400 F. 3d at 1292). Under California law, Plaintiffs must show class members would have (1) been aware of the disclosure, and (2) behaved differently because of it. *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993). Dr. Befurt's testimony clearly provides evidence to rebut Plaintiffs' contention that had Plaintiffs known about the alleged design defect, they may have behaved differently. Accordingly, Dr. Befurt's "testimony is admissible even if it may only assist the trier of fact with determining [this] fact in issue (provided the other *Daubert* requirements are satisfied)." *Ohio State Troopers Ass'n, Inc.*, 2020 WL 1666763, at *6.

Plaintiffs also claim that the inapplicability to Florida law discussed above somehow renders Dr. Befurt's testimony unreliable. Mot. at 19. But this challenge blatantly ignores the pertinent standard under *Daubert* of "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261–62 (citation omitted) (internal quotation marks omitted). This is evidenced by Plaintiffs' attacks on Dr. Bufert's survey, stating that "corrective statements used within it also do not fit with Plaintiffs' claims because Befurt did not test the effect on market price of any of the omissions by Ford in this case[;]" the "survey tests the irrelevant matter of the impact of a hypothetical disclosure of the defect on the consumers'

likelihood to purchase a Subject Vehicle[;]" and "because Befurt did not measure in any way whether the survey participants actually viewed, read, or understood the purported disclosure in the warranty section." Mot. at 20, 21, 23.  None of these claims, however, indicate that Dr. Befurt's underlying methodologies are not scientifically valid.  In fact, Plaintiffs' reliability challenges are not reliability challenges at all; they fail to point out flaws in Dr. Befurt's testimony and are all based on the mistaken belief that the survey is not relevant to the matter at hand.

Ultimately, Dr. Befurt's testimony clearly would assist a trier of fact in determining whether a hypothetical disclosure could impact a consumer's decision to purchase a Class Vehicle. This satisfies the requirement "that methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261–62.  Accordingly, the Court finds the testimony sufficiently reliable and helpful under *Daubert* such that it does not warrant exclusion at this stage of the proceedings.

### IV.    Eric P. Guyer

Dr. Guyer is a purported expert in materials science.  Guyer Report at A-2-3 [ECF No. 117-4].  He specializes in failure analysis, metallurgy, adhesion science, fracture and fatigue of materials, material degradation, material deformation, and paints and protective coatings.  *Id*. His past representative matters involve determining the root cause of product recalls.  *Id*.  He holds a B.S. in Chemical Engineering from Iowa State University, and both an M.S. and Ph.D. in Materials Science and Engineering from Stanford University.  *Id*.  Dr. Guyer opines "that class vehicles differ in ways that affect corrosion performance, both in design and manufacturing processes[,]" "that corrosion is a complex issue for which there is no single root cause, and that Plaintiffs' proposed solution–full perimeter overhem sealer–will not prevent leading edge hood corrosion." Resp. at 3.  Further, Dr. Guyer "tested Plaintiffs' expert's theory that water could flow by gravity from the sides of the hoods to the leading edge, and found that this was not true for all class

vehicles." *Id*.  Plaintiffs challenge Dr. Guyer's qualifications, as well as the reliability and helpfulness of his opinions.  For the following reasons, the Court finds Dr. Guyer's opinions admissible under *Daubert*.

### a. Qualifications

While Plaintiffs challenge Dr. Guyer's qualifications, the sole fact they cite in support of their argument is that Dr. Guyer is not an expert in vehicle design specifically.  Mot. at 33. Although it is true that Dr. Guyer is not an expert on vehicle design specifically, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *J.G.*, 2013 WL 752697 at *3.  Dr. Guyer is clearly qualified to give opinions on corrosion, its sources, and various design aspects that could exacerbate corrosion as evidenced by his extensive education, training, and professional career involving materials science and engineering. The alleged design defect in this case involves corrosion of the aluminum hood panels in the Class Vehicles.  Thus, the Court is satisfied that Dr. Guyer is qualified, "[and] objections to the level of [Dr. Guyer's] expertise go to credibility and weight, not admissibility."  *Clena Invs., Inc.*, 280 F.R.D. at 661.

### b. Reliability

In addition to Dr. Guyer's qualifications, Plaintiffs challenge the reliability of his "flow-path-test" and his survey of competitor exemplar hoods.  Mot. at 38–39.  However, Plaintiffs do not challenge Dr. Guyer's methodology as much as they simply point out the disagreements between Dr. Guyer and their own design defect expert.  Dr. Guyer and Plaintiffs' expert have a fundamental disagreement over whether the hood designs of the Class Vehicles lead to early onset corrosion, as well as a related disagreement over the proper method of determining the source of corrosion.  *Id*.  Courts in this Circuit have recognized that "[t]wo experts can disagree and yet both

be allowed to testify if they both pass the *Daubert* test." *McCreless v. Glob. Upholstery Co.*, 500 F. Supp. 2d 1350, 1353 (N.D. Ala. 2007).   The proper course of action when a district court is faced with this "battle of the experts," is to submit the question to the factfinder.  *See Ho v. Royal Caribbean Cruises Ltd.*, No. 18-23541, 2020 WL 5534278, at *3 (S.D. Fla. Aug. 4, 2020) (citing *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 682 (11th Cir. 1984) (approving of the district court's decision to present to the jury "a battle of experts on the question of causation")).

As Dr. Guyer's opinions are based on established principals and methods, the Court is satisfied that his testimony is sufficiently reliable to be considered at the class certification stage. Dr. Guyer's disagreement with Plaintiffs' design defect expert is a question of weight, not admissibility.

### c.   Helpfulness

Plaintiffs challenge all ten of Dr. Guyer's opinions claiming they are irrelevant and thus unhelpful to the finder of fact.  Mot. at 34–40.  The Court disagrees and will discuss each challenged opinion in succession beginning with Dr. Guyer's five rebuttal opinions.  First, Plaintiffs claim that Dr. Guyer's rebuttal opinion that Plaintiffs' design defect expert "did not perform adequate testing to demonstrate how water flows through the side of the hem joint and offers a test on two hoods to show that no such path existed[,]" is irrelevant.  Mot. at 34 (citing Guyer Report at 31, 50–55) (internal quotation marks omitted).  But this opinion rebuts Plaintiffs' testimony that a design defect existed and is thus relevant and helpful to determine a key issue in the case.  Second, Plaintiffs state that Guyer's opinion that Anderson "disregarded or did not notice . . . the fact that both filiform corrosion and blistering corrosion occurred[,]" is irrelevant.  Mot. at 35 (citing Guyer Report at 31) (internal quotation marks omitted).  Once again, this opinion is clearly relevant as it would help the finder of fact determine if a design defect existed.

Finally, regarding Dr. Guyer's remaining rebuttal opinions, Plaintiffs state,

> In Rebuttal Opinion 3, Guyer identified a handful of competitor hoods that contained some of the elements of Anderson's alternative hem design that also exhibited hem flange corrosion. Guyer Report at 61-66. As explained in Plaintiffs' opposition to Ford's Daubert Motion, that fact is irrelevant to Anderson's theory that the design is defective. In Rebuttal Opinion 4, Guyer repeats the canard that Anderson expects zero failures. Guyer Report at 66-67. As discussed in Plaintiffs' opposition to Ford's Daubert Motion, Anderson does not have that expectation. Ford does not cite to Rebuttal Opinion 5 in any of its briefing to date. But fundamentally, Anderson does not offer an opinion on "an alternative design" used by "most competitors." Anderson Report at 27, ¶¶ 5-9.

Mot. at 36. Once again, these opinions were offered as a critique of Plaintiffs' design defect expert's conclusions and methodologies. They are directly relevant to the existence of a design defect and are therefore admissible under *Daubert*.

In addition to challenging the relevance and helpfulness of Dr. Guyer's rebuttal opinions, Plaintiffs lodge the same challenges to five of his affirmative opinions. In challenging his first three affirmative opinions, Plaintiffs summarize Dr. Guyer's conclusions, claiming he merely concludes that "Ford's design for corrosion performance in general and its manufacturing process changed over time, and a consumer's environment and use profile affect corrosion performance." Mot. at 36. Even utilizing this distilled version of Dr. Guyer's conclusions, such testimony is still relevant and helpful under *Daubert*. Dr. Guyer's testimony alone need not rebut commonality; instead, the opinions offered by Defendant's experts each "constitute one piece of the puzzle that the [Defendant] endeavor[s] to assemble" in their opposition to class certification. *City of Tuscaloosa*, 158 F.3d at 565.

Plaintiffs also challenge Dr. Guyer's fourth affirmative opinion that "materials and construction of vehicle panels in the proposed class are consistent with relevant competitors." Mot. at 37. Plaintiffs claim that this opinion is irrelevant because "Guyer does not offer evidence

of a competitor's hem design that is a closed hem design without full perimeter sealer, that eliminates corrosion on the leading edge of the hood." *Id*. As Defendant notes in its Response, this point is clearly relevant as a "piece of the puzzle" to establish a lack of materiality. *See* Resp. at 7. Specifically, Defendant points out that "[c]orrosion in particular can and sometimes does occur in all vehicles, and a reasonable consumer would not find this fact material if the corrosion rate were comparable to other available vehicles." *Id*. Accordingly, Dr. Guyer's fourth affirmative opinion is relevant and helpful as it could assist the trier of fact in determining whether the alleged design defect was material.

Finally, Plaintiffs cite instances where they claim Dr. Guyer improperly "agrees with the testimony of Ford's employees in this case or the analysis that Ford performed internally." Mot. at 38. But upon thorough review of Dr. Guyer's Report, it is clear that his references to other witnesses are not "used to bolster the credibility of the testimony of [the] fact witness[es]" as Plaintiffs claim. *Id*. (citing *Kleiman v. Wright*, No. 18-80176, 2020 WL 6729362, at *9 (S.D. Fla. Nov. 16, 2020)).

Notably, in each instance that Dr. Guyer references the testimony of Kathy Minnich, the Manager of Core Materials Engineering at Ford, he provides his own unique conclusion and adds his personal expertise. For example, in referencing Minchin's testimony that "corrosion protection is a system[,]" Dr. Guyer stated, "[t]he corrosion protection system is exactly that: a system. All components, processes and materials comprising the system must be properly implemented to achieve optimal corrosion performance. Variations in any component of the corrosion protection system or the manufacturing processes involved in construction can affect corrosion performance." Guyer Report at 34, ¶¶ 76–77. Thus, Dr. Guyer's unique opinions are relevant and helpful to the jury.

### V.    Thomas Clayton Gibson O'Guinn

Dr. O'Guinn is a purported expert in consumer behavior.  O'Guinn Report at 1 [ECF No.

117-56].  He is a Professor of Marketing and Sociology at the University of Wisconsin and was

previously Executive Director for the Center for Brand and Product Management.  *Id*.  He holds a

Ph.D. in Communications from the University of Texas.  *Id*.  After his analysis in the present

matter, Dr. O'Guinn formed three primary conclusions:

> 1.  Information about potential corrosion in class vehicles was available to purchasers of class vehicles from 2013 forward.
>
> 2.  However, the incidence of corrosion in class vehicles causing significant customer dissatisfaction is rare, and comparable to that of competitive vehicles.
>
> 3.  Not all consumers would have made a purchase decision based in whole or in part on the small risk of corrosion on any part of class vehicles.

Resp. at 30 (citing O'Guinn Report at 18).  Plaintiffs challenge the reliability and helpfulness of

all three opinions.  However, the Court disagrees and finds Dr. O'Guinn's testimony admissible

under *Daubert* as explained below.

### a.  Reliability

While Plaintiffs challenge the reliability of Dr. O'Guinn's testimony, a thorough review of

his report shows that his underlying data on consumer behavior is supported by extensive peer

reviewed research from experts in the field, and he used reliable principles and methods in the

studies that he himself performed.  Resp. at 40.  The basis of Dr. O'Guinn's opinions is an internet

survey which sought to determine the extent of discussions regarding instances of corrosion in

Class Vehicles and comparable vehicles.  *Id*.  As Dr. O'Guinn points out, the internet is a well-

established source for consumer information related to vehicles and is frequently utilized by

behavioral scientists to determine customer satisfaction and behavior in response to purported issues with vehicles. *Id*.

While Plaintiffs claim that this method is unreliable because Dr. O'Guinn failed to study forums and use keywords that they felt were more appropriate, nothing in Plaintiffs' Motion suggests that Dr. O'Guinn's testimony is unreliable to the point that it warrants wholesale exclusion. Instead, Plaintiffs' issues regarding Dr. O'Guinn's survey go to the weight of his opinions as opposed to their admissibility.

### b. Helpfulness

In opposing class certification, Defendant has "argued that a presumption of reliance does not apply where class members had access to the allegedly undisclosed information and individual inquiry is necessary to determine if class members were aware of the information." Resp. at 30. This contention renders Dr. O'Guinn's testimony both relevant and helpful. O'Guinn's conclusion that information about potential corrosion in Class Vehicles was available to purchasers of Class Vehicles from 2013 onward is essential to determining whether this information was actually undisclosed. The conclusion that incidents of corrosion in Class Vehicles causing significant customer dissatisfaction were rare—and comparable to that of competitive vehicles—addresses the purported existence of a design defect, and the idea that Plaintiffs did not receive the benefit of their bargain.

Finally, Dr. O'Guinn's contention that not all consumers would have made a purchase decision based in whole or in part on the small risk of corrosion is directly relevant to whether actual reliance is a common question—an essential point regarding Plaintiffs' claims under California law, as mentioned above. Accordingly, all three of Dr. O'Guinn's opinions are relevant and could assist the factfinder in determining various issues.

## <u>CONCLUSION</u>

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs'

Motion to Exclude Defendant's Experts' Opinions [ECF No. 126] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 17th day of January, 2022.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**