**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-CV-81558-RAR**

**CLARENCE SIMMONS,** *et al*.,

     Plaintiffs,

v.

**FORD MOTOR COMPANY**,

     Defendant.

_____/

## ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This is a class action suit brought by Plaintiffs on behalf of themselves and similarly situated members of four proposed multi-state classes against Defendant Ford Motor Company alleging design defects, unfair or deceptive warranty, and unjust enrichment related to the purchase of Ford Mustang-, Expedition-, and Explorer-branded vehicles. *See* Second Am. Class Action Compl. [ECF No. 70] ("Compl.") at 1–2. The alleged defect causes "the Class Vehicles' aluminum panels to corrode and the exterior paint on the aluminum body parts to bubble, flake, peel, rust and/or blister." *Id*. at 2. The unfair or deceptive warranty and unjust enrichment claims stem from Ford's alleged actions concerning this defect, specifically Ford's treatment of claims under their New Vehicle Limited Warranty ("NVLW")—including Ford's purported failure to repair the vehicles when the defect manifested, and Ford's inclusion of extended warranty provisions that limited claims to perforation of body panels as opposed to simple corrosion. *Id*. at 2.

Plaintiffs propose four classes: (i) an unfair or deceptive design defect class brought under New York, California, and Florida law; (ii) an unfair or deceptive warranty class related to the perforation requirement of the warranty brought under New York, California, and Florida law; (iii)

an unfair or deceptive warranty class related to the ineffective repair of Class Vehicles brought under New York, California, and Florida law; and (iv) an unjust enrichment class brought under California, Florida, Illinois, Indiana, New Jersey, New York, North Carolina, and Pennsylvania law.

This action is now before the Court on Plaintiffs' Motion for Class Certification [ECF No. 150] ("Motion").[1]  In addition to arguments regarding standing, class action waiver, and personal jurisdiction, the parties disagree as to whether Plaintiffs meet the requirements of Federal Rule of Civil Procedure 23.  Ford argues that this action is not suited for class certification because individual issues permeate all of Plaintiffs' claims due to factual and legal issues predominating over common questions; variations in state laws; Plaintiffs' lack of an appropriate class-wide measure of damages for all classes; and because a class action would not be a superior method of adjudicating the claims at issue.  Plaintiffs, however, assure the Court that this action satisfies the requirements of Rule 23 and posit that Ford's arguments are based on mischaracterizations of Plaintiffs' theory of liability.

After careful review of the record, the Court finds that Plaintiffs have failed to meet their burden.  These claims are not suited for class certification due to issues with standing, as well as predominance and superiority under Rule 23(b)(3).  Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Class Certification [ECF No. 150] is **DENIED** as set forth herein.

---

[1]   The Motion is ripe for adjudication. *See* Defendant's Opposition to Plaintiffs' Motion for Class Certification [ECF No. 156] ("Response"); Plaintiffs' Reply in Support of Motion for Class Certification [ECF No. 158] ("Reply"); Plaintiffs' Notice of Supplemental Authority [ECF No. 114]; Defendant's Notice of Supplemental Authority [ECF No. 199]; and Plaintiffs' Response to Notice of Supplemental Authority [ECF No. 200].

## BACKGROUND

The parties are well-versed in the facts of this case.  Below, the Court gives only a brief recitation of the factual and procedural background relevant to the instant Motion.

### I.  Factual Background

#### A.  Defendant

Ford "is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan."  Compl. ¶ 55.  "Ford and/or its agents (itself and through its related business entities) designed, manufactured, marketed, sold, serviced, distributed, and warranted" Ford Mustang-, Ford Expedition-, and Ford Explorer-branded vehicles, model years 2013-2018. *Id*. ¶¶ 2, 55.

#### B.  Plaintiffs

The named Plaintiffs are purchasers of alleged Class Vehicles.  The Court has summarized the relevant characteristics of the named Plaintiffs in the following chart:[2]

| Plaintiff # | Plaintiff Name | Model Purchased | Model Year Purchased | State of Purchase |
|---|---|---|---|---|
| 1 | Clarence Simmons | Mustang | 2018 | GA |
| 2 | Franklin Navas | Explorer | 2016 | CA |
| 3 | Jorge Arroyave | Explorer | 2017 | FL |
| 4 | Joseph Dabbs | Explorer | 2013 | FL |
| 5 | Jenniffer Dewitt | Mustang | 2016 | FL |
| 6 | Anne Erdman | Mustang | 2014 | FL |
| 7 | Mark James | Expedition | 2014 | FL |
| 8 | Shane Jackson | Mustang | 2017 | GA |
| 9 | Mike Tierney | Explorer | 2013 | IN |

---

[2]  As explained below, only ten of the nineteen named Plaintiffs were included as class representatives and three subsequently withdrew.

| 10 | Mark Van Bus Kirk | Explorer | 2013 | IL |
| 11 | Lynne Minish | Mustang | 2014 | MI |
| 12 | John Buczynski | Explorer | 2015 | NJ |
| 13 | Ilja Lopatik | Mustang | 2015 | NJ |
| 14 | Brian Yaborough | Mustang | 2013 | NY |
| 15 | William MacSaveny | Mustang | 2013 | PA |
| 16 | Ryan Marshall | Explorer | 2015 | PA |
| 17 | Allyson Rogers | Explorer | 2013 | PA |
| 18 | Peter Tulenko | Mustang | 2015 | TX |
| 19 | Greg Lichtenberg | Mustang | 2018 | SC |

Compl. ¶¶ 19–54.  Although Plaintiffs describe themselves summarily as "owners and lessees of Ford Mustang-, Ford Expedition-, and Ford Explorer-branded vehicles, model years 2013-2018," *id*. ¶ 1, the above chart illustrates that said characterization is not so simple.  The named Plaintiffs are purchasers or lessees of 2013-2018 Mustangs; 2013, 2015, and 2016-2017 Explorers; and a single Plaintiff who leased, and eventually purchased, a 2014 Expedition.  *Id*. ¶¶ 19–54.

In their Motion, Plaintiffs request that ten of the nineteen named Plaintiffs be named class representatives: Navas, Arroyave, Dabbs, Dewitt, Erdmann, and Yarborough as representatives of the Unfair or Deceptive Design Defect Classes and each of the Unfair or Deceptive Warranty Classes; and Navas, Arroyave, Dabbs, Dewitt, Erdmann, Yarbough, Van Bus Kirk, Tierney, Lopatik, and Marshall as representatives of the Unjust Enrichment Class.  These ten proposed class representatives allege that the design defect "manifest[ed] itself [at some point in] time," *id*. at 2, as evidenced by the fact that "each Plaintiff noticed that the paint on the hood bubbled, peeled, or flaked." Mot. at 3.  However, Plaintiffs Arroyave, Lopatik, and Marshall later withdrew their request to be appointed as representatives for any of the proposed classes in this action.  [ECF No. 105].

### C.  The Class Vehicles

In their Motion, Plaintiffs define the Class Vehicles as model year 2013-2016 Ford Mustangs, model year 2013-2017 Ford Expeditions, and model year 2013-2018 Ford Explorers, Mot. at 2, while Ford describes Plaintiffs' class as "limited to owners of 2013-2016 Mustangs, 2013-2017 Expeditions, and 2013-2018 Explorers, 15 different configurations of models and model years."  Resp. at 2.  As discussed below, the factual record indicates that manufacturing differences existed from model to model; model year to model year; and, in some instances, among various production runs within the same model years.

### D.  The Alleged Defect

Plaintiffs allege that all Class Vehicles' hoods feature a hem which is, as described by Ford, "a fold-over to finish an article."  Dep. Tr. of Kathy Minnich ("Minnich Dep.") at 36:21.  More precisely, "[a] hem is a type of joining method that is applied to the perimeter of automotive closures, including hoods."  Expert Report of Erik Anderson ("Anderson Report") at 6.  The Class Vehicles, Plaintiffs claim, have a "closed" hem along the leading edge of the hood.  *Id*.  In this closed-hem design, "the outer panel is designed to . . . touch the inner panel at the trim end of the outer panel."  Dep. Tr. of Mark Nichols ("Nichols Dep.") at 262:6–10; *see also* Anderson Report at 6 ("A closed hem design means that, by design, the outer panel is wrapped around the inner panel, with parallel surfaces in contact or near contact with the inner panel, including at the trim end of the outer panel.").  Strategies used to protect against corrosion include "sealing" strategies and "drainage" strategies.  Anderson Report 8.  In a sealing strategy, "exposure to corrosion-enabling fluid is prevented at susceptible initiation locations."  *Id*.  In a drainage strategy, "corrosion inducing fluids may flow or evaporate away from susceptible initiation locations, to avoid fluid stagnation."  *Id*.  Plaintiffs claim that "because Ford's design does not call for full

sealing wherever the hem is closed, the design is therefore inadequate to prevent premature corrosion." *Id*. at 8–11.

The "design strategy for the leading edges of the Mustang and Explorer hoods (included in the Class Vehicles) was to seal the hem against moisture exposure and stagnation in an attempt to prevent corrosion initiation at the trim edge." *Id*. at 9. But Plaintiffs claim that "[o]n the Mustang and Explorer hoods, Ford only applied over-hem sealer to the leading edge of the hoods, not the full perimeter." *Id*. "Because there is no drain path from the leading edge hem, when water or condensate enters from other unsealed portions of the hood hem and drains downwards to the front hem section, it becomes entrapped under the over-hem sealer at the leading edge." *Id*. Plaintiffs maintain that Ford's design is defective because "the hem on the leading edge of the hoods of the Class Vehicles could not be kept dry without a full-perimeter over-hem sealer." *Id*. Finally, "[o]n the subject Expedition vehicles, Ford chose to apply no over-hem sealer at all. While sides of the Expedition hoods feature an open section which can drain, the leading edge is hemmed with the common flat-hem design of the Class Vehicles, and likewise has no drain path for trapped moisture." *Id* at 11.

### E. The Warranties

In addition to the alleged design defect, Plaintiffs claim that the NVLW "failed the essential purpose of the warranty and was deceptive and unfair." Mot. at 11. In support of this claim, Plaintiffs submit that "[f]irst, the sand-and-paint repair that Ford provided was ineffective, only made the corrosion worse, and served to further conceal the underlying Design Defect," and "[s]econd, the corrosion coverage for the model year 2013-2015 Class Vehicles was deceptive, unfair, and ultimately worthless because perforation was a requirement for coverage but aluminum does not perforate – a fact that Ford knew." Mot. at 11–12.

The NVLW provided "Bumper-to-Bumper Coverage [that] lasts for three years – unless you drive more than 36,000 miles before three years elapse." Mot. at 12. Thereunder, Ford would, "without charge, repair, replace, or adjust" malfunctioning parts. *Id*. Plaintiffs claim that "Ford has taken the position that the Bumper-to-Bumper coverage would cover repairs for the corrosion at issue in this case." *See id*. ("This [aluminum corrosion] concern would be covered by the 3-year 36,000-mile paint warranty.") ("For U.S., Canada, Mexico, and U.S. Export Market vehicles, corrosion damage to body sheet metal is covered for the Bumper-to-Bumper periods . . . .") ("You have a 3/36 warranty. If there's a problem somewhere, we're going to correct it under warranty."). Additionally, each NVLW provided an "extended warranty" that covered "body sheet metal panels . . . for an extended Corrosion Coverage Period, which lasts for five years, regardless of miles driven. The extended warranty coverage only applies if a body sheet metal panel becomes perforated due to corrosion during normal use due to a manufacturing defect in factory-supplied materials or factory workmanship." *Id*.

In addition to the NVLW generally, Plaintiffs claim that the "extended warranty" which covered "body sheet metal panels . . . for an extended Corrosion Coverage Period, which lasts for five years, regardless of miles driven," was also deceptive and unfair. *Id*. This extended warranty coverage "only applie[d] if a body sheet metal panel [became] perforated due to corrosion during normal use due to a manufacturing defect in factory-supplied materials or factory workmanship." *Id*. The problem, Plaintiffs claim, is that "aluminum does not perforate during the warranted life of the vehicle." *Id*. Further, Plaintiffs allege that Ford was aware of this fact since at least 2009 and "[i]n 2016 . . . Ford removed the perforation requirement for the 2016 and later-model Class Vehicles." *Id*. at 13.

### F. Damages

Due to Ford's alleged conduct concerning the purported design defect and the warranties, Plaintiffs seek damages, as well as injunctive, equitable, and declaratory relief. Compl. ¶ 3. Regarding the design defect, Plaintiffs allege that the "damages occurred when 'Ford failed to fulfill the bargain under which consumers agreed to purchase the Class Vehicles.'" Expert Report of Edward M. Stockton ("Stockton Report") ¶ 8. As a result, Plaintiffs claim "the members of the Unfair or Deceptive Design Defect Class each overpaid for their vehicles at the time of purchase." *See id*. ¶ 26. Further, Plaintiffs claim that both the NVLW and the extended corrosion warranty for Class Vehicle model years 2013 to 2015 are unfair or deceptive and request additional relief. *Id*. ¶ 3.

### II. Procedural Background

### A. Causes of Action

The Complaint includes three nationwide counts and state law counts under the laws of Alabama, California, Florida, Georgia, Illinois, Indiana, Michigan, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, and Texas. Compl. at 59–135. Given that the Motion does not address numerous counts in the Complaint, the Court held a hearing to clarify the scope of Plaintiffs' request for class certification. *See* [ECF No. 204]. At the hearing, Plaintiffs confirmed that they seek class certification regarding their nationwide count for unjust enrichment and their state counts under California, Florida, and New York law as to three unfair or deceptive practices—design defect, perforation warranty, and ineffective warranty repair. *See* Tr. of Status Conference for Clarification on Pls.' Mot. for Class Certification, 16–17, Mar. 2, 2022.

Accordingly, the Court only considers whether the following counts in the Complaint are appropriate for class certification: Nationwide Count II for Unjust Enrichment; California Count

II for Violation of California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE §

1750, *et seq*.; Florida Count I for Violation of the Florida Deceptive and Unfair Trade Practices

Act ("FDUTPA"), FLA. STAT. § 501.201, *et seq*.; and New York Count I for Violation of New

York General Business Law ("GBL § 349"), N.Y. GEN. BUS. LAW § 349.

### B. Proposed Classes

Plaintiffs seek an order certifying the following classes:

*Unfair or Deceptive Design Defect Class*: All current owners who purchased a new or used model year 2013-2016 Ford Mustang, model year 2013-2017 Ford Expedition, or model year 2013-2018 Ford Explorer from a Ford dealership in California, Florida, or New York.

*Unfair or Deceptive Warranty Class (Perforation)*: All current owners who purchased a new or used model year 2013-2015 Ford Mustang, model year 2013- 2015 Ford Expedition, or model year 2013-2015 Ford Explorer from a Ford dealership in California, Florida, or New York.

*Unfair or Deceptive Warranty Class (Ineffective Repair)*: All current owners who purchased a new or used model year 2013-2016 Ford Mustang, model year 2013-2017 Ford Expedition, or model year 2013-2018 Ford Explorer from a Ford dealership in California, Florida, or New York.

*Unjust Enrichment Class*: All current owners who purchased a new or used model year 2013-2016 Ford Mustang, model year 2013-2017 Ford Expedition, or model year 2013-2018 Ford Explorer from a Ford dealership in California, Florida, Illinois, Indiana, New Jersey, New York, North Carolina, or Pennsylvania.

Mot. at 2. Additionally, Plaintiffs request that "[i]f the Court believes that any or all of these

proposed Classes would be more appropriately divided into subclasses by state or otherwise, then

Plaintiffs alternatively request such relief." *Id*. at 4.

### LEGAL STANDARD

A district court "has broad discretion in determining whether to certify a class."

*Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). "All

else being equal, the presumption is against class certification because class actions are an

exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). To certify a class, the named plaintiffs must have standing and the putative classes must satisfy an implicit ascertainability requirement, the four requirements listed in Rule 23(a), and at least one of the requirements listed in Rule 23(b). *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Rule 23(a) requires a court to make the following findings before certifying a class:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

If the Rule 23(a) prerequisites are satisfied, a court must then turn to Rule 23(b). Here, Plaintiffs seek class certification under Rule 23(b)(3). Rule 23(b)(3) requires a court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In addition, under Rule 23(b)(3), a plaintiff must "establish that damages are susceptible of measurement across the entire

class," though "[c]alculations need not be exact." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

Importantly, a plaintiff seeking class certification carries the burden of proof and must "affirmatively demonstrate" that all the requirements of Rule 23(a) are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *see also Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). A plaintiff "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33. Accordingly, the merits of the underlying claim may be considered "to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Therefore, "before a district court determines the efficacy of class certification, it may be required to make an informed assessment of the parties' evidence. That a trial court does so does not mean that it has erroneously reached the merits of the litigation." *Cooper v. S. Co.*, 390 F.3d 695, 712–13 (11th Cir. 2004) (internal quotations omitted), *overruled on other grounds* by *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).

## ANALYSIS

### I. Standing, Warranty Waiver, and Personal Jurisdiction

The Court begins with three preliminary issues raised by Ford in its Response: standing, waiver, and personal jurisdiction. For the reasons stated below, the Court holds that the issue of standing requires significant alterations to Plaintiffs' proposed classes but finds Ford's waiver and personal jurisdiction arguments unfruitful.

### A. Standing

"[A]ny analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). "[I]t is well-settled that prior to the certification

of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman*, 221 F.3d at 1279; *see also Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019). Article III standing exists where the plaintiff: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (quotations omitted). For the injury to be "concrete," it must be "real," and not "abstract;" though it need not be "tangible." *Id.* at 340. "It is not enough that the conduct of which the plaintiff complains will injure *someone*." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982). "Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Id.* All harm alleged in the present case is monetary and the Supreme Court has long held that "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

### i.   *Initial Standing Concerns*

In choosing their named class representatives and proposed classes, Plaintiffs have disregarded the well-settled principle that at least one named class representative must have Article

III standing to raise each class subclaim.  *Cordoba*, 942 F.3d at 1273.  The Complaint lists ninteen named Plaintiffs, but since filing their Motion, three Plaintiffs have withdrawn as proposed class representatives.  *See* [ECF No. 105].  The remaining proposed class representatives are: Navas (California, 2016 Explorer); Yarborough (New York, 2013 Mustang); Dabbs (Florida, 2013 Explorer); DeWitt (Florida, 2016 Mustang); Erdman (Florida, 2014 Mustang); Tierney (Indiana, 2013 Explorer); and Van Bus Kirk (Illinois, 2013 Explorer).

Courts in this district have explained that plaintiffs do not have "standing to bring claims for products that they did not purchase."  *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 347 F. Supp. 3d 1207, 1220 (S.D. Fla. 2018).  Further, Plaintiffs are "prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises."  *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1205 (S.D. Fla. 2021) (quoting *Feldman v. BRP US, Inc.*, No. 17-61150, 2018 WL 8300534, at *6 (S.D. Fla. Mar. 28, 2018)) (internal quotation marks omitted).  In other words, Plaintiffs Navas, Yarborough, Dabbs, DeWitt, Erdman, Tierney, and Van Bus Kirk cannot serve as class representatives for make and model Class Vehicles that none of them owned or leased—nor can they bring suit under state laws completely disassociated from their own claims.  Consequently, Plaintiffs lack standing to bring suit on behalf of Expedition owners, purchasers of cars later than model year 2016, and Plaintiffs outside the states of California, Florida, New York, Indiana, and Illinois.

### ii.  *Variations in Models and Model Years*

Plaintiffs' claims also suffer from standing issues related to the inclusion of a wide array of models and model years intermixed among their proposed classes.  "[A] named plaintiff in a consumer class action lacks standing to challenge a non-purchased product because there is no injury-in-fact as to that product, even if he purchased a substantially similar product."  *Garcia v.*

*Kashi Co.*, 43 F. Supp. 3d 1359, 1393 (S.D. Fla. 2014) (citing *Toback v. GNC Holdings, Inc.*, No. 13-80526, 2013 WL 5206103, at *4–5 (S.D. Fla. Sept. 13, 2013)).  There is significant debate among courts in this district as to whether different model years of the same car can be treated as the same product under the Eleventh Circuit's holding in *Prado*.  *See Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1180 (S.D. Fla. 2019) (collecting cases).  The collected cases on the issue do not support a bright line rule regarding whether a plaintiff who owns one model year of a vehicle has standing to represent another who owns a *different* model year of that *same* vehicle in a class action suit.  Instead, "standing turn[s] on a fact-intensive inquiry regarding whether the different models [or model years] were identical."  *Id*.  While the court in *Weiss* held that the plaintiff had standing to bring suit on behalf of Chevrolet Silverado owners across multiple model years, it did so with the expectation that "[d]iscovery [would] reveal whether GM used the same drive shaft in these vehicles over different model years and types."  *Id*.

Here, at this later stage of litigation, the record clearly indicates that the model year 2013-2016 Ford Mustang and model year 2013-2016 Ford Expedition are not the same products for purposes of determining standing under Article III.  In making this determination, it is worth noting the obvious: the Mustang and Explorer are not remotely similar vehicles.  The Mustang is a two-ddor compact car while the Explorer is a midsize SUV.  The cars have different body styles, hood shapes, and, most importantly, corrosion protection systems.  Resp. at 4.  These differences are apparent not only from model to model, but from model year to model year and production runs within the same model year.

Plaintiffs counter that all vehicles have the same inherent design defect.  But the post-discovery record in this case shows the opposite.  As Defendant points out in its Response, Ford utilized a variety of corrosion protection "strategies (and the related manufacturing processes)

differed from vehicle to vehicle and from model year to model year." Resp. at 4. The immense differences in models, model years, and even manufacturing techniques within various production runs of the same model and model years are readily apparent from the record.

The record establishes the following key differences: (1) the shape of the hoods and their varying ability to capture fluids; (2) the amount and placement of adhesive added to the edges of the panels; (3) how the panels are stored in racks following manufacture but before installation as the oils and lubricants used in the stamping and hemming process collect in the panels' cavities; (4) cleaning and conditioning, pretreatment, and painting; (5) electrocoating, or "E-coat," processes following pretreatment; and (6) the type of aluminum used in the hoods, which was switched to a low-copper aluminum alloy beginning in late 2013 models. Resp. at 4–8. Asking the Court to ignore these differences and classify these vehicles as the same product because they share a similar, but not identical, feature is not only nonsensical, it is contrary to even the most liberal interpretations of Article III's standing requirements by other courts in this district. *See Weiss*, 418 F. Supp. 3d at 1180 (citing *Heuer v. Nissan N. Am., Inc.*, No. 17-60018, 2017 WL 3475063, at *5 (S.D. Fla. Aug. 11, 2017). In *Heuer*, the court explained "that where the plaintiff alleged that the defect was '*materially identical*' from product to product, the plaintiff had standing, at the motion to dismiss stage, to pursue claims on behalf of class members who purchased different products." *Id*. (emphasis added).

In this case, the factual record, even when considered in the light most favorable to Plaintiffs, does not provide enough evidence to meet the "materially identical" bar suggested by the court in *Heuer*. Accordingly, in order to satisfy standing requirements under Article III, Plaintiffs' claims must be, at a minimum, divided into subclasses by model and model year.

### iii. The Multi-State Classes

In addition to the standing issues presented by the proposed classes, which intermix Plaintiffs who purchased different models and model years, "named plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises." *Lewis*, 530 F. Supp. 3d at 1205 (quoting *Feldman*, 2018 WL 8300534, at *6) (internal quotation marks omitted).  That principle is well-settled law in this circuit.  *Id.*  Nevertheless, Plaintiffs criticize this Court's past decision in *Lewis*, claiming that the Court "relied chiefly on older district court orders, and not on *Fox*," and that *Fox* "made clear that the inquiry was on interest and injury, and not the place where the injury may have occurred." Reply at 3 (citing *Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1046 (11th Cir. 2020)).  But the Court did not rely on *Fox* when deciding *Lewis* because the holding in *Fox*—that a class could be certified for claims under Florida law arising from injuries suffered at different Florida restaurants—has no bearing on the settled question of whether a plaintiff may assert claims under a state law other than that which the plaintiff's own claim arises.  *See Fox*, 977 F.3d at 1044 ("Fox filed this class action complaint against Ritz-Carlton on behalf of himself and all the others who . . . paid the illegal automatic gratuity and sales tax under the hotel's practice at its *forty-nine Florida restaurants*.") (emphasis added).  Thus, *Fox* is inapplicable here, and Plaintiffs' proposed classes must be divided into subclasses by state for Plaintiffs to maintain standing.

Plaintiffs' proposed multi-state class for unjust enrichment suffers from the same infirmity. This is because the unjust enrichment claims "are common law claims, and such claims rely on state law." *Lewis*, 530 F. Supp. 3d at 1205 (quoting *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 223 (D.N.J. 2020)) (internal quotation marks omitted).  Thus, while Plaintiffs' Complaint "lists one generic general unjust enrichment claim, that claim is, in reality, [five] unjust

enrichment claims—one for each state [represented].  Such a claim would thus need to be brought on behalf of [five] state subclasses." *Id*.  Accordingly, further subclass division by state regarding Plaintiffs' unjust enrichment claims would be required to establish standing.

The same standing issue exists for both of Plaintiffs' warranty claims.  Despite being separate claims, the design defect, warranty repair, and perforation warranty claims are all brought under FDUTPA, GBL § 349, and the CLRA.  As "named plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises," the claims, to survive, must be further divided into subclasses by state.  *Lewis*, 530 F. Supp. 3d at 1205 (citation and quotation marks omitted).  However, Plaintiff's perforation warranty claim suffers from an additional standing defect: no California Plaintiffs own a model year 2015 or earlier Class Vehicle.  *Supra* I.B.  As it is undisputed that the warranty language at the center of Plaintiffs' perforation warranty claim was removed after 2015 (and therefore only applies to model year 2015 or earlier Class Vehicles), Mot. at 16, no Plaintiffs have standing to pursue a perforation warranty claim under the CLRA.  Accordingly, only Plaintiffs in the Florida and New York subclasses have standing to pursue this particular class.

### B.  Warranty Waiver

In addition to the standing issues discussed above, Ford points out that "[t]he Florida and New York Plaintiffs agreed in their warranty contracts not to bring any warranty-related claim as a class representative, . . . a member of a class of claimants or in any other representative capacity." Resp. at 11.  This Court has previously noted that "[u]nder both federal and Florida law, it is well-established that parties can agree to class action waivers." *See Roman v. Spirit Airlines, Inc.*, 482 F. Supp. 3d 1304, 1315 (S.D. Fla. 2020), *aff'd*, No. 20-13699, 2021 WL 4317318 (11th Cir. Sept. 23, 2021) (internal quotations omitted).  The same is true under New York law.  *See U1it4Less,*

*Inc. v. FedEx Corp.*, No. 11-CV-1713 KBF, 2015 WL 3916247, at *4 (S.D.N.Y. June 25, 2015) (holding a class action waiver is enforceable and not "ineffective in the absence of an arbitration agreement").

Plaintiffs challenge Ford's reliance on these waiver provisions on two grounds: (1) Ford did not raise class action waiver in its Answer to Plaintiffs' Complaint; and (2) "Ford's actions in this litigation are plainly inconsistent with any desire to enforce the class action waivers." Reply at 4. The Court agrees with both points. The plain language of Federal Rule of Civil Procedure Rule (8)(c), this Court's treatment of class action waivers, and circuit precedent regarding the analogous situation of arbitration waivers all cut in favor of requiring that class action waivers be raised before parties engage in extensive discovery.

Rule 8(c) states in relevant part: "In responding to a pleading, a party must affirmatively state any . . . affirmative defense, including: . . . waiver." Fed. R. Civ. P. 8(c). Additionally, the Eleventh Circuit has recognized that the "[f]ailure to plead an affirmative defense generally results in a waiver of that defense." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010). Further, it has long been established in this circuit that the assertion of an affirmative defense of arbitration rights is waived when the asserting party "substantially participates in litigation to a point inconsistent with an intent to arbitrate and this participation results in prejudice to the opposing party." *Morewitz v. W. of Eng. Ship Owners Mut. Prot. & Indem. Ass'n (Luxembourg)*, 62 F.3d 1356, 1366 (11th Cir. 1995). The parallels between class action waiver and an arbitration clause are obvious, especially when considering the Eleventh Circuit's holding that "[f]acial challenges to the legal sufficiency of a claim or defense . . . should . . . be resolved before discovery begins." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997). Lastly, this line of reasoning is consistent with this Court's ruling in *Roman*, which noted that "[t]he

enforceability of a procedural device, like a class action waiver, should be resolved at [the pre-discovery] stage of the litigation by way of a motion to dismiss." 482 F. Supp. 3d at 1311 (citing *DeLuca v. Royal Caribbean Cruises, Ltd.*, 244 F. Supp. 3d 1342, 1345 (S.D. Fla. 2017)).

Here, Ford has asserted its class action waiver defense for the Florida and New York Plaintiffs almost three years after the class action suit was initiated. *See* Resp. at 11. Ford's Answer makes no mention of the class action waiver provision of the warranty, and Ford never filed a Motion to Dismiss the warranty claims for the Florida and New York Plaintiffs. *See generally* Answer and Affirmative Defenses to Am. Compl. [ECF No. 71]. Further, Ford and the Plaintiffs have engaged in extensive discovery related to the warranty claims. *See generally* Exs. to Mot. [ECF Nos. 100-1 to 100-41]; Exs. to Resp. [ECF Nos. 117-1 to 117-58]. Ford's conduct prior to their opposition to the instant Motion clearly constitutes "substantial[] participat[ion] in [class action] litigation . . . and this participation [could] result[] in prejudice to the opposing party." *Morewitz*, 62 F.3d at 1366. To allow Ford to assert class action waiver at this stage in the proceedings would prejudice Plaintiffs as they would be "forc[ed] to bear the expenses of [warranty class related discovery], which in this case was quite [extensive]." *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Tex.*, 559 F.2d 268, 269 (5th Cir. 1977). Accordingly, the Court finds that Ford has failed to timely assert its defense of class action waiver and may not do so at this time.

### C. *Personal Jurisdiction*

Citing *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773 (2017), Ford asserts that, "under the Fourteenth Amendment, a state such as Florida cannot exercise specific personal jurisdiction to resolve product-related claims asserted against a non-resident manufacturer by nonresident plaintiffs who did not purchase the product in Florida and were not injured in Florida."

Resp. at 12.  This exact argument, raised by this exact Defendant, in this exact district, has been rejected before.  *See In re Takata Airbag Prods. Liab. Litig.*, 524 F. Supp. 3d 1266, 1277–78 (S.D. Fla. 2021) (Moreno, J.) (explaining "that *Bristol-Myers* does not *per se* preclude federal courts from exercising pendent personal jurisdiction over claims advanced by nonresident plaintiffs") (collecting cases).

In *Bristol-Myers*, the Supreme Court explained the "decision concerns the due process limits on the exercise of specific jurisdiction by a State, [and] leave[s] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Bristol-Myers*, 137 S. Ct. at 1781, 1783–84.  Thus, *Bristol-Meyers* does not affect the "Court's ability to exercise supplemental jurisdiction over non-Florida Plaintiffs' claims against Ford."  *In re Takata Airbag Prods. Liab. Litig.*, 524 F. Supp. 3d at 1278; *see also Mussat v. IQVIA, Inc.*, 953 F.3d 441, 443 (7th Cir. 2020).

### D.  The Acceptable Subclasses

When held to the standing limitations described above, the Court finds that Plaintiffs' proposed classes, *see supra* II.B, must be limited to the following revised subclasses:

> ***Unfair or Deceptive Design Defect Subclasses***:
> (1) California purchasers who purchased a 2016 Explorer.
> (2) Florida purchasers who purchased a 2013 Explorer.
> (3) Florida purchasers who purchased a 2014 Mustang.
> (4) Florida purchasers who purchased a 2016 Mustang.
> (5) New York purchasers who purchased a 2013 Mustang.
>
> ***Unfair or Deceptive Warranty Class (Perforation) Subclasses***:
> (1) Florida purchasers who purchased a 2013 Explorer.
> (2) Florida purchasers who purchased a 2014 Mustang.
> (3) New York purchasers who purchased a 2014 Mustang.[3]

---

[3]  As previously noted, no California Plaintiff owns a Class Vehicle model year 2013-2015.  Therefore, no Plaintiffs are eligible to represent a perforation-related warranty class under California law.  *See supra* I.B; I.A.iii.; I.B.

***Unfair or Deceptive Warranty Class (Ineffective Repair) Subclasses***:
(1) California purchasers who purchased a 2016 Explorer.
(2) Florida purchasers who purchased a 2013 Explorer.
(3) Florida purchasers who purchased a 2014 Mustang.
(4) Florida purchasers who purchased a 2016 Mustang.
(5) New York purchasers who purchased a 2014 Mustang.

***Unjust Enrichment Subclass***:
(1) California purchasers who purchased a 2016 Explorer.
(2) Florida purchasers who purchased a 2013 Explorer.
(3) Florida purchasers who purchased a 2014 Mustang.
(4) Florida purchasers who purchased a 2016 Mustang.
(5) New York purchasers who purchased a 2014 Mustang.
(6) Indiana purchasers who purchased a 2013 Explorer.
(7) Illinois purchasers who purchased a 2013 Explorer.

Thus, Plaintiffs' proposed classes could only survive from a standing perspective if divided into an astounding twenty subclasses. While these subclasses would, in theory, overcome the standing issues associated with Plaintiffs' proposed classes, they are still inherently flawed. These flaws, as explained in detail below, concern a lack of ascertainability due to the inclusion of uninjured class-members—as well Plaintiffs' failure to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## II. Ascertainability

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little*, 691 F.3d at 1304 (internal citations and quotation marks omitted). "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014) (internal citation omitted). Accordingly, "[a] court should deny class certification where the class

definitions are overly broad, amorphous, and vague." *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003); *see also Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012) (affirming denial of class certification where class was not adequately defined or clearly ascertainable).  As instructed by the Eleventh Circuit in *Cherry v. Dometic Corp.*, the Court focuses its analysis on whether the classes are "adequately defined such that [their] membership is capable of determination."  986 F.3d 1296, 1304 (11th Cir. 2021).

"Courts have been particularly reluctant" to certify "classes that include both class members whose product has manifested the deficiency and those whose product has performed satisfactorily." *Harris v. Nortek Glob. HVAC LLC*, No. 14-21884, 2016 WL 4543108, at *5 (S.D. Fla. Jan. 29, 2016).  "Indeed, if a class is 'overbroad' in this way, there is a 'compelling reason' to redefine it more narrowly." *Cordoba*, 942 F.3d at 1276 (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 678 (7th Cir. 2009)).  This is because "a class defined so as to improperly include uninjured class members increases the potential liability for the defendant and induces more pressure to settle the case, regardless of the merits."  *Id*.  Here, the class definitions are "overbroad because Plaintiffs seek to include all [owners], including those whose [vehicles] have not manifested a defect." *Ohio State Troopers Ass'n, Inc.*, 481 F. Supp. 3d at 1274, *aff'd*, No. 20-13588, 2021 WL 4427772 (11th Cir. Sept. 27, 2021).

The Eleventh Circuit has suggested that the mere presence of uninjured class members does not necessarily preclude class certification. *See Cordoba*, 942 F.3d at 1275–76.  However, "a class should not be certified if it is apparent that it contains *a great many* persons who have suffered no injury at the hands of the defendant." *Id.* at 1276 (quoting *Kohen*, 571 F.3d at 678). In *Ohio State Troopers*, which involved purportedly defective bulletproof vests, this Court explained that the proposed class "[was] overbroad because it include[d] *all* individuals who

purchased . . . vests, *including vests that are not defective*." 347 F. Supp. 3d at 1232 n.12 (emphasis

added).  Thus, the Court held that class certification was improper.  *See, e.g.*, *Harris*, 2016 WL

4543108, at *6 (denying class certification where proposed class definition included "class

members who have experienced the deficiency and those who have not"); *Breakstone v.

Caterpillar, Inc.*, No. 09-23324, 2010 WL 2164440, at *6 (S.D. Fla. May 26, 2010) (denying class

certification because "it is inappropriate to certify a class containing both individuals who have

manifested a deficiency and those whose product has performed satisfactorily") (internal citation

and quotation marks omitted); *see also Melton v. Century Arms, Inc.*, No. 16-21008, 2018 WL

6980715, at *6 (S.D. Fla. Nov. 28, 2018) (recommending denial of class certification where "the

record evidence fail[ed] to support Plaintiffs' contention that the Class Weapons all exhibit the

Class Defect"); *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1139 (Fla. 3d DCA 2008)

(reversing class certification in FDUTPA and breach of warranty action where "the class

representative . . . [sought] compensation not only for class members whose brakes have

manifested a deficiency, but also for those whose brakes have performed satisfactorily," explaining

that "[i]n certifying the class, the trial court deviated from the majority of jurisdictions, which

consistently have denied class recovery on the type of theory the class representative presses in

this case").

Even accepting as true Plaintiffs' claimed warranty repair rates, the class definitions

proposed by Plaintiffs would include approximately 800,000 Ford owners, the vast majority of

which have never had corrosion issues with their vehicles.  Mot. at 17.  To counter this argument,

Plaintiffs state, without any further explanation, that they were harmed at the point of purchase

because "Ford failed to fulfill the bargain under which consumers agreed to purchase the Class

Vehicles."  Mot. at 13 (citing Stockton Report ¶ 8).  However, in *Ohio State Troopers*, this Court

considered and rejected a virtually identical argument.  There, plaintiffs attempted to rely on *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166, 2011 WL 1833366, at *6 (S.D. Fla. May 13, 2011), for the proposition that under FDUTPA, "the injury occurred at the time of sale, not at failure."  *Ohio State Troopers Ass'n, Inc.*, 481 F. Supp. 3d at 1276 n.9.  But this argument missed the point—there must be *an injury*.  *Id.*  In *Toyobo Am.*, as the Court explained, the product "was unusable" and therefore the injury occurred at the time of sale.  2011 WL 1833366, at *6.  That is not the case here, and the classes requested by Plaintiffs impermissibly include hundreds of thousands of Ford owners who have not suffered any identifiable injury—thereby frustrating ascertainability.  *Cf. Cherry*, 986 F.3d at 1303–04. ("A difficulty in identifying class members is a difficulty in managing a class action.").

In sum, Plaintiffs have failed to establish that their proposed classes are clearly ascertainable.  And while the Court could hypothetically re-define the proposed classes to include solely Plaintiffs who owned vehicles that experienced corrosion caused by the Design Defect, it declines to do so.  That is because Plaintiffs fail to meet the predominance and superiority requirements under Rule 23(b)(3) as discussed *infra*.

### III.  Rule 23(a) Requirements

While the lack of ascertainability, coupled with Plaintiffs' failure to satisfy one of the factors in Rule 23(b), is fatal to their bid for class certification, in the interest of completeness, the Court will also analyze the requirements under Rule 23(a).

Plaintiffs satisfy numerosity, typicality, and adequacy.  Issues with commonality that exist in the failed classes are addressed below alongside the Court's analysis of Rule 23(b)(3)'s predominance requirement.

### A.   Numerosity

Under Rule 23(a)(1), Plaintiffs must demonstrate that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[A]lthough mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class."  *Vega*, 564 F.3d at 1267 (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 2009)).  Rule 23(a)(1) imposes a "generally low hurdle."  *Id*. "[W]hile there is no fixed numerosity rule, generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors."  *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (citations and quotations omitted).

Ford does not dispute numerosity.  *See generally* Resp.  Regardless, Plaintiffs have shown that their purported class of purchasers is so numerous that joinder of all members is impracticable because "[o]ver 800,000 people bought the Class Vehicles, and Ford has sold more than 100 Class Vehicles in each state for which Plaintiffs seek to represent a class."  Mot. at 17 (internal quotation marks omitted).

### B.   Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[T]he typicality requirement is permissive: representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 674 (S.D. Fla. 2011) (citation omitted).  To demonstrate typicality, a plaintiff must establish that a "sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification."  *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001).  Put another way, "[t]he claim of a class

representative is typical if 'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (quoting *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).  Thus, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Prado-Steiman*, 221 F.3d at 1279 n.14 (internal quotation and citations omitted).

Once again, Ford does not dispute this factor under Rule 23(a).  *See generally* Resp.  Here, Plaintiffs allege that they were damaged in the same way as other members of the class because they were harmed by an identical design defect and Ford's conduct related to the warranty and repair.  Plaintiffs' claims are typical of the claims of the unnamed class members with the same model and model year because they all "arise from the same event or pattern or practice and are based on the same legal theory." *Ault v. Walt Disney World Co*., 692 F.3d 1212, 1216 (11th Cir. 2012).

### C.  Adequacy of Representation

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class."  Fed R. Civ. P. 23(a)(4).  "The adequacy-of-representation requirement 'encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.'" *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (quoting *Valley Drug Co.*, 350 F.3d at 1189).  In addition, plaintiff's counsel must be "qualified, experienced, and generally able to conduct the proposed litigation." *Bowe v. Pub. Storage*, 318 F.R.D. 160, 172 (S.D. Fla. 2015) (quoting *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985)).

Ford does not dispute that Plaintiffs are adequate representatives of the proposed class members.  Both inquiries regarding the adequacy of representation are satisfied.  Plaintiffs and class members clearly share a common goal as owners of supposedly defective vehicles, and it is obvious that "[i]f the Plaintiffs succeed, the benefits will inure to all class members." *Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997).  Further, Plaintiffs' counsel, as evidenced by the firm resumes submitted with their Motion, have significant experience litigating class actions involving design defects.  *See* Mot. at 27.  Accordingly, Plaintiffs have shown that they and their counsel would adequately represent the proposed classes.

### IV.  Rule 23(b) Requirements

In addition to satisfying the four requirements of Rule 23(a), Plaintiffs must meet one of the alternative requirements set forth in Rule 23(b).  Despite Plaintiffs' satisfactory showing under the former, they are unable to meet their burden under the latter.  Plaintiffs seek class certification under Rule 23(b)(3), which requires a court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "Because there is considerable overlap between Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement, courts often address them together."  *Justice v. Rheem Mfg. Co.*, 318 F.R.D. 687, 695 n.4 (S.D. Fla. 2016).

Rule 23(a)(2)'s commonality requirement demands "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  As with numerosity, the Eleventh Circuit has described the commonality requirement as a "low hurdle" or a "light" burden, as commonality "does not require that all questions of law and fact raised be common."  *Alhassid v. Bank of Am., N.A.*, 307 F.R.D. 684, 696 (S.D. Fla. 2015) (quoting *Williams*, 568 F.3d at 1356; *Vega*, 564 F.3d at 1268).  The

Supreme Court has held that the commonality inquiry requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Dukes*, 564 U.S. at 350 (citation omitted). Additionally, the Court must take into account whether certification of the class will "generate common *answers* apt to drive the resolution of the litigation." *Id.*

Though similar to the commonality requirement under Rule 23(a)(2), predominance is "far more demanding." *Vega*, 564 F.3d at 1270. Rule 23(b)(3) requires a court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Common issues of fact and law predominate if they have a *direct impact* on every class member's effort to establish liability *that is more substantial than the impact of any individualized issues* in resolving the claims of each class member." *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (quoting *Vega*, 564 F.3d at 1270).

However, common issues do not predominate over individual questions if "as a practical matter, the resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009). Courts typically "focus on whether there are common liability issues which may be resolved efficiently on a class-wide basis." *Brown v. SCI Funeral Servs. of Fla.*, 212 F.R.D. 602, 606 (S.D. Fla. 2003). To conduct this inquiry, courts "must take into account the claims, defenses, relevant facts, and applicable substantive law." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004) (internal quotation and citation omitted), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). "Because predominance

relates to individual issues regarding liability, the elements of the underlying cause of action are critical." *Harris*, 2016 WL 4543108, at *12.

Plaintiffs assert that common questions predominate and that their claims do not depend on any individualized issues. However, upon thorough review of the claims, defenses, relevant facts, and applicable substantive law related to the design defect, warranty repair, and unjust enrichment classes, it is clear that individualized issues do in fact predominate in each of Plaintiffs' claims. The perforation warranty class brought exclusively under the laws of Florida and New York does not suffer from the same predominance infirmities, but Plaintiffs fail to propose a class-wide measure of damages and to establish superiority for all claims.

Accordingly, for each proposed class, the Court proceeds to analyze the individual factual issues, the variations and individualized determinations required under state law, and whether Plaintiffs propose a valid, class-wide measure of damages that matches each class's liability theory under *Comcast*.

### A. *Design Defect*

#### i. *Individualized Factual and Legal Issues Predominate*

Regarding their design defect claim brough under California, Florida, and New York law, Plaintiffs fail to establish that the factual underpinnings of their claims share common questions such that individual issues do not predominate. While the question of whether the hem design supposedly shared by all Class Vehicles leads to premature corrosion may be a common issue, upon close examination this "common issue breaks down into an unmanageable variety of individual . . . factual issues." *Babineau*, 576 F.3d at 1191. These issues stem from the fact that Plaintiffs' design defect claim encompasses—even when limited by standing and separated into subclasses—an unmanageable seven different vehicle and model year combinations. As explained

*supra*, the record establishes the following differences exist between many of the models and model years:

> (1) the shape of the hoods and their varying ability to capture fluids; (2) the amount and placement of adhesive added to the edges of the panels; (3) how the panels are stored in racks following manufacture but before installation as the oils and lubricants used in the stamping and hemming process collect in the panels' cavities; (4) cleaning and conditioning, pretreatment, and painting; (5) Electrocoating, or "E-coat," processes following pretreatment; and (6) the type of aluminum used in the hoods which was switched to a low-copper aluminum alloy beginning in late 2013 models.

*Supra I.A.ii.* In addition to these manufacturing differences, the discovery record indicates that factual issues associated with environmental and use factors could lead to significant individualized questions. Use factors include on-road versus off-road driving, owner maintenance, and whether a vehicle is typically parked in a location (e.g., city street as opposed to a rural driveway or garage) where it is more susceptible to nicks and dents that can initiate corrosion. Resp. at 7.

Further, environmental factors including rain, humidity, snow (and the corresponding use of road salts), and atmospheric concentrations of chloride, can vary significantly—even within the same state. *Id*. These individual issues are essential to determining whether a defect existed. Indeed, determining if the hem design leads to corrosion—thereby qualifying as a design defect under FDUTPA, CLRA, and GBL § 349—requires particularized inquiries into the way the vehicle was used and in what environment, as well as whether Ford's manufacturing practices were sufficient to prevent corrosion. Faced with four proposed classes, seven different model/model year combinations, and twenty subclasses, it is little surprise that such factual complexities render determination of a design defect unsuitable for class certification.

In addition to individual factual questions that predominate over common factual issues related to the design defect claims, the same is true for the legal issues presented under Florida, New York, and California law. When determining whether common legal issues predominate, courts "must take into account the claims, defenses, . . . and applicable substantive law.". *Klay*, 382 F.3d at 1254. "Although there is no categorical bar to class treatment where the law of multiple states will apply, courts have expressed some skepticism of such treatment, particularly in substantive areas where the content of state law tends to differ." *Sacred Heart*, 601 F.3d at 1180 (citing *Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 95 F.R.D. 168, 177 (D. Del. 1982), *on reconsideration*, 98 F.R.D. 254 (D. Del. 1983)) (collecting cases for the proposition that "[c]ourts have often refused to certify class actions when they involve the law of more than one state").

While the Eleventh Circuit has not specifically held "what level of analysis is appropriate in a case such as this one where the laws of fewer than all fifty states are at issue, it is clear that more than a perfunctory analysis is required." *Id*. In cases where all fifty state laws are involved, "[t]he party seeking certification . . . must . . . provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007) (quotation marks and citations omitted). Although this case involves the laws of three states, circuit precedent makes clear that "[t]he issue can only be resolved by first specifically identifying the applicable state law variations and then determining whether such variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines." *Sacred Heart*, 601 F.3d at 1180 (citing *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)). Additionally, "it falls to the plaintiff to

demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable." *Id*. (citing *Klay*, 382 F.3d at 1262).

Although FDUTPA and GBL § 349 are materially similar as discussed *infra* under the Court's analysis of the perforation warranty class, a thorough examination of Plaintiffs' pleadings and the applicable state laws unveils numerous differences and individualized determinations when it comes to California's CLRA and its applicability to the design defect class. And Plaintiffs' effort to establish the homogeneity of the three state laws at issue falls short of the extensive analysis required. Instead, Plaintiffs summarily aver that "CLRA, FDUTPA, and GBL § 349 are materially similar" because "[e]ach prohibits unfair or deceptive conduct." Mot. at 21–22. But this conclusory argument is a misguided attempt to mask the marked differences between California, Florida, and New York law—especially when it comes to claims regarding defective design.

The Court starts with the differences in the statutory elements. The CLRA requires (1) an unlawful act or practice; (2) reliance; (3) damages; and (4) causation. *See Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1201 (N.D. Cal. 2014). FDUTPA requires (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). Finally, to succeed under GBL § 349, a plaintiff must demonstrate (1) the defendant's deceptive acts were directed at consumers; (2) the acts were misleading in a (3) material way; and (4) the plaintiff has been injured as a result. *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. Oct. 5, 2015). The differences are obvious; while the CLRA specifically requires reliance, under FDUTPA a "plaintiff need not show actual reliance on the representation or omission at issue." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016) (citation and quotation marks omitted). Similarly, under New York Law, "[p]laintiffs need

not show justifiable reliance." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). Courts interpreting the CLRA have found that determining whether the reliance element has been satisfied requires individualized determinations. *See, e.g., Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1119 (N.D. Cal. 2016). Further, the Eleventh Circuit has held that "the reliance element of a class claim presents problems of individualized proof that preclude class certification." *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1344 (11th Cir. 2006).

It is clear from this statutory analysis that individualized legal issues predominate over common legal questions due, in part, to the inclusion of claims under California law. While the Court has the authority to excise the CLRA claims and hold that common *legal* issues predominate under FDUTPA and GBL § 349 as to the design defect claims, it declines to do so given the individual factual issues discussed above, and the lack of a class-wide damages model under any of the state laws as discussed below.

### ii.  Plaintiffs Do Not Propose a Valid Class-Wide Measure of Damages

"[U]nder Rule 23(b)(3), a plaintiff must also 'establish that damages are susceptible of measurement across the entire class' . . . ." *Ohio State Troopers Ass'n*, 481 F. Supp. 3d at 1271 (quoting *Comcast*, 569 U.S. at 35). "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." *Comcast*, 569 U.S. at 35 (quotations and citation omitted). Plaintiffs do not outline their exact damages theory in their Motion. Thus, it is somewhat unclear what model they are pursuing. However, in his deposition, Plaintiffs' expert Edward Stockton uses "repair cost" as a measure of "benefit of the bargain" damages for Plaintiffs' design defect claims under the laws of Florida, California, and New York. *See* Stockton Dep. [ECF 117-24] at 24, 59, 99. This damages model, however, is

unworkable on a class-wide basis due to differences in the applicable laws of Florida, California, and New York.

Beginning with New York, the damages model is inconsistent with Plaintiffs' theory of liability under New York law. Plaintiffs request that the Court certify a class of "[a]ll current owners who purchased a new or used [Class Vehicle] from a Ford dealership in . . . New York." Mot. at 2. However, under New York law, "[w]here . . . a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies." *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 123, 741 N.Y.S.2d 9, 14 (2002) (citing *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y. 1997)) (internal quotations marks omitted). Indeed, "[i]t is well established [under New York law] that '[p]urchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own.'" *Weaver*, 172 F.R.D. at 99 (quoting *Hubbard v. General Motors Corp.*, No. 95 Civ 4362, 1996 WL 274018, at *3 (S.D.N.Y. May 22, 1996)). Consequently, Plaintiffs' damage model is inapplicable given underlying issues regarding the breadth of their class which, as discussed above, suffers from ascertainability problems given the number of Class Vehicle owners who have not experienced a manifested design defect in the form of corrosion.

In the case of Florida, the issue is less about incompatibility between Plaintiffs' damage model and their theory of liability and more about an inherent flaw in the model itself. This is because FDUTPA does not cover repair costs. *Ohio State Troopers Ass'n*, 481 F. Supp. 3d at 1284. While Plaintiffs claim that Stockton utilized repair costs "only as a measure for actual point-of-sale damages," Mot. at 25 n.12, "FDUTPA damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered . . . ." *Ohio State Troopers*

*Ass'n*, 481 F. Supp. 3d at 1283.   Hence, this model is inconsistent with FDUTPA damages available under Florida law.

As for California, Plaintiffs correctly point out that the "benefit-of-the-bargain measure of damages is . . . cognizable under the CLRA." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 818 (9th Cir. 2019).  Although this suggests Plaintiffs' damages model will work for their California claims, the question remains as to whether the model properly measures damages across the *entire* class proposed by Plaintiffs—one composed of California, Florida, and New York claims.   The answer is no because the damages model under the CLRA leads to more individualized issues. This is because "[c]lass wide damages calculations under the . . . CLRA are particularly forgiving," and "require[] only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Id*. (internal quotations omitted).  As explained above, damages under FDUTPA are "measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered," and "GBL § 349 restricts Plaintiffs' recovery to actual damages." *Rotblut v. Ben Hur Moving & Storage, Inc.*, 585 F. Supp. 2d 557, 561 (S.D.N.Y. 2008).  Thus, it is readily apparent that Plaintiffs' damages model fails to match their theory of liability as required by *Comcast*—and Plaintiffs do not have a valid class-wide measure of damages due to differences in how damages are calculated under each respective state law.

### B.  Unfair or Deceptive Warranty (Perforation)

At the outset, the Court reiterates that Plaintiffs do not have standing to bring a claim under the CLRA for their perforation warranty claim.  But even if the Court were to eliminate Plaintiffs' claims under the CLRA, a class still cannot be certified as to the perforation warranty under Florida

and New York law due to Plaintiffs' failure to provide any class-wide measure of damages. Thus, under *Comcast*, class certification must be denied with respect to this warranty claim.

### i. *Common Issues of Law and Fact Predominate*

Plaintiffs' perforation warranty claim is simple: Ford's NVLW was unfair or deceptive because it only covered instances of corrosion where the body panel perforated, and Ford knew that it was impossible for aluminum body panels to perforate. Mot. at 11–12. This warranty was provided with all Class Vehicles from 2013 to 2015 and all Class Vehicles contained aluminum body panels which, according to Plaintiffs, could not perforate. *Id*. Unlike Plaintiffs' design defect claim, which involves different models, model years, manufacturing practices, and environmental factors, this claim can be broken down into two common questions: are the aluminum body panels capable of corrosion and, if not, is the corrosion warranty provision limiting coverage to instances in which the aluminum body panels perforated unfair or deceptive.

Accordingly, the crux of Plaintiffs' claim is not whether the multiple underlying products are defective, but rather, whether the identical warranty is unfair or deceptive. Other courts have found class certification proper when "class members purchased *similar* products and received the same standard warranty." *See, e.g., Barden v. Hurd Millwork Co., Inc.*, 249 F.R.D. 316, 319 (E.D. Wis. 2008) (emphasis added); *see also Weiss*, 418 F. Supp. 3d at 1180 ("[W]here the plaintiff alleged that the defect was 'materially identical' from product to product, the plaintiff had standing, at the motion to dismiss stage, to pursue claims on behalf of class members who purchased different products."). Thus, by dividing the proposed classes into subclasses and removing the CLRA claims under California law for lack of standing as explained *supra*, common issues of fact exist between the New York and Florida subclasses as to whether the perforation warranty was unfair or deceptive.

In addition to common factual questions, FDUTPA and GBL § 349 present significant overlap in legal questions.  Under FDUTPA, "a plaintiff need not prove reliance on the allegedly false statement . . . , but rather a plaintiff must simply prove that an objective reasonable person would have been deceived." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011). Similarly, for claims under GBL § 349, "[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 389 (S.D.N.Y. 2016) (internal quotation marks omitted).  Additionally, under GBL § 349, "the potentially common question of whether a given product . . . is misleading can be measured under an objective standard: whether it was 'likely to have misle[d] a reasonable consumer acting reasonably under the circumstances.'" *Id.* (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (1995)).  "The materiality of potentially deceptive representations is similarly subject to objective proof." *Id.*  Further, "[t]o satisfy the causation requirement [under GBL § 349], nothing more is required than that a plaintiff suffer a loss because of defendants' deceptive act." *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 147 (S.D.N.Y. 2014) (citations, brackets, and internal quotation marks omitted).  Consequently, "whether that allegedly deceptive conduct would deceive an objective reasonable consumer [is a] common issue[ ] for all the putative class members, amenable to classwide proof." *Fitzpatrick*, 635 F.3d at 1283 (citing *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. 1st DCA 2000) ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.").  Because of this, multiple courts have held that "claims under both [FDUTPA and GBL § 349] meet the predominance requirement." *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 274 (E.D.N.Y. 2019).

Ford counters that "Plaintiffs' claim cannot be certified because, whether any reasonable consumer would have found the information important, and actually read the warranty and was deceived by it, can only be determined through individual inquiry." Resp. at 23. In *Hasemann*, the court dismissed this exact argument, stating "the Court conclude[s] that the FDUTPA and sections 349 and 350 of the GBL do not contain a viewing requirement or a reliance requirement, nor do they require individual determination of how a particular advertisement affected each putative class member." *Hasemann*, 331 F.R.D. at 274. All of Ford's remaining predominance arguments related to this claim specifically go to the merits and are not properly suited for adjudication at this stage.

Ultimately, even though minor individualized questions do exist, the Court finds that common questions "have a *direct impact* on every class member's effort to establish liability *that is more substantial than the impact of any individualized issues* in resolving the claims of each class member." *See Sacred Heart*, 601 F.3d at 1170. For example, under GBL § 349, a plaintiff must show the defendant had knowledge that the act was deceptive. *See Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 118 (E.D.N.Y. 2011). However, "knowledge of a deceptive act is not required to state a claim under FDUTPA." *Lewis*, 530 F. Supp. 3d at 1232. This is the textbook definition of a difference in state law that "can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines." *Sacred Heart*, 601 F.3d at 1180. The perforation warranty class has already been divided into subclasses due to standing concerns, and remedying this difference would be as simple as including a jury instruction explaining that knowledge is an element of one claim but not the other. Thus, the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Nevertheless, a perforation warranty claim under

Florida and New York law cannot be certified due to Plaintiffs' failure to propose a valid class-wide measure of damages.

### ii.   *Plaintiffs Fail to Propose a Valid Class-Wide Measure of Damages*

"[P]redominance . . . requires that damages resulting from the injury be measurable on a class-wide basis through use of a common methodology." *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 696 (S.D. Fla. 2014) (citing *Comcast*, 569 U.S. at 30) (internal citation and quotation omitted).  Here, Plaintiffs fail to put forth any such methodology.  "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.  While the "[c]alculations need not be exact," lower courts must conduct a "rigorous analysis" to determine whether the purported damages model fits the liability theory. *Id*. at 1433.

Here, Plaintiffs state that for the perforation warranty claim, "it is appropriate to determine the overpayment amount of both the base warranty and corrosion warranty, and that this amount is capable of being determined on a Class-wide basis for particular component parts using accepted methodologies[.]"  Mot. at 25.  As explained above, damages under FDUTPA are "measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered," and "GBL § 349 restricts Plaintiffs' recovery to actual damages[.]" *Rotblut*, 585 F. Supp. 2d at 561; *see also Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 195 (E.D.N.Y. 2018) (explaining that GBL injury may be established by an allegation that a plaintiff overpaid); *Marty v. Anheuser–Busch Cos.*, *LLC*, 43 F. Supp. 3d 1333, 1346 (S.D. Fla. 2014) ("[U]nder Florida law, a plaintiff

who alleges that he or she has paid a premium price for a product as a result of a defendant's misrepresentation has pled damages under FDUTPA.").

Therefore, under FDUTPA and GBL § 349, overpayment is a valid measure of damages. However, in support of their claim that a valid damages model exists, Plaintiffs state that their expert, Kirk Kleckner, "proposes a methodology to evaluate Ford's failure to fulfill the bargain under which consumers agreed to purchase the Class Vehicles at the point of sale due to the deceptive warranties." Mot. at 25. But Kleckner's report, which the Court has reviewed extensively, says nothing of the sort. *See generally* Decl. of Kirk D. Kleckner ("Kleckner Declaration"). Kleckner does not once mention overpayment or the effect that Ford's alleged deception would have on the value of the warranty. *Id*. The report's conclusion merely states that "available methodologies exist to determine the value of a warranty for a vehicle component and those methodologies are applicable in this particular case." *Id*. at 1. It is clear that "Plaintiff[s] ha[ve] simply stated, in a conclusory fashion, that [Kleckner] will be able to calculate the [amount of overpayment]; Plaintiff[s] ha[ve] made no attempt to present the Court with an example or summary of the model to be applied." *Randolph*, 303 F.R.D. at 697 (explaining that a plaintiff must "actually demonstrate, through evidentiary proof, that class-wide damages are capable of measurement, not simply assert that it is so").

Even before the Supreme Court's holding in *Comcast*, courts regularly denied class-certification claims based on proposed damages models submitted without actual proof. *See, e.g., Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25–26 (D.D.C. 2012) (pre-*Comcast* decision declining to certify class under Rule 23(b)(3) where proposed methodology was vague and expert had not even informed the court of the "precise analyses he intended to undertake"). Accordingly, the Court finds that Plaintiffs have failed to provide a damages model that is "capable of proof at

trial through evidence that [was] common to the class rather than individual to its members," and have not shown that damages are "measurable on a class-wide basis through use of a common methodology." *Comcast*, 569 U.S. at 30 (citations omitted).  Thus, Plaintiffs' perforation warranty class cannot be certified.

### C.  Unfair or Deceptive Warranty (Repair)

Plaintiffs' unfair or deceptive warranty claim related to the repair of Class Vehicles under Ford's NVLW suffers from virtually all the same predominance infirmities present in Plaintiffs' design defect claim—if not more so due to the individualized nature of the repairs.  Additionally, Plaintiffs provide no valid, class-wide measures of damages.

#### i.  Individualized Factual and Legal Issues Predominate

In addition to the aforementioned differences in models and model years, which would implicitly lead to different repair solutions and strategies because the repair is being performed on non-identical vehicles, individual questions necessary to resolve the warranty repair claim specifically include: (1) whether class members purchased vehicles still under warranty; (2) whether class members were provided repairs; and (3) whether the repair they were provided was effective.  Resp. at 21.  Indeed, whether each repair provided was "effective" cannot be answered with common evidence because the repairs provided differed from time to time and from dealer to dealer.  *Id*.  Further, beginning in 2016, dealers were supposed to add full perimeter hem sealer, which according to Plaintiffs should have eliminated or substantially reduced the potential for hood corrosion.  Anderson Dep. at 147.  These individual questions may therefore have different answers for cars repaired before this change was made and for those repaired after—especially when considering that the proposed warranty repair class includes model years 2013 to 2018.

Further, as these claims are brought under FDUTPA, GBL § 349, and CLRA, the same individual legal issues predominate as explained *supra*.

### ii.   Plaintiffs Fail to Propose a Valid Class-Wide Measure of Damages

Plaintiffs' proposed model of damages for their warranty repair class is identical to the model proposed under Plaintiffs' perforation warranty class.  Mot. at 25.  The model fares no better in the context of the warranty repair class because Plaintiffs once again misstate the testimony of their own expert, and do not explain whatsoever how they would go about calculating the amount of overpayment that occurred as a result of ineffective warranty repair.  Mot. at 25. Consequently, class certification for Plaintiffs' warranty repair claim must be denied.

### D.   Unjust Enrichment

### i.   Individualized Factual and Legal Issues Predominate

It is well established that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega*, 564 F.3d at 1274. This is because "before it can grant relief on this equitable claim, a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist."  *Id*.   Because of the "individualized equities attendant to each class member, courts, including [the Eleventh Circuit], have found unjust enrichment claims inappropriate for class action treatment." *See, e.g., id*. (citing *Klay*, 382 F.3d at 1267; *Rollins*, 951 So. 2d at 876–77; *Ortiz v. Ford Motor Co.*, 909 So. 2d 479, 481 (Fla. 3d DCA 2005) (noting that "the equities surrounding each class member's [interaction with the defendant] is [sic] not the same")).

In addition to the fact that Plaintiffs make no attempt to explain why the Court should disregard circuit precedent and certify a class on their unjust enrichment claim, they also fail to

"demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable." *Sacred Heart*, 601 F.3d at 1180. Unjust enrichment claims "rely on state law," and although Plaintiffs' Complaint "lists one generic general unjust enrichment claim, that claim is, in reality, [five] unjust enrichment claims—one for each state [represented]." *Lewis*, 530 F. Supp. 3d at 1205. Here, the Court is unable to "identify[] the applicable state law variations and then determin[e] whether such variations can be effectively managed," because the Plaintiffs have failed to even identify what is required to succeed on an unjust enrichment claim in any of the states under the laws of which they bring their claim. *Sacred Heart*, 601 F.3d at 1180 (internal quotation marks and citation omitted). Given that circuit precedent cautions against class treatment of unjust enrichment claims unless it can be determined that the various state laws in play are manageable—a showing that Plaintiff has wholly failed to make—class certification must be denied.

### ii. *Plaintiffs Fail to Propose a Valid Class-Wide Measure of Damages*

In addition to failing to meet their burden of showing that common issues of law and fact predominate regarding Plaintiffs' unjust enrichment claim, Plaintiffs fail to propose a valid class-wide measure of damages. As they did for their warranty related claims, for the unjust enrichment claims, "the Plaintiff[s] ha[ve] simply stated, in a conclusory fashion, that [Kleckner] will be able to calculate the [amount of overpayment]; Plaintiff[s] ha[ve] made no attempt to present the Court with an example or summary of the model to be applied." *Randolph*, 303 F.R.D. at 697. This is because Plaintiffs propose identical damages models for their warranty and unjust enrichment classes, despite these claims arising under completely different laws and theories of liability. Mot. at 25. In fact, the model for Plaintiffs' unjust enrichment claim is even more conclusory as the extent of Plaintiffs' analysis is a footnote stating that the "models [proposed for the warranty

classes] equally suffice for unjust enrichment, where the measure of damages may be benefit of the bargain." Mot. at 25 n.13.

Regardless of whether benefit of the bargain damages are available for unjust enrichment claims, which the parties dispute, this one-sentence argument that the warranty damages model also applies to Plaintiffs' unjust enrichment class clearly does not meet the standard imposed by the Supreme Court in *Comcast*, which held that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." 569 U.S. at 35. Once again, Plaintiffs have failed to provide a damages model that is "capable of proof at trial through evidence that [was] common to the class rather than individual to its members," have not shown that damages are "measurable on a class-wide basis through use of a common methodology," and they have certainly not provided the Court with enough information about their damages model to conduct a "rigorous analysis" to determine whether the purported damages model fits the liability theory. *Id.* at 33–35 (citations omitted). Thus, Plaintiffs' unjust enrichment class cannot be certified.

## V. Superiority

Rule 23(b)(3) requires Plaintiffs to establish that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement "turns on whether a class action is better than other available methods of adjudication." *Cherry*, 986 F.3d at 1304. The factors relevant to this analysis include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The Court examines each factor below.

### A. Individual Interest

"Whether putative class members have a significant interest in individually prosecuting their own separate lawsuits is affected by the financial stakes involved in each individual's case." *DA Air Taxi LLC v. Diamond Aircraft Indus., Inc.*, No. 09-60157, 2009 WL 10668159, at *7 (S.D. Fla. Nov. 5, 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 238-39 (E.D. Pa. 2007)).  Thus, "[c]lass actions are frequently the superior method for adjudicating a controversy where each class member's damages are minimal and individual lawsuits would be cost prohibitive." *Id.* (citations omitted).

The alleged loss amounts in this suit are not insignificant.  The Class Vehicles cost tens of thousands of dollars, and the Court recognizes that purchasing a car is a major expenditure for virtually all American families.  While Plaintiffs' Complaint provides little insight into the value of these claims beyond their allegation that it meets the jurisdictional requirement, two of the named Plaintiffs brought suit under their states' respective lemon laws.  Resp. at 29.  These Plaintiffs brought suit for the full price of their vehicles, and Plaintiff Navas accepted a $3,000 settlement plus attorney's fees.  *Id.*

### B. The Extent and Nature of Related Litigation

As previously stated, two Plaintiffs have brought claims related to those in this lawsuit. While the parties do not provide any additional information regarding instances of litigation related to hood corrosion on Ford vehicles, the fact that two of the original nineteen Plaintiffs sued Ford individually, and one did so successfully, highlights the potential superiority of individual actions under state lemon laws.

### C.  The Desirability of This Forum

Where "[t]he putative class members . . . are spread across the United States, and the Defendant has no Florida connection," courts have found "the desirability of concentrating the litigation in a single forum is at best unclear." *DA Air Taxi LLC*, 2009 WL 10668159, at *7.  This case's connection to Florida is tenuous.  Several Plaintiffs purchased their vehicles in Florida, and three of the claims for which Plaintiffs seek class treatment include FDUTPA claims.  However, Plaintiffs' class representatives are scattered throughout the country in seven states; Ford is headquartered in Michigan; and nothing in the record indicates any other connection to the forum state.  Accordingly, this factor weighs against certification.

### D.  Difficulties in Managing a Class Action

The Eleventh Circuit has held that "the presentation of a substantial amount of evidence specific to each of an unknown number of class members . . . poses serious challenges to the efficiency and manageability of a class action proceeding." *Vega*, 564 F.3d at 1278.  As explained above, the varying requirements under the laws of seven different states, as well as caselaw regarding the CLRA, FDUTPA, and GBL § 349—which establishes the need for individualized determinations to satisfy a number of distinct statutory elements—would lead to difficulties in managing this class.  And said difficulties would only be magnified by the large number of model and model year combinations that would exist if this class were to be certified.  The difficulties weigh against certification.

In sum, because all four superiority factors weigh against certification, class treatment is not "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## CONCLUSION

The Court recognizes that determining "predominance requires a qualitative assessment . . . and the relative importance of the common versus individual questions also matters." *Brown*, 817 F.3d at 1235. However, as evidenced by the analysis above, the individual issues presented by the multiple model and model year combinations, the legal variations under California law as compared to the laws of Florida and New York, and Plaintiffs' failure to propose a viable class-wide measure of damages for any of their classes have created insurmountable barriers. Simply put, there are individual issues that predominate over the common question of whether the over-hem sealer is a design defect—as well as whether Ford's NVLW was unfair or deceptive and resulted in unjust enrichment. This, in combination with the infirmities related to standing, ascertainability, and superiority discussed *infra*, results in four proposed classes unfit for certification.

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Class Certification [ECF No. 150] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 21st day of March, 2022.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**